```
 1                          - VOLUME C -

 2                IN THE UNITED STATES DISTRICT COURT

 3                IN AND FOR THE DISTRICT OF DELAWARE

 4
      PHARMACYCLICS LLC and         :   CIVIL ACTION
 5    JANSSEN BIOTECH, INC.,        :
                                    :
 6                  Plaintiffs,     :
                                    :
 7        vs.                       :
                                    :
 8    CIPLA LIMIGTED, et al..,      :
                                    :
 9                  Defendants.     :   NO. 18-192 (CFC)
      --------------------------    :
10    PHARMACYCLICS LLC and         :   CIVIL ACTION
      JANSSEN BIOTECH, INC.,        :
11                                  :
                    Plaintiffs,     :
12                                  :
          vs.                       :
13                                  :
      ALVOGEN PINE BROOK LLC and    :
14    NATCO PHARMA,                 :
                                    :
15                                  :
                    Defendants.  :   NO.  18-275 (CFC)
16

17                            - - -

18
                              Wilmington, Delaware
19                            Thursday, October 15, 2020
                              8:30 o'clock, a.m.
20
                              - - -
21
      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
22
                              - - -
23

24                            Valerie J. Gunning
                              Official Court Reporter
25
```

1    APPEARANCES:

2
              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
3             BY:   JACK B. BLUMENFELD, ESQ. and
                    JEREMY A. TIGAN, ESQ.
4

5                  Counsel for Plaintiffs

6

7             COVINGTON & BURLING LLP
              BY:   CHRISTOPHER SIPES, ESQ.,
8                   ERICA N. ANDERSEN, ESQ.,
                    ALEXA HANSEN, ESQ.
9                   BRIANNE BHARKHDA, ESQ. and
                    CHANSON CHANG, ESQ.
10                  (Washington, D.C.)

11
                   Counsel for Plaintiff
12                 Pharmacyclics LLC

13

14            KRAMER LEVIN NAFTALIS & FRANKEL
              BY:   IRENA ROYZMAN, ESQ.
15                  (New York, New York)

16
                   Counsel for Plaintiff
17                 Janssen Biotech, Inc.

18

19
              HEYMAN ENERIO GATTUSO & HIRZEL LLP
20            BY:   DOMINICK T. GATTUSO, ESQ.

21
                        -and-
22

23

24

25

```
 1    APPEARANCES (Continued):

 2

 3              ALSTON & BIRD
              BY:  NATALIE CLAYTON, ESQ. and
 4                 (New York, New York)

 5
                    -and-
 6

 7              ALSTON & BIRD
              BY:  SHRI ABHYANKAR, ESQ.
 8                 (Atlanta, Georgia)

 9
                 Counsel for Defendants
10               Sandoz Inc. and Lek Pharmaceuticals d.d.i

11

12
              YOUNG CONAWAY STARGATT & TAYLOR LLP.
13            BY:  MELANIE SHARP, ESQ.

14
                    -and-
15

16              PROSKAUER ROSE
              BY:  SIEGMUND Y. GUTMAN, ESQ. and
17                 DAVID MICHAEL HANNA, ESQ.
                   (Los Angeles, California)
18

19               Counsel for Defendants.
                 Alvogen Pine Brook LLC and Natco Pharma
20               Ltd.

21
                    -  -  -
22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom

 4    beginning at 8:30 a.m.)

 5

 6              THE COURT:  All right.  Good morning.  Are you

 7    all there?  Good morning, all.  Are you all there?

 8              MS. BHARKHDA:  Yes, Your Honor.

 9              MS. CLAYTON:  Good morning, Your Honor.

10              THE COURT:  Ms. Clayton, anything we need to

11    address before we start testimony today?

12              MS. CLAYTON:  No.  We're still discussing with

13    Alvogen about the time.  We hope to come to an agreement.

14    If not, we can let you know.

15              THE COURT:  Let's make sure we tackle that.  If

16    it's not resolved at the mid-morning break, we'll tackle it

17    right after.  All right?

18              MS. CLAYTON:  Good morning, Your Honor.  Thank

19    you.

20              THE COURT:  Ms. Bharkhda, anything from you from

21    the plaintiffs' side?

22              MS. BHARKHDA:  I would be happy to address the

23    question you posed to us at the end of the day yesterday

24    regarding confidential information if Your Honor would like

25    to hear about that.  If we are going to do it, I would
```

1    suggest we do it outside the presence of Dr. Swift, but I'm

2    happy to address it if you would like.

3             THE COURT:  Is it going to come up in her

4    testimony?  Was it her testimony or the prior testimony?

5             MS. BHARKHDA:  It was.

6             THE COURT:  So let's quickly address it.  We'll

7    put Dr. Swift in a waiting room real briefly and address it.

8    All right?

9             Dr. Swift, good morning.

10            MS. BHARKHDA:  Yes, Your Honor.  So I think Your

11   Honor is correct, that one could potentially consult

12   confidential documents in order to confirm the presence of

13   an inherent property that would result from, necessarily

14   result from a disclosed invention or product.  However, that

15   is, and we took a look at with an I believe was the opinion

16   you were referring to and I think that's a very different

17   situation than what we have here.

18            Alvogen is not making an argument that the

19   confidential documents are confirming an inherent property

20   of ibrutinib.  What they are saying is they show that what

21   was used in the Phase 1 study was crystalline form A in the

22   doses that were given to the patient.

23            Now, the fact that it's crystalline form A is

24   not an inherent property of ibrutinib.  As you have heard

25   quite a bit I think earlier in the case, there are multiple

1    forms of crystalline ibrutinib.  There's amorphous

2    ibrutinib.  So the choice of which one of those went into

3    the dosages is not an inherent property and so we don't

4    think that the use of confidential information to the extent

5    that it is permissible, we're showing an inherent property

6    or limitation is present in a reference that discloses some

7    particular disclosure about the art applies here at all.

8              THE COURT:  So I had thought they were going to

9    show essentially that form A was used and the data showed it

10   was 2-Theta.  There were 2-Theta peaks rather.

11             MS. BHARKHDA:  Correct.  But it goes further

12   than that because my understanding of Alvogen's argument is

13   by virtue of using the code name, PCI-32765, that would tell

14   a POSA in and of itself not only that you were using

15   ibrutinib, but that that code name itself, PCI-32765, is

16   necessarily and only and always associated with form A of,

17   crystalline form A of ibrutinib and then taking it a step

18   further, that form A has those peaks.

19             So it's not just to prove the XRPD limitation.

20   It is to prove that crystalline form A was actually used in

21   the studies even though there are other options and that is

22   not the type of scenario that confidential information could

23   be used for.

24             THE COURT:  Okay.  But now let me ask you.

25   Before I even hear from Mr. Gutman, let's just assume what

1    you are saying is uncontested.  Then why don't you just save

2    it and on cross-examination, you just ask the witness, by

3    the way, ibrutinib comes in other forms.

4                MS. BHARKHDA:  Your Honor, we plan to have that

5    discussion with Dr. Swift, absolutely.  We are going to have

6    that.  I think Your Honor asked a question about what the

7    confidential information was going to be used for and

8    whether or not that was an appropriate use of confidential

9    information, in the inherent anticipation context.

10               We can certainly elicit testimony from Dr. Swift

11   about what she's using that information for.  That's my

12   understanding.

13               THE COURT:  Okay.

14               MS. BHARKHDA:  And so I don't think that is a

15   proper use of confidential information in this scenario.

16               THE COURT:  All right.  I am going to let it in.

17   If you are right, it will be, you know, addressed probably

18   pretty adequately on cross and maybe Mr. Gutman is going to

19   show that you're not right, and he can do that through the

20   testimony.

21               So I'm going to overrule the objection and let

22   the witness discuss it.  Okay?  All right.  Thank you.

23               MS. BHARKHDA:  Thank you, Judge.

24               THE COURT:  All right.  Thank you.

25               Mr. Gutman, are you ready?

Swift - direct

1              MR. GUTMAN:  Yes Your Honor.

2              THE COURT:  All right.  We can bring the witness

3      back in and continue.

4              ... DR. JENNIFER ANN SWIFT, having been

5      previously duly sworn/affirmed as a witness, was examined

6      and testified further as follows ...

7              DIRECT EXAMINATION, Continued.

8      BY MR. GUTMAN:

9      Q.    Good morning, Swift.

10     A.    Good morning.

11     Q.    I believe yesterday we left off where you were

12     discussing DTX-1514 and what that was.  I think we had slide

13     17 up.  And can you describe what slide 17 is?

14     A.    Yes.  This is an excerpt from the clinical study

15     report, PCY-04753, which was the Phase 1 dose escalation

16     study that we talked about yesterday and this particular

17     excerpt identifies the lot numbers of ibrutinib that were

18     used in that clinical study.  Those numbers are all

19     highlighted and underlined in red.

20     Q.    And in the upper right-hand corner, there's a

21     reference to clinical study report PYC-04753.

22              Do you see that?

23     A.    Yes.

24     Q.    What's your understanding about what that was

25     referring to?

Swift - direct

1    A.    So that is the specific code referring to the clinical

2    study that was done, that was reported by Pollyea.

3    Q.    And is that a Phase 1 dose escalation study?

4    A.    Yes.

5    Q.    Are you aware of -- how many Phase 1 dose escalation

6    studies are you aware of that were conducted on PCI-32765?

7    A.    I am only aware of one.  If there are more than one,

8    it would have a different clinical study report number, but

9    I am only aware of one.

10   Q.    Can we go to slide 18, please.  Now, can you please

11   describe what is here on this slide?

12   A.    Yes.  So this is from the IND report and there are two

13   columns of numbers that are highlighted.  The ones in the

14   middle of the page correspond to the lot number, the drug

15   product number, and those are the same numbers that are in

16   the previous slide from the PCYC study.

17        What this table does, it correlates the drug

18   product batch or lot number with the drug substance number.

19   That's the column on the left-hand side.

20   Q.    Now, if you could go to slide -- so actually, before

21   me move on, so what's your understanding about whether the

22   batch numbers or the drug substance that are identified in

23   the left-hand-most column, how those relate to the batch

24   numbers for the PCI-32765 drug product that were used in the

25   Phase 1 dose escalation study?

Swift - direct

1    A.    The way to line up the numbers, that's what I'm trying

2    to do here.  In the previous slide I have the drug product

3    number.  What this table does, it matches up each and every

4    one of the lot numbers in the clinical study with the batch

5    numbers that were used in that study.

6    Q.    Can we go to slide 19, please.

7                Now, can you please tell us what is on this

8    slide?

9    A.    Yes.  And this is the table that follows the previous

10   table that I just showed where it takes those batch numbers

11   for the drug product and these are underlined again, and it

12   gives additional information, such as who manufactured that

13   material, the manufacturing date as well as the crystalline

14   form that is present in those samples.  And what you will

15   notice is that in every single column, which is highlighted,

16   it indicates that the crystalline form that was used in

17   those clinical studies was form A, the form A of PCI-32765,

18   which we know as ibrutinib.

19   Q.    So based on this information regarding the batches

20   that were used in the Phase 1 dose escalation study for

21   PCI-32765, have you developed any opinions about what

22   crystalline form PCI-32765 was in when it was used in that

23   Phase 1 dose escalation study?

24   A.    It says quite clearly that it was form A,

25   unambiguously.  There's no other option but for it to have

Swift - direct

1    been form A in those dose escalation studies.

2    Q.    Do you have an opinion about whether PCI-32765 as used

3    in the Phase 1 dose escalation study disclosed in Pollyea

4    2009 is necessarily referring to crystalline form A of

5    ibrutinib?

6    A.    Yes.  Absolutely.

7    Q.    Can we go to slide 20, please.  Can you please

8    describe what this slide is?

9    A.    So this slide identifies the compound in question with

10   its product name, ibrutinib.  Identifies it with the

11   PCI-32765.  These terms are being used synonymously.  It

12   gives the chemical name and it also gives you the chemical

13   structure.  It draws out the molecule for you.

14   Q.    Can we go to DTX-1646, please.  Dr. Swift, what is

15   DTX-1646?

16   A.    This is a powder X-ray analysis that was performed by

17   a private company on different lot numbers of PCI-32765 on

18   behalf of Pharmacyclics.

19   Q.    Can you please go to slide 23.  Can you please

20   describe what's on slide 23?

21   A.    So slide 23 has a comparison between one of the lot

22   numbers, 111365, which is, I believe, one of the lot numbers

23   that was used in the dose escalation study, and it compares

24   it against a reference standard, which is lot 11003.  And

25   it's comparing those two powder X-ray patterns.

Swift - direct

1    Q.    And what does this tell you about whether lot 111365

2    of PCI-32765 that was used in the Phase 1 dose escalation

3    study is crystalline form A of ibrutinib as recited in claim

4    5 of the '455 patent?

5    A.    Well, the lot 11003 is identified in this lot as form

6    A.    It makes sense that's the reference standard.  And when

7    you compare it up against the powder pattern for this lot

8    111365, the two powder patterns have peaks in all the same

9    spots so that you would conclude that this actually is a

10   good match.  Almost an ideal match for form A.

11   Q.    Does this confirm your previous conclusions based on

12   the batch records that lot 111365 is crystalline form A as

13   recited in claim 5 of the '455 patent?

14   A.    Yes.  So the IND report refers to it as form A.  When

15   you actually look the raw data, the raw data also confirms

16   that it's form A.

17   Q.    Now, were there other lots of PCI-32765 that were used

18   in the Phase 1 dose escalation study disclosed in Pollyea

19   2009 that were addressed in this report, that is DTX-1646?

20   A.    Yes.  This report compares several lot numbers and

21   each and every one of them corresponds to form A.

22   Q.    Now, just briefly, based on your conclusion that all

23   of the lots used in the Phase 1 dose escalation study are

24   crystalline form A of ibrutinib, can you explain why those

25   lots would also have the 2-Theta peak positions that are

Swift - direct

1    recited in claim 5 of the '455 patent?

2    A.    The six lines of -- the six powder diffraction lines

3    that are cited in the '455 patent are present in those

4    samples.  The X-ray pattern that form A gives as an inherent

5    property of that form is associated with the powder pattern

6    with the form because you can't make the powder pattern

7    without the form.

8    Q.    Have you seen evidence that demonstrates that

9    PCI-32765 as used in the Phase 1 dose escalation study

10    necessarily refers to crystalline form A of ibrutinib with

11    the 2-Theta peaks recited in claim 5 of the '455 patent?

12    A.    Yes.  I checked every single powder pattern

13    corresponding to every single lot and in every single powder

14    pattern, it has the six powder diffraction patterns that are

15    cited in the '455 patent.

16    Q.    Can you turn to DTX-0148, please.  Dr. Swift, what is

17    DTX-0148?

18    A.    This is the article entitled BTK inhibitor, PCI-32765,

19    induces durable responses with minimal toxicity in patients

20    with relapsed/refractory B cell malignancies:  Results from

21    a Phase 1 study.  The first author is Nathan Fowler and it

22    was published in the journal Blood.

23    Q.    And is this prior art to the '455 patent?

24    A.    Yes, it is.

25    Q.    Do you have an opinion about whether Fowler 2010,

Swift - direct

1   which is DTX-0148, anticipates claim 5 of the '455

2   patent?

3   A.   Yes, I think it does anticipate the claim.  This is an

4   update on the Phase 1 dose escalation study.  So for all the

5   same reasons that I think Pollyea anticipates the claims of

6   the patent at issue, I think this one does as well.

7   Q.   Can we go to DTX-1700, please.  Dr. Swift, what is

8   DTX-1700?

9   A.   DTX-1700 is a journal article by Vit Zvonicek, I'm not

10  sure how to pronounce his name as the first author that was

11  published in crystalline growth and design.  The paper

12  discusses ibrutinib polymorphs.

13  Q.   Can we go to slide 24, please.  And what did DTX-1700

14  disclose with respect to the crystalline form A of

15  ibrutinib?

16  A.   So they identified form A as the most stable polymorph

17  on the basis of its melting point compared to other forms.

18  And they also state quite clearly that the preparation of

19  form A did not present any challenges because it was the

20  most thermodynamically stable polymorph.  It was obtained as

21  a solid for most of the screening experiment.

22  Q.   Would that be consistent with the fact that

23  crystalline form A is the most stable polymorph of

24  ibrutinib?

25  A.   Yes.  That's exactly what they say.

Swift - direct

1    Q.    Can we go to JTX-0551, please.  Can you please

2    describe what JTX-0551 is.

3    A.    So this is a study conducted by a company on the

4    market.  The title is called polymorphism studies on PCI

5    32765-00 for Pharmacyclics.

6    Q.    And can you go to the next page, please.  Do you see

7    at the top there's a reference to customer details?

8    A.    Yes.

9    Q.    What is the name of that customer?

10   A.    So the customer is Pharmacyclics with a contact person

11   as Dr. Mark Swift.

12   Q.    Do you have an understanding about whether Dr. Swift

13   is a named inventor on the '455 patent?

14   A.    I believe he is.

15   Q.    Can we go to slide 44, please.  Dr. Swift, what were

16   the conclusions that were drawn from the polymorphism study

17   that was addressed in JTX-0551?

18   A.    So some of the major conclusions are highlighted on

19   this slide here.  They report that the fact that form A is

20   easy to produce and control was a significant advantage over

21   other forms both because it was easy to get and because you

22   could competently make it over and over and over again.  The

23   fact that it's a thermodynamically stable form means that

24   you also don't have to worry about it converting to

25   something else because it's already a thermodynamic bottom.

1                    And, you know, from that, the last sentence here

2      is that they actually recommended it as the ideal

3      crystalline form to move forward in development steps

4      because -- precisely for those reasons.

5      Q.    Can we go to DTX-1683, please.  Can you identify what

6      is DTX-1683?

7                    MS. BHARKHDA:  Your Honor, sorry.  We have an

8      objection to DTX-1683.

9                    THE COURT:  Okay.

10                   MS. BHARKHDA:  This was a portion, excerpted

11     portion of prosecution history documents from the

12     prosecution of something other than the '455 patent.  It

13     postdates the patent and it doesn't discuss either the

14     Pollyea or Fowler references.

15                   THE COURT:  So is the objection on relevance?

16                   MS. BHARKHDA:  The objection is on relevance,

17     hearsay.  There doesn't seem to be any connection between

18     this and the '455, the actual claims of the '455 patent.

19     It's addressing the prosecution of a different later patent.

20                   THE COURT:  All right.

21                   MS. BHARKHDA:  It doesn't discuss any of the

22     references.

23                   THE COURT:  It's a relevance and hearsay

24     objection.  All right.  Mr. Gutman, it is hearsay.  Right?

25                   MR. GUTMAN:  No, it's not, Your Honor.  We're

Swift - direct

1    going to be using this to demonstrate that the ibrutinib

2    with various peaks -- first of all, let me start out by

3    saying, this is a related application to the '455 patent.

4              THE COURT:  Wait.  I mean, I'm sorry.  Just

5    address the hearsay objection.  I thought you were going to

6    say, sure, it's hearsay, but there's an objection.  Isn't it

7    hearsay?

8              MR. GUTMAN:  No, it's not hearsay, because we're

9    not offering it for the truth of the matter asserted, Your

10   Honor.

11             THE COURT:  Okay.  You're not going to offer

12   then anything in this document for the truth of the matter

13   asserted.  Really?  I'm going to be surprised at that.  I

14   mean, you are not going to say -- maybe.  Okay.  Why is it

15   relevant?  Let's go to the relevance then.

16             MR. GUTMAN:  Yes.  It's relevant because claims

17   that are similar to the claims that are being asserted in

18   claim 5 of the '455 patent were considered in a related

19   application within the same family.  The claims that are

20   similar that cover ibrutinib were rejected by the Patent

21   Office for various reasons that are consistent with the

22   testimony that you have heard today and the applicant didn't

23   respond to the office action which rejected these claims and

24   abandoned the claims.

25             So that's highly relevant because it shows, it

Swift - direct

1    shows what plaintiffs' thinking was with respect to the

2    validity of the claim that is being asserted against

3    Alvogen.

4                THE COURT:  Okay.

5                MS. BHARKHDA:  Your Honor, may I respond?

6                THE COURT:  No, because I've got to try to

7    understand what Mr. Gutman just said.

8                So this is a -- this is an amendment proposed by

9    Pharmacyclics?  Mr. Gutman?

10               MR. GUTMAN:  Yes.

11               THE COURT:  So it's an amendment proposed by

12   Pharmacyclics in 2018.  It's an amendment proposed to a

13   patent application that is not, it's clearly not the patent

14   at issue here.

15               You are saying though it's a similar patent with

16   similar claims to the patent, and you are saying that

17   Pharmacyclics' failure to respond, or not failure, but the

18   fact that it didn't respond to the rejection of these

19   proposed amendments is probative?

20               MR. GUTMAN:  Not just that it didn't respond,

21   but it allowed the application to be abandoned, and I think,

22   Your Honor, even if this was hearsay, I think it falls under

23   a hearsay exception.  It's a statement against party

24   interest and it's a public record.

25               THE COURT:  What is the statement against

Swift - direct

1    interest?

2              MR. GUTMAN:  The statement against interest is

3    the fact that they didn't respond and they let the

4    application be abandoned.

5              THE COURT:  I'm going to sustain the objection.

6    I don't see any relevance to this and I don't think it has

7    very probative value for sure.

8              I think it's unduly confusing and under 403, I a

9    ban it because frankly there has not been a proffer that

10   makes me persuaded that the probative value of this is

11   sufficient and I think the danger of confusion and prejudice

12   substantially outweighs any probative value it could

13   possibly have.  All right.  Sustained.

14             MR. GUTMAN:  Can you please turn to DTX-0278.

15   BY MR. GUTMAN:

16   Q.   Dr. Swift, before we address this document, do you

17   have an opinion about whether claim 5 of the '455 patent is

18   obvious?

19   A.   I do.  My conclusion based on what I have seen is that

20   it is obvious.

21   Q.   What is DTX-0278?

22   A.   This is a journal article from PNAS.  The first author

23   is Lee Honigberg.  The title is the Bruton Tyrosine Kinase

24   Inhibitor PCI-32765 blocks B cell activation and is

25   efficacious in models of autoimmune disease and B cell

Swift - direct

1    malignancy.  It was published in July 2010.

2    Q.    Can we go to slide 48, please.

3              Now, if I refer to DTX-0278 as Honigberg 2010,

4    would you understand what I'm referring to?

5    A.    Yes.

6    Q.    What does Honigberg 2010 disclose about PCI-32765?

7    A.    So you can see in Figure 1, it discloses the chemical

8    structure.  It draws the molecule out for you.  It

9    identifies it as a BTK inhibitor.

10   Q.    And can we go to slide 49, please.

11             What does Honigberg 2010 say about the clinical

12   activity of PCI-32765?

13   A.    So it spells out for the reader that it's currently

14   undergoing human clinical development in patients and that

15   it has shown promising activity.  It's potent, it's highly

16   selective, and it presents a potentially unique therapeutic

17   approach to treating various diseases.

18   Q.    Now, based on what we've seen that Honigberg 2010

19   discloses, would a POSA prior to June 4, 2012, have been

20   motivated to make crystals of ibrutinib or PCI-32765?

21   A.    I think they would have.

22   Q.    Can you explain why?

23   A.    So if you have a drug compound that shows promising

24   clinical activity, most patients would prefer to take some

25   oral tablet than be required to have an injectable.  So you

1  would be motivated to try to put that drug company into a

2  stable form that could be delivered in a, in a pill or a

3  tablet or capsule.  In order to do that, you would need to

4  do polymorph screening and identify stable forms that could

5  be safely delivered to a patient.

6  Q.   And did methods exist prior to June 4th, 2012, that

7  would have allowed a POSA to make crystals of ibrutinib or

8  PCI-32765?

9  A.   Sure.  The standard protocol for how you would go

10 about it, how you would at least start the polymorph

11 screening.

12 Q.   Now, based on what Honigberg 2010 discloses, would a

13 POSA have been motivated prior to June 4th, 2012, to screen

14 for different polymorphs of ibrutinib or PCI-32765?

15 A.   I would think so.  As disclosed in the paragraph, if

16 it's undergoing human clinical development, I assume

17 somebody has already gone to the trouble of screening for

18 polymorphs, so a POSA would probably conclude that somebody

19 has already done it.  If they hadn't already done it, they

20 needed to have done it or they would certainly be motivated

21 to do it.

22 Q.   And were there methods available to a POSA prior to

23 June 4, 2012, that a POSA could have used to do polymorph

24 screening?

25 A.   Sure.  There are plenty of conventional methods on how

Swift - direct

1    you would approach screening of polymorphs.

2    Q.    And based on the disclosures of Honigberg 2010, would

3    a POSA have been motivated to characterize any polymorphs

4    that resulted from the polymorph screening?

5    A.    Yes.  If you are going to make them, you are certainly

6    going to characterize them.

7    Q.    And were there methods available prior to June 4th,

8    2012, that would have allowed a POSA to characterize any

9    polymorphs?

10   A.    Yes.  I think at the beginning of my testimony

11   yesterday, I answered a variety of very different

12   conventional methods that a POSA would use to characterize

13   polymorphic material.  These include X-ray diffraction,

14   powder X-ray diffraction, thermal methods, spectroscopic

15   methods.

16   Q.    Would a POSA reasonably, based on the disclosures of

17   Honigberg 2010, would a POSA have reasonably expected to

18   succeed at making a crystalline form A of ibrutinib as

19   recited in claim 5 of the '455 patent?

20   A.    I believe that any POSA that would embark upon trying

21   to crystallize PCI-32765 would be able to get crystalline

22   materials.  If you are starting a polymorph screen, you get

23   the most stable form early in the process.  We know form A

24   is the most stable form and if you have form A and you take

25   a powder pattern of it, it's going to have the six

Swift - direct

1    refraction lines that are recited in claim 5 of the asserted

2    patent.

3    Q.    Can we go to DTX-0001, please.  Thank you.

4            Dr. Swift, what is DTX-0001?

5    A.    This is a patent, 7,514,444, that was, it's entitled

6    inhibitors of Bruton's tyrosine kinase.  It was issued on

7    April 7th, 2009.

8    Q.    Is it prior art to the '455 patent?

9    A.    Yes, it is.

10   Q.    Does the '444 patent disclose ibrutinib?

11   A.    Yes, it does.

12   Q.    And would a POSA have been motivated to crystallize

13   ibrutinib pursuant to the teachings of the '444 patent?

14   A.    Yes.  So this patent, broadly speaking, discloses the

15   synthesis of several compounds, ibrutinib among them.  And

16   in the text of the patent, it spells out very conventional

17   methods for how one would go about purifying their materials

18   and crystallizing them.

19   Q.    Can we go to slide 33, please.  Can you briefly

20   describe what the '444 patent says about the methods that

21   were available to crystalline ibrutinib?

22   A.    So in the -- in any synthesis, if you are isolating a

23   solid, it's conventional to try to purify that material and

24   you would use conventional methods, including

25   crystallization and filtration among them.  Once you have

Swift - direct

1    purified your materials, you would try to, you would

2    characterize it.  Right?  Every, every chemist would try to

3    make pure materials and then, you know, if you have gone to

4    the trouble of making it, you would most certainly

5    characterize it.

6            So once you have made it, again, you would --

7    you'd be using these conventional techniques,

8    crystallization and recrystallization among them.

9    Q.    Can we go to slide 42 please.  What is the '444 patent

10   describing here?

11   A.    So the -- what's shown on the slide is the abstract.

12   The patent tells you how to make them and it tells you why

13   they're interested in making them and the reason why they

14   are interested in making them is because they have potential

15   for treating autoimmune diseases and other diseases, like

16   cancer.

17   Q.    And is lymphoma mentioned as one of those diseases?

18   A.    Yes.  Lymphoma.

19   Q.    And how does this disclosure fit in with your opinions

20   that a POSA would be motivated to make and obtain

21   crystalline form A of ibrutinib?

22   A.    So if you, if you tell me how to make the compound and

23   you tell me I can use conventional methods to create

24   crystalline forms of that material and that that material

25   will have some therapeutic value in patients, I think that

Swift - direct

1   provides sufficient motivation to do so.

2   Q.   Can we go to DTX-1688, please.  What is DTX-1688, Dr.

3   Swift?

4   A.   So this is a book chapter.  This is just the cover of

5   the book.  So the book is pharmaceutical sciences.  It's

6   from 1990.  The chapter I think you are asking about is

7   chapter 75 on pre-formulations.

8            The first author is Lewis Ravin.

9   Q.   Can you briefly describe what is pre-formulation?

10  A.   The pre-formulation are the early steps that one would

11  take in the development process to try to characterize the

12  physicochemical properties of the drug substance.

13  Q.   Can you go to the Bates page ending in 113, the first

14  full paragraph on the right-hand column.  Oh, I'm sorry.

15  And the second paragraph as well.  Thank you.

16           Can you describe what DTX-1688 is saying here,

17  Dr. Swift?

18  A.   So it's saying in very general terms that once you

19  establish that you can, that if polymorphism is an issue for

20  your compound, then you would be using a variety of

21  techniques to try to characterize that material.  It's

22  important to identify different polymorphic forms and to

23  isolate them and to characterize them.

24  Q.   Can we turn to the Bates page ending in 1114, and then

25  the first sentence in the left-hand column.

Swift - direct

1              And what is this -- the first full sentence,

2     what is DTX-1688 saying here, Dr. Swift?

3     A.      So as I introduced yes, if there are multiple forms,

4     multiple polymorphs of a compound, only one gets the

5     thermodynamically most stable form.  And what this statement

6     in this paper says is that the, metastable form, which is by

7     definition anything except the thermodynamic form, that it

8     has the potential to convert to other -- well, the statement

9     says that it will convert to the stable forms over time.

10    Q.      And what -- what do you take away from that with

11    respect to crystalline form A of ibrutinib?

12    A.      Well, I already know that form A from multiple sources

13    is the most stable, most thermodynamically stable form, so I

14    would expect that it does not convert to anything else.

15    Other forms would convert to form A, not the other way

16    around.

17    Q.      Can we go to DTX-147, please.  What is DTX-147?

18    A.      So this is a document by the FDA, which provides

19    industry guidance on pharmaceutical quality for

20    manufacturing, manufacturing and control information.

21    Q.      And when was this published?

22    A.      July 2007.

23    Q.      Can we go to slide 55, please?  And what is DTX-147?

24    Does it recommend anything with respect to conducting a

25    polymorph screen?

Swift - direct

1    A.     So FDA's main objective is to protect the public, and

2    part of that is to advise companies that if you were

3    delivering a drug and trying to do that in solid form, you

4    need to be aware of polymorphism and you need to screen for

5    it, because they say in the highlighted sentence here that

6    polymorphism can affect the quality, safety, and efficacy of

7    the drug product that's given to the public.

8    Q.     Can we go to DTX-1025, please.  Dr. Swift, can you

9    please tell us what is DTX-1025?

10   A.     So 1025 is a book chapter.  The picture that's being

11   shown is just the cover.  The chapter that's cited is

12   chapter five, which is generation of polymorphs, hydrates,

13   solvates, and amorphous solids.  It's authored by J. K.

14   Guillory.  The publication came out in 1999.

15   Q.     Can we go to slide 57, please.

16          Can you please tell us what is on this slide,

17   Dr. Swift, with respect to DTX-1025, the Guillory reference

18   and the '455 patent?

19   A.     Yes.  So in this slide, Table 1 is reproduced from

20   this reference.  It's a shorter solvent table.  I know I

21   gave you a very long table and this is a difference, a

22   solvent that one might use to prepare polymorphs and do a

23   polymorph screen.  This is just a very much shortened

24   version of it.

25          And on the right-hand side is an excerpt from

Swift - direct

1    the '455 patent, which lists some of the solvents that form

2    A can be obtained from.  And the purpose of juxtaposing

3    these two items next to one another is to draw attention to

4    the fact that the solvents that are being used to generate

5    form A are very much the same solvents that are cited in

6    most of the solvent tables.

7    Q.    Dr. Swift, do you have an opinion, do you have an

8    opinion about what references render the obvious -- render

9    obviousness claim -- let me back up.  Excuse me.

10         Do you have an opinion about what references

11   render obvious claim 5 of the '455 patent?

12   A.    So as I said over the last two days, I think that

13   there are several references that make claim 5 obvious.

14   Honigberg 2010 tells you that there is a drug that has

15   potential to treat diseases.  The '444 patent tells you that

16   you can -- tells you how to make that drug and that you

17   should use conventional methods to prepare it.  References

18   that were introduced yesterday and introduced Miller 2007,

19   which was the, a list of solvents, a much longer list of

20   solvents than this one, which instructed you how to do a

21   polymorph screen as well as the Bauer reference from

22   yesterday, which was from 2008, which spoke about the

23   importance in a pharmaceutical context with trying to do a

24   polymorph screen.

25         I think the sum total of those four references

Swift - cross

```
 1    alone speaks to the obviousness, but there are actually many

 2    more references that one could cite and 20 of institutional

 3    acquired knowledge that would also speak to the fact that

 4    really anybody in their right mind would conduct a polymorph

 5    screen knowing that you are going to try to put this in a

 6    pharmaceutical product.

 7                    MR. GUTMAN:  Thank you, Dr. Swift.  I have no

 8    further questions, Your Honor.

 9                    THE COURT:  All right.  Thank you.

10    Cross-examination.

11                            CROSS-EXAMINATION

12    BY MS. BHARKHDA:

13    Q.    Good morning, Dr. Swift.

14    A.    Good morning.

15    Q.    Prior to your involvement in this case, you had never

16    worked with ibrutinib; is that correct?

17    A.    That's correct.

18    Q.    And you were not aware of ibrutinib before you were

19    engaged by Alvogen to work on this case; correct?

20    A.    I'm sorry.  There was somebody playing something.  If

21    you could just restate the question.

22    Q.    You were not aware of ibrutinib before you were

23    engaged by Alvogen to work on this case; is that correct?

24    A.    I had no direct involvement with ibrutinib.  I -- I

25    don't know that I didn't see the paper from Sonic.  I
```

Swift - cross

1    usually read drug and design.  I'm sure that I saw that

2    title at least in the table of contents.

3    Q.    You had no specific knowledge of ibrutinib prior to

4    June 4, 2012; correct?

5    A.    That's -- I had no specific knowledge.  I think that's

6    probably fair to say.

7    Q.    And you never made any form of ibrutinib?

8    A.    No.

9    Q.    You've never performed any analytical tests on any

10   form of ibrutinib?

11   A.    No.

12   Q.    And you have never tested ibrutinib capsules or

13   tablets; is that correct?

14   A.    That's correct.

15   Q.    Now, you have never performed any polymorph screening

16   or crystallization experiments on ibrutinib?

17   A.    I performed plenty of polymorph screenings on other

18   compounds but I never performed them on ibrutinib.

19   Q.    You've never actually ever seen a sample of ibrutinib;

20   is that right?

21   A.    That's correct.

22   Q.    Now, Dr. Swift, ibrutinib capsules and tablets are a

23   commercial embodiment of claim 5 of the '455 patent; is that

24   correct?

25   A.    My understanding is that that drug product is used in

Swift - cross

1    those commercial products, yes.

2    Q.    Now, none of the anticipation theories that you have

3    testified about are express anticipation theories; is that

4    correct?

5    A.    They're -- now you are talking legal terms.  I'm a

6    scientist, so when you talk, when you use the word express,

7    my understanding is there is express and inherent.  It may

8    not be on the, in the four corners of the documents Pollyea

9    and Fowler, but I do think common sense dictates that if you

10   are using a, if you are delivering a drug to patients in a

11   clinical study, you must have gone through the exercise of

12   identifying a stable form.

13            If you don't have it in a stable form, you might

14   as well throw out all of your data from a clinical study

15   because it's not going to be worth very much.

16            So knowing that you disclosed a Phase 1 study

17   helping somebody to put in that work, there's no possible

18   way in which that work wasn't done.  So it may not be

19   explicitly in the documents, but there's no scenario that I

20   can perceive of where it is not inherently in those

21   documents.

22   Q.    So let's take a step back for a moment because in

23   order for something to be anticipated, each and every

24   limitation of the claims of the '455 patent have to be

25   either disclosed expressly or inherently in the reference

 1    that you are pointing to.

 2                    Do you understand that?

 3                    MR. GUTMAN:  Objection, Your Honor.  It calls

 4    for a legal conclusion.

 5                    THE COURT:  Overruled.

 6    BY MS. BHARKHDA:

 7    Q.    Dr. Swift, do you understand that?

 8    A.    I understand that is what you just told me, yes.

 9    Q.    Is that the analysis you applied when you performed

10    your validity analysis in the case?

11    A.    That it needs to be expressly or inherently

12    anticipated, yes, that's the analysis that I used in this

13    case.

14    Q.    And you are not claiming that each and every

15    limitation of claim 5 of the '455 patent is expressly

16    disclosed in either Fowler or Pollyea; is that correct?

17    A.    I'm not saying that it's expressly disclosed, but I do

18    believe that it is inherently disclosed just based on common

19    sense.

20    Q.    And the only two references that you are relying on as

21    anticipatory references for claim 5 of the '455 patent are

22    Pollyea and Fowler; is that right?

23    A.    When I did my literature search, I found multiple

24    references.  I could probably have cited other, other

25    references, but I thought that Pollyea and Fowler were

1    sufficient to demonstrate prior disclosure of form A.

2    Q.    So the opinions that you have actually offered in this

3    case regarding anticipation are limited to anticipation

4    based on Pollyea and anticipation based on Fowler; is that

5    correct?

6    A.    Yes, I think that's in the report.

7    Q.    And you understand that in order for there to be

8    inherent anticipation, each and every limitation of claim 5

9    of the '455 patent must necessarily be present in Pollyea

10   and Fowler; is that right?

11   A.    Yes.

12   Q.    So it can't be probably or possibly or likely present.

13   It has to be necessarily present; is that right?

14   A.    Yes.

15   Q.    Now, let's discuss the Pollyea reference first.

16           Now, Dr. Swift, in rendering your opinion, you

17   reviewed the '455 patent, JTX-9; is that correct?

18   A.    Yes.

19   Q.    And you understand that the face of the '455 patent

20   contains a references cited section that begins on the first

21   page?  And if we could have JTX-9, that might help.

22   A.    Yes.  There's a very long list of references cited.

23           MS. BHARKHDA:    And, Mr. Brooks, can you please

24   go to JTX-9-10.  I'm omitting the leading zeros to reduce

25   the wordage.  Okay.  And can you please highlight the

1    reference to Pollyea.

2    BY MS. BHARKHDA:

3    Q.    Dr. Swift, Pollyea is listed in a references cited

4    section on the face of the '455 patent, JTX-9; correct?

5    A.    Yes, I believe that's the same reference, although

6    it's not a complete reference.  It's not published in -- if

7    you have the Pollyea reference, can you remind me which?

8    Q.    The Pollyea reference in DTX-467.

9    A.    So that is not exactly the same reference as DTX-467,

10   and I doesn't contain all of the information.

11   Q.    Dr. Swift, I'm not sure I understand.  Actually, can

12   you explain that to me?

13   A.    My Pollyea reference is a publication in Blood from

14   2009 and the reference that you have highlighted on that

15   slide, there's no indication that that corresponds to the

16   reference from Blood.

17   Q.    It has the same title.

18   A.    It has the same title.

19   Q.    And it has the same year.

20   A.    Title and year are not necessarily indicative that

21   they are the same document.

22   Q.    I understand.  Did you actually pull the poster

23   abstract from the 51st annual meeting and exhibition that's

24   referred to on the face of the '455 patent?

25   A.    If all I have is that snippet from the '455 patent, I

Swift - cross

 1    don't know how to get that.  Where am I supposed to find

 2    that?

 3    Q.    My question was:  Did you look for it?  Did you, for

 4    example, ask counsel to find it for you?

 5    A.    I did not ask counsel to find that reference for me,

 6    no.

 7    Q.    And did you look for it yourself?

 8    A.    Again, I just said I don't know how to find an

 9    incomplete reference.

10    Q.    You consider a poster abstract to be an incomplete

11    reference?

12    A.    The way that's written there, that's an incomplete

13    reference.  I don't even know what journal.  Not all poster

14    abstracts are reproduced in journals, so I would not have

15    any knowledge that this is published somewhere.  Just

16    referring to a poster abstract doesn't help me with that.

17    Q.    So you would not be able to -- so you can't tell from

18    this whether or not the Pollyea referred to on the '455

19    patent is the same poster abstract that is published in the

20    Blood journal 2009 that you are looking at?

21    A.    Based on the similarity of the title, I would not

22    think that they are -- that it is impossible that they refer

23    to the same thing, but that's different than what you asked

24    me.  You asked me if this is the same thing and I told you

25    that based on what's written in the '455 patent, that I

Swift - cross

 1   don't know where to find that reference because it's an

 2   incomplete reference.

 3   Q.    But the Patent Office considered a Pollyea reference

 4   with the identical title to the one that you relied on from

 5   the identical year with the identical abstract number; is

 6   that correct?

 7   A.    Apparently, yes.

 8   Q.    And the title specifically mentions PCI 367 -- 32765;

 9   is that correct?

10   A.    It does.

11   Q.    And so the fact that a reference is listed on the

12   front of the patent means that the Patent Office considered

13   it during prosecution of the patent; is that right?  Excuse

14   me.  A reference is listed on the front of the patent means

15   that the Patent Office considered it during prosecution of

16   the patent.

17             MR. GUTMAN:  Okay, Your Honor.  It calls for a

18   legal conclusion.  Lacks foundation.

19             THE COURT:  I'm going to sustain the objection.

20   BY MS. BHARKHDA:

21   Q.    Now, Dr. Swift, there are numerous references listed

22   in the publications section of the references cited of the

23   '455 patent that use the code PCI-32765.  Correct?

24   A.    You know, nobody wants to spend their time reading

25   them all, but I can see just below that, there's another one

Swift - cross

1    that says PCI-32765, so I assume there are multiple

2    references that refer to PCI-32765.

3    Q.    And, in fact, if you look in the publication section,

4    there are over 40 publications listed there that contain the

5    phrase PCI-32765 in their title; isn't that right?

6    A.    Yes.

7    Q.    So the references cited section of the '455 patent,

8    let's say the references that were provided to the examiner

9    during prosecution contain dozens of references to

10   PCI-32765; is that correct?

11   A.    Well, again, I have not counted them, so I'm going to

12   take your characterization of this as being dozens as true

13   and I do this and I assume that you are telling me the truth

14   here.  Nobody wants me to sit here and count, but I will

15   assume that what you are telling me is factually correct,

16   and so then I have to agree with your statement.

17   Q.    And the Patent Office granted the patent application

18   any way?

19   A.    Yes, the patent was granted.

20   Q.    So the Patent Office did not conclude that mere

21   disclosures of the phrase PCI-32765 disclosed form A and

22   all of the 2-Theta limitations in claim 5 of the '455

23   patent?

24            MR. GUTMAN:  Objection, Your Honor.  Lacks

25   foundation.

1          THE COURT:  Well, I mean -- actually, what was

2    the question?  Hold on.  Sustained.

3    BY MS. BHARKHDA:

4    Q.    So, Dr. Swift, let's talk about the version of Pollyea

5    that you walked through during your testimony.

6              MS. BHARKHDA:  Mr. Brooks, can we have DTX-467,

7    please.

8    BY MS. BHARKHDA:

9    Q.    So DTX-467 is not a version of Pollyea that would have

10   been available to a person of ordinary skill in the art at

11   the time of the June 4, 2012, priority date for the '455

12   patent; is that correct?

13   A.    No, it was available in May of 2010.  Why would it not

14   be available in 2012?

15   Q.    DTX-467 was actually generated in 2020; is that

16   correct?  It's a printout from the Internet from 2020?

17   A.    It may have been printed out in 2019, but if you ask

18   was I -- in 2012?  No, I would have no reason to print this

19   out in 2012.

20   Q.    So it was printed out in 2019 or 2020 to the best of

21   your knowledge?

22   A.    To the best of my knowledge, yes.

23   Q.    And, in fact, if you look, there is a list of articles

24   at the end of the second page and there's a reference there

25   to an article dating from 2020.

1              Do you see that?

2    A.    Yes, I see that.

3    Q.    So DTX-in order for an article from 2020 to be, from

4    2020 to be included in DTX-467, the document could not have

5    been printed before 2020; is that correct?

6    A.    I understand the reason, yes.

7    Q.    And you don't know whether DTX-467 represents the

8    version of Pollyea that would have been available to a POSA

9    as of June 4th, 2020 -- 2012?

10   A.    I -- I remember you asking me questions about this in

11   the deposition and I cannot tell you what a journal does on

12   their on line platform.  I assume that it's reasonable that

13   they would update relevant articles at the end, but the

14   actual article itself ends where the copyright 2009 by the

15   American Society of Hematology is listed.  Whatever updates

16   get done to that article to draw attention to more recent

17   literature is what I would expect to be the only part of

18   this that changes with time.

19   Q.    But you didn't actually go and attempt to get the

20   version of Pollyea that would have been in the literature

21   publicly available to a person of ordinary skill in the art

22   prior to June 4, 2012; is that correct?

23   A.    You're asking an impossible task.  You cannot do that.

24   I should say I know of no way to do what you are asking.

25   Q.    Did you make any requests to any library for the

Swift - cross

1    actual version of Blood from the relevant month in 2009 in

2    order to obtain the version of the article that would have

3    been provided, that would have been available to a POSA in

4    2012?

5    A.    No, I didn't, but if this is going to be an issue,

6    then it's going to be a big problem going forward because

7    there are many journals that are only published on line, not

8    in print edition.

9    Q.    But you didn't make an attempt to actually get the

10   hard copy version of the article that would have been

11   available to a POSA in 2012?

12   A.    No.  It didn't occur to me to do that because I don't

13   see how that is relevant.

14   Q.    Okay.  And so you relied on this 2020 Internet

15   printout of the article to render your opinion about what a

16   POSA would have known from that article as of June 4th,

17   2012?

18   A.    Yes.

19   Q.    And your opinion is the mere mention of the code name

20   PCI-32765 would have inherently disclosed to a person of

21   ordinary skill in the art prior to June 4th, 2012, that each

22   and every one of the elements of claim 5 of the '455 patent

23   was present; is that right?

24   A.    Yes, that's true, because the PCI-32765 is being used

25   in this reference as part of a Phase 1 dose escalation

                          Swift - cross

 1    study, and if you are doing a clinical trial, you have put

 2    that drug into a stable form, and when you go through the

 3    documents that must be behind this Phase 1 study, the

 4    clinical study report, the IND documents, it must correspond

 5    to form A.  The fact that claim 5 cites six powder X-ray

 6    diffraction lines, you don't have just six -- six X-ray

 7    diffraction lines on their own don't publication.  The fact

 8    that six refraction lines reflect an inherent property of

 9    form A is what's important.  So, yes, this reference

10    discloses, the PCI-32765 is used in a Phase 1 dose

11    escalation study and that that is a form A which has, which

12    necessarily has all of the claims that are being asserted.

13    Q.    So I just want to make sure I understand.  Are you

14    saying that PCI-32765 as you reviewed in that particular

15    study is form A or that PCI-32765 in all circumstances

16    always and necessarily is form A of ibrutinib?

17    A.    In every Phase 1 study that I am aware of, it is

18    necessarily form A.

19    Q.    Okay.  But only in the context of Phase 1 study?

20    A.    That's -- this reference only discloses a Phase 1

21    study, so I'm limiting my opinions to what existed in this

22    Phase 1 study.

23    Q.    So your opinions are limited to the dosage forms used

24    in the Phase 1 study of Pollyea?

25             MR. GUTMAN:  Objection, Your Honor.

Swift - cross

1            THE COURT:  Overruled.

2            THE WITNESS:  Are people waiting for me?

3            THE COURT:  Doctor, so the question pending to

4    you is, so your opinions are limited to the dosage form used

5    in the Phase 1 study of Pollyea.

6            THE WITNESS:  I don't think it's limited to

7    Pollyea.  We have other references as well that report on

8    this Phase 1 dose escalation study.  I'm simply saying that

9    what is disclosed in these studies indicates form A and all

10   the properties of form A, which include the fact that it is

11   the most stable form, that it has those powder diffraction

12   lines.

13           I don't know how it -- I'm probably not

14   answering your question, but I don't know how to answer your

15   question.

16   BY MS. BHARKHDA:

17   Q.    You are not offering the opinion that the code name

18   PCI-32765 in and of itself inherently and necessarily and

19   always discloses to a POSA that you are talking about

20   crystalline form A ibrutinib; is that right?

21   A.    I think a POSA in 2012, all of the available

22   information that I could get that talks about how PCI-32765

23   is used in clinical studies responds, corresponds to form A.

24   Q.    So, Dr. Swift, I understand that you keep repeating a

25   limitation to clinical studies, but that is not my question.

Swift - cross

1    What I'm asking about is:  Does the code name PCI -- would

2    the code name PCI-32765 prior to June 4th of 2012 have

3    necessarily and always meant crystalline form A of ibrutinib

4    with the six claimed peak of the '455 patent?

5    A.    I am aware that ibrutinib can exist in multiple

6    polymorphic forms.  My understanding is that in clinical

7    studies, it has always benefited from (inaudible).

8    Q.    But ibrutinib exists in other crystalline forms; is

9    that correct?

10   A.    It existed in other less stable forms which convert to

11   form A.

12   Q.    Now --

13   A.    The other forms cited in the, in other crystal form

14   patents in the family, but those require more specialized

15   conditions to obtain them and they readily convert.  That

16   was part of some of the other documents that have been, part

17   of the other studies that have been done.  That's what he

18   said, he tested form B and C and they both converted to A.

19   Q.    But not in all instances?

20   A.    No.  He identified some very specialized conditions

21   which would not allow it, which would -- where it would

22   not convert quickly, but in the vast majority of conditions,

23   he said that it was easy to obtain and other forms converted

24   to it.

25   Q.    Now, prior to June 2012, amorphous ibrutinib also

1    existed; is that correct?

2    A.    Yes, I believe it did.  But amorphous forms are less

3    stable than crystalline form.  When you know there's a

4    stable crystalline form available, amorphous ibrutinib

5    converts to crystalline form A.

6    Q.    Now, is it your opinion and testimony that amorphous

7    ibrutinib converts to crystalline form A in all

8    circumstances?

9    A.    It may not convert in all circumstances.  If you take

10   it down to 0 Kelvin, my guess is that nothing 0 Kelvin

11   converts.  I would not say all conditions convert, but I

12   would say the vast majority of conditions that people would

13   be working on, amorphous form ibrutinib would readily

14   convert to form A, particularly, put one tiny little seed

15   crystal into that mixture.  I would expect that would

16   catalyze the transformation to form A.

17   Q.    So prior to June 4, 2012, there were six forms, six

18   crystalline forms of ibrutinib and an amorphous form of

19   ibrutinib available to the inventor; correct?

20              MR. GUTMAN:  Objection.  Lacks foundation.

21              THE COURT:  Overruled.

22              THE WITNESS:  I -- again, I don't know if it was

23   exactly six and an amorphous form.  I will take that on face

24   that that is accurate.

25   BY MS. BHARKHDA:

1    Q.    Well, there are six forms that were disclosed in the

2    patent, the filing date for which is June 4, 2012; is that

3    correct?

4    A.    Yes.  I just won't be an expert on other patents that

5    might exist should there be anything else.

6    Q.    So there -- it would be accurate to say there are at

7    least six, there were at least six crystalline forms and one

8    amorphous form available to the inventor prior to June 2012;

9    is that right?

10   A.    Yes, but, again, as I said yesterday, only one form

11   can be the most stable form.

12   Q.    Right.  Claim 5 of the '455 patent doesn't contain any

13   limitation to a thermodynamically stable form; is that

14   correct?

15   A.    No.  It just happens that the powder X-ray diffraction

16   pattern line corresponds.

17   Q.    We know that because the inventor made form A.  Is

18   that correct?

19               THE COURT:  So, Dr. Swift, we lost your voice.

20   Sorry.  All right.  You said, no.  It just happens that the

21   powder X-ray diffraction pattern line corresponds, and then

22   we lost everything you said, so do you remember what you

23   were saying?

24               All right.  So the question -- let me do this.

25   There was a question put to you:  Claim 5 of the '455 patent

Swift - cross

1    doesn't contain any limitation to the thermodynamic stable

2    form; is that correct?

3                    And you said, no.  It just happens that the

4    powder X-ray diffraction pattern line corresponds.

5                    THE WITNESS:  To the thermodynamically stable

6    form.

7                    THE COURT:  Okay.  Thank you very much.

8                    THE WITNESS:  Sorry.  I don't know what

9    happened.

10                   THE COURT:  That's okay.  That's the limitation

11   of technology.

12                   Go ahead.  Ms. Bharkhda, I guess you want to

13   pick up.

14                   MS. BHARKHDA:  Sure.

15                   THE COURT:  Then you said we know that because

16   the inventor made form A; is that correct?

17                   MS. BHARKHDA:  Thank you, Your Honor.

18   BY MS. BHARKHDA:

19   Q.    Dr. Swift, we know that form A is the most, is

20   currently the most thermodynamically known form of ibrutinib

21   because the inventors made the form and then tested it

22   relative to the other form, forms and determined which one

23   was the most thermodynamically stable known se forms; is

24   that right?

25   A.    The inventors did characterize all of the forms and

1    based on what they found, they concluded that form A was the

2    thermodynamically stable form.

3    Q.    But before form A was made, when, for example, only

4    form B existed, form B was the most thermodynamically stable

5    form of the known forms of ibrutinib or the existing forms

6    of ibrutinib; is that correct?

7    A.    I'm not sure that that is true.  I -- I introduced the

8    '444 patent previously.  That patent disclosed how to

9    synthesize ibrutinib.  It disclosed that you could use

10   conventional methods to crystallize it and re-crystallize

11   it.  I think it's very likely given the relative stability

12   of form A and amorphous form that you are referring to, that

13   there's amorphous -- that there's form A in the product.

14   Q.    But you are not making any of your inherent

15   anticipation arguments on the '444 patent; is that correct?

16   A.    I did not talk about that patent in the context of

17   that -- for the testimony for the Court.  That's correct.

18   Q.    Okay.  So, but the fact that we now know today that

19   form A is the most thermodynamically stable form of

20   ibrutinib that we know, it's based on the work of the

21   inventor; is that correct?

22   A.    It's based on the inventors, but it's also based on

23   the outside analysis that was performed to do the polymorph

24   screen.  Some of those people who did the screen weren't

25   listed as inventors, as I recall.

Swift - cross

1    Q.    So it's all based on Pharmacyclics' work to make the

2    form, characterize them and figure out which one is the most

3    thermodynamically stable?

4    A.    They are the ones that are developing the drug, so,

5    yes.

6    Q.    And before the crystalline forms of ibrutinib were

7    made, a person of ordinary skill in the art could not have

8    known which ones would be the most thermodynamically stable;

9    correct?

10   A.    I think a POSA would look at the molecule and readily

11   assume that it's crystallizable based on its chemical

12   structure; they would be motivated to do a screen and based

13   on that screen, they would also inevitably create form A,

14   and if they create other forms and do a comparison of their

15   relative stability, they would deduce that form A is a

16   thermodynamically stable form.

17   Q.    My question was different.  My question was:  Before

18   crystalline forms of ibrutinib had been made, a POSA could

19   not have predicted which one would be the most

20   thermodynamically stable.

21   A.    No.  You have to do the -- that's correct.  You have

22   to do the experiment to figure out which one is the

23   thermodynamically stable form.

24   Q.    And a POSA, there is no disclosure in the art prior to

25   June 2012 that form A of ibrutinib is the most

Swift - cross

1    thermodynamically stable known form of ibrutinib; correct?

2    A.    It's not form A until somebody decides to call it form

3    A.  A thermodynamically stable form by any other name would

4    still be a thermodynamically stable form.

5    Q.    There's no disclosure that a crystalline form with the

6    properties of crystalline form A was the most

7    thermodynamically known form prior to June 2012.  There's no

8    disclosure about which -- whether you call it form A or form

9    X or form Y, there is no discussion in the art of what was

10   the most thermodynamically stable form of ibrutinib; is that

11   correct?

12   A.    That's correct, but I think you're misconstruing this,

13   because I don't think that citing six powder X-ray

14   diffraction lines necessarily talk about some property.

15   It's not talking about its melting points.  It's not talking

16   about -- it's simply telling you what the structure is, so

17   it's not measurable from the --

18   Q.    Those six lines, those six X-ray powder diffraction

19   lines were disclosed in the art the first time in the

20   application that led to the '455 patent; correct?

21   A.    That's -- it is the case, I think, that that was the

22   first time that those powder diffraction lines were cited.

23   Q.    Now, let's talk about Pollyea for a second.  Pollyea

24   doesn't identify what chemical compound PCI-32765 is; is

25   that correct?

Swift - cross

1    A.    When I found this, I will say that when I did my

2    literature search and I found this article among many

3    others, many others included PCI-32765 in the title.  Many

4    of those other articles gave you a molecule that identified

5    PCI 33765 like the Honigberg 2010 maybe that I just showed a

6    little bit ago.

7    Q.    Dr. --

8    A.    I don't know the order, whether I looked at Pollyea

9    before I looked at Honigberg before I looked at any other

10   reference.

11   Q.    Well, that was not my question.  I just want to know

12   what is in Pollyea?  Pollyea does not identify what chemical

13   compound PCI-32765 is.

14   A.    I think it does.

15   Q.    Point me to where in Pollyea, in the actual document,

16   DTX-467, the article identified what chemical compound

17   PCI-32765 is.

18   A.    The way it's used in every sentence indicates that it

19   is the drug substance.  Right?  If I'm giving somebody a

20   drug, I know that's a molecule, and so even if I -- I will

21   grant you that it does not say, it does not give you the

22   long IEPAC chemical name of the compound and it does not

23   draw the structure out for you, and the fact that it doesn't

24   draw it out could be because this is a limited size.  It

25   doesn't give that.

Swift - cross

1    Q.    But when you read, when a POSA reads PCI-32765,

2    they're going to understand that it's a molecule and that

3    molecule will be given structure, but they won't know what

4    the molecule in a given structure is from reading the words

5    PCI or the phrase PCI-32765?

6    A.    No, but I assume a POSA is sufficiently intelligent to

7    be able to figure out what that refers to.

8    Q.    Now, Pollyea doesn't contain the chemical name for

9    PCI-32765?

10   A.    Right, but, again, for all the same reasons that I

11   just said, a POSA would be able to figure it out without --

12   with very little effort.

13   Q.    Now, Pollyea doesn't mention crystalline form A of

14   ibrutinib in any way, does it?

15   A.    Not expressly, no, but inherently, it does.

16   Q.    Pollyea doesn't even mention crystalline form of

17   ibrutinib; is that correct?

18   A.    Not explicitly, though when you say it's being

19   delivered as an oral drug, I believe it does disclose that

20   crystalline forms are present.

21   Q.    But an oral dosage form could be amorphous; is that

22   correct?

23   A.    It could be, but my experience with oral drugs are

24   delivered as crystalline forms and not method forms.

25   Q.    Most, but not all; is that right?

Swift - cross

1    A.    Most, but not all.

2    Q.    And there would not have been any sort of regulatory

3    or legal prohibition on using an amorphous form in a Phase 1

4    trial for a drug substance; correct?

5                MR. GUTMAN:  Objection.  Lacks foundation.

6                THE COURT:  Overruled.

7                THE WITNESS:  I don't know that -- I don't know

8    of any specific requirement that it must be a crystalline

9    form, but, again, when I look at the chemical structures of

10   the molecule, my intuition based on years of experience and

11   based on what I think a POSA would know is that they would

12   have every confidence that that molecule was crystallize

13   able and given that crystalline forms are more stable than

14   amorphous forms, they would be motivated to put it in a

15   crystalline form.

16               So, yes, if I make an assumption in this Phase 1

17   study it is being delivered in crystalline form, that

18   reflects my own personal experience based on lots of other

19   compounds.

20   BY MS. BHARKHDA:

21   Q.    You said, and part of that is based on you looking at

22   the chemical structure for ibrutinib; is that right?

23   A.    Yes.

24   Q.    And that's not disclosed in Pollyea; is that correct?

25   A.    No, but, again, like I said, it wouldn't take much

Swift - cross

1    work to figure out what the chemical structure is.  It

2    certainly didn't take me much work to figure out what the

3    structure is.

4    Q.    Now, and one wouldn't be able to tell simply from the

5    mention of a solid oral form whether or not the actual

6    dosage being used was amorphous or crystalline; is that

7    correct?

8    A.    That is technically correct, although, like I said,

9    given that most drugs are delivered in crystalline form, a

10   POSA would likely assume that it's being delivered in

11   crystalline form.

12   Q.    Pollyea does not teach a POSA how to make crystalline

13   form A of PCI-32765 of ibrutinib; is that correct?

14   A.    That's correct.  It's simply using it.  It's not

15   teaching you how to make it.

16   Q.    And it doesn't teach you how to make crystalline, any

17   crystalline forms of PCI-32765?

18   A.    That's correct.  It's just using something that has

19   already been made.

20   Q.    And Pollyea contains no XRPD data; is that correct?

21   A.    That's also correct, but the XRPD data is just an

22   inherent property of the material they are using.

23   Q.    Now, Pollyea doesn't identify the protocol number for

24   the Phase 1 dose escalation study that it's talking about;

25   is that correct?

Swift - cross

1   A.    I believe that's true, but I also know that any Phase

2   1 steady must have a clinical study behind it, a clinical

3   study protocol behind it.

4   Q.    Now, just to confirm, a POSA reading Pollyea wouldn't

5   have a firm position that, or, excuse me, a firm opinion

6   that PCI-32765 was crystalline form A of ibrutinib; is that

7   correct?

8   A.    I think it depends on what you mean by firm.  I said

9   that my assumption would be that a POSA would assume that

10  you could make this into a crystalline form, so my

11  assumption is that if I'm a POSA in 2012, my assumption is

12  this is a different form.

13        If you want me to assume that it's an amorphous

14  form, I probably need additional information that would make

15  me think that it's amorphous.  Otherwise, my default

16  position is going to be I'm going to assume that it's

17  crystalline.

18  Q.    Do you recall giving deposition testimony in this

19  case?

20  A.    Oh, yes.

21  Q.    And I took your deposition in August; is that correct?

22  A.    Yes, for many, many, many hours.

23  Q.    And that was just about two months ago?

24  A.    Yes.

25  Q.    Okay.  And do you recall testifying then that you

1    didn't know whether a POSA would have a firm opinion on

2    whether or not PCI-32765 was crystalline form A of

3    ibrutinib?

4    A.    Vaguely.

5    Q.    So during your deposition, you testified that a POSA

6    would not have a firm opinion regarding whether PCI-32765 is

7    a crystalline form of ibrutinib; is that correct?

8    A.    I think at the deposition, I didn't challenge your

9    definition of what firm means, and I've been very careful

10    just now to say that my assumption is that it would be

11    crystalline.

12              So I think it comes down to what you want to

13    call it as firm, you know.  Do we want to talk about this in

14    terms of probability.  Right?  You've got a one in a million

15    chance, is that firm, is that not firm?  You've got a one in

16    ten chance, is that firm or is that not firm.  So I think my

17    testimony in deposition is not -- is exactly what I'm saying

18    here.  We're just maybe parsing the boundaries of what firm

19    means.

20              MS. BHARKHDA:  Now, Mr. Brooks, can we please

21    play Dr. Swift's deposition testimony starting from lines,

22    from line, 222:14 to 223:11.

23              (The videotape deposition clip was played as

24    follows.)

25              Question.  Now, Dr. Swift, looking only at the

Swift - cross

1     disclosure of Pollyea 2009, not considering any other

2     outside documents, does Pollyea 2009 disclose whether

3     PCI-32765 is amorphous or crystalline?

4             "Answer:  If I read the introduction, it says

5     PCI-32765 is an oral, potent selective covalent inhibitor.

6     And since it's an oral, oral to me suggests that it's a

7     solid.  The fact that it's in a Phase 1 dose escalation

8     study suggests that it's stable.

9             "And I think I would need to know something

10    about the -- if I'm a POSA, I'm going to assume that the

11    oral form is a stable form; otherwise it wouldn't be in a

12    Phase 1 study.  Beyond that, I don't know that a POSA would

13    have a firm ibrutinib on whether it is crystalline form A,

14    for example.

15            "But I think actually it would be fairly

16    reasonable to assume that if it's a stable form, it's more

17    likely than not to be a crystalline form because crystalline

18    forms are known to be more stable than amorphous forms."

19            (End of video clip.)

20            MR. GUTMAN:  Your Honor, objection as improper

21    impeachment.

22            THE COURT:  Well, I mean, I thought it was a

23    little odd at the time we were just playing a deposition,

24    but you didn't object at the time, so it's kind of like a

25    late objection.  You know, I mean, kind of the cat is out of

Swift - cross

1    the bag.

2                   MR. GUTMAN:  Your Honor, to the extent they want

3    to move that testimony into evidence, it's not a prior

4    inconsistent statement because it's improper impeachment.

5                   THE COURT:  Well, wait a second.  What do you

6    mean it's not a prior inconsistent statement?

7                   MR. GUTMAN:  It's not, it's not proper

8    impeachment, so --

9                   THE COURT:  Well --

10                  MR. GUTMAN:  Ms. Bharkhda hasn't shown that Dr.

11   Swift's testimony that she just played is inconsistent with

12   what she testified here.

13                  THE COURT:  I don't know.  I mean, I can go back

14   and look at the transcript, I guess.  I mean, this is not

15   the norm that I see a deposition played.  Normally, the

16   witness is confronted with, didn't you say and then the

17   witness denies she says it.  It's played.  I mean, this is

18   made even more difficult because we're remote.

19                  I don't know that there's even a move --

20                  THE WITNESS:  Am I allowed to make any comments?

21                  THE COURT:  No, no.  Just hold up, Doctor.  This

22   is lawyers stuff.  In fact, Sanji, you should have this as a

23   sidebar, so let's move Dr. Swift to a waiting room so the

24   lawyers can talk with me privately.  Thank you.

25                  All right.  Give me a second.  Let me go back

1    and look.

2              So, you know, Ms. Bharkhda, we can't just play a

3    deposition.  You've got to lay the foundation.  You've got

4    to --

5              MS. BHARKHDA:  Your Honor, I apologize if you

6    didn't think I did that.  I did that by asking Dr. Swift if

7    she thought a POSA would have a firm opinion about whether

8    PCI-32765 is crystalline form A.

9              THE COURT:  Right.  But I mean what happened

10   was, she said we're kind of parsing what firm is.  You guys

11   had a discussion back and forth reminiscing about your

12   lengthy deposition in August, and then -- hold on.  Let me

13   just find the transcript.

14             MS. BHARKHDA:  Your Honor, I believe actually

15   the testimony she provided is clearly inconsistent.  The

16   testimony she provided at her deposition was clearly

17   inconsistent with the testimony she just gave regarding that

18   opinion.

19             THE COURT:  All right.  Just give me a second

20   here.  I'm putting you all on mute for a second so I can ask

21   the court reporter something.

22             Okay.  Having reread the transcript, I think

23   this was appropriately played as an inconsistent statement

24   given the answer that Dr. Swift had.  So the prior

25   inconsistent statement made under oath, the objection is

1    overruled.  Let's bring Dr. Swift back.

2              All right.  You can bring Dr. Swift back in.

3              You can resume questioning.

4    BY MS. BHARKHDA:

5    Q.    Now, Dr. Swift, a person of ordinary skill in the art

6    would have understood prior to June 4, 2012, that a drug

7    product could use a metastable crystalline form of a drug

8    substance; is that correct?

9    A.    Yes.

10   Q.    And here, for example, crystalline form B of ibrutinib

11   would be considered a metastable form of ibrutinib?

12             MR. GUTMAN:  Objection, Your Honor.  Outside the

13   scope.

14             THE COURT:  All right.  Hold on.

15             THE WITNESS:  Yes.  Form B --

16             THE COURT:  Any way, it's overruled.  Go ahead.

17             THE WITNESS:  I'm sorry.  I thought you --

18             THE COURT:  No, no.  You're right.  Well, we're

19   all talking over each other because of the remoteness.  The

20   objection is overruled, so, Dr. Swift, you should go ahead

21   and answer the question.

22             THE WITNESS:  So that's what I thought I was

23   answering, that you, you asked me if B was metastable and,

24   yes, I agree that B is metastable.

25   BY MS. BHARKHDA:

Swift - cross

1    Q.    And crystalline form B of ibrutinib would be

2    considered a metastable form of ibrutinib; is that correct?

3    A.    That's correct.

4    Q.    Now, Dr. Swift, your opinions relating to the Fowler

5    reference, DTX-148, they are essentially the same as your

6    opinion for the Pollyea reference; is that correct?

7    A.    That's correct.

8    Q.    So there's nothing unique to Fowler that is not

9    contained in Pollyea that you believe would inherently

10   anticipate claim 5 of the '455 patent?

11   A.    Yes, that's correct.  Fowler, an update to the ongoing

12   study.

13   Q.    Now, can we look at DTX-148 itself, the version of

14   Fowler that Dr. Swift used on her direct examination?

15             DTX-418, Dr. Swift, that's also the version that

16   you used when you were doing your anticipation analysis in

17   forming your opinions in this case; is that right?

18   A.    I believe so.

19   Q.    But DTX-148 is an Internet printout from 2019;

20   correct?

21   A.    Again, I don't know if it's 2019 or 2020, but it would

22   have been one of those two years.

23   Q.    So DTX-148 itself is not the of Fowler that would have

24   been available to a person of ordinary skill in the art

25   prior to June 12, 2012; is that correct?

Swift - cross

1    A.    I don't know exactly what would have been available in

2    2012 because I did not look at this document printed in

3    2012, but there's nothing in this abstract or in the two

4    pages here that is, that relates to any new content since

5    2012, so I have no reason to believe this wouldn't be what

6    somebody in 2012 would be looking at.

7    Q.    You didn't make any attempt to actually obtain the

8    version of Fowler that was published in the literature prior

9    to 2012; is that correct?

10   A.    I did not, but I was also not aware that that would be

11   a thing, that anybody would not -- that anybody would

12   question the validity of an oral that I'm able to pull in

13   real time now being something that was the same or different

14   from ten years ago.

15   Q.    But you understood you were supposed to put yourself

16   in the shoes of a person of ordinary skill in the art as of

17   2012 and accept the information that would have been

18   available to them; is that right?

19   A.    I do understand that.

20   Q.    To confirm, Dr. Swift, Fowler does not identify a

21   protocol number for the Phase 1 dose escalation study that

22   it discusses.  Is that correct?

23   A.    I think that's correct.

24   Q.    And not --

25   A.    Not explicitly.

Swift - cross

1    Q.    And it doesn't disclose a chemical name for PCI-32765?

2    A.    Not explicitly, no.

3    Q.    And it doesn't identify the chemical compounds that,

4    for PCI-32765?

5    A.    No, but as I said, with Pollyea, if you know

6    PCI-32765, it does not take very much work to figure out

7    what the chemical structure is contained in the four corners

8    of this document.

9    Q.    And Fowler doesn't mention crystalline form A of

10    ibrutinib; is that correct?

11    A.    No, it does not mention it explicitly.

12    Q.    And it doesn't say anything about the physical form of

13    PCI-32765 that was used in the Phase 1 study; is that

14    correct?

15    A.    Well, it makes reference to the fact that it's orally

16    bioavailable, so beyond the fact that it's being delivered

17    orally, it does not specify which form had been explicitly.

18    Q.    And Fowler contains no XRPD data; is that correct?

19    A.    That's correct.  In the study, they are just receiving

20    the samples and using them to deliver them to patients.

21    They would have no reason to do XRPD on the sample.

22    Q.    Now, none of the references that you discussed in your

23    direct examination that were publicly available prior to

24    June 4, 2012 contain the phrase crystalline form A of

25    ibrutinib; is that correct?

Swift - cross

1    A.    I think that's correct.

2    Q.    None of the references that you discussed in your

3    direct examination that were publicly available prior to

4    June 4th, 2012 contained any X-ray powder diffraction data

5    for any form of ibrutinib; is that correct?

6    A.    That is correct if you are limiting it to explicitly

7    identifying, yes.

8    Q.    And none of the references you discussed in your

9    direct examination that were publicly available prior to

10   June 4, 2012, contain mention of ibrutinib with XRPD peaks

11   at 5.7, 13.6, 16.1, 18.9, 21.3 and 21.6 degrees 2-Theta plus

12   or minus 0.1; is that correct?

13   A.    I believe the references inherently disclose it but

14   they don't explicitly disclose it.

15   Q.    Now, one of the documents that you talked about, one

16   of the references that you talked about on direct was

17   JTX-77.

18              MS. BHARKHDA:   Mr. Brooks, can we put up JTX-77.

19   Actually, if you can pull up Dr. Swift's slides, Alv J S 17.

20   Okay.

21   BY MS. BHARKHDA:

22   Q.    So you have on your slide 3 two pages of the document.

23   Right?  We have one document displayed over the cover page

24   of JTX-77?

25   A.    Yes.

Swift - cross

1    Q.    Okay.

2              MS. BHARKHDA:  Mr. Brooks, can we please bring

3    up JTX-77 itself.  In the portion of the cover on the slide

4    we have a confidentiality statement saying that the

5    information in JTX-77 is confidential and proprietary to

6    Pharmacyclics; is that right?

7    A.    Yes, but I've never shared this information with

8    anybody outside this case.

9    Q.    Now, JTX-77 is an internal confidential Pharmacyclics

10   document; is that right?

11   A.    I actually don't, I don't know whether that's right or

12   wrong.  But based on the confidentiality statement and the

13   fact that it's a Pharmacyclics document, I actually -- I

14   don't know.

15   Q.    You mentioned, I think, in your testimony on direct

16   examination that you performed literature searches as part

17   of your analysis in the case; is that correct?

18   A.    That's correct.

19   Q.    You did not obtain JTX-77 through one of those

20   literature searches; is that correct?

21   A.    No, I could not have obtained that on my own, but when

22   I found based on the literature that I did find, I asked

23   counsel if there were underlying documents and if I had the

24   ability to get those documents.

25   Q.    And then they provided the Pharmacyclics documents

Swift - cross

1    that were produced by plaintiffs in this case to you to

2    answer that question; is that right?

3    A.     Yes.

4    Q.     Now, and to confirm, you have no basis to believe that

5    JTX-77 would have been publicly available to a person of

6    ordinary skill in the art prior to June 4th, 2012; is that

7    correct?

8    A.     You know, I don't know how Pharmacyclics treats their

9    confidential documents.  If somebody was interested in this,

10   would they decide to share it?  Would the coordinating

11   investigator decide to share it?  I don't know.  I don't

12   know those people.  I don't know what their policy is.  I

13   expect that they would say, no, it's confidential, we're not

14   going to share it, but if somebody decides to share it for

15   some other reason, I don't know.

16   Q.     You have not seen anything that JTX-77 was, in fact,

17   shared by Pharmacyclics on a nonconfidential basis prior to

18   June 4, 2012; is that correct?

19   A.     That's correct.

20   Q.     And you don't know when JTX-77 was created; is that

21   correct?

22   A.     Well, at the bottom of the page it says it was

23   approved in February 2017, so I assume I'm afraid it's

24   before that date.  I assume a document of this length is not

25   created in a day and that there were several drafts

1    available of this prior to that date.  But it covers the

2    study that went from 2009 to 2012.

3    Q.    And according to JTX-77, the study was completed after

4    June 4, 2012; is that correct?

5    A.    Yes.

6    Q.    And the document date of February 27, 2013, is after

7    June 4, 2012; is that correct?

8    A.    That's correct.

9              MS. BHARKHDA:  Now, can we please have DTX-1514,

10   please, Mr. Brooks.

11   BY MS. BHARKHDA:

12   Q.    So this is the other document that you relied on to

13   indicate that PCI-32765 would have been understood to

14   necessarily disclose form A of ibrutinib; is that correct?

15   A.    Yes.

16   Q.    Now, the cover page of DTX-1514 similarly has a

17   confidentiality statement like JTX-77; is that right?

18   A.    That's correct.

19   Q.    And as far as you know, JTX-1514 is a confidential

20   internal Pharmacyclics document?

21   A.    That's what I assumed it means when it has the

22   confidentiality statement on the front cover.

23   Q.    And you did not find DTX-1514 in any of your

24   literature; is that correct?

25   A.    Correct.  This is not publicly available.

Swift - cross

1    Q.    And it would not have been publicly available to a

2    person of ordinary skill in the art prior to June 4, 2012;

3    is that correct?

4    A.    That's true.

5    Q.    And can we have Dr. Swift's slide 19.

6          So, Dr. Swift, you took us to slide 19 during

7    your direct testimony and indicated that the page that was

8    the chart, table 21 that we're showing from DTX-1514,

9    indicates to you that PCI-32765 is always associated with

10   crystalline form A of ibrutinib; is that correct?

11   A.    It is always associated with crystalline form A and in

12   every clinical study that's done.

13   Q.    But in table 21 on DTX-1514, we can see that you have

14   one batch in the top of Table 1 that is not highlighted.

15         Do you see that?

16         MS. BHARKHDA:    Mr. Brooks, can we put a box

17   around that box, which is in the exactly upper -- yes.

18   There we go.

19   BY MS. BHARKHDA:

20   Q.    So this is the box that describes batch 072097.

21         Do you see that?

22   A.    I see that.

23   Q.    And that's actually form B of ibrutinib; is that

24   correct?

25   A.    That non-clinical batch is form B and it's a lot

1   number that was not used in the clinical study.

2   Q.    But here, Table 1, table 21 is using the code

3   PCI-32765 to refer to form B of ibrutinib; is that correct?

4   A.    The content in the blue box there corresponds to form

5   B.

6   Q.    And that is listed under the heading PCI-32765?

7   A.    That's how they chose to put it in the table.

8   Probably easier to put it in the table that way than it is

9   to have a separate table for 1, 1 lot number.

10  Q.    So even within Pharmacyclics, PCI-32765 was used to

11  refer to both form B and form A of ibrutinib; is that

12  correct?

13  A.    You know, I don't know.  Does this lot number

14  corresponding to form B?  I don't know how Pharmacyclics

15  talked about it, but they are making the distinction in this

16  table that there is form A and form B of this compound.

17  Q.    So there's form A of PCI-32765 and form B of

18  PCI-32765?

19  A.    Form B, it's my understanding it's not even a single

20  form.  It's a mixture, or at least it's referred to as being

21  a mixture.  The content that refers to it as form B or

22  polymorph B, I don't remember the exact terms.  I don't want

23  to be on the record.  I shouldn't talk about this.  There's

24  form A and form B in this table, but every clinical batch

25  and every batch that was used in that dose escalation study

Swift - cross

1   is identified as form A.

2   Q.    And all of that is referred to as PCI-32765?

3   A.    Again, if that's how you want to interpret the

4   table, that's fine.  Like I said, they could have just put

5   that in there to avoid making a whole other table for one,

6   one batch.

7   Q.    And documents from Pharmacyclics from the relevant

8   time period also use the code PCI-32765 when they are just

9   talking amorphous ibrutinib; is that correct?

10  A.    I don't -- I can't speak confidently about in which

11  every way they refer to amorphous form because I was focused

12  on form A.

13  Q.    So you didn't look into the question of how the term,

14  of whether or not the term PCI-32765 was used within

15  Pharmacyclics to amorphous ibrutinib?

16  A.    I'm sure I looked at it, but I didn't really think

17  about it deeply.

18  Q.    Because you were focused on form A?

19  A.    Yes.

20  Q.    All right.  DTX-1514, if we can go back to the cover

21  page, Mr. Brooks, that has a date of August 27, 2012?  Do

22  you see that?

23  A.    August 17th.

24  Q.    Thank you for the correct.  August 17th, 2012.

25        Do you see that?

Swift - cross

1  A.    Yes.

2  Q.    So that document also dates after the June 4th, 2012,

3  date of the patent application?

4  A.    Yes.

5  Q.    Now, we also talked about, I think you referred to the

6  Zvonicek article, DTX-1700.  DTX-1700 was not available to a

7  POSA prior to June 4th of 2012; is that correct?

8  A.    That's correct.

9  Q.    And if we can look at the experimental section of

10  DTX-1700.  Okay.  So the authors of DTX-1700 made forms A, B

11  and C in 2018 by following the procedures described in the

12  '455 patent; is that correct?

13  A.    That's correct.

14  Q.    And then they used forms A and B to conduct further

15  polymorph screening; is that right?

16  A.    Yes, that's correct.

17          MS. BHARKHDA:  Now, can we go to the section

18  3.1.3, evaluation of the methods, Mr. Brooks.

19          THE COURT:  Can we take a break?  Let's just

20  hold for one second, would you, please?  Hold on just one

21  second.

22          So I've also got a technical issue.  That's what

23  I was trying to deal with.  I just lost something on my

24  computer screen.

25          I will tell you what.  Let's take -- I mean, is

1    this a good time or do you want a couple minutes and then

2    we'll break in terms of the flow of examination?  Where are

3    we?

4            MS. BHARKHDA:  Your Honor, we can take a break

5    now if you would like.  Then, hopefully, actually, I can,

6    you know, streamline some things and we'll keep it as

7    efficient as we can when we come back.

8            THE COURT:  Why don't we do that.  Why don't we

9    break then until 10:45.  All right?  All right.  Thank you.

10           (Short recess taken.)

11                    -  -  -

12           (Proceedings resumed after the short recess.)

13           THE COURT:  Okay.  I'm here.  Is everybody else

14   here?  It looks like it.  Okay.  All right, counsel.

15   BY MS. BHARKHDA:

16   Q.    Dr. Swift, were you present for opening statements on

17   Tuesday?

18   A.    No, I wasn't.

19   Q.    You didn't attend.  You talked a bit about X-ray

20   powder diffraction and X-ray powder diffraction 2-Theta

21   peaks.

22           Do you agree that 2-Theta peaks in an X-ray

23   powder diffraction provides structural information about the

24   crystalline form of the polymorph at issue?

25   A.    Yes.

1    Q.    I want to talk about some of the references that you

2    discussed during your opening, excuse me, during your direct

3    examination.

4            So I believe that you, you referred to Bauer

5    2008; is that correct?

6    A.    Yes.

7    Q.    And that was DTX-1008; is that right?

8    A.    I don't know.  I have to find it.

9            MS. BHARKHDA:  Mr. Brooks, can we pull up

10   DTX-1008 to make it easier.

11           THE WITNESS:  Yes, it is 1008.

12   BY MS. BHARKHDA:

13   Q.    Okay.  Now, I believe you described Bauer as a general

14   reference that would provide guidance that would lead one to

15   perform a polymorph screen or polymorph search I believe as

16   you said yesterday; is that right?

17   A.    Yes.  This is a pretty general article.

18   Q.    It does not mention ibrutinib or PCI-32765; is that

19   correct?

20   A.    That's correct.

21   Q.    And it provides no specific guidance on how to make

22   crystalline forms of ibrutinib; is that correct?

23   A.    That's correct.  There's no mention of ibrutinib in

24   this, in this report, in this document.

25   Q.    And Fowler, in essence, says that one should use their

1   technical know-how and their individual know-how about the

2   compound they are working with to design a set of

3   experiments, execute those experiments and then test the

4   result of those experiments; is that right?

5   A.    That's right, later he offers this advice for every

6   pharmaceutical that would be in development.

7   Q.    And let's look at Miller 2007.  We'll just find the

8   right number for that one.

9              I believe it's DTX-1657.  Can we have that one,

10  Mr. Brooks?

11             And Miller is also a general reference that

12  is not in any way specific to ibrutinib or PCI-23765l;

13  correct?

14  A.    It's the general reference that should apply to --

15  most pharmaceuticals are all homocyclic.

16  Q.    It provides no specific teaching about crystallization

17  experiments or conditions for ibrutinib or PCI-32765?

18  A.    The word ibrutinib does not appear in that document,

19  no.

20  Q.    And I believe you pointed us to the solvent table in

21  Miller?

22  A.    Yes.

23  Q.    Let me just find the right table number.  I apologize.

24  Table 3.

25             MS. BHARKHDA:  Mr. Brooks, can we go to Table 3?

1    I believe it begins on the base number beginning 761.  There

2    we go.  Table 3 of Miller spans numerous pages of the

3    reference; correct?

4    A.    That's right.

5    Q.    It contains over 120 solvents; is that right?

6    A.    I didn't count them, but that's probably right.

7    Q.    And I think you indicated that a POSA might choose to

8    use all of these solvents when conducting crystallization

9    experiments relating to a particular compound; is that

10   right?

11   A.    They might, but, again, it depends on how much time

12   and money and interest you have.  If you have unlimited

13   time, interest and money, why not use all solvents.  Most of

14   us don't work in that environment, so you would be judicious

15   and use a smaller subset of the entries in this table, the

16   screen.

17   Q.    And so if you don't have unlimited time, money and

18   resources, a person of ordinary skill in the art who was

19   attempting to perform crystallization experiments on a new

20   drug compound would have to make a decision about which

21   solvent to use and whether to potentially combine some of

22   the solvents on this table?

23   A.    They would, but, you know, right below the Table 3

24   heading, it offers up that the bold solvents would be a

25   smaller subset of one set a POSA wouldn't want to focus on.

1  Q.    So a POSA could potentially stick to just stick to

2  testing the bolded solvent here in a crystallization

3  experiment; is that right?

4  A.    They could.

5  Q.    Or they could use the bolded solvents and some other

6  solvents that they use from the list; is that correct?

7  A.    Correct, but I think the way that you embark on a

8  polymorph screening experiment is not that you start from

9  the infinite number of solvents and you whittle your way

10  down.  You start with a small number of solvents and you

11  throw it out.

12  Q.    And there are a number of factors that affect the, or

13  that one could use when conducting a polymorph screen or a

14  polymorph search; is that correct?

15  A.    There are a number of variables one could probe.  I

16  think solvents and temperature are the two easiest ones to

17  look at and those would be the first two that a POSA would

18  reasonably assess.

19  Q.    And there was no teaching or, no teaching in the art

20  prior to June 4th, 2012, about how any of those particular

21  variables would apply to or should be used with ibrutinib;

22  is that correct?

23  A.    The general information available that a POSA would

24  know on how to approach the problem, but, no, you're not

25  going to find a document that tells you exactly which

 1    solvents to try because that's the purpose of doing

 2    experiments.  Why would you do an experiment if it's already

 3    done?

 4    Q.    Now, Dr. Swift, one of the other references that you

 5    talked about during your direct examination is the '444

 6    patent.

 7              Do you recall that?

 8    A.    Yes.

 9    Q.    Okay.

10              MS. BHARKHDA:  And, Mr. Brooks, can we have the

11    '444 patent?  I believe it's DTX-1.  And if you could go to

12    the second page DTX-one.

13    BY MS. BHARKHDA:

14    Q.    And the references cited on the face of the '444

15    patent, the '444 patent appears.  You can see it there in

16    the upper right corner of the first page of content of the

17    patent.

18              MS. BHARKHDA:  Mr. Brooks, can we hone in on it

19    up in the right-hand corner underneath the patent number?

20    I actually meant to go to JTX-9.  Thank you for correcting

21    me.

22    BY MS. BHARKHDA:

23    Q.    So this is the '455 patent, and on the face of it,

24    have listed the '444 patent that you discussed in your

25    testimony; is that correct?

Swift - cross

1   A.    Yes.

2   Q.    And so the '444 patent was submitted to the Patent

3   Office during prosecution of the '455 patent?

4   A.    Yes.

5   Q.    Now, the '444 patent does not mention crystalline form

6   A of ibrutinib; is that correct?

7   A.    The '444 patent offers crystallization and

8   recrystallization as common methods to purify any of the

9   compounds that were listed in that compound patent.  Among

10  them was ibrutinib, but it does not specifically call out

11  form A.

12  Q.    And the '444 patent contains no X-ray diffraction

13  data; is that correct?

14  A.    It doesn't contain X-ray diffraction data, but it

15  references standard characterization methods, which would

16  include X-ray powder diffraction.

17  Q.    Now, a POSA would understand that the specification of

18  the '444 patent only generally discusses different

19  crystalline forms without disclosing how to make any

20  specific crystalline form; is that correct?

21  A.    In general, that's correct, but I will say that the

22  word crystal, crystallization and recrystallization appear

23  in the text of this document a remarkable number of times.

24  Q.    I understand.  I want you to -- I would like you to

25  answer the question that I asked though.  A POSA would

Swift - cross

1    understand that the specification of the '444 patent only

2    generally discusses different crystalline forms without

3    disclosing how to make any specific crystalline form?

4    A.    Yes, it generally discusses how to make crystalline

5    forms.

6    Q.    Without disclosing how to make any specific

7    crystalline form; is that correct?

8    A.    I don't know.  If it offers you a recipe, if you

9    decide to call it a recipe, the fact that you have crystal

10   form or doesn't it?

11   Q.    So is it your testimony that the '444 patent discloses

12   how to make a specific crystalline form?

13   A.    It's not telling me how to make a specific crystal

14   form, but it's telling me how to do it.

15   Q.    Okay.  So --

16   A.    That doesn't make any sense.  I'm sorry.  It's giving

17   me general information on how to purify my compounds, which

18   are solids, crystalline, but it's not giving you a specific

19   route to obtain form A, B, C or any, any other form of any

20   of the drugs in the, in the, that the patent covers.

21   Q.    And, finally, I think you talked in your direct

22   examination about Honigberg 2010.  Can we have Honigberg

23   2010.  I believe it's DTX-28.  And DTX-278 does not contain

24   any specific teaching about how to make any crystalline form

25   of ibrutinib; is that correct?

Swift - redirect

1    A.    It does not explicitly tell you how to make any forms

2    of ibrutinib, that's correct.

3    Q.    And it doesn't specifically reference crystalline

4    forms of ibrutinib?

5    A.    I would need to read it.  I believe that's true.

6          MS. BHARKHDA:  Thank you, Your Honor.  I have no

7    further questions for Dr. Swift.

8          THE COURT:  All right.  Redirect.

9                    REDIRECT EXAMINATION

10   BY MR. GUTMAN:

11   Q.    Dr. Swift, how many Phase 1 dose escalation studies

12   for ibrutinib were undertaken?

13   A.    There's only one as far as I know.

14   Q.    Is your opinion that Pollyea and Fowler anticipate

15   claim 5 of the '455 patent based on the disclosure of

16   PCI-32765 in the context of that Phase 1 dose escalation

17   study of ibrutinib?

18   A.    Yes.

19   Q.    Is that different from answering the question of what

20   is PCI-32765 in any and all contexts?

21   A.    I think that's a different question.

22   Q.    Are you -- as part of your anticipation argument for

23   Pollyea and Fowler, is it your argument that for -- excuse

24   me.  Is it your opinion that PCI-32765 is form A in any and

25   all contexts?

Swift - redirect

1  A.      Depending on how somebody is using PCI, using the

2  term, I wouldn't say that it is form A in every context, but

3  it is certainly form A in the context of the Phase 1 dose

4  escalation study.

5  Q.      And how do you know that?

6  A.      Because behind any Phase 1 study there must be study

7  protocol, and the study protocols identify specific lot

8  numbers which can be traced back to specific batches, which

9  can be traced back to specific characterization data, and

10  when I looked at that that characterization data, it was

11  with every single batch that was used in that those, in dose

12  escalation studies corresponding to form A, and form A

13  necessarily, inherently has the six powder diffraction lines

14  that are cited in claim 5 that has been asserted.

15  Q.      Now, Ms. Bharkhda asked you some questions about a

16  citation to an abstract in the '455 patent that she

17  suggested is Pollyea.

18          Do you recall that?

19  A.      I do recall that.

20  Q.      Are you aware of any information that was available to

21  the Patent Office in considering whether to issue into the

22  '455 patent that was identical to the information that you

23  analyzed in forming your opinion that Pollyea and Fowler

24  anticipate claim 5 of the '455 patent?

25  A.      I wasn't in the Patent Office, so I don't know

Swift - redirect

1    the total of the documents that they saw or didn't see.  I

2    have no knowledge to what they, what they had at their

3    disposal.

4    Q.    The clinical trial report and the IND documents that

5    you analyzed to correlate the batch numbers with what

6    crystalline form PCI-32765 was in the Phase 1 dose

7    escalation studies, are you aware of whether those documents

8    were considered by the Patent Office in addressing the

9    Pollyea reference that Ms. Bharkhda pointed to?

10   A.    I have no knowledge of that, but I imagine if they

11   were considered, they would be in the materials that were

12   considered.

13            MR. GUTMAN:  Can we go to DTX-467, please.

14   BY MR. GUTMAN:

15   Q.    Now, Dr. Swift, is there any doubt in your mind about

16   whether the information pertaining to the abstract in

17   DTX-467 was published in November of 2009?

18   A.    I have no reason to doubt that.

19   Q.    And when a POSA would want to obtain an abstract or a

20   scientific article given the existence of computers and

21   technology, would a POSA typically obtain such a publication

22   from a database or would they go physically to a library to

23   obtain the article?

24   A.    In this day and age, people don't use the library very

25   much.

1          MS. BHARKHDA:  Your Honor, okay.  I was on mute.

2    I'm sorry.  I'm late.  The question is leading, it lacks

3    foundation and is outside the scope of the opinion that Dr.

4    Swift offered in the case.

5          THE COURT:  I think you opened the door.

6    Overruled.

7    BY MR. GUTMAN:

8    Q.    Now, I want to take this Pollyea reference section by

9    section.  The title through the introduction of the

10   reference, is there any doubt in your mind that that was

11   published by November 20th, 2009?

12   A.    No.

13   Q.    Now, can we go to patients and methods through result,

14   if you can make it there.  Okay?

15          Is there any doubt in your mind that the

16   patients and methods and results sections were published as

17   of November 20th, 2009?

18   A.    No.

19   Q.    Can we continue, please.  Now, is there any doubt in

20   your mind that the conclusion through the disclosure section

21   was published as of 2009?

22   A.    No.

23   Q.    And what does that copyright scan at the bottom tell

24   you?

25   A.    The copyright tells me that that is the publication

Swift - redirect

 1    date.

 2    Q.    Now, are the -- see the topics section there?

 3    A.    Yes.

 4    Q.    And if you can scroll up, please, or, I'm sorry,

 5    scroll down.  I apologize.  Okay.

 6           And in including these citations that Ms.

 7    Bharkhda pointed to, some of which are after 2009, do you

 8    see that?

 9    A.    I do.

10    Q.    Are those simply the results of the obtaining this

11    article online as opposed to obtaining the abstract from a

12    printed copy in the library?

13    A.    That's my assumption.  If you had a printed copy in a

14    library, it would not contain those potential articles of

15    interest.

16    Q.    Did you rely on any of those articles of interest or

17    any other part of Pollyea 2009 that was not part of Pollyea

18    2009 that was published in November of 2009 in forming your

19    opinions that Pollyea 2009 anticipates claim 5 of the '455

20    patent?

21           MS. BHARKHDA:  Objection Your Honor.

22           THE COURT:  Hold up.  The question is did you

23    rely on any of those articles of interest or any other part

24    of Pollyea 2009 that was not part of Pollyea 2009 that was

25    published in November of 2009 in forming your opinions that

Swift - redirect

1    Pollyea 2009 -- and you have an objection for what?  Based

2    on what?

3                MS. BHARKHDA:  Lack of foundation and

4    speculation at least.  Dr. Swift said she had no idea of

5    what the actual version of Pollyea 2009 looked like, so how

6    could she make a comparison about that with what she

7    actually looked at?

8                Mr. Gutman is asking me to compare a document we

9    have with a document that she says she has never seen.

10               THE COURT:  Okay.

11               MS. BHARKHDA:  Your Honor, I will point out,

12   Mr. Gutman said that the topics section of the article would

13   have been part of the 2009 article and we don't think that's

14   true.

15               MR. GUTMAN:  I --

16               THE COURT:  Hold up.  Actually, I will tell you

17   what we'll do.  Let's put Dr. Swift in the waiting room,

18   please.  And tell me when that's done.

19               So let's just talk about this generally, because

20   I've got the funny feeling this may come up again.

21               Let's figure out just generally, I think, you

22   who we're going to deal with this situation, which is a

23   product of living in the Internet world, potentially, maybe

24   not.

25               So, look, if there's going to be extrinsic

1    evidence that is going to call into question the

2    authenticity of the documents, and by authenticity, I mean

3    whether or not the documents printed out from the Internet

4    in 2020 is actually the abstract or the poster, and I'm kind

5    of curious what those two things mean because I'm actually,

6    you know, not exactly sure.  I was going to ask the witness

7    myself.

8              But if there is something like that, then that

9    is going to be very probative and I'm going to admit it.

10   For instance, one of the articles was, one of the two

11   exhibits were where these types of issued had been raised

12   was authored at least in part by Honigberg.

13             Now, I assume, Ms. Bharkhda, you've got access

14   to Honigberg; correct?

15             MS. BHARKHDA:  Your Honor, I believe the two

16   references for this, in fact, were Fowler and Pollyea.

17             THE COURT:  Hold on, please.  I'm not so sure

18   about that.  Hold on.

19             So you think the two articles are -- yes, so

20   Pollyea.  What is the exhibit number?

21             MS. BHARKHDA:  The exhibit number for Pollyea is

22   467.

23             THE COURT:  All right.  So hold on.  Let me just

24   look at it.

25             MS. BHARKHDA:  DTX.

Swift - redirect

```
 1              THE COURT:  Okay.  So my reading of it is
 2    Honigberg is listed as one of the authors of this.
 3              MS. BHARKHDA:  Yes, Your Honor.
 4              THE COURT:  So my question is:  You have access
 5    to Honigberg; right?  You do.  He's the inventor.  You have
 6    access.
 7              MS. BHARKHDA:  He's no longer, he's no longer an
 8    employee of the company or anything like that.
 9              THE COURT:  That's not really my question.
10    Look, do you have access?  Did you guys represent him during
11    his deposition?
12              MS. BHARKHDA:  Yes.
13              THE COURT:  You have access to him.
14              MS. BHARKHDA:  We have access to Dr. Honigberg.
15              THE COURT:  All right.  Let's always try to cut
16    to the chase so I don't have to probe on things like that.
17    You've got access to him.
18              My point would be, it would be probative, in
19    fact, it would be killer, killer testimony if Dr. Honigberg
20    came in and said, you know what?  Dr. Swift has the wrong
21    article, DTX-0467 didn't exist in this form back in 2009
22    and, you know, that would be killer.  Otherwise, it's just
23    just cute cross-examination in my book.
24              Unless you want to tell me differently, maybe
25    you're going to bring in another document that shows, this
```

1    iteration of the document, and I'm not counting the, you

2    know, the print line that says it was whether it was

3    printed.  I'm not counting the fact that there are potential

4    articles of interest that postdate 2009.  That was clearly

5    out.  I'm talking about the substance of the article.  That

6    would be damning evidence, potentially.  Right?

7             Do you have something like that?

8             MS. BHARKHDA:  So, Your Honor, so if I could

9    take a step back, I think our main concern about what is in

10   this printout, what is in DTX-467 that we do not believe was

11   in the original article is the topic section that links to

12   other key words.

13            THE COURT:  All right.  Hold up.  So where is

14   the topic section?

15            MS. BHARKHDA:  On the second page.

16            THE COURT:  I just found topic.

17            MS. BHARKHDA:  That section was not in the

18   article.

19            THE COURT:  What's the evidence of that?  What

20   is the evidence of that?

21            MS. BHARKHDA:  We ordered the original copy --

22            THE COURT:  My point is, that's going to be

23   killer evidence.  I get that.  That's really good evidence.

24   That's what I meant by -- I only gave Honigberg as an

25   example because I see his name on top and I'm thinking, oh,

Swift - redirect

1        maybe you're going to walk in with Honigberg.

2                    So that is helpful to me to understand this.

3        Okay.

4                    MS. BHARKHDA:  But, Your Honor --

5                    THE COURT:  Then I'm kind of at a loss with why

6        you want to preclude her testimony on this, because you're

7        going to come in and contradict it.

8                    MS. BHARKHDA:  I -- I don't think we're actually

9        asking to preclude her testimony on it.  I think the issue

10       is, as the defendants presenting evidence on invalidity in

11       this case, Alvogen has the burden to produce the relevant

12       prior art and establish that what they are showing in the

13       report is prior art and they have not done that and also in

14       our, in the deposition, we pointed this out to her two

15       months ago in front of Alvogen's counsel.  We pointed out

16       the fact that this is not the right, this is not the version

17       of the article that a POSA would have had.

18                   THE COURT:  Right.

19                   MS. BHARKHDA:  And they have done nothing do

20       correct it.

21                   THE COURT:  Here's the thing.

22                   MS. BHARKHDA:  We don't think they can meet

23       their burden.

24                   THE COURT:  You are objecting to questions, I

25       think, by Mr. Gutman.  Basically, he's asking Dr. Swift, do

1    you have any doubt, and I think it's kind of peculiar how

2    she could have no doubt whatsoever, frankly.  I question

3    that.  Right?  She pulled it off the Internet.

4                But putting that aside, he's asking her this

5    series of questions.  Do you have any doubt what?  That the

6    introduction section was part of it.  You're going to bring

7    in a witness that shows that part of these articles were not

8    there.  I'm just wondering why I'm, like, trying to figure

9    out whether there's a foundation for this question, and I

10   wanted to take a sidebar because I'm going to guess, like, I

11   didn't see anything on the face of the other document, like

12   Honigberg's name that might suggest, oh, my gosh, we really

13   have the wrong article here.

14                Okay.  So hold on.  So now with all of that

15   background and now having a better sense of why you are

16   calling into question the authenticity of this document,

17   which I get now, let me think.

18                So the question here, though, is:  Did Dr. Swift

19   rely on any of the articles of interest.  Right?  And you've

20   established and the document itself establishes that at

21   least some of those documents postdate the June 2012 date.

22                So did you rely on any of those articles or any

23   part of Pollyea that was not part of Pollyea in November of

24   2009 that was published in 2009?

25                Right.  There is no foundation.  I see your

1    point now.  It's that we don't know if she ever looked at

2    the original article.  Right.  Okay.

3                  I'm going to sustain the objection then and you

4    can't ask that question.  There has been no foundation that

5    she established -- I mean, Mr. Gutman, can you point me to

6    anywhere in the record where it was established that she saw

7    the original Pollyea 2009?

8                  MR. GUTMAN:  Your Honor, I think the foundation

9    that I would lay with her is that a scientist, a POSA who

10   prints out an article from the Internet knows what part of

11   the article was in the original, you know, print version

12   versus what part of the article is the product of just

13   merely printing it out on the Internet.

14                  THE COURT:  Okay.  You know what I'm going to

15   do?  I'm going to let you ask that question.  I will tell

16   you why.  Because I think you are doing what I think you

17   hurt yourself with your prior expert witness when you gave

18   that witness, and I don't know whether you personally,

19   instructions about the PTO regs, and then the witness ends

20   up opining based on an incomplete understanding of PTE regs,

21   because, you know, at the end of the day, it's a trial, and

22   at the end of the day when I have in front of me competing

23   expert evidence, I have to make a credibility determination

24   based on what is in front of me, and I'm going to tell you.

25   Whoever it was that educated Dr. Lepore about the patent

Swift - redirect

1    examination and had him put in his slide deck, that very

2    much negatively affected his credibility.

3              If you want to ask this witness whether she's

4    able to look at the Internet and figure out based on that

5    whether information was in or not in the original published

6    document, go for it, because I think you are -- you know,

7    I've already said.

8              So actually, Ms. Bharkhda, I hear your point, I

9    take it, but I actually am not even sure it's in your

10   interests to grant the objection.  I am overruling the

11   objection.

12             Mr. Gutman, you can proceed at your peril.

13             MR. GUTMAN:  Your Honor, may I explain?

14             THE COURT:  No, you may not.  Let's move on and

15   you can address it at the next break.  Let's just move on

16   because of the witness.  You can object and say whatever you

17   want.  All right?

18   BY MR. GUTMAN:

19   Q.    Dr. Swift, I want to go back to DTX-467, which is

20   Pollyea 2009.  Can you please describe for me what portions

21   in this actual document you believe were published in

22   November 2009 and provide the basis for that conclusion?

23   A.    So my opinion is that I would expect in 2009 the

24   publication would include the title, the author's name, the

25   abstract, the introduction, patients and methods, the

 1    results, the conclusion, the disclosure, and most likely,

 2    the author notes with the asterisk indicating the names of

 3    the deciding member and a copyright symbol with 2009 by the

 4    American Society of Hematology.  That's what I would be

 5    confident in as being available, in 2009.

 6    Q.    And what's your basis for that understanding, Dr.

 7    Swift?

 8    A.    Because all of those components would be part of the

 9    original abstract, and that is what would be in published

10    form.

11           The topics section that appears above the author

12    notes may or may not have been in that original publication

13    in 2009.  It's above other notes, which I could, I would

14    guess, and it would be a total guess, means that it was

15    available in 2009, but the fact that the font is in a

16    different color makes me uncertain, so I don't want to claim

17    to have firm knowledge of whether the topic is available or

18    isn't available.

19           Anything that comes after author notes is

20    unavailable, which is kind of obvious since all of that

21    material postdates 2009.

22           MR. GUTMAN:  Your Honor, I want to address

23    something, but I want to make sure that I can do so given

24    the circumstances that we're doing this remotely, so I would

25    like to have the witnessing into a different room to be able

Swift - redirect

1    to address a particular issue with you.

2                    THE COURT:  All right.  That's a good idea.

3                    All right, Dr. Swift, we're going to excuse you

4    again.

5                    THE WITNESS:  Okay.

6                    THE COURT:  All right.  Go ahead, Mr. Gutman.

7                    MR. GUTMAN:  Thank you, Your Honor.

8                    So I'm just going to hold this up.  This is a

9    print copy of Pollyea 2009.

10                    THE COURT:  Okay.

11                    MR. GUTMAN:  And we repeatedly asked plaintiffs,

12    because we thought it was silly, their objection, quite

13    honestly, because substantively, it's exactly the same, it's

14    exactly the same as the printed version substantively.

15                    And they never called into question the

16    substance of any of it, and so we told them that if they had

17    a problem, we'll just replace out the copies, because

18    substantively, it's exactly the same.  And when we were

19    putting together our exhibit list, they refused to allow us

20    to do that.

21                    And so that's why we're left in this situation

22    and we're spending just an inordinate amount of time

23    addressing something that is undisputed.  It is undisputed

24    that the substance is exactly the same.

25                    So I have this Pollyea article.  I can give it

Swift - redirect

1   to the witness.  I can bring up a comparison between this

2   and the, you know, the version that we're looking at that is

3   an exhibit, and we can go through and show that

4   substantively, it's exactly the same.

5              THE COURT:  Okay.  But the only thing is -- I

6   mean, that can be done at this point, but why keep this

7   witness when she said she has never laid a foundation that

8   she has seen this original article?

9              MR. GUTMAN:  She can say that substantively.

10             THE COURT:  I can do that myself, or, counsel,

11  you guys can close that out in your closing documents if

12  they're the same or they're different.

13             MR. GUTMAN:  Well, there are indicia that this

14  was pulled from the published journal article.

15             THE COURT:  But it sounds like the other side is

16  going to introduce the original article any way.

17             Ms. Bharkhda, what's your position on this?

18             MS. BHARKHDA:  I mean, Your Honor, we have no

19  problem with the actual version of Pollyea coming in,

20  particularly because it shows the topics that were included

21  in the version that Dr. Swift used and relied on were not

22  part of the original article.  There was no reference to

23  ibrutinib or NHL or any of the answers listed in the topic

24  section.

25             It's not the article that the witness was using

1    and relied on in forming her opinions, but we don't have any

2    objection to it coming in as an exhibit, but I don't think

3    it's relevant for Mr. Gutman to show it to the witness

4    because she has never seen it before and has no foundation

5    for it.

6              THE COURT:  It sounds like you both will agree

7    to stipulate to the admissibility of the article and then we

8    can have the attorneys argue whether or not they're the same

9    or different in that regard, and I don't need to do this

10   through this witness.

11             It doesn't sound like she has any knowledge of

12   the original article in any event.  Right?

13             MS. BHARKHDA:  Correct.

14             THE COURT:  Mr. Gutman, why don't you just save

15   it and you can stipulate to the admission of the article and

16   then you guys are free to argue if it's significant.

17             MR. GUTMAN:  Thank you, Your Honor.

18             THE COURT:  Thank you.  That was smart to do

19   that outside the presence of the witness.  Thank you.

20             You can bring the witness back in, please.

21             MR. GUTMAN:  Can we bring up DTX-148.

22   BY MR. GUTMAN:

23   Q.   Dr. Swift, I would like to go through the same

24   exercise as we did with Pollyea and to have you identify

25   what on this document you believed was published by November

1   of 2010.

2              Can we start at the top?

3   A.    I think you would see the title, the author's name,

4   the abstract.  She would state an introduction.  The pts and

5   methods, the results.  Table 1 would be included.  The

6   conclusions would be included.  The disclosures would be

7   included.

8              And, again, I don't know what to make of the

9   topics because it's in a different color, but I assume that

10  the copyright 2010 by the American Society of Hematology

11  would be included.

12             It's only the font that's in red there that I'm

13  not certain about.

14  Q.    And you didn't rely on the information in the topics

15  section as part of your opinion that Fowler anticipates

16  claim 5 of the '455 patent?

17  A.    No, I did not.

18  Q.    Is stability of form A an inherent property of form A,

19  whether that's disclosed in the prior art or not?

20  A.    Yes, it is.

21  Q.    Why is that?

22  A.    Because the stability is a function of the crystal

23  form.  It's inherent.  It's not separable from that firm.

24  Q.    Can we bring up JTX-0001.

25             When did the '444 patent issue, Dr. Swift?

1    A.    April 7th, 2009.

2    Q.    And you pointed to some discussion in the '444 patent

3    that crystallization and characterization and purification

4    were described as conventional; is that correct?

5    A.    Described as conventional several times in this

6    document.

7    Q.    Now, can we bring up Pollyea again, DTX-467.

8          Now, DTX-467, which is Pollyea, when did Pollyea

9    2009 publish?

10   A.    2009.

11   Q.    What month?

12   A.    November.

13   Q.    Okay.  Is that after when the '444 patent issued?

14   A.    It is after when the '444 patent issued.

15   Q.    So would a POSA prior to April, or, sorry, prior to

16   2012 have had available both the '444 patent as well as

17   Pollyea?

18   A.    Yes.

19   Q.    In your opinion, would a POSA reading Pollyea,

20   especially in light of the '444 patent, be able to make

21   crystallized and characterized ibrutinib?

22         MS. BHARKHDA:  Objection, Your Honor.  I believe

23   either outside the scope of any of Dr. Swift's reports.  She

24   never indicated that a POSA would combine or look to the

25   '444 patent in order to understand Pollyea.

1              MR. GUTMAN:  Your Honor --

2              THE COURT:  Let's excuse Dr. Swift.  Sorry about

3    this, Doctor.  The joys of litigation.

4              If we could excuse Dr. Swift.  Thank you.

5              All right.  Mr. Gutman, where is it in the

6    report?

7              MR. GUTMAN:  No, Your Honor.  I don't, I don't

8    know that it's in the report, but Ms. Bharkhda opened a door

9    because what she was questioning Dr. Swift on was whether a

10   POSA -- what she was really getting at is whether Pollyea is

11   enabled for ibrutinib, and she asked questions of Dr. Swift

12   about whether Pollyea teaches someone how to make ibrutinib,

13   and what she is really getting at is that Pollyea is not

14   enabling for ibrutinib.

15             And so this is this is in response to that line

16   of questions from Ms. Bharkhda.  And I will also not that --

17             THE COURT:  Hold on.  I'm sorry.  I'm sorry I'm

18   slow on some of these things.  It's just a lot to digest.

19             Did Dr. Swift testify that the patent is invalid

20   for lack of enablement?

21             MR. GUTMAN:  No, Your Honor.

22             THE COURT:  Let's just assume for argument's

23   sake during the cross-examination, the witness was asked

24   questions about implicitly at least whether Pollyea enabled

25   the invention.  Why does it matter?

1            MR. GUTMAN:  Well, what plaintiffs will probably

2    argue in their post-trial briefing, you, is Pollyea is not

3    enabled for making ibrutinib.

4            THE COURT:  Wait.

5            MR. GUTMAN:  If they --

6            THE COURT:  Hold on.  Stop, stop, stop.  I have

7    to digest what you just said.  Okay.  They are going to say

8    it's not enabled or they are just going to say it doesn't

9    disclose the subject matter because, among other things, it

10   doesn't teach how to make ibrutinib.  Isn't that a different

11   question?

12           MR. GUTMAN:  Well, I think what plaintiffs are

13   getting at and Ms. Bharkhda can tell us whether this is not

14   plaintiffs' position, but in order for an anticipatory

15   reference to anticipate, it has to be enabling for what it

16   teaches.

17           THE COURT:  Okay.

18           MR. GUTMAN:  And so I believe that plaintiffs

19   will argue in their post-trial briefing that Pollyea is not

20   enabling for ibrutinib and as an attempt to try to remove it

21   as an anticipatory reference.

22           THE COURT:  Okay.

23           MR. GUTMAN:  And so Ms. Bharkhda was asking Dr.

24   Swift questions about whether in the context of Pollyea,

25   whether Pollyea taught how to make ibrutinib, which is going

1       to the enablement question.

2              And so the questions that I was asking Dr. Swift

3       was in response to that line.

4              THE COURT:  Okay.  Before we hear from Ms.

5       Bharkhda, let me ask you both something.  I actually, I've

6       never had to deal with anticipation as a judge, so one thing

7       I'm just confused about, frankly, is, to read something into

8       Pollyea 2009, you have to incorporate something twice in the

9       '444 patent.  Why aren't we in obviousness as opposed to

10      anticipation?

11             MR. GUTMAN:  Well, Your Honor, I think Dr. Swift

12      testified that Pollyea anticipates because by referring to

13      PCI-32765 in the context of the Phase 1 dose escalation

14      study, that inherently discloses within the four corners

15      that PCI-32765 is crystalline form A ibrutinib that will

16      have inherently the peaks that form A has.

17             THE COURT:  But I mean, so, and I caught,

18      there's obviously -- even the plaintiffs had questions.  I

19      will learn about that.  But it seems to me if you're -- if

20      by inherent, the theory is you bootstrap other prior art,

21      why don't you move into obviousness at that point?  What am

22      I missing?

23             MR. GUTMAN:  Because under the theory of

24      inherency, Your Honor, inherent anticipation, the literature

25      references that you rely on to demonstrate what is inherent

Swift - redirect

```
 1    need not be prior art, and, in fact, there's no requirement

 2    that the inherency within the anticipatory reference needed

 3    to have even been recognized by a POSA as of the priority

 4    date.

 5              It's really what you were talking about

 6    yesterday, Your Honor, where this is really asking the

 7    question as a matter of fact whether something that is

 8    disclosed within the four corners has certain properties,

 9    and we know --

10              THE COURT:  Yes, but let me stop.  But the

11    difference when I talked about it is, at least as I

12    understood it, it's after the fact.  Like as of today, is

13    the property inherent?  That's a completely different

14    question than what was in the brain of a POSA when we look

15    at anticipation and obviousness.

16              So I don't -- I'm not buying into that, that

17    comparison respectfully, Mr. Gutman.  I am --

18              MR. GUTMAN:  Your Honor, may I try it another

19    way?

20              THE COURT:  Yes.

21              MR. GUTMAN:  The anticipatory reference itself

22    needs to be prior art.

23              THE COURT:  Got that.  I mean, anticipatory

24    reference is Pollyea.  It doesn't sound like anybody

25    disputes -- actually, Ms. Bharkhda, do you dispute the
```

1    Pollyea 2009 prior art?

2            MS. BHARKHDA:  The actual Pollyea 2009 article

3    that we just talked about entering, we do not dispute that.

4            THE COURT:  Okay.  All right.

5            MR. GUTMAN:  And so, Your Honor, there are two

6    ways to anticipate it, expressly or inherently.

7            THE COURT:  Right.

8            MR. GUTMAN:  Dr. Swift is saying that Pollyea

9    2009 inherently discloses.  So Pollyea needs to be prior

10    art, but the inherency part of it, the demonstration of what

11    is inherently disclosed within the prior art reference and

12    what you will rely on to prove what is inherent need not be

13    prior art.

14            THE COURT:  I get that and I get, like, for

15    instance, you know, if it's inherent that, you know, a

16    structure has carbon atoms.  Everybody knows that.  I get

17    that.  But what you seem to be doing is arguing that the

18    '444 patent, rather, Pollyea combined with the '444 patent

19    leads to these conclusions.

20            MR. GUTMAN:  No.

21            THE COURT:  That's where I'm losing you.

22            MR. GUTMAN:  I apologize.  If I led to your

23    misunderstanding, I apologize.  We're not relying on the

24    '444 patent to demonstrate what's inherent in Pollyea.  What

25    Dr. Swift was relying on were documents that matched up

Swift - redirect

1    batch numbers.

2              THE COURT:  I got that part.  So now we're back

3    to then, why do you want to explore further this

4    relationship between the '444 patent and Pollyea?  That's

5    where I lose you.

6              MR. GUTMAN:  Because, you know, if plaintiffs

7    want to say they are not going to make a lack of enablement

8    argument for Pollyea, I don't need to ask these questions,

9    but, but Ms. Bharkhda asked questions to try to demonstrate

10   that Pollyea is not enabling for ibrutinib.

11             And so this isn't about the inherency part of

12   it.  This is about the separate requirement that an

13   anticipatory reference must also enable what it discloses.

14   And so Ms. Bharkhda through her questions was trying to

15   establish that Pollyea is not enabled for what it discloses

16   and that's what my questions were addressing.

17             It's not, it's not addressing the inherency

18   question.

19             THE COURT:  All right.  Let me hear from Ms.

20   Bharkhda.

21             MS. BHARKHDA:  Your Honor, in order for a

22   reference to be anticipatory, to anticipate, so for Pollyea

23   two anticipate claim 5 of the '444 patent, it not only has

24   to, it has to disclose the elements either expressly or

25   inherently.

Swift - redirect

1          It also has to teach a POSA how to make and use

2     crystalline form A of ibrutinib with the five claimed peaks

3     of the '455 patent.  So that's what it means when we say the

4     anticipatory reference has to be enabling.

5          THE COURT:  Right.  That makes sense.  So that

6     makes sense to me.

7          MS. BHARKHDA:  Okay.

8          THE COURT:  So, now, there's probably maybe, you

9     know, a line here.  Right?  And in order for it to be

10    inherently enabling, the POSA would have to read it and

11    probably, would have to understand some concepts that are

12    not expressly set forth in Pollyea.  You know, like, basic,

13    for instance, if I'm making a chemical, just turn the flame

14    on to heat the chemical or something like that.  Right?

15         At some point you've got to bring in a POSA who

16    has knowledge that goes beyond the four corners of the

17    document.

18         Do you agree with that?

19         MS. BHARKHDA:  Yes.

20         THE COURT:  Where do you draw the line?  By

21    going specifically to the '444 patent, it sounds to me like

22    obviousness.  Where do you draw the line on that?

23         MS. BHARKHDA:  If you are filling a hole in the

24    disclosure of the -- you are combining for the actual

25    teaching, you're in obviousnessland.

Swift - redirect

1          Now, you could potentially review the reference

2     to illustrate to the Court how a POSA would understand, for

3     example, terms or phrases that are used in the anticipatory

4     reference.

5          So, for example, in Pollyea, you know, it would

6     potentially be okay to look to a difference to explain to

7     the Court BTK, that a person of ordinary skill in the art in

8     2009 would have seen a reference to this term BTK and

9     understood that that was Bruton's tyrosine kinase.  Maybe if

10    you go to a dictionary of tyrosine kinases or something like

11    that.

12         That is when it is okay to look outside the

13    extrinsic evidence, to explain how a POSA reading the

14    actual -- that they have in the anticipatory reference would

15    have understood those terms and phrases, but not being able

16    to fill a gap.

17         So I think when you are arguing that, when you

18    are combining the teachings of two difference, you are in

19    obviousness land.

20         I think here with this particular line of

21    questioning that Mr. Gutman is getting into that

22    precipitated my objection, the additional issue is Dr. Swift

23    never offered an opinion that if you look to the '444

24    patent, that would show that Pollyea would enable, would

25    meted the enablement requirement of an anticipation

Swift - redirect

1    reference.

2                So the issue is Alvogen always had to prove that

3    Pollyea was an enabling anticipation reference, that it

4    would teach a POSA how to make and use claim 5, the elements

5    of claim 5, crystalline form A of ibrutinib with the six

6    claim peak.  They always knew they had to do that.  That's a

7    legal standard for anticipation.

8                They never offered an opinion for Dr. Swift

9    saying that she would combine Pollyea and the '444 patent in

10   order to show that it was enabling.  That's the problem.

11               I mean, they are now trying to bring in another

12   reference to fill a deficiency.  It was pointed out in

13   cross-examination.  There wasn't any reason they couldn't

14   have disclosed that in her report because they always have

15   to show that.  They always have to show that Pollyea is

16   enabling.

17               THE COURT:  Okay.

18               MR. GUTMAN:  Your Honor, we are not combining

19   references.

20               THE COURT:  Well, we're past that.  I kind of

21   did that, but I guess I'm still back now.  It's not in the

22   report.  Why should she be allowed to offer this opinion

23   right now?

24               MR. GUTMAN:  Well, it's in response to the

25   cross-examination of Ms. Bharkhda.  I mean, there was no

 1     testimony from Dr. Swift about the issues that we're

 2     discussing right now on direct, so either --

 3                 THE COURT:  But actually, the way she was

 4     cross-examined was, my recollection was to show that if you

 5     read the '444 patent, you could have figured out how to make

 6     it.  Right?  No?  All right.  Hold on.  Wait, wait.  What

 7     was the point -- Ms. Bharkhda?

 8                 MS. BHARKHDA:  Actually, I think she was

 9     questioned on cross-examination about the '444 patent not

10     disclosing any crystalline form of ibrutinib.

11                 THE COURT:  That's true.  Okay.  I do recall

12     that.  All right.

13                 MS. BHARKHDA:  Yes.

14                 THE COURT:  So, Mr. Gutman, is that the limit of

15     the cross-examination?  Now you want to bring in, she gets

16     what to say what about the '444 patent?

17                 MR. GUTMAN:  That the '444 patent teaches how to

18     make ibrutinib and one of ordinary skill in the art, at

19     least by the time that the '444 patent issued, would know

20     how to make ibrutinib, and therefore, that by itself

21     demonstrates that Pollyea that was published later and both

22     of them that were published before 2012, a POSA reading

23     Pollyea would know, there was public information, would know

24     how to make and use ibrutinib.

25                 THE COURT:  All right.  Hold on one second.  I'm

Swift - redirect

 1    going to put you on mute one second.

 2                MR. GUTMAN:  Yes, Your Honor.

 3                (Pause.)

 4                THE COURT:  All right.  Here's where we were.

 5    Ms. Bharkhda, I went off to speak with my law clerk who has

 6    the same recollection I do.

 7                I thought Dr. Swift actually testified

 8    consistent with what I said, my recollection, that you could

 9    have figured out how to make it from the '444 patent.  You

10    don't think that she said that.  I think the transcript,

11    it's obviously going to reflect what it will.  I think she

12    has already testified to that.

13                MS. BHARKHDA:  So I think I asked her whether it

14    disclosed any specific crystalline forms of ibrutinib.  I

15    think she said, general conventional crystalline method and

16    general synthesis method for making ibrutinib or something

17    along those lines.  Obviously, I have not read it in the

18    transcript.

19                But I think that was the nature of the

20    testimony.  But she has not offered any opinion in the case

21    that somehow you would, the teachings of the '444 patent

22    would enable the Pollyea reference.  That could have been

23    disclosed in her report.

24                MR. GUTMAN:  This is extraordinary, Your Honor,

25    because the '444 patent is essentially the same '309

                            Swift - redirect

1    compound patent that is being asserted against Alvogen and

2    if it's plaintiffs' position that the '444 patent doesn't

3    enable how to make and use ibrutinib, then the '309 patent

4    is invalid under 112.

5              MS. BHARKHDA:  I mean, that's, Your Honor,

6    that's just a complete mischaracterization of both our

7    position and the line of questions Mr. Gutman was pursuing

8    with the witness.

9              THE COURT:  Okay.  I'm going to put you on mute

10   again.

11             All right.  Here's what we're going to do.  I'm

12   just going to let the testimony in.  You can preserve the

13   objection and if we have to, we'll deal with it in

14   post-trial briefing.  I don't want to delay further.  I

15   really have a lot to learn, so now, keep in mind I've got a

16   12:00 o'clock proceeding and then another proceeding.  They

17   are supposed to be quick so we can start at 12:30, but in

18   terms of timing, keep that in mind.  So, Mr. Gutman, go

19   ahead.

20             MR. GUTMAN:  Thank you, Your Honor.

21   BY MR. GUTMAN:

22   Q.   Dr. Swift, is it your opinion that the '444 patent

23   would have taught one of ordinary skill in the art how to

24   make and use ibrutinib?

25   A.   Yes, I think it would have.

                               Swift - redirect

1    Q.    I just want to go back to -- what was my last

2    question, actually.  Can we go back to DTX-467, and I just

3    want to go down to the topics section.

4              I feel like we've addressed this, but I just

5    want to make sure, Dr. Swift.  Did you rely at all on any of

6    this information in forming your opinions that Pollyea 2009

7    anticipates claim 5 of the '455 patent?

8              THE WITNESS:  I specifically did not consider

9    that topic section because my instructions were to look at

10   material prior to 2012, and if I'm not certain that that

11   part of it is prior to 2012, my understanding is I was not

12   supposed to look at it.  So I did not consider that part as

13   part of my decision.

14             MR. GUTMAN:  Thank you, Dr. Swift.  No further

15   questions, Your Honor.

16             THE COURT:  All right.  Thank you, Mr. Gutman.

17             Dr. Swift, I have a few questions for you.  And

18   then I will let counsel for both sides if they have follow

19   up, ask.  Sorry to subject you to further questioning.

20             What is PCI?  API.  If I said to you API, what

21   does that mean to you?

22             THE WITNESS:  API is active pharmaceutical

23   ingredient.

24             THE COURT:  Okay.  PCI, does that mean something

25   to you?

1          THE WITNESS:  My assumption was always that PCI

2     meant Pharmacyclics.

3          THE COURT:  So it's not like in industry.  You

4     don't look at PCI as an industry standard.  It's not

5     something that the FDA looks at or anything like that.  You

6     did not see PCI, come away with an understanding of an

7     industry term?

8          THE WITNESS:  If it was, I was not aware of it.

9     That was not my assumption.

10          THE COURT:  Okay.  What's a poster board?

11          THE WITNESS:  A poster board.  When scientists

12     give presentations at meetings, you're either invited to

13     give an oral talk or you present a poster, which is what it

14     sounds like, usually a four-by-six large printed document --

15          THE COURT:  Right.

16          THE WITNESS:  That spells out the science and

17     then as other people come and visit you at your poster, you

18     describe what you did.

19          THE COURT:  Okay.  So when I look at the Pollyea

20     and it says, poster board, Roman Numeral III-649, what does

21     that mean?

22          THE WITNESS:  So at the conference where this

23     poster was presented, there are typically lots of posters

24     presented at the same time and so the audience would walk

25     around to talk to whoever they wanted to speak to and

Swift - redirect

1     there's typically a book of abstracts so that you can find

2     the person that you want to talk to.

3                 So the posters would be arranged in the room

4     according to some number and that number just helps you find

5     the person that you want to talk to during the conference.

6                 THE COURT:  All right.  And so that poster board

7     is literally the poster that's physically there; is that

8     right?

9                 THE WITNESS:  Yes.

10                THE COURT:  And you say it's like a four-foot by

11    six-foot board?  Is it going to have verbatim everything

12    that is in, for instance, if I were looking at a poster

13    board Roman Numeral III-649 of Pollyea, would the poster

14    board have every word of what is in what has been marked as

15    Exhibit DDX-467?

16                THE WITNESS:  It would have that and more.

17    Typically, it would have more graphics.  It expands upon

18    the --

19                THE COURT:  Okay.

20                THE WITNESS:  The subject that's summarized

21    here.

22                THE COURT:  And I'm looking his Pollyea and it

23    says abstract.  Right above poster board, it was abstract

24    3713 and above that, it says abstract.  Right?

25                So what's an abstract?

1          THE WITNESS:  An abstract is a short nugget.

2     It's like a summary piece.  You condense down your science

3     to try to attract an audience to come visit you.

4          THE COURT:  Right.

5          THE WITNESS:  So that's a summary piece.

6          THE COURT:  And where I've seen abstract before

7     in the context of scientific things is, like, I see an

8     abstract of an article, which is a much lengthier exhibition

9     of topic.  But can you have an abstract that just stands

10    alone, I take it?

11         THE WITNESS:  You can.  Typically, when my

12    posters, we have it, we might call it an abstract or we

13    might call it an introduction.  That's the first little bit

14    of your poster and then it goes on.

15         THE COURT:  So when I look at DTX-467, Pollyea,

16    is it an article, is it an abstract, is it a poster board,

17    what is it?

18         THE WITNESS:  It's all of the above.

19         THE COURT:  Okay.  All right.

20         THE WITNESS:  It is all of those things.

21         THE COURT:  All right.  Now, you said that when

22    you look at Pollyea, it wouldn't take much work to figure

23    out what the structure of PCI-32765 was.

24         Do you remember that?

25         THE WITNESS:  Yes.

1              THE COURT:  All right.  So what I want you to do

2    is, I want you to list as succinctly as you can what you

3    would have to look at beyond the four corners of Pollyea to

4    figure out, you know, what is the not too much work that had

5    to be done.

6              THE WITNESS:  So I assume that you are familiar

7    with different types of search engines when you want to

8    look for literature.  I could go on Google Scholar, for

9    example.

10             THE COURT:  Let me put it this way.  I'm a POSA

11   and I'm back in 2000, in early 2012.  I've got Pollyea.

12   Right?

13             What am I going to do?  When you say it wouldn't

14   take much work to figure out what the structure of PCI-32765

15   is.  What's the not too much work I would have to do back in

16   early 2012?

17             THE WITNESS:  Yes.  So that not too much work

18   that I did.  I literally typed into Google Scholar BTK, or

19   Bruton's tyrosine kinase inhibitor.  That's what BTK stands

20   for.  And I did a search and I constrained that search only

21   to articles and materials that would come up prior to 2012

22   and you get lots of hits.  Lots of those hits say PCI-32765

23   in the title, and if you click on the first few, they take

24   you to articles that have the structure in them laid out for

25   you in the picture.

Swift - redirect

```
 1                    THE COURT:  Okay.

 2                    THE WITNESS:  By them.  If you do that search in

 3     2020, you wind up with thousands of articles.

 4                    THE COURT:  That's okay.

 5                    THE WITNESS:  But if you constrain it 2012, you

 6     still wind up with a hundred plus articles.

 7                    THE COURT:  All right.  I don't know if my

 8     questions prompt any other questions from Mr. Gutman?  No?

 9                    MR. GUTMAN:  To the witness?

10                    THE COURT:  Yes.  Right.  To the witness.

11                    MR. GUTMAN:  Oh, yes.  May I ask one question?

12                    THE COURT:  Look --

13                    MR. GUTMAN:  It is so brief.

14                    THE COURT:  No.  Does it follow on what I asked?

15                    MR. GUTMAN:  It does.

16                    THE COURT:  All right.  Go ahead and ask it.

17     BY MR. GUTMAN:

18     Q.    Dr. Swift, does Honigberg 2010 relate PCI-32765 to the

19     structure of ibrutinib?

20     A.    Yes.  That's one of the articles that came up in the

21     search where PCI-32765 and the chemical structure are

22     identified together.

23                    THE COURT:  Okay.  Ms. Bharkhda, do you have any

24     questions?

25                    MS. BHARKHDA:  I do not, Your Honor.
```

1          THE COURT:  All right.  Thank you very much.

2    Thank you very much, Dr. Swift.  You're excused.

3          MR. GUTMAN:  Thank you, Dr. Swift.

4          THE COURT:  Okay.  Counsel, let's see.  Ms.

5    Clayton?  Dr. Swift, you can leave.  Okay?

6          (Witness excused.)

7          THE COURT:  Yes?  Ms. Clayton?

8          MS. CLAYTON:  Your Honor, I was just getting

9    ready.  We are going to break for lunch.  The next witness I

10   believe is going to be Dr. Steed and he'll be ready after

11   lunch.

12         THE COURT:  Is he your witness?

13         MS. CLAYTON:  He's waiting.  He's in the U.K.,

14   so it's starting to get a little late there.  He was hoping

15   to go earlier, but he is available starting at 12:30.

16   Whenever the Court is ready.

17         THE COURT:  We'll go as soon as I can.  Did you

18   resolve the time issue?

19         MS. CLAYTON:  Unfortunately, Your Honor, we have

20   not.  Sandoz requested ten-and-a-half hours total of the

21   27 hours.  I think by our calculations thus far, we've used

22   approximately an hour and 15 minutes and so we would ask to

23   have nine hours and 15 minutes more and my understanding is

24   that Alvogen is asking for less, or asking us to have less

25   because they have more patents.

1          We think obviously, we are not asking for half

2     because we realize they have more patents, but that gives

3     them 16 and a half hours and us ten-and-a-half and we think

4     that extra time gives them more than sufficient time to

5     cover all of their patents while making sure that we are not

6     prejudiced either.

7          THE COURT:  Okay.  Mr. Gutman, I've got to run,

8     but do you agree that's where we are, that you want 16 hours

9     and 15-minute of the total 27 hours?  Is that right?

10         MR. GUTMAN:  I'm not sure about the specific

11    break up, Your Honor.  I apologize because I wasn't involved

12    in those negotiations.

13         THE COURT:  Okay.

14         MR. GUTMAN:  But I will say that, you know, we

15    have, Alvogen has two-thirds of this case in the defense as

16    opposed to Sandoz, which has one-third, and so --

17         THE COURT:  And that's based on -- how do you

18    get the two third, one-third?

19         MR. GUTMAN:  For example, Sandoz right now has

20    two witnesses that they want to direct and only two

21    witnesses that they want to cross, but we have many more

22    witnesses because we have many more claims and many more

23    patents.

24         And --

25         THE COURT:  How many more claims do you have?

```
 1    I've got to say we're confused here in the courtroom.  I
 2    didn't think there was a big difference in the number of
 3    claims.
 4                 MR. GUTMAN:  Well, I think, and, Ms. Clayton,
 5    you can correct me if I'm wrong, but I believe that --
 6                 THE COURT:  We have five and five.  That's what
 7    I'm told.
 8                 MR. GUTMAN:  I don't know that that --
 9                 MS. CLAYTON:  That's correct, Your Honor.  The
10    one patent, the '604 patent, there are not going to be any
11    issues during trial, so there are three claims that we are
12    going to be presenting on.
13                 THE COURT:  All right.
14                 MS. CLAYTON:  Again, which is why we had said we
15    are willing to take less than half, ten-and-a-half total and
16    they can have 16 and a half.
17                 THE COURT:  You've got three claims.  How many
18    claims do you have, Mr. Gutman?
19                 MR. GUTMAN:  Five, Your Honor, across four
20    different patents.  The problem is also the claims that were
21    asserted against Alvogen were asserted in, you know, across
22    different patent families, so there's no easy way to address
23    those outside of addressing them individually.
24                 And so one of the big issues here is that
25    Alvogen has to address four patents and Sandoz has to
```

```
 1   address two patents, and that's creating some of the issue,

 2   I believe, Your Honor.

 3                THE COURT:  I don't know.  It sounds is pretty

 4   reasonable to break it up, ten-and-a-half, 16-and-a-half.

 5   I'm inclined to go with that.  If you want to talk maybe

 6   during lunch, but that sounds like a pretty reasonable

 7   distribution of time.

 8                So, all right.  I've got to break for lunch.

 9   We'll start at 12:30.

10                MR. GUTMAN:  Your Honor, should I move the

11   exhibits into evidence?

12                THE COURT:  We'll do it later on today, later on

13   in the day.  Thank you.

14                MR. GUTMAN:  All right.

15                (Luncheon recess taken.)

16                        -  -  -

17                Afternoon session, 12:40 p.m.

18                THE COURT:  All right.  Good afternoon.

19                MR. SIPES:  Good afternoon, Your Honor.

20                THE COURT:  Apologies for the delay.  One of the

21   conferences went late.  Incidentally, the total time

22   yesterday, I'm going with defendant because it's a little

23   bit less total time to you all.  I will give you the benefit

24   of that.

25                So plaintiffs used two hours and seven minutes.
```

Steed - direct

 1   Defendants used five hours and 40 minutes.  It was very

 2   close to what we had, the total.  All right?

 3                  MR. SIPES:  Thank you, Your Honor.

 4                  THE COURT:  Okay.  Ms. Clayton, I guess you're

 5   next?

 6                  MS. CLAYTON:  Yes, Your Honor.  At this time

 7   Sandoz would call Dr. John Steed.

 8                  THE COURT:  All right.  Mr. Gutman, did you have

 9   something that you needed to address?  You're on mute.

10   Okay.  He's go.  We'll just go.  Go ahead.

11                  So actually, if I could have the witness raise

12   his right hand, please.

13                  ... JONATHAN WILLIAM STEED, having been duly

14   sworn/affirmed as a witness, was examined and testified as

15   follows...

16                  THE COURT:  Counsel, you may proceed.

17                         DIRECT EXAMINATION

18   BY MS. CLAYTON:

19   Q.    Good afternoon, Dr. Steed.

20   A.    Good afternoon.

21   Q.    Can you tell us by whom are you currently employed?

22   A.    Durham University in the U.K.

23   Q.    What is your position at Durham University?

24   A.    I'm a professor of medicinal chemistry.

25   Q.    And if you could turn to DTX-1352 in your in your

Steed - direct

1    binder and if you could pull that up on your screen, what is

2    this document here?

3    A.    This is my C.V.

4    Q.    Does this C.V. adequately reflect your academic and

5    professional history?

6    A.    It does.

7    Q.    Okay.  And have you created some slides today to help

8    aid in the presentation of your testimony?

9    A.    I have.

10   Q.    Okay.  And if we could pull up the first of those

11   slides, DTX-6-3.  Could you walk us through what you are

12   showing on this slide?

13   A.    Yes.  This is my academic and professional history in

14   brief.  So I got my Bachelor's degree in chemistry from the

15   University College London, graduating in 1990 with first

16   class honors.

17          I got a Ph.D at the same institution in 1993.

18   Then post-doctoral for awhile and an academic position back

19   in London in 1995.

20          Since 2007, I've been a professor of chemistry

21   at Durham.

22          I'm Editor-in-Chief of the American Society

23   Journal Crystal Growth and Design, which as the name

24   suggests, is the American Chemical Society's journal in the

25   area of crystals.

Steed - direct

1          Prior to that I worked for the Royal Society of

2     Chemistry in the U.K.

3     Q.    And as a professor, what type of classes do you teach?

4     A.    I teach classes, chemistry.  Particularly to do with

5     solids, materials, and techniques that are used to

6     characterize them as well as things like inorganic chemistry

7     and laboratory classes.

8     Q.    When you say solid materials, does that include

9     crystals?

10    A.    Yes, absolutely.

11    Q.    Okay.  And do you have a primary area of research that

12    you focus on?

13    A.    Yes.  My research is on solid forms of organic

14    molecules such as pharmaceuticals using crystallization

15    methodology and the way in which the solid forms are

16    characterized.

17    Q.    And have you written or have you published articles in

18    peer-reviewed journals?

19    A.    Yes.  I'm the author of around 350 peer-reviewed

20    articles and international journals.  Those articles have

21    been cited around 25,000 times.

22    Q.    And have you published any books in the field of

23    crystals and crystalline form?

24    A.    Yes.  I'm an author of a book in 2000 called

25    Supramolecular Chemistry.  It's the way in which molecules

Steed - direct

 1   interact with each other.  For example, the way they build

 2   up crystals by joining one to another.  That has been

 3   translated into Russian and Chinese.

 4              There was a second edition in 2009 and a third

 5   edition will come out next year.  So I regard it as the book

 6   in the area.  I've authored several books as well.

 7   Q.    So in total, how many years of experience do you have

 8   in the study of crystals, crystalline form and associated

 9   analytical testing?

10   A.    Around 30.

11   Q.    Okay.

12              MS. CLAYTON:  Your Honor, at this time Sandoz

13   would like to tender Dr. Steed as an expert in the area of

14   crystal, crystalline forms and associated analytical

15   testing.

16              MR. SIPES:  No objection, Your Honor.

17              THE COURT:  All right.

18   BY MS. CLAYTON

19   Q.    So before we get into the substance of your opinions,

20   I would like to give the Court an overview of what you are

21   going to walk through today.

22              If we could bring up the next slide, please.

23              And, Dr. Steed, can you tell us quickly the

24   areas of testimony you're going to walk through today?

25   A.    Yes.  I'm going to begin with a technology tutorial,

1    crystals, I will touch upon claim construction and my

2    interpretation of a person of ordinary skill in the art.

3              And then I will be testifying towards the lack

4    of written description for asserted claims 18 and 19 in the

5    '548 patent and the resulting invalidity.

6              And then, finally, the lack of enablement of

7    asserted claims 18 and 19 of the '548 patent.

8    Q.    Okay.  And before we get into the tutorial, did you

9    reach an opinion in this case as to whether claims 18 and 19

10   are invalid for lack of written description or not?

11   A.    I did reach an opinion.  I believe they are invalid.

12   Q.    Okay.  And with respect to enablement, have you

13   reached a conclusion in this case as to whether claims 18

14   and 19 are invalid for lack of enablement?

15   A.    I believe they are and not enabled.

16   Q.    Okay.  So before we get to the substance of those

17   opinions, let's talk about some of the technology at issue.

18             MS. CLAYTON:  Your Honor, Dr. Swift talked about

19   some of these concepts yesterday, so if at any point you

20   feel like you already understand things and want us to move

21   along, just let me know.  We're happy to do that.

22             THE COURT:  Okay.

23   BY MS. CLAYTON

24   Q.    Now, Dr. Steed, in general, what is a crystal?

25   A.    So a crystal is a physical object.  It's in this case,

706

Steed - direct

1    in the case of a pharmaceutical, it's made up of molecules

2    of that pharmaceutical extending effectively infinitely in a

3    three-dimensional space.  And they have a periodic regular

4    repeating structure such that the crystal, the interaction,

5    made up of building blocks that repeat essentially.

6    Q.    And if you could pull up the next slide, please,

7    DDX-6-5.

8                 Dr. Steed, tell us what you're showing here?

9    A.    Here I'm contrasting the crystalline solid with an

10   amorphous solid.  In amorphous solid, the atoms or molecules

11   are arranged kind of randomly.  An example of that might be

12   glass.  Even though it's a hard transparent substance, glass

13   is actually amorphous.  And that contrasts to a crystalline,

14   which is the subject matter we're talking about today, in

15   which the atoms or molecules have long range orders, so

16   there's a periodic and repeating array, like bricks in a

17   brick wall.  An example might be diamonds.

18   Q.    Okay.  Now, you said that they have repeating

19   patterns.  Do crystalline forms always have the same

20   repeating pattern?

21   A.    No.  The same atoms or molecules can adopt different

22   packing arrangements in the solid state and that gives rise

23   to different properties.  We use the term polymorphism in

24   many shapes in the context of molecules, whether it's more

25   than one possibility of the range of the molecules.

Steed - direct

1    Q.    Okay.  If we could pull up the next slide.  Dr. Steed,

2    could you tell us what you're trying to demonstrate through

3    these different arrangements here.

4    A.    Yes.  I think the brick wall analogy is quite helpful.

5    In this context I've taken a brick, which is represented

6    above the molecule or repeat unit of the crystal.  I've

7    shown how that same brick can be arranged in many different

8    patterns, six possibilities are shown here.

9              And so a typical brick wall would be the

10   arranged form type of arrangement which gives it radial

11   strength as one brick overlaps with the joint between the

12   others.  You can have them running stacked, joints running

13   up.  Even the herringbone pattern you might find in a

14   driveway or something, more decorative.  Made up of the same

15   fundamental block, the molecule, but it's repeating in a

16   different structure and that gives rise to the different

17   properties.

18   Q.    Now, is there a common example of a substance that is

19   the same compound but exhibits different polymorphic or

20   crystalline forms?

21   A.    Yes.  The most easily appreciated is carbon, graphite

22   or diamond.  It's not an exact analogy, but it gives you the

23   idea.

24   Q.    And if you could pull up the next slide.  And is that

25   what you are depicting here on this slide?

Steed - direct

1   A.    Yes.  That's right.  So graphite and diamond are both

2   made up of arranged carbon atoms.  The arrangement of those

3   carbon atoms is completely different between the two

4   materials.  In diamond, each carbon atom which is

5   represented by black circles there is bonded to four

6   circles, kind of tetrahedrous sort of way, and that gives

7   rise to diamonds are hard materials as known.

8           Graphite is a different structure.  Each carbon

9   is bonded, go with this sheet line structure.  So graphite

10  is slippery.  It is used as a lubricant, for example.  Those

11  properties of graphite and diamond arrange from their

12  pattern arrangement.

13          Because carbon is a chemical element, and this

14  is called polymorphs, the idea is the same, that the

15  different structures give rise to different properties.

16  Q.    All right.  And so what about crystalline forms of

17  pharmaceutical ingredients?  Do they exhibit different

18  physical properties if they have different crystalline

19  forms?

20  A.    Yes.  Each different crystal form of the

21  pharmaceutical has its own crystal pattern arrangement.  You

22  can in turn determine its physical properties as a solid.

23  So, for example, different polymorphs will have different

24  stabilities, like chemical stabilities.  There are different

25  solubilities and that impacts upon their bioavailability,

Steed - direct

1    how much actually gets into the bloodstream.

2              They'll have different crystal shapes sometimes

3    and that can create issues in terms of different polymorphs,

4    more or less formulated into tablets.

5    Q.    Is it possible to distinguish one crystalline form

6    from another?

7    A.    Yes.  That is a very routine piece of technology.  We

8    use various techniques, which we call characterization

9    techniques to identify characteristics of a particular

10   polymorph, but the most common is X-ray powder diffraction.

11   Q.    Let's take a look at X-ray powder diffraction.  And

12   can we bring up the next slide, please.

13             Dr. Steed, can you tell us using this slide how

14   X-ray powder diffraction works?

15   A.    Yes.  This is the basic geometry of an X-ray powder

16   diffraction experiment.  So on the top left there we have a

17   source of X-ray.  Literally live beams of X-rays at the

18   sample shown in the middle.  In this context, our sample is

19   a powder, but a powder is made up of lots of different

20   crystals, so it's not amorphous, it is crystalline.  Those

21   crystals are randomly oriented.

22             And the top, the powder sample, will diffract

23   into an X-ray beam in a variety of different directions.

24   I'm showing one them there.  It is the scatter beam.  And

25   the scatter beam is picked up by an X-ray detector which

Steed - direct

1    measures the intensity as a scattering angle.  That is given

2    the name two 2-Theta, and I'm showing what it is, the angle

3    of the scattered beam compared to the straight beam.

4    Q.    Now, when you run this in practice, is there only one

5    scattering beam that typically comes out of a scattering

6    sample?

7    A.    No.  When crystalline sample, it scatters the X-ray

8    beam in lots of different specific directions and the X-ray

9    detector is moved around the dotted circle there and it

10   measures the intensity in each particular value.  So

11   some 2-theta of values where there won't be any scattering,

12   no intensity other than background and some 2-Theta values

13   will give rise to peak that arise from the scattering

14   sample.

15   Q.    If we could pull up the next slide and are you showing

16   multiple scattering beams in this slide?

17   A.    Yes.  So each color barrier represents a different

18   scattering beam in cartoon fashion here.  When these are

19   being hit with the sample, it scatters in a number of

20   different quite specific directions and the X-ray detector

21   makes its way around and measures the intensity of each

22   2-Theta point.  From that we can work out where the

23   scattering beams, where they're heading.

24   Q.    Okay.  So I see the X-ray detector on the right.  Tell

25   me how that is working in relation to the scattering beams

1   and what is it doing?

2   A.    Yes.  So for each incident beam, a whole bunch of

3   scattering beams will come off.  The X-ray detector makes

4   its way around the dotted line, around the circle and

5   measures the intensity of each angle and the high intensity

6   regions will be the scattering beam where there's no

7   intensity, where there isn't a scattered beam.  The incident

8   beam can change as well.

9   Q.    Does this result in a graph or plot of some sort?

10  A.    Yes.  The net result is a two-dimensional of the

11  intensity that the X-ray detector measures as a function of

12  that 2-Theta scattering angle.

13  Q.    Okay.  If we could bring up the next slide.

14        And tell us what you are showing here and how it

15  relates to the slide we just saw.

16  A.    Yes.  This is a relatively simple X-ray diffraction

17  pattern on the vertical axis.  So what I've done is sort of

18  show how each of those colored beams coming off can be

19  mapped to a particular peak position.  Some of those peaks

20  will be intense.  The one labeled 100 is a very intense one.

21  You can see the sort of black bell-curved shape of a profile

22  with a peak there whereas some of the other peak positions

23  will have relatively low intensity and this overall pattern

24  of where the peaks are and their relative intensities acts

25  as a fingerprint for that particular crystalline form.

Steed - direct

1  Q.    Okay.  If we could pull up the next slide.  You just

2  mentioned a fingerprint.  So tell us how a fingerprint

3  relates to what we're seeing below.

4  A.    Well, literally, just as an individual's fingerprints

5  are unique to them, can be used to identify them, so the

6  X-ray powder pattern diffraction patents with their peaks

7  and relative intensity arise from the structure of the

8  crystal and can be used in a pattern recognition way to

9  identify which particular crystal form it is.  So the

10 patterns are characteristic of a particular crystal form,

11 just like fingerprints are characteristic of a particular

12 individual.

13 Q.    Now, looking at the graph that's on the bottom of that

14 slide, could you take a single peak and use it to identify

15 which crystalline form you have?

16 A.    No, you couldn't.  One peak cannot identify a

17 particular crystalline form.  That's because multiple

18 different crystal forms may well happen to have a peak in

19 the same place.  You can see from this, this is a typical

20 kind of powder diffraction for a small molecule on the drug

21 and you can see that particularly, a higher diffraction

22 angle above ten, there's also lots of peaks.  So there's a

23 high chance of one or more of those peaks might happen to be

24 in the same place in more than one polymorph.  So you have

25 to look at the whole pattern and match the whole pattern

Steed - direct

1    with a reference standard in order to identify a polymorph.

2    Q.    And is that similar to a fingerprint in any way?

3    A.    Yes.  Exactly.  You wouldn't identify a person by

4    looking at just one ridge of their fingerprint, reading a

5    couple ridges.  You look at the whole print and compare it

6    to a reference or what you might have on file for them.

7    Q.    Now, did your brick analogy also help you explain why

8    you can't use one or even two peaks to identify a specific

9    crystalline form?

10   A.    Yes, it does, I suppose.

11   Q.    Okay.  Bring up the next slide.  Yes.

12   A.    Yes.  So the actual, the actual position and intensity

13   of a peak is a complex result of the way literally the

14   electrons are distributed in the crystal, and by electrons,

15   I just mean the position of the molecules.  The molecules

16   have electrons in them.

17                And so this is not really a direct map to any

18   particular structure of the molecule that is in the crystal.

19   What I've done here is just for the sake of highlight, I've

20   highlighted a particular motif within the crystal.  There

21   are two bricks at 90 degrees to one another.

22                And even though the three that I've highlighted,

23   for that matter, the herringbone, too, all have this

24   particular feature in them, imagine that correlates to a

25   peak on the simplest graph.

Steed - direct

1              Then these three have the same kind of feature.

2     They are all quite different pattern arrangements, different

3     polymorphs, so there's a fair chance that two different

4     polymorphs might have a similar feature in them and give,

5     that would give rise to a similar X-ray diffraction peak,

6     but they're definitely different.

7     Q.    So if two crystalline forms share the same peaks, what

8     does that tell us about the similarity between the two

9     crystalline form?

10    A.    Nothing, really.  It's just coincidence.  Somewhere in

11    the middle of the crystals somewhere there is some electron

12    that happens to be similarly spaced.  Essentially, it

13    doesn't tell us anything about the crystals.  Just

14    coincidence.

15    Q.    If they share two of the same peaks, does it tell us

16    they share the same crystalline structure in any way?

17    A.    No.  It's the whole pattern that derives from the

18    structure.  There's information about the structure in all

19    of these.  You can't really single out one peak and

20    correlate it with a structure.

21    Q.    Okay.  Now, you say you can't use 1 or 2 peaks.  Is

22    there a number of peaks at which point if those two forms

23    have it in common, you could say, okay, they have enough

24    peaks in common, they are likely the same crystalline form?

25    A.    Yes.  The best practice is to use the whole

Steed - direct

1    diffraction pattern as a fingerprint.  The United States

2    Pharmacopeia suggests that a technical person who is trying

3    to compare them to a reference standard, it is sufficient

4    from the USP's view to stand for the ten strongest peaks.

5    Then you have a pretty high chance you've identified a

6    particular example against a reference of the ten strongest

7    peaks you can match up.  Even that's just a shorthand for

8    the whole pattern.

9    Q.    If we could pull up JTX-0322, Dr. Steed, what is this

10   document?

11   A.    As I mentioned, the United States Pharmacopeia.  This

12   is, this is the outer cover of the 2012 edition, edition 35.

13         This has become a national repository of

14   standards for pharmaceuticals within the U.S. and this

15   gives, this gives standard methodologies, for example, for

16   analyzing.  So this document that I was quoting suggests the

17   ten strongest peaks are a good approximation for the whole

18   pattern.

19   Q.    Okay.  If we could turn to pages 430 to 431 of this

20   document and if we could call out on the right-hand side the

21   bottom paragraph that starts with qualitative.  And we see

22   the highlighted section on the right.

23         Is that the language that you were referring to

24   with respect to the USP?

25   A.    That's right.  This is the section of the United

Steed - direct

1    States Pharmacopeia, Chapter 941, that teaches a person of

2    skill how to identify a sample that they have in their

3    possession against a requisite standard by means of X-ray

4    powder diffraction.

5                You can see in the highlighted, generally

6    identified in a single X-ray.  So you take your reference

7    standard with the ten strongest peaks and compare that to

8    your unknown.  If they match, you can consider yourself to

9    have identified that particular crystal form.

10               MS. CLAYTON:  Your Honor, I think Covington

11   might need to mute themselves.

12               THE COURT:  Okay.  Did they do it?

13               MS. CLAYTON:  Thank you.

14   BY MS. CLAYTON

15   Q.   So let's say that you've run a sample and you have a

16   pattern.  What do you do next?  What do you do with that

17   pattern?

18   A.   So the question is what polymorph is that -- does that

19   pattern correspond to and when a polymorph is discovered, it

20   will be studied and a reference, reference pattern will be

21   published and perhaps in assign particular paper, perhaps in

22   an electronic database and so the known crystal forms that

23   will be available somewhere in the literature, a reference

24   standard pattern.

25               You can go and compare the one you just made

Steed - direct

1    with, as I say, ten strongest peaks or ideally the whole

2    pattern matches up.  Of course, if you can't find anything

3    that it matches in the published literature in electronic

4    databases, you may have made a new form.

5    Q.    Okay.  So can we pull up the next slide.  Is this

6    showing one of the, the type of comparison that you just

7    mentioned?

8    A.    Yes.  So this is taken from my report and in this

9    case, I was over laying the X-ray powder diffraction pattern

10   with form I shown in red of ibrutinib with the pattern of

11   form A shown in the '548 patent.  I'm showing this because

12   you can see whether the pattern peak positions and relative

13   intensities matches up.

14           So in this case, there's a mismatch here in the

15   two different patterns.  You can see that quite easily by

16   over laying the two patterns.

17   Q.    Okay.  So we just discussed what crystalline forms

18   are, some of the techniques used to analyze them.  I want to

19   now turn to how we actually make these crystals.  And let's

20   turn to the next slide, please.  And tell us what you are

21   trying to demonstrate through this slide.

22   A.    Yes.  So there are lots and lots of different ways to

23   make a crystal and new ways are being invented on a

24   continual basis.  That's part of my research.  But perhaps

25   the most common way is to use a solution-based approach and

Steed - direct

1    there are two ways you can do that, evaporation shown on

2    this slide or cooling.

3              And very, very simply, it's supposed to be a

4    simple process to do evaporative crystallization.  You

5    simply dissolve your compound of interest.  You get a powder

6    in a liquid called solvent in which it's soluble.  It might

7    be water.  It might be sugar in your tea for example, or it

8    might be some other organic liquid.  It dissolves.

9              We've got to bring an increase in the

10   concentration of the molecules in that solution to the point

11   where they are no longer soluble and the way we do that in

12   an evaporative process, we just let it evaporate, so the

13   liquid passes from liquid to the vapor phase.  There's less

14   liquid and that concentrates the sample.

15             And so here's a point where the crystals are no

16   longer soluble and they begin to crystallize out.  One of

17   the solvent evaporated crystals should be present at the

18   bottom and side of the vial.  You can dry the crystals.

19   Q.    And is there also a process similar to this, but it's

20   called a cooling process?

21   A.    Yes, that's right.

22   Q.    Okay.  And if we could pull up the next slide.  So

23   describe for us how the cooling process works as opposed to

24   the evaporation process.

25   A.    Yes.  And I stress again, there are many ways to make

1    crystals, but these kind of solution-based approaches are

2    perhaps the most popular.  This is a very similar idea.

3    Again, we're going to dissolve solids and the powdered

4    sample in a solution.

5            Another idea here is that the compound is more

6    soluble when the solution is hot than when it's cold and

7    that's very, very common.  I heat it.  There's a name there

8    going up the solution.  You dissolve as much as you can

9    while it's hot and then as the solution is allowed to cool,

10   perhaps by leaving it in the ambient atmosphere, then the

11   solubility of the compound would decrease and, again,

12   crystals should begin to form.

13           And once those crystals are formed, once the

14   solution is cooled to room temperature, for example, you can

15   use filtration to obtain the solid characterization.

16   Q.   Okay.  Now, are these the only two crystalline,

17   crystallization techniques that can be used to make

18   crystalline form?

19   A.   No, not by a long way and these are being developed

20   all the time.  So, for example, we could also use melting of

21   the solid.  We can use grinding.  We can use some

22   advancement, such as non-compliant crystallization

23   technologies.  We can use, there are diffusion techniques.

24   So the whole range of different techniques, some of them

25   very common.

Steed - direct

1    Q.    Okay.  Now, in these two processes that we just looked

2    at, the evaporation and cooling process, are there different

3    variables that are involved here that can affect the

4    crystalline form that you obtain?

5    A.    Yes.  The particular crystalline form, polymorphic

6    form that comes from any crystallization is a function of

7    the exact conditions on which the crystals grow.  And so

8    even within these relatively simple to do, but a one off

9    solution based crystallizations.  One is a solvent.

10        There are probably hundreds of different

11   solvents you can use of which certainly many have common

12   usage.  You can change things like cooling rates, the

13   heating rate, the temperature, the concentration, things

14   like the conventional flow within the vials.  Stirred or not

15   stirred.  The list is quite long.

16   Q.    Let's just pull up the next slide.

17        You talked about solvent and crystallization

18   potentially giving different methods.  What about these

19   other items that are listed on this slide?  Can those

20   variables affect which crystal form you obtain?

21   A.    Yes.  All of these are more counter effects of crystal

22   form because the crystal forming, the exact circumstances

23   under which the nucleus form, the molecules begin to form

24   together to form the first beginnings of the crystal.  And

25   each of these particular sets of conditions or variables can

Steed - direct

 1    affect that.

 2              Crystallization method I described in the

 3    solvent.  I think I didn't mention pH.  That can make a

 4    difference as well.  Even the dry conditions.  When the

 5    sample is moist, it may be one form.  When it is dry, it may

 6    transport to another.

 7    Q.    Okay.  Now, do we see examples in the '548 patent of

 8    how some of these different variables can affect the

 9    crystalline form that you obtain?

10    A.    Yes, we do.

11    Q.    Okay.  If we could pull up JTX-1, which is the '548

12    patent.  And I'd like to start by looking at column 64,

13    which is Example 1.

14              So, Dr. Steed, what does Example 1 of the '548

15    patent talk about?

16    A.    Example 1 is quite a long example, and this is where

17    the inventors of the patent give us the recipes by which, by

18    which a person of skill could make and reproduce each of the

19    six crystal forms that are disclosed in this patent.  So for

20    each crystal form, there is one or more recipes that if you

21    follow them carefully, then you should end up making the

22    disclosed crystal.

23    Q.    Okay.  And if we could go to column 66 here and I want

24    to specifically highlight the paragraph where it says form D

25    and form E.

1          Now, what solvent is used to make form D?

2    A.    That's a solvent called MIBK, a common solvent.

3    Q.    And what solvent is used to make form E?

4    A.    That's totally a different solvent.

5    Q.    Right.  And so is it fair to say that the use of those

6    two different solvents give you two different forms of

7    ibrutinib?

8    A.    Yes.  They are different forms of ibrutinib and

9    clearly, they're coming from different solvents.  They just

10   go straight to the point, different solvents can result in

11   different crystalline forms.

12   Q.    All right.  Now let's go to column 65, form A through

13   three, and column 66, which discusses form C.

14          Now, form A, route three and form C, what

15   solvent are both of these examples using?

16   A.    Both of these use methanol points.  There's no

17   difference of solvents in this case.

18   Q.    So why are we getting different forms even though the

19   same solvent is used?

20   A.    A long story short, it's the details of all the other

21   things that have changed in the crystallization.  So, for

22   example, you can see that the solutions are heated to

23   different initial temperatures, 45 versus 50 degrees.

24   There's a different concentration of ibrutinib within the

25   methanol.  In Form A, 3, it's 12 grams in 120 mLs, which is

1    a different ratio of two rounds and 25 mills.  There are

2    various differences.  But, again, it shows you it's not just

3    solvents.  There are other differences within the details of

4    the recipes that give rise to the different crystalline

5    forms.

6    Q.    Are these groups that we're looking at here and shown

7    in Example 1, are these the cooling and evaporation

8    crystallization processes that you were talking about

9    earlier?

10   A.    Yes, that's right.  These are solution-based

11   crystallization methods.

12   Q.    And I think you said solution-based crystallization

13   methods are common and known to those in the art; is that

14   right?

15   A.    Yes.

16   Q.    All right.  Is it, even though those are common, is it

17   common and routine to vary all the variables we just

18   discussed to be able to arrive at every crystalline form of

19   a compound?

20   A.    Not every crystalline form, no.  It is common and

21   routine to do what's called a polymorph screening.  So

22   that's where when you have a new active ingredient and

23   you've got a molecule, you can do these kinds of

24   experiments.  You can vary some of the conditions fairly

25   exhaustive and try to find the most stable form.  That's a

Steed - direct

1    very different kind of inquiry to try to find every single

2    possible form of a given compound.  I think we still don't

3    know how to do that.

4           You would never be sure if you're finished.

5    There could always be a form yet.

6    Q.    Okay.  Now, in advance of -- let's say you have form

7    A, Route 3, but you have not discovered form C yet.

8           Would you know that making the changes to the

9    form A route 3 would result in form C before you conducted

10   the experiment?

11   A.    No, not at all.  You can never know -- without trying,

12   you can never know what set of conditions will give rise to

13   a particular polymorphic form.  So the way to proceed is

14   just to try different sets of conditions, different

15   crystallization methods, and see what results in analyzing

16   crystals.

17          So given the teachings to make form A with a

18   recipe shown on the left here, the only thing you would know

19   is you must do something else, but you wouldn't know what,

20   what, if anything, would give rise to anything new.  You

21   just have to keep trying things until you find something

22   different or until you run out of resources or time or

23   interest.

24          THE COURT:  Doctor, can I -- if I could, if you

25   could, if you could slow down a little bit, we would

Steed - direct

1    appreciate it over here.

2              THE WITNESS:  I apologize, Your Honor.

3              THE COURT:  Don't apologize.  Just it helps.

4    Thanks.

5    BY MS. CLAYTON

6    Q.    Now, before you actually make a given crystalline

7    form, do you know in advance what physical properties that

8    form will have?

9    A.    No.  You have to make a measurement, long story short.

10   Q.    Okay.  So what type of techniques would you run then

11   to see what crystalline form you have?

12   A.    Yes.  In terms of identifying crystal form, X-ray

13   powder diffraction.  I talked about earlier, it's probably

14   the most common, most useful, because the X-ray powder

15   diffraction is a fingerprint for that particular crystalline

16   form.  And there are other characterization techniques as

17   well, but do provide some bits of useful information.

18   Q.    And can you predict in advance what that pattern will

19   look like for a particular crystalline form?

20   A.    Typically, there are some advanced computation

21   approaches that can generate hundreds or thousands of

22   possible crystal forms, but you don't remember which of

23   those will come out of a particular set of conditions and

24   what the properties will be without actually trying.

25   Q.    Okay.  Now, with that background, I would like to turn

Steed - direct

1   to some of your opinions in this case.  Let's bring up the

2   outline of his testimony again at 16-17.

3              And so next let's turn to your definition of a

4   person of ordinary skill in the art.  Have you, do you have

5   an opinion on what the definition is for a person of

6   ordinary skill in the art in this case?

7   A.    Yes, I do.

8   Q.    And if we could pull up the next slide.

9              Does this summarize the experience that you

10  think a person ever ordinary skill in the art should have

11  for the '548 patent?

12  A.    Yes, it does.  A person of ordinary skill is a pretty

13  highly skilled kind of person that's educated to at least

14  degree level, if not Ph.D. level, and have experience in

15  crystallization of the kind we talked about as well as

16  characterizing solid forms and then also be family with the

17  beginnings of formulation, pre-formulation, testing that

18  goes with it.

19  Q.    Okay.  And are you aware of the definition of a person

20  of ordinary skill that plaintiffs' expert, Dr. Myerson, has

21  offered in this case?

22  A.    Yes, I have.

23  Q.    Okay.  If we could bring up the next slide.  Does this

24  slide reflect the summary of your understanding of Dr.

25  Myerson's definition of a person of ordinary skill?

Steed - direct

1    A.    Yes, it does.

2    Q.    Is your definition and Dr. Myerson's definition the

3    same or different?

4    A.    They are different in some regards.  For example, Dr.

5    Myerson places less stress on the knowledge of a medicinal

6    chemistry, saying just some knowledge is required.

7    Generally, that's similar in terms of the kinds of skill

8    that we both think a person of skill would possess.

9    Q.    Okay.  And so do your opinions in this case turn on

10   whether the Court adopts your definition of a person of

11   ordinary skill and Dr. Myerson's definition?

12   A.    No, they don't.

13   Q.    Okay.  Now, let's move on to claim construction.  Are

14   you aware whether there was a claim construction order

15   issued in this case for the '548 patent?

16   A.    Yes, I believe there was.

17   Q.    Okay.  If we could pull up demonstrative 6-20.

18         Does this reflect the claim construction

19   definition that you understand the Court issued in this

20   case?

21   A.    Yes, that's my understanding.

22   Q.    And for a crystalline form of ibrutinib, what claim

23   interpretation are you applying for that phrase, a

24   crystalline form of ibrutinib?

25   A.    Well, I based my opinion of invalidity through the

Steed - direct

1    lens of plaintiffs' interpretation of claim construction.

2    In other words, that this phrase, a crystalline form of

3    ibrutinib is not limited to forms A through F, but could

4    refer to any possible form of crystalline form of ibrutinib

5    whether known at the time of the filing of the '548 patent

6    or not.  Indeed, whether known now or not.

7    Q.    All right.  And one last housekeeping question that I

8    forgot.  Do you qualify as a person of order skill in the

9    art under your definition and Dr. Myerson's definition?

10   A.    Yes, I believe so.

11   Q.    Okay.  Now let's turn to your invalidity analysis.

12   And I would like to review the legal standard that you were

13   instructed to apply in this case.  If we could pull up

14   DTX-6-22.

15           And so, Dr. Steed, I know you're not a lawyer,

16   but could you explain in your own words for us what do you

17   understand you were supposed to look at in conducting your

18   written description analysis?

19   A.    Yes.  As you say, I'm not a lawyer, but I guess the

20   instruction I was given is shown on the slide 3.

21           My basic understanding of written description,

22   that the inventors have to show by means of what they write

23   in the disclosure that they're in possession of the full

24   scope of the invention, that they actually had what they

25   claimed they would invent and they have to establish that,

1    so a person of skill would have that description.

2    Q.    Okay.  And what about this last bullet point about if

3    the patent claim covers a genus?  I know it's a complicated

4    concept, but what is your layman's understanding of the

5    genus standard in the context of written description?

6    A.    Yes.  Insofar as a genus is appropriate, in other

7    words, a group of inventions with something in common that

8    allow them to become grouped together, then it's my

9    understanding there has to be a representative number of

10   examples so that a person could recognize what it is that

11   this genus has in common and separate it from things that

12   aren't part of the genus or a series of features, the

13   structure, members of the genus, again, that a person can

14   recognize and understand what that genus is.

15   Q.    Okay.  So let's start your analysis by looking at the

16   claims of the '548 patent.  If we could pull up JTX-1 again.

17   And let's start with the cover page, please.

18                And so, Dr. Steed, what is the title of the '548

19   patent?

20   A.    It's called crystalline forms of ibrutinib tyrosine

21   kinase inhibitor.

22   Q.    And what is, what Bruton kinase inhibitor is this

23   invention specifically referring to?

24   A.    That means ibrutinib.

25   Q.    Okay.  And who are the inventors on the '548 patent?

Steed - direct

1    A.    Norbert Purro, Mark Smyth, Erick Goldman and David D.

2    Wirth.

3    Q.    Okay.  And so now if we could go to column 80 and pull

4    up claims 15 through 19 of the '548 patent.

5          And so what are the claims that are at issue

6    here in this litigation?

7    A.    It's my understanding just claims 18 and 19.

8    Q.    Okay.  And in your understanding, based on plaintiffs'

9    interpretation, what is the scope of claim 18 of the '548

10   patent?

11   A.    So my understanding is that this is an extremely broad

12   claim, so any, any crystalline form of ibrutinib, whether

13   known at the time of the filing of the patent or not,

14   indeed, whether it's discovered now or not, a peak of

15   18.9 degrees and unsolvated would fall under this claim

16   under plaintiffs' interpretation of the Court's claim

17   construction.

18   Q.    And 18.9 2-theta feature, did that come from

19   independent claim 15?

20   A.    Yes, it does.

21   Q.    All right.  And what about claim 19?  Based on

22   plaintiffs' interpretation, what does claim 19 of the '548

23   patent cover?

24   A.    That will be very similar.  It's claim 18 and the

25   limitation, depending as it does from claim 16, that there

Steed - direct

1    should also be a peak at 16.1 degrees.

2    Q.    Okay.  And how do claims 18 and 19 of the '548 patent

3    compare to the original claims that were filed in connection

4    with the '548 patent application?

5    A.    They're very, very different.  Much, much broader.

6    Q.    Okay.  If we could pull up JTX-41.  If we could zoom

7    in on that cover page, please.

8              Dr. Steed, what is this document?

9    A.    This is the file wrapper of the '548 patent.

10   Q.    Okay.  And if we could turn to Bates ending in 1484.

11             MS. CLAYTON:  Your Honor, for the record, this

12   is one of those really voluminous exhibits and we've only

13   provided an excerpt for the Court.

14             THE COURT:  Okay.  Thank you.

15             MS. CLAYTON:  Sorry.  Bates ending '386 first,

16   Your Honor.  I jumped ahead.

17   BY MS. CLAYTON

18   Q.    So, Dr. Steed, what is this portion of the file

19   history?

20   A.    So I understand this is the patent application that

21   eventually became the '548 patent as it was originally

22   filed.

23   Q.    Okay.  And if you would turn -- this document is

24   slightly out of order the way the Patent Office kept it.

25   Could you turn two pages earlier, please, which is ending in

Steed - direct

1    1484.

2              And what is this portion of the file history

3    showing us?

4    A.    So these are the original claims as the inventors

5    originally filed them.

6    Q.    Okay.  And what were these claims and the original

7    claims directed to?

8    A.    There's one independent claim, claim 1, and that's

9    directed specifically to just one crystalline form,

10   crystalline form A of ibrutinib characterized by 3 2-Theta

11   peaks in the positions listed.  The other 12 claims are all

12   dependent on claim 1.

13   Q.    Now, to the best of your understanding, what happened

14   to these original claims?

15   A.    To my understanding, the inventors cancelled these 13

16   claims that were directed just to crystalline form A.

17   Q.    Okay.  If we could turn to a later portion of the file

18   history ending in Bates number 1519.

19              And what do you understand this document in the

20   file history to be?

21   A.    So this is --

22              THE COURT:  Wait.  Stop.  Sorry.  I want to find

23   it.  Okay.  Go ahead.  Thank you.

24   BY MS. CLAYTON

25   Q.    All right.

1    A.    So I understand this is an amendment to the

2    application in which they amended their claims during the

3    process of the prosecution of the patent.

4    Q.    Okay.  And if we could turn the page ending in Bates

5    number 1422.  And, Dr. Steed, what was this document dated?

6    A.    April the 4th, 2018.

7    Q.    Okay.  And who is it signed by?

8    A.    It's signed by Jana A. Lewis.

9    Q.    Okay.  If you could turn now, just a couple pages

10   later to Bates ending, one-page later, 1523.

11          And what is this page reflecting?

12   A.    So these are the now amended claims beginning with the

13   amended claims.

14   Q.    Okay.  And what does it show happened to claims 1

15   through 13?

16   A.    They were canceled.

17   Q.    Okay.  And if we could go down to claim 44 of this

18   amendment, please, which is on the next page ending in Bates

19   number 1524.

20          Does claim 44 match up with claim 15 of the '548

21   patent?

22   A.    Yes, it does.

23   Q.    Okay.  Have you created a slide that shows how these

24   new claims match up with claims 15, 16, 18 and 19 of the

25   '548 patent?

Steed - direct

1    A.    Yes, I have.

2    Q.    If we could pull up demonstrative, defendants'

3    demonstrative 6-23.

4          So what is this demonstrative showing here, Dr.

5    Steed?

6    A.    Yes.  Well, here I'm just mapping all of the new

7    claims from that amended claim listing that we were just

8    looking at.  What's at issue is the '548 patent.  Just

9    as we saw in the previous slide, the new claim 44 maps to

10   what became claim 15 of the '548 patent, and similarly,

11   new claims 45, 48 and 49 now map to claims 16, 18 and 19,

12   which, of course, the last two are the two that are at

13   issue.

14   Q.    Okay.  Now, speaking about the issued claims here and

15   talking about them for a moment, are you aware that

16   plaintiffs claimed these claims, in fact, all of them, cover

17   a genus of crystalline forms of ibrutinib?

18   A.    I've heard that argument.

19   Q.    Do you think that makes sense in the context of what

20   these claims, or how these claims read?

21   A.    No I don't at all.  I don't really understand how you

22   can describe crystalline forms.  Each crystalline form is

23   unique.  It has its own unique crystal pattern arrangement

24   formed by a different method.  In each case as we've seen.

25   And with its own unique set of properties.

Steed - direct

 1              So I can understand the concept of the genus as

 2      it might apply to a chemical molecule, for example.  So a

 3      chemical molecule might have a particular fragment on it,

 4      and as a synthetic chemist, I might know how to add benzene

 5      rings to a variety of different molecules if they had some

 6      useful properties, for example, and then I could recognize a

 7      genus of chemical molecules with benzene rings on them.

 8              I never have to make that and I can recognize it

 9      by looking at that genus.  The crystalline forms are all

10      unique.  Each one is unique and unto its own rights.  So

11      trying to group them into a genus doesn't make any sense to

12      me.

13      Q.    Could you describe I want you to create a crystalline

14      form that has a peak at 18.9, but you could with a chemical

15      compound that has a benzene ring?

16      A.    No.  It's completely different.  There's no way to

17      control where the peaks are.  So the information of the

18      peaks is determined by the very complex sort of series of

19      interactions between molecules of the crystals formed and

20      effectively, I don't want to add more, but effectively, the

21      crystal by virtue of its, the pattern arrangement that it

22      falls into, then generated its own powder diffraction

23      pattern, which we can't predict without doing the experiment

24      in advance and seeing what form actually comes out.

25              So there would be nothing about having in my

Steed - direct

1    possession one compound that makes another polymorph, 18.9,

2    where they could do that with a chemical compound to install

3    fragments of molecules.

4    Q.    Okay.  Now, let's turn to actually the actual

5    disclosures in the specification of the '548 patent.

6              THE COURT:  Actually, can you just give me a

7    second.  Thanks.

8              MS. CLAYTON:  Sure.

9              THE COURT:  All right.  Ms. Clayton, this is

10   what makes it very difficult with the zoom compounded by I'm

11   sure the distance that we are from London or England and

12   mastering accents as well.

13             I think this is a pretty important part of the

14   testimony.  You had asked a question something along the

15   lines of, could you describe I want you to create a

16   crystalline form that has a peak at 18.9.  It's a little

17   garbled to us.  But you could with a chemical compound that

18   has a benzene ring.  And then there was an answer.

19             I would like you, if you could, just to repeat

20   that question and we can have the professor respond again,

21   just so I would like to make sure the record is very clear

22   on this point.

23             MS. CLAYTON:  Yes.

24             THE COURT:  Do you know what I'm talking about?

25             MS. CLAYTON:  I am.  I'm going to pull up my

Steed - direct

1    real time to make sure I remember which specific question.

2    It doesn't sound like it's exactly what I asked.  I think if

3    I take a look at it --

4                THE COURT:  If you are looking at real time,

5    it's literally the first line on the page and it follows

6    testimony that trying to group them into a genus doesn't

7    make any sense to me.

8                MS. CLAYTON:  Okay.  Okay.  Yes.

9                THE COURT:  All right.  So if we could just

10   begin.  And I don't think it's -- it's not bad if we have to

11   repeat it.  That's fine.  I think it's important to get this

12   very clear.  Thank you.

13               MS. CLAYTON:  Okay.

14   BY MS. CLAYTON

15   Q.    You described how you would be able to add a benzene

16   ring to a chemical compound.  Is it possible to

17   intentionally add a 2-Theta peak at 18.9 to a crystalline

18   form?

19   A.    No, it isn't.  Long story short, nothing about, even

20   if I had in my possession another crystalline form that had

21   a peak at that position, there's nothing about that that

22   would tell me how to add peaks at that position.  I was

23   explaining, trying to do it a little bit more slowly, that

24   the position of the peaks, the whole pattern arises from,

25   from the detailed distribution of the molecules within the

Steed - direct

1    crystal, and that's not something that we can control as

2    chemists.

3                We just have to bring about a situation in which

4    crystals will form all by themselves and whether they do

5    that, the result is a crystal which gives rise to a

6    diffraction pattern, and you get what you are given.  You

7    can't control that process.  So you would have no idea

8    whether it's going to be a peak at any particular 2-Theta

9    position until you went and measured it, having completed

10   the crystallization process.

11               MS. CLAYTON:  Is that clear, Your Honor?

12               THE COURT:  That's clear to me.  Thank you.

13               MS. CLAYTON:  Okay.

14               THE COURT:  Basically, Doctor, there's no

15   predictive ability here essentially that you can, is the way

16   to think about it?

17               THE WITNESS:  Exactly, Your Honor, yes.  Just do

18   the crystallization, see what you get.

19               THE COURT:  All right.

20   BY MS. CLAYTON

21   Q.    Now, let's turn to the disclosures in the '548 patent

22   itself.  Which crystalline forms of ibrutinib does the

23   specification in the '548 actually describe?

24   A.    It describes six crystalline forms.  Forms A, B, C, D,

25   E and F.

Steed - direct

1    Q.    And what type of position does the specification

2    provide for the six specific forms?

3    A.    It provides a lot of information.  It describes how to

4    make them.  That's what we looked at.  At least one recipe

5    for each crystal form.  And then it describes how to

6    recognize them.  So there's at least an X-ray powder

7    diffraction pattern for each of these six crystal forms

8    given in the patent.  And there's also most of the

9    crystalline forms, there's other kinds of information as

10   well.  Characterization techniques such as DSC, TGA,

11   infrared spectroscopy and things like melting point and

12   stability as well.

13   Q.    Okay.  So you say it teaches how to make them.  Let's

14   take a look at that.  If we could go back to Example 1 of

15   the '548 patent, column 64 through 66.  Again, is Example 1

16   the example that teaches you how to make crystalline form

17   2-Theta?

18   A.    Yes.  These are the recipes that get you these six

19   forms.

20   Q.    How many recipes does it provide for form A?

21   A.    There are three variations, all of which end up making

22   Form A.

23   Q.    What about for form B?

24   A.    Two for form B.

25   Q.    And what about for each of forms C, D, E and F?

Steed - direct

1   A.    One each for each of those.

2   Q.    Okay.  Now, does the '548 patent describe how to make

3   any crystalline form of ibrutinib besides the six forms we

4   see here?

5   A.    No, not at all.  These recipes are each directed

6   specifically to ending up with these six forms.

7   Q.    Okay.  Now, does the '548 patent, I think you said it

8   provides the X-ray powder diffraction pattern for each of

9   these six forms.  Is that right?

10  A.    Yes, it does.

11  Q.    All right.  If you would pull up the next slide.  What

12  are you showing on this slide?

13  A.    Yes.  So here I've just extracted from the patent's

14  disclosure each of the six X-ray powder diffraction

15  patterns.  There are only six of them.  They are all shown

16  here.  There's one given as a representative

17  characterization for each of the six forms of the patent

18  actually disclose it.  So forms A through F.

19  Q.    And so for the record, that's figures 1, 5, 9, 12, 14

20  and 16 in the '548 patent?

21  A.    Correct.

22  Q.    Okay.  Now, are there any other X-ray powder

23  diffraction patterns in the '548 patent besides the six we

24  see here?

25  A.    No, just these 6, 1 for each of the forms that's

Steed - direct

1    disclosed.

2    Q.    Okay.  And I think you said that there are some other

3    physical properties for each of these forms that are

4    described in the '548 patent.  Did I state that correctly?

5    A.    Yes, that's correct.  It's a characterization of

6    processes.

7    Q.    Okay.  Let's take a look at just one example of that

8    and if we could go to Column 2, lines 50 through Column 3,

9    line 15 of the '548 patent.  What are we seeing in this call

10    out?

11    A.    This is a listing of all the information that's

12    provided for crystalline form A.  So we can see, for

13    example, sort of bullet point A there, the X-ray powder

14    diffraction pattern in Figure 1.  Some characteristic peaks

15    are called out in peak B there, stability.  Certainly,

16    humidity.  And then the patent goes on to say it's providing

17    us with the infrared spectrum, which characterizes the way

18    the molecule vibrates.  Can also be indicative of a solid

19    form.  It provides the DSC thermogram.  That's the

20    differential scanning calorimetry.  That measures the

21    thermal behavior of samples.  Heat it up.  Whether it's

22    going to melt or change form or any other behavior like

23    that, which is again characteristic of a particular

24    crystalline form.

25                We're also told that we get the

Steed - direct

1   thermogravimetric analysis.  That tells you whether a sample

2   loses weight.  If it was a solvate, you would expect it to

3   lose weight.

4              And then it talks about the positions of the DSC

5   thermogram, activity correlating to a melting point and.

6   Something about its solubility.

7   Q.    Now, is similar information provided for the other

8   crystalline forms in the specification, namely, form B, C,

9   D, E and F?

10  A.    Yes.  They're similar kinds of information, at least

11  the powder X-ray pattern.  Typically, DSC and other

12  information at this time.

13  Q.    Okay.  Now, is this physical information provided for

14  any crystalline form of ibrutinib besides forms A through F?

15  A.    No, no, not at all.  All information relates to forms

16  A through F, nothing else.

17  Q.    Okay.  Now, I want to take a look at a few other

18  portions of the specification and if we could pull up three

19  portions together.  The abstract, the field of the

20  invention, and column one, line 26 through 33, which is a

21  summary of the invention.

22              Now, here in the abstract, do you see where it

23  says described here in is the BTK inhibitor and gives the

24  name of ibrutinib, including crystalline form solvate and

25  pharmaceutically acceptable salts?  Do you see that

Steed - direct

1    language?

2    A.    Yes.

3    Q.    Do you see similar language in the field of the

4    invention?

5    A.    Yes.

6    Q.    Okay.  Now, does this language that says, including

7    crystalline form, does that tell you as a person of ordinary

8    skill in the art that the inventors were in possession of

9    crystalline forms of ibrutinib besides A through F in any

10   way?

11   A.    No, no, not at all.  This is just general introductory

12   text that tells a person reading it that they are going to

13   be reading about crystalline forms of ibrutinib.  I take

14   that to mean some crystalline forms, the ones that are then

15   later described, not all crystalline forms.

16   Q.    All right.  And what about that text there in the

17   summary of the invention where it says, described

18   herein   is ibrutinib, including solvates, hydrates,

19   polymorphs.

20          Does that tell a person of skill like

21   yourself that the inventors possessed forms other than A

22   through F?

23   A.    No, not at all.  Again, this is very, very general

24   introductory text that just says what I'm going to read

25   about when I read the invention.  There can be some

Steed - direct

1   pharmaceutically acceptable solvates, polymorphs, so on.

2   Q.    Okay.  If we could look a little further down in

3   Column 2 of the '548 patent, lines 13 through 16.  And do

4   you see hear it says, also described here in are methods for

5   preparing crystalline forms of ibrutinib?

6   A.    Yes, I see that.

7   Q.    Does having this general language that describes here

8   our method for preparing crystalline forms of ibrutinib,

9   does that tell you that the inventors had methods of making

10  forms other than A through F?

11  A.    No.  Again, this is very general introductory text.

12  It just says the patent is going to be describing some

13  methods for preparing some crystalline forms of ibrutinib,

14  the ones that the inventors actually knew how to prepare.

15  It doesn't tell you anything else about anything in them.

16  Q.    If we could turn further in the patent at column 79,

17  lines 8 through 11.  And it's right above the claims.  And

18  hear it says, the examples and embodiments described here in

19  are illustrative and various modifications or changes

20  suggested to persons of skill in the art are to be included

21  within the disclosure.

22        Now, does this language suggest to you that the

23  inventors were in possession and had identified crystalline

24  forms to size A through F?

25  A.    No, not at all.  I think this language is referring to

Steed - direct

1    the fact there's more than one way to skin a cat.  So, in

2    other words, there are, for example, three ways given to get

3    to form A.  It's form A in every case, but you can make it

4    by some variations of a big crystallization methodology, and

5    that's quite common.

6            There are lots of different ways of

7    crystallizing it and getting to form A and that's what the

8    inventors are including here.  I wouldn't be able to claim I

9    had anything new if I just ran a slightly different

10   crystallization method and got that form A.

11   Q.    So looking at the specification as a whole, in your

12   opinion, does the specification inform you as a person of

13   skill in the art that the inventor could actually have

14   invented any crystalline form other than A through F as of

15   the filing date June 4, 2012?

16   A.    No.  It's quite clear that this is directed specific

17   to crystalline forms, ways to make them.

18   Q.    Okay.  If, in fact, they had discovered other

19   crystalline forms and had invented them as of June 4th,

20   2012, what type of information would you expect to see in

21   the specification of the '548 patent?

22   A.    Similar to the information that was provided in the

23   six forms the inventors do disclose, you would expect at the

24   very least a way to make any other crystalline forms,

25   crystallization method, at least one and a way to recognize

Steed - direct

1    those crystalline forms.  At least x-ray powder diffraction

2    pattern.

3              I fully expect based on documents like this

4    other information to be provided as well.  Particularly

5    things like stability and so on so that a person would know

6    how the form is to be used or what it's for.

7    Q.    Okay.  So, Dr. Steed, we've just gone through the

8    specification and I want to talk about how those disclosures

9    match up with the claims here.

10             So what is your understanding as to which

11   crystalline forms that Dr. Myerson says are disclosed in the

12   '548 patent and match up with claim 18?

13   A.    So I believe there's just two forms, form A and C.

14   Q.    And that's because those are the two forms that have a

15   2-Theta peak at 18.9, 16.1 and are unsolvated?  Is that an

16   accurate statement?

17   A.    For claim 18, I think they just need the 18.9 peak.

18   Q.    You're correct.  It was not an accurate statement.  So

19   let me re-ask that question.  So for the reason that --

20   well, why don't you tell me.  What is the reason that forms

21   A and C match up with claim 18?

22   A.    Yes.  So forms A and C both have peaks of 18.9.  They

23   are both crystalline forms of ibrutinib and they are both

24   non-solvates.

25   Q.    Okay.  And what about for claim 19?  Which of the

Steed - direct

1  forms discussed in the '548 patent match up with what's

2  required for claim 19?

3  A.    Now we've introduced another peak at 16.1 and that is

4  just form A.

5  Q.    Okay.  So we've been talking about the disclosures in

6  the '548 patent and the claims and I want to talk about the

7  forms that you understand the plaintiffs actually

8  discovered.

9            So which forms of ibrutinib do you understand

10  that Pharmacyclics had actually discovered as of June 4th,

11  2012?

12  A.    It's the same.  My understanding is that they had

13  discovered forms A through F.

14  Q.    And what is that understanding based on?

15  A.    Well, that's the testimony of the inventors themselves

16  and it's also repeated in Dr. Myerson's expert report.

17  Q.    As of today, are there crystalline forms of ibrutinib

18  besides A through F that are known to exist?

19  A.    Yes, yes.  Many new forms have been discovered since

20  the filing of the '548 patent.  I think we're up to about 20

21  forms now.

22  Q.    Have you created a chart that shows the forms that

23  you're aware of that not just to claims 15 through 19?

24  A.    Yes, I have.

25  Q.    Okay.  If you could pull that up.  So, Dr. Steed, what

Steed - direct

1   are we seeing here?

2   A.    So this is the basis of a non-comprehensive literature

3   search.  As far as I'm aware, these are the, these are the

4   list of crystalline forms that have been published,

5   discovered since the filing of the '548 patent.  They

6   weren't known at that time that would fall under the claims

7   of the '548 patent.

8   Q.    All right.  And so for claim 15, which requires a

9   crystalline form of ibrutinib with a peak at 18.9, how many

10  different forms of ibrutinib have been discovered after

11  June 4, 2012, that have a peak at that position?

12  A.    At least the eight listed here, perhaps more.

13  Q.    Okay.  And what about crystalline forms with peaks at

14  18.9 and 16.1?  How many crystalline forms have been

15  discovered since for this chart, June 4th, 2012, with peaks

16  at those positions?

17  A.    Yes.  At least three additional forms.

18  Q.    Okay.  And what about for forms that have a peak at

19  18.9 and are unsolvated as required by claim 18?  How many

20  forms are you aware of that have been discovered since

21  June 4th, 2012?

22  A.    At least two more forms that are listed there.

23  Q.    And the same for claim 19.  How many forms that match

24  claim 19 are you aware of that have been discovered since

25  June 4th, 2012?

Steed - direct

1    A.    At least one, one more.

2    Q.    Okay.  Now, I want to take a closer look at a couple

3    of these, but first let's look at them altogether.

4          Can we pull up the next slide, which is

5    demonstrative 26.  And what are we showing on this slide?

6    A.    This is just the front page of different patents or

7    patent applications that have disclosed the forms I was

8    listing on the previous slide.

9    Q.    Okay.  And just for the record, this includes JTX-34,

10   which is the '802 patent; JTX-57, which is the '468

11   patent; JTX-57, which is the '468 patent; JTX-31, which is

12   the '869 patent; JTX-68, which is the EP842; and JTX-56,

13   which is the '026 patent.

14         Dr. Steed, now, are the inventors that are

15   listed on these patents, are they the same as the inventors

16   that are on the face of the '548 patent?

17   A.    No.  They are all different.  These forms were

18   invented by different inventors.

19   Q.    Okay.  Now, let's take a closer look at the '889

20   patent, which is JTX-13.  Now, if we could zoom in on that

21   patent.

22         Dr. Steed, when was this patent filed?

23   A.    November 26, 2014.

24   Q.    Okay.  And how many years after the filing of the '548

25   patent was that?

Steed - direct

1    A.    It was about two-and-a-half years.

2    Q.    Okay.  And what is the title of this patent?

3    A.    It's crystalline form I of ibrutinib.

4    Q.    Okay.  If we could go to Examples 1 and two of this

5    patent, which is in column four.

6            Dr. Steed, what do Examples 1 and 2 of the '889

7    patent describe?

8    A.    These are two alternative recipes by which the

9    inventors of the '889 patent are telling you how to make

10   their invention, which is crystalline form I of ibrutinib.

11   Q.    Okay.  And what solvent combination do they use?

12   A.    It is a mixed solvent.  It's a mixture of 2-propanol

13   n-heptane.

14   Q.    Okay.  And is this mixture of solvent described in any

15   of the recipes that we saw in the '548 patent in Example 1?

16   A.    No.

17   Q.    Okay.  And I quickly want to go back to the '548

18   patent, too, Example 1.  Column 64 and look at the form A,

19   Route 1.

20           So we see four lines down, isopropyl alcohol is

21   mentioned.

22           Do you see that?

23   A.    Yes.

24   Q.    Is isopropyl alcohol the same thing as 2-propanol?

25   A.    It is.

Steed - direct

1    Q.    Now, is using 2-propanol as a single solvent in a

2    crystallization route the same thing as using 2-proponal and

3    n-heptane as a solvent mixture?

4    A.    No, it isn't.  A mixture of solvents will have its own

5    properties and effectively act as if it were a new solvent

6    with its own range of properties.  Of course, we're taught

7    by the '548 patent that using isopropyl alcohol alone gives

8    us form A and so clearly, there was something different

9    about the isopropyl alcohol and n-heptane mixture that's

10   giving form I.

11   Q.    Okay.  If we could turn to form A, route two in column

12   65.  Do you see in the second line down it says heptane?

13   A.    Yes.

14   Q.    Now, is the solvent heptane the same as the solvent

15   n-heptane?

16   A.    No, it isn't.  The heptane refers to a kind of a

17   low rate mixture of a bunch of different types of heptanes.

18   It may include some n-heptane, but not all heptane mixtures.

19   Q.    And is using the heptanes as a solvent the same as

20   using a mixture of 2-propanol n-heptane?

21   A.    No.  Of course, we're taught that heptane in this

22   context gives us form A.  Of course, the mixture 2-proponal

23   and n-heptane give us form I.

24   Q.    Okay.  If we could go back to JTX-13, which is the

25   '889 patent.  Does the '889 patent provide an X-ray powder

Steed - direct

1    diffraction pattern for form I?

2    A.    Yes.

3    Q.    If we could pull up Figure 1 of the '889 patent.  And,

4    Dr. Steed, is this X-ray powder diffraction pattern of the

5    '889 patent for form I?

6    A.    Yes.

7    Q.    How does this pattern compare to the X-ray powder

8    diffraction pattern for A through F in the '548 patent?

9    A.    It's a different pattern.  Different intensities,

10   different peak positions.  It clearly identifies form I as a

11   different crystalline form polymorph to forms A, B, C, D, E

12   or F.

13   Q.    Have you overlaid this diffraction pattern with the

14   patterns in the '548 patent?

15   A.    Yes.  I've looked at each one carefully using the kind

16   of overlay I showed earlier.

17   Q.    Okay.  If we could pull up PTX-6-27.  And does this

18   show those over lays?

19   A.    Yes, it does.  So in blue here, I've got that X-ray

20   diffraction pattern, which is looking at the '889 patent.

21   Just using the PowerPoint, I've lined up the 2-Theta scales

22   so that they are directly comparable and I've overlaid in

23   blue the with each of these six patents for A, B, C, D, and

24   E and F and looked at them in detail peak by peak and the

25   overall appearance of the patent and assured myself that

Steed - direct

1    form I is a different form to any of the other forms A

2    through F in the '548 patent.

3    Q.    Okay.  Now, what form of ibrutinib do you understand

4    that Sandoz uses in an ANDA product?

5    A.    They use form I.

6    Q.    And does Sandoz's ANDA also include X-ray powder

7    diffraction pattern data for form I?

8    A.    It does.

9    Q.    And did you also do a comparison of that X-ray powder

10   diffraction data for form I with the X-ray powder

11   diffraction pattern for A through F in the '548 patent?

12   A.    Yes, I did.

13   Q.    If we could pull up the slide DDX-6-28.  And for the

14   record, these are pulled from DTX-2232.

15          Dr. Steed, can you describe for us what we're

16   seeing here?

17   A.    Yes.  This is in my report and it's the same kind of

18   an exercise.  So, again, we've got in black the X-ray powder

19   patents for form A through F of the '548 patent.

20          At this time I overlaid the X-ray powder

21   diffraction patent, sample form.  I again carried out that

22   comparison with the whole patent, detailed overlay.  You can

23   see in more detail that form I in Sandoz's hands is also

24   different to each of the forms A through F.

25   Q.    Okay.  How, are you aware that Dr. Myerson argues that

Steed - direct

1    Sandoz's form I uses the teaching of the '548 patent and a

2    method in which it's arrived at?

3    A.    I've heard of that.

4    Q.    Do you agree with that?

5    A.    No, I don't.

6    Q.    All right.

7             MS. CLAYTON:  Your Honor, at this time we need

8    to show a document from our supplier and the supplier

9    produced it and made available with strict instructions that

10   only certain parties can access it, so we would ask to seal

11   the courtroom at this time for a brief portion of Dr.

12   Steed's testimony.

13            THE COURT:  Well, I don't know how we seal the

14   remote courtroom.  I mean, I can tell you that visually, my

15   understanding is that the only people who are participating

16   visually are the parties and the Court, but there is access

17   to the proceedings by audio only by the public at large and

18   I have no way of knowing if there's anybody present from the

19   public.  Hold on.

20            MS. CLAYTON:  Your Honor, this is a public

21   dial-in that is active.  There are also several individuals

22   in the room who we're not entirely certain who they are.

23   The only people that they could be are either clients or

24   approved by the parties because the parties and the Court

25   are the only ones who were given links.

Steed - direct

1        THE COURT:  Okay.  That's right.  And like, for

2   instance, there's my law clerks half on occasion linked in,

3   whatever, if that is what the right word would be.  I don't

4   know, Ms. Clayton.  How do you want to handle it?

5        MS. CLAYTON:  I don't know if it would be

6   possible to keep just us, the Court, the witness and

7   plaintiffs' counsel here.  If there's a dial-in, we can't

8   close that off and it may not be possible.  I just have to

9   make sure that, you know, I have lodged that request with

10  the Court, Your Honor.

11       THE COURT:  Well, you've lodged the request with

12  the Court, but I can't -- hold on.

13       I mean, Saji, can you put us in a private room

14  such that the particular information is not shared with the

15  public call in?

16       TRIAL TECH:  Yes.  If you give me a couple

17  minutes, I can push everyone out who isn't one of the

18  parties or the Court into a waiting room.

19       THE COURT:  Okay.  We can try that.  You say a

20  few minutes.  We could take a break then if you want.

21       MS. CLAYTON:  Sure.  That works.  And, Saji, our

22  clients, my client hasn't been able to see this information.

23  The client requested that it literally be the lawyers, the

24  expert and the Court.

25       TRIAL TECH:  Are there other witnesses you would

1    like to push out as well?

2                    MS. CLAYTON:  Yes, Your Honor.

3                    TRIAL TECH:  Great.  I just need a couple

4    minutes.

5                    THE COURT:  All right.  So then --

6                    MR. SIPES:  Your Honor, I want to bring up one

7    quick thing.  Mr. Sipes for plaintiffs.

8                    THE COURT:  Yes.

9                    MR. SIPES:  I think one of our experts may be

10   zoom in, that's the verb I will use.  Dr. Myerson, who will

11   be responding to Dr. Steed, it would be helpful to keep him

12   zoomed in, too, if it's possible to identify him.

13                    MS. CLAYTON:  That's perfectly fine, Your Honor.

14                    THE COURT:  Okay.  So, Saji, is that possible?

15                    TRIAL TECH:  That's fine.  Is that Alan Myerson?

16                    MR. SIPES:  That's correct.

17                    TRIAL TECH:  Great.  I will keep him in.

18                    THE COURT:  Okay.

19                    MR. SIPES:  Thank you.

20                    THE COURT:  And then, Saji, how much time would

21   you like?  Ten minutes, 15 minutes, what do you mean?

22                    TRIAL TECH:  Maybe like two minutes.

23                    THE COURT:  Then, parties, do you want to take a

24   15-minute break now?  You tell me.  Ms. Clayton, what are

25   you thinking?

Steed - direct

 1                MS. CLAYTON:  I'm good with maybe just a short

 2      break, Your Honor, under five minutes.

 3                THE COURT:  Okay.  Then we'll go for five

 4      minutes.  We'll be back at 2:10.  Thanks.

 5                MS. CLAYTON:  Thanks.

 6                (Short recess taken.)

 7                       -  -  -

 8                MS. CLAYTON:  Just let me know when you are

 9      ready, Your Honor.

10                THE COURT:  I am ready.

11                MS. CLAYTON:  Okay.

12      BY MS. CLAYTON

13      Q.    If we could pull up JTX-0573 and if we could call up

14      the top part of the document and then the bottom part of the

15      document as well together.

16                Dr. Steed, what is this document?

17      A.    This is a section of the Drug Master File from

18      Sandoz's supplier that describes the manufacturing process

19      of ibrutinib.

20      Q.    Okay.  And if we could turn to the second page of this

21      document and zoom in on that.

22                What is this page showing?

23      A.    Yes.  So this is a pretty complex looking chemical

24      diagram.  This is a kind of chemical flow chart showing

25      the individual chemical reaction steps that are involved

Steed - direct

1    in, first of all, building the ibrutinib molecule, and then

2    subsequently the crystallization steps that result in form

3    I.

4              So everything all the way up to the bottom row,

5    second molecule from the left are chemical steps in which

6    the molecules are being transformed one into the other and

7    we don't actually get to the molecule ibrutinib until the

8    second structure on the bottom row from the left.

9    Q.    Could we highlight that structure to make it clear

10   what -- can we highlight that second structure?  When you

11   say the second structure on the bottom, is the highlighted

12   one the one you're referring to?

13   A.    That's right.  That's the ibrutinib molecule, so

14   that's being made in that step.

15   Q.    Okay.

16   A.    As it's labeled there.

17   Q.    Okay.  So the first time we see ibrutinib, it's

18   labeled ibrutinib form E.

19              Do you see that?

20   A.    Yes.

21   Q.    And then it looks like it gets transformed to

22   ibrutinib form C?  Is that correct?

23   A.    Correct.

24   Q.    And then what happens next?

25   A.    And then it's re-crystallized and it forms form I,

Steed - direct

1   which is the form that Sandoz actually used.

2   Q.    Are you aware that Dr. Myerson contends that because

3   forms E and form C are intermediate that are formed

4   during the manufacture of form I, this somehow means that

5   the teachings of the '548 patent are used in arriving at

6   form I?

7   A.    I've heard that, that theory, but I don't agree with

8   it.

9   Q.    Well, why do you not agree with that theory?

10   A.    What's happening here is that the ibrutinib molecule

11   happens to be made in toluene in that last chemical

12   synthesis, step five, and so when they isolate the ibrutinib

13   solid for the first time, it just happens to come out in

14   solvate because the chemistry is done in toluene.  That

15   happens to be what's in the '548 patent, form E.  They

16   dissolve that solid up to get rid of the toluene and the

17   toluene solvate and that first, that crystallization step

18   and purification step is step six.  That involves methanol.

19   And then we get a solvent in freeform, form C.  Sandoz still

20   doesn't want form C, so they use this ethanol water step to

21   recrystallize again to get form I.  At each stage --

22             THE COURT:  So, Doctor, Dr.  I think you've got

23   to slow down again.

24   BY MS. CLAYTON

25   Q.    Doctor, let me ask you a question.  So you have

Steed - direct

```
 1    ibrutinib form E and then it looks like you're going to

 2    dissolve it in methanol.  What happens to the crystal

 3    structure of form E when you dissolve it and heat it up?

 4    A.    All the crystals dissolve, so all information, all

 5    traces of that crystal structure is gone because you're

 6    forming a solution in the ways that we described earlier.

 7    And so, in fact, all you end up with during the process of

 8    step six is a methanol solution of ibrutinib.  And so it

 9    actually wouldn't matter what form ibrutinib you started

10    with.

11    Q.    And so what about then when you get to form C and you

12    dissolve it in ethanol and water?  What happens to the

13    ibrutinib form C once it gets dissolved?

14    A.    This is another solution crystallization process we

15    were describing earlier and again you end up with a solution

16    of ibrutinib in ethanol and water which then crystallizes

17    form I.  Again, it wouldn't matter what form you started

18    with.  It's the crystallizing of ethanol and water that's

19    important and that gives you form I.

20    Q.    Okay.  Now, is there any disclosure in the '548 patent

21    of starting with form C and then using ethanol in water to

22    convert it to form I?

23    A.    No, not at all.

24    Q.    And, again, is there any information related to the

25    physical properties of form I anywhere in the specification
```

1    of the '548 patent?

2    A.    No.

3    Q.    Okay.

4                  TRIAL TECH:  I'm sorry to interrupt.  I've

5    just gotten an e-mail asking if I can permit Dominick

6    Gattuso, who is counsel for Sandoz?

7                  MS. CLAYTON:  We are actually done with this

8    line of questioning.

9                  THE COURT:  Wait.  Before you go, hold up.

10                 MS. CLAYTON:  Yes.

11                 THE COURT:  Hold up.

12                 MS. CLAYTON:  But Mr. Gattuso can come in.

13                 THE COURT:  You can bring in Mr. Gattuso.  All

14   right.  Just hold on a second.

15                 Just in terms of going forward, there's going to

16   have to be cross-examination on this point.  I guess we'll

17   have to break out another room for cross-examination.  In

18   terms of drafting an opinion or speaking about something,

19   I've got to think about how to do it.

20                 So basically, you're saying that it confidential

21   that during the manufacturing process they make ibrutinib

22   form E and ibrutinib form C.  Right?  I mean, that's a fair

23   summary of what they do to make this API.  Correct?

24                 MS. CLAYTON:  Correct.  The supplier designated

25   this document highly confidential.  Your Honor, it is

Steed - direct

1    possible, depending on what cross is, that we might be able

2    to substitute this version with one that has a lesser

3    confidentiality designation on it if that would be helpful

4    for purposes of the record.

5              THE COURT:  I think the least that goes under

6    the seal is always the better.  We really should try to

7    avoid that.

8              MS. CLAYTON:  Yes.

9              THE COURT:  And so, for instance, if it's really

10   not a big secret that the manufacturing process by the

11   supplier makes ibrutinib form E, then ibrutinib form C, you

12   know --

13             MS. CLAYTON:  Sandoz has a document with this

14   same schematic.  It's not this full document, so we could, I

15   guess, substitute.  If there aren't questions asked about

16   the later portion of the document, we could substitute this

17   version for that version.

18             THE COURT:  This is not a secret.  It could be

19   made public?

20             MS. CLAYTON:  Yes.  This portion, yes.

21             THE COURT:  Oh, okay.  All right.

22             MR. SIPES:  Your Honor, actually, I have a

23   question about that.  I will need to be mindful of this on

24   cross.  So if I come either to the name of the third-party

25   supplier or -- can you hear me?

Steed - direct

1              THE COURT:  Yes.

2              MR. SIPES:  The name of the third party supplier

3    for this particular synthetic group, do I need to ask for

4    the courtroom to be closed or not?  That's what I'm trying

5    to figure out.

6              MS. CLAYTON:  So with respect to just the

7    synthetic route and the name, that is fine.

8              MR. SIPES:  Okay.

9              MS. CLAYTON:  Until you get to later portions of

10   the document.

11             MS. SIPES:  That's very helpful.

12             THE COURT:  Okay.

13             MR. SIPES:  And, Your Honor, we'll try to do,

14   all the testimony and we're done with the trial and we've

15   had a couple of days to sleep, try to come up with an

16   agreement in the trial transcript what would be the part

17   that needs to be sealed for purposes of making the writing

18   of an opinion easier.  So we'll try to resolve that

19   question, too, when the record is closed and we can look at

20   what's in the record, to minimize what is sealed.

21             THE COURT:  I think to date, there's nothing.

22             MS. CLAYTON:  I agree with that, Your Honor.

23             THE COURT:  Okay.

24             MR. SIPES:  If my understanding from Ms. Clayton

25   is correct, that what we've been talking about doesn't have

                              Steed - direct

 1    to be sealed, that's my understanding.

 2                  THE COURT:  Okay.  Great.  Thank you for both

 3    being helpful.

 4                  All right.  Saji, you can take us all back out.

 5                  MS. CLAYTON:  Can we pull that down?

 6                  THE COURT:  We can proceed now.  Thank you.

 7    BY MS. CLAYTON

 8    Q.     Now, I want to turn back to slide, the slide with the

 9    new forms that have been created.  I think it's slide 25.

10    Okay.

11                  Now, have you looked at the disclosure of each

12    of these patents?

13    A.     Yes, I have.

14    Q.     Okay.  And have you created a chart that summarizes

15    some of the information that is in those patents?

16    A.     Yes, I have.

17    Q.     Okay.  If we could pull up demonstrative 6-29.

18                  Now, what are we seeing here in this chart?

19    A.     Yes.  So these are the, that listing of

20    later-discovered forms.  So I've just listed where they are

21    published, when that patent application was filed, the route

22    of crystallization of these later discovered forms and the

23    X-ray powder diffraction pattern, whether or not it's

24    different to the X-ray powder diffraction patterns disclosed

25    in the '548 patent.  And these are the other forms -- forms

Steed - direct

1    that I -- that we're talking about.

2              And so where I've written different there, that

3    means under my analysis, each of these forms have a

4    different X-ray powder diffraction pattern to any of the six

5    forms and their X-ray powder diffraction pattern disclosed

6    in the '548 patent.

7    Q.    All right.  And so are the route of and

8    crystallizations described here, are those disclosed in the

9    '548 patent?

10   A.    No, not at all of these are all different recipes that

11   of course result in different forms.

12   Q.    What about the X-ray powder diffraction for each of

13   these patterns?  Does it match up with any of the X-ray

14   powder diffraction patterns shown in the '548 patent?

15   A.    No.  They're all different.  These are all different

16   to the six forms that are reported in the '548 patent.

17   Q.    Okay.  And if we could go back to slide 25 again.

18             So, Dr. Steed, I want to focus on claims 18 and

19   19 that are listed here for a moment.  And are you aware

20   that plaintiffs and Dr. Myerson contend that the universe

21   and genus of crystalline forms described by claim 18 is

22   narrow because only two new forms are listed in this chart?

23   A.    I've heard that argument.

24   Q.    Do you agree with that argument?

25   A.    No, I don't, just because --

Steed - direct

1    Q.    And why is that?

2    A.    Sorry.  Just because we happen to have already found

3    two additional forms in addition to the two that are

4    disclosed in the '548 patent that fall under claim 18 don't

5    in any way limit the universe of forms that are covered by

6    claim 18.  There could always be more forms discovered if

7    new crystallization method are invented or new

8    crystallization methods to try.

9              Even though we only know of two additional forms

10   in addition to what the '548 patent disclosed, there could

11   be unlimited number of forms disclosed, discovered in the

12   future as crystallization technology advances.  So it's

13   still an unlimited universe even though we only know of two

14   forms so far.

15   Q.    What about 19?  Do you agree with Dr. Myerson's,

16   plaintiffs' argument, that the scope of claim 19 is narrowed

17   because to date you're only aware of one additional form

18   that meets the claim limitation?

19   A.    I'm aware of an argument, but I don't agree with it.

20   Q.    And why is that?

21   A.    Well, again, let me put it this way.  Already in less

22   than ten years, we found another form that falls under claim

23   9 that the inventors weren't in possession of and, again,

24   this is an unlimited universe.

25              At any point another crystallization method

Steed - direct

1  could be developed and another crystallization technique

2  could be tried that result in yet another form that happens

3  to have two peaks in this crowded region in the 18.9 and

4  16.1 region and that could go on without limit.

5  Q.    In fact, have you worked on compounds where new

6  crystalline forms have continued to be discovered for years

7  after the original forms have been discovered?

8  A.    Yes.  Part of my research is inventing new ways to

9  produce crystalline forms and, yes, I've worked on an

10  example.  It's a drug precursor to the anti-schizophrenia

11  drug Galantamine, where there are 14 forms, of which three

12  of them have been discovered in 2019 and 2020.

13  Q.    What is the name of that compound?

14  A.    We called it ROY.  The polymorphs happen to have a

15  very attractive red, orange and yellow color, so we called

16  it ROY for short.

17  Q.    If we could pull up DTX-1308, please.  And, Dr. Steed,

18  what is this document?

19  A.    This is a pre-print of a paper that I'm a co-author

20  on.  It was developed this year.  This is the

21  pre-publication version.  Developed a new crystallization

22  method.

23          MR. SIPES:  Objection, Your Honor.  I don't

24  believe this is in his report.  If it is, I apologize.  I

25  don't recall seeing this in his report.

1              MS. CLAYTON:  It's in his reply report at

2      paragraph 58, Your Honor.  It's on Page 19.  It's the last

3      article listed there, Tyler.

4              MR. SIPES:  Your Honor, all I was going to say,

5      if that's a paper, that's fine.  There's no except from it.

6      There's no indication that he's going to talk about anything

7      about the contents of the paper.

8              If he's going to talk about what's in the text

9      of his report, that's fine, but there's no indication from

10     this that he's going to at all get into anything else that

11     is in the paper.  And it's sort of interesting the way it

12     has been cited, you can't even tell that Dr. Steed is an

13     author.

14             MS. CLAYTON:  Your Honor, all he's going to

15     establish is to show the article is concerned within that

16     method.

17             THE COURT:  Yes.  I'm going to overrule the

18     objection.  I mean, we don't need to go into much.  The

19     point here is that they continued to develop crystalline

20     forms.  Right?

21             MS. CLAYTON:  Correct, Your Honor.

22             THE COURT:  He has made that point.  I get it

23     and he personally has and it's reflected in this article.

24             Is there anything else you need to dive into on

25     this particular study?

Steed - direct

1              MS. CLAYTON:  No, Your Honor.

2              THE COURT:  All right.  Then I'm going to

3    overrule the objection.

4              MR. SIPES:  Thank you, Your Honor.

5    BY MS. CLAYTON

6    Q.    All right.  And if we could pull up DTX-1307.  And is

7    this another article about the ROY molecule that you cite in

8    your report?

9    A.    Yes, it is.

10   Q.    And does this article also discuss a new form of ROY

11   that has been discovered recently?

12   A.    Yes.  This article was published just last year in

13   Montreal.  They also mentioned a new crystallization method.

14   They also mentioned a new form of ROY.

15   Q.    To date, how many forms of ROY have been discovered?

16   A.    I believe it's 14 now.

17   Q.    And how many of those forms are unsolvated?

18   A.    All 14.

19   Q.    Okay.  And when was the crystalline form of ROY first

20   discovered?

21   A.    I think it was around the year 2000.

22   Q.    And so is it fair to say that 20 years later, you and

23   other scientists continue to discover new crystalline forms

24   of the compound ROY?

25   A.    Yes, that's correct.

Steed - direct

1    Q.    Can you predict in advance whether you are going to

2    discover a new polymorphic compound?

3    A.    No, not at all.  We are were interested in developing

4    new crystallization methods.  We tried it on ROY because

5    it's a new and colorful compound.  I was surprised we got a

6    new ROY.

7    Q.    Have plaintiffs also comment on the predictability of

8    obtaining new crystalline forms?

9    A.    Yes.

10   Q.    If we could pull up JTX-53.  And if we could scroll in

11   there.  What is this document?

12   A.    So this is the file wrapper of a number '753.  I

13   believe it's in the same patent family as the '548 patent.

14   Q.    Okay.  And if we could turn to page 9 of this document

15   and pull out the paragraph the sentence that's highlighted

16   in the middle there.

17          The author or the patentee is saying, indeed,

18   there is no reliable way of predicting the synthesis of a

19   particular polymorph, or the influence of a particular

20   polymorph on the behavior of a chemical compound, since each

21   polymorph imparts unique properties to the parent compound.

22          Do you agree with this statement?

23   A.    Yes, I do.  I'm trying to -- there's no way that you

24   can know in advance what the conditions are, what will give

25   rise to a particular polymorph or what properties it's going

Steed - direct

1    to have out doing the crystallization of analyzing the

2    product.

3    Q.    All right.  So I want to take the discussion that we

4    just had about the specification of the '548 patent and

5    after discovered forms and frame it in the context of that

6    slightly complicated genus analysis that we looked at.  If

7    we could pull back up demonstrative 22 and highlight that

8    bottom bullet there.

9              And I want to start with the first prong and

10   discuss whether there are a sufficient number of

11   representative species in the specification for them to

12   claim a genus.

13             Now, again, we discussed earlier how many forms

14   disclosed in the '548 patent specification come within the

15   scope of claim 18.

16   A.    There are two forms, A and C.

17   Q.    And for claim 19, how many forms disclosed fall within

18   the scope of claim 19?

19   A.    Just a single form, A.

20   Q.    So in your opinion, are the two species disclosed in

21   the '548 patent sufficient to represent all crystalline

22   forms of ibrutinib that have the properties described by

23   claim 18?

24   A.    No.  A very small number indeed and it wouldn't be

25   clear to a person what, what this genus would have in common

Steed - direct

1    just by looking at form A and seeing it, two different

2    forms, two different properties in their own right, and it's

3    not clear how you would go on from those two to create the

4    rest of the genus.

5    Q.    Okay.  And what about for claim 19?  Is the single

6    species disclosed in the '548 patent sufficient to tell a

7    POSA that the inventor had invented the entire category of

8    crystalline form that had the properties of claim 19?

9    A.    No.  A single species, of course, you have no way

10   of knowing what properties the species first have in

11   common or how to get to them because you've only got one

12   to look at.

13   Q.    Okay.  And now I want to focus on the second prong,

14   which is the structural features common to members of the

15   genus, which is also complicated, but let's see if we can

16   simplify it a little bit.

17          Now, and I want to start with, does it make

18   sense to say that there are structural features of claims 18

19   and 19 that a crystalline form could have in common so that

20   you could visualize the entire genus?

21   A.    This doesn't make sense to me in the context of

22   crystal forms.  As I said before, in terms of molecules with

23   a particular functional chemical group, you might recognize

24   particular structural features of molecules that might give

25   them properties in common.  Certain kind of chemical

Steed - direct

```
 1    reactivity, for example.  The polymorphs, each one is

 2    unique.  Each one forms all by itself based upon the

 3    condition in which it finds itself and each one has its own

 4    unique structure.

 5               So I suppose they may have things in common

 6    in the sense that they represent a molecule other than the

 7    fact that there's no linking polymorph.  Each one is

 8    individual.

 9    Q.   Okay.  So now let's go through the structural features

10    plaintiffs claim this genus has in common.  And can we bring

11    up slide 6-30.

12               Now, are these the structural features

13    plaintiffs claim the genus or genera of claims 18 and 19

14    have in common?

15    A.   Yes.  This is what they were able to identify as

16    what's in common within this genus.

17    Q.   Okay.  Let's go through those one by one.  If you can

18    go to the next slide, 31.

19               So do you agree that being a crystalline form of

20    ibrutinib is a feature that is unique to the genera of

21    claims 18 and 19?

22    A.   No, not at all.  Obviously, by definition, any

23    crystalline form of ibrutinib contains the compound

24    ibrutinib by definition.  So, of course, there are

25    crystalline forms of ibrutinib that don't fall within the
```

Steed - direct

1  scope of claims 18 and 19, so having ibrutinib in them can't

2  be an uniting feature of the genus because there are

3  crystalline forms of ibrutinib that aren't part of the

4  genus.

5  Q.    If we can go to the next slide.  What are you showing

6  by filling in these two columns, one with A and C and one

7  with A, B, C, D, E and F?

8  A.    In this I'm pointing out there are other forms which

9  are crystalline forms of ibrutinib that don't fall within

10  this claimed genus and so therefore having ibrutinib can't

11  be part of the genus because forms B, D, E and F are also

12  crystalline forms of ibrutinib but don't fall within the

13  scope of the claims and aren't part of the genus.

14  Q.    Okay.  Let's pull up the next slide, which shows

15  plaintiffs' second argument.  So next they argue that the

16  2-Theta peaks, 18.9 and 16.1 are a structural feature that

17  unites the genus.

18         Do you agree with that?

19  A.    No.  There's no structural feature I can recognize

20  that gives rise to 18.9 or 16.1.  Whether or not there's a

21  peak in the position is a complex outcome of the way in

22  which the molecules impacts the crystal as a whole, and

23  there's no way to engineer or predict that and even if you

24  had in your hands something that already has a peak in that

25  position.

Steed - direct

1              And, moreover, there are, again, crystalline

2     forms disclosed in the '548 patent that don't fall within

3     the scope of this genus.  They don't fall in the scope of

4     claims 18 or 19 but do have two peak to peak at 18.9 and

5     16.1.  They're having 2-Theta peaks, those two positions

6     can't be the feature.

7     Q.    Okay.

8     A.    They don't fall into the claims.

9     Q.    If we could pull up the next slide.  Is that what you

10    are showing here?

11    A.    Yes.  So claim 18 was noted to form A and C.  Claim

12    19.  That's the species falling within the genus

13    interpretation.  But, in fact, forms A, C, D and F all have

14    peaks at 18.9 and 16.1.  So D and F have the peaks, but

15    they're not part of the genus.  That again can't be a

16    feature of the genus.

17    Q.    Okay.  So let's go to the third argument, the argument

18    that both forms A and I are monoclinic.  Do you agree

19    that -- let me start.  Do you agree that both form A and I

20    are monoclinic?

21    A.    No.  In fact, we don't know what crystal class is form

22    I.  It hasn't been determined yet.  Form A.

23    Q.    And why do we not know whether form I is monoclinic or

24    not?

25    A.    Well, there's no known crystal structures.  We don't

Steed - direct

1    know what its -- both Dr. Myerson and I are taking the X-ray

2    pattern of form I tried to do a mathematical process called

3    indexing and what that does, it derives from the X-ray

4    pattern what the unit cell, the basic building block.

5    Monoclinic is one of just seven categories.  And it just

6    means it happens to have one angle of incline.

7              So if we were able to index the pattern

8    successfully, we would have found out if it was monoclinic

9    or not, but neither Dr. Myerson nor I were able to do that.

10   The data was not good enough for indexing.

11             And so we simply didn't, didn't get to a correct

12   solution.  We both produced a number of different possible

13   solutions, none of which were very reliable.  Some were

14   okay.  Some we were trying to make.  We don't know if any of

15   those --

16   Q.    So to be clear, the data that Dr. Myerson generated

17   and the one you generated in response to that, is that data

18   scientifically reliable in your opinion?

19   A.     No, not at all.  The computer really wasn't able to

20   find a suitable fit to that pattern, so we don't know

21   whether one of the 20 odd solutions the computer tried to

22   come up with is reliable or it's not reliable.

23   Q.     All right.  Now, we discussed at form C in claim 18.

24   Is form C monoclinic?

25   A.     No, it isn't.  It's triclinic.

Steed - direct

1    Q.    Okay.  How do we know that?

2    A.    It's a paper published in 2018 which definitively

3    characterized Form C.  Having a full X-ray structure

4    analysis and derived the units and showed that it's

5    triclinic.

6    Q.    Okay.  If we could pull up DTX-1304.  And what is this

7    article, Dr. Steed?

8    A.    Yes.  This is a paper published in 2018 that I was

9    talking about which did a full crystallographic study on A,

10   B and C.

11   Q.    If we could turn to page 1318 of this document, across

12   the table.  I see in the third column it says ibrutinib

13   polymorph C?

14   A.    Yes.

15   Q.    If we go down to the space group, I see it says for

16   form A, it's monoclinic and for form C, it's triclinic; is

17   that correct?

18   A.    Yes.  It's the crystal system.  As I said, it's

19   just --

20   Q.    Sorry.

21   A.    Monoclinic and triclinic are the common ones and in

22   this particular one, polymorph C was shown to go triclinic.

23   Q.    Okay.  So we can take that down.

24         If we could pull back up the next slide and go

25   to DDX-6.36.  What are you showing here based on what we

1    just discussed?

2    A.    Being monoclinic, like a million other crystals known

3    to science, can't be the defined feature of this genus

4    because form A and C are supposed to be part of the genus,

5    the genus that forms claim 18.

6            Forms C and D are monoclinic, so that can't be a

7    defining feature.  And then in terms of other forms in the

8    '548 patent, we just don't know.  We don't know the crystal

9    system of some of the other forms.  We don't know.

10   Q.    Okay.  Now, let's go to the second-to-last argument

11   that plaintiffs make and if we go to the next slide.

12           So now they argue that both forms A and I are

13   relatively thermodynamically stable and somehow that is a

14   uniting feature for claim 19 in particular.  Do you agree

15   with that argument?

16   A.    No, I don't.

17   Q.    Why not?

18   A.    Well, any given set of conditions, temperature,

19   pressure, one particular polymorph for the most stable and

20   it's always form A and everything else is less stable than

21   form A.  In terms of what's meant by relatively stable, I

22   would argue that all of form A, B, C, D, E and F are

23   relatively stable in the sense you can isolate them, you can

24   study them at least long enough to study their X-ray

25   diffraction pattern.  As compared to an unstable form,

1    something that transforms into something else or decomposes

2    before you can study it.  All six are relatively stable.

3    Not as stable as A.  They're all stable enough to study, so

4    I would say they're thermodynamically stable.

5              THE COURT:  Can you stop for one second?  You

6    mean form A for ibrutinib?  Is that what you are talking

7    about?

8              THE WITNESS:  Yes.

9              THE COURT:  I just want to make sure.  Form A,

10   that's just a name they gave it in terms of ibrutinib.

11   Right?  They could have called it form 45.  Right?  That is

12   just an -- there's no naming convention to that.  Is that

13   correct?

14             THE WITNESS:  That's absolutely right, Your

15   Honor.

16             THE COURT:  Sorry.  I wanted to make sure I

17   wasn't missing something.  All right.  Thanks.

18   BY MS. CLAYTON

19   Q.    So in your understanding, which form as between form A

20   and I of ibrutinib is more stable?

21   A.    Form A.

22   Q.    Okay.

23             THE COURT:  Wait, wait.  That's where your

24   British accent may have affected us.  So it's form A as in

25   apple.  Is that right?

Steed - direct

1          THE WITNESS:  Yes.  "A" as in apple.  I

2    apologize.

3          THE COURT:  Okay.

4    BY MS. CLAYTON

5    Q.    If we could pull up the next slide.  So why have you

6    filled in this row in this manner here?

7    A.    Yes.  Well, as I explain, I would describe all the

8    forms of the '548 patent as being relatively stable because

9    they're stable enough to study.  And so being relatively

10   thermodynamic stable can't be a defining feature of this

11   genus because there are forms that are not part of the genus

12   that do have that characteristic.

13   Q.    Okay.  And if we can go to the last item on the next

14   slide.  Next, they argued both A and I are monotropically

15   related.  Let's start with, what does monotropically related

16   mean?

17   A.    Yes.  Complex terms.  Actually, it refers to a fairly

18   simple phenomenon.  So if two polymorphs are monotropically

19   related, that means one of those two is the most stable

20   throughout the whole temperature range up until the melting

21   point.  So in this case, it's true, forms A and I are

22   monotropically related because form A is always more stable

23   than I irrespective of the temperature.

24          There are other examples in other compounds

25   where the temperature, but you have a former high

1    temperature different than the one that's stable.

2                THE COURT:  I'm sorry.  I need to put you on

3    hold.  We've got something going on here in the building.

4    I'm sorry to interrupt.  It's a bad time.  Everybody is

5    going to have to wait for a second.

6                (Pause.)

7                THE COURT:  Okay.  Sorry about that.  And we're

8    trying to figure out what's going on, but we can pick up.

9    Apologies.

10               So we left off where there are other examples

11   and other compounds where the temperature, but you have the

12   former high temperature different from one that's stable.  I

13   guess I will leave you, Ms. Clayton, to figure out how to

14   pick up.

15               MS. CLAYTON:  Sure.  Yes.

16   BY MS. CLAYTON

17   Q.    So, Dr. Steed, I think you were just describing how,

18   what the difference is between monotropically related and

19   enantiotropically related.  I can't even get that word out.

20               Can you describe for the Court the difference

21   between those two?

22   A.    Yes.  So there's just the two possibilities.  You can

23   either be monotropically related or enantiotropically

24   related.  And enantiotropically just means that the

25   stability swaps over as a function of temperature, so A is

Steed - direct

1    more stable than I at low temperature and you warm it up and

2    if they were are enantiotropically related, then A is

3    stable.

4              Forms A and I are indeed monotropically related.

5    Form A is the most stable up to the melting point.  But so

6    are the other forms.  Form A is the most stable out of all

7    the forms described in the '548 patent as well.

8              So, again, being monotropically related can't be

9    feature.  There are other forms.  Monotropically related

10   that don't fall within.

11   Q.    If you pull up the next slide, is that what you are

12   showing here?

13   A.    Yes.  It is my understanding that form A is the most

14   stable form.

15   Q.    Okay.  So in sum, after looking at all of plaintiffs'

16   arguments, what is your opinion as to whether any of these

17   structural features unite the genera that are set forth in

18   forms 18 and 19?

19   A.    They don't.  These are all just general descriptions

20   of many different crystals.  They don't seem to define any

21   kind of genus because there are forms that have the feature,

22   have each one of those features that don't inform claims 18

23   and 19.  All of these features can't be defining features of

24   the genus that's fall under claim 18 and 19 in this kind of

25   genus argument.  It doesn't make any sense.

Steed - direct

1    THE COURT:  All right.  Hold up one second.  So,

2    Ms. Clayton, were you using the word genera, I think.

3    MS. CLAYTON:  I was.

4    THE COURT:  Okay.  Now, genera is plural of

5    genus.  Right?

6    MS. CLAYTON:  Correct.

7    THE COURT:  Okay.  All right.

8    BY MS. CLAYTON

9    Q.    So in sum, based on all the evidence we just looked

10   at, what is your opinion as to whether as of June 4th, 2012,

11   any of the inventors were in possession of crystalline forms

12   besides A through F?

13   A.    They were not in possession of anything other than

14   claims A, B, C, D, E and F.

15   Q.    And so in your opinion, does the specification of the

16   '548 patent sufficiently describe any crystalline forms of

17   ibrutinib other than A through F?

18   A.    No, it doesn't.  It doesn't describe anything other

19   than forms A through F.

20   Q.    And so what is your opinion as to whether or not there

21   is sufficient written description support for claims 18 and

22   19 of the '548 patent?

23   A.    Insofar as the claim language taken to mean any form

24   with characteristics, any form of ibrutinib with peak

25   positions being unsolvated and the patent, written

Steed - direct

1    description other than form A through F and therefore is

2    invalid for written description.

3    Q.    Okay.  Now, let's turn to your enablement analysis.

4    I'm hoping we can get through that quickly because we set

5    the foundation with a lot of things you already discussed.

6          And so let's start by reviewing what you

7    understand to be the correct standard to apply.  Can you

8    pull up slide 642, please, PDX-6-42.

9          So, again, I know you're not a lawyer, but can

10   you describe for us what you understand you are supposed to

11   analyze for enablement?

12   A.    Yes.  So my understanding is it's basically the patent

13   has to teach you how to use the invention.  So everything

14   that falls under the claims of the patents and the patents

15   actually teach you how to make and use that.  In other

16   words, the language says make and use the full scope of the

17   claim.  So if the claim claims something, the patent has to

18   teach you how to get to it and make it.

19   Q.    And on the second bullet point, do you understand that

20   there are certain factors called the Wands factors you're

21   supposed to apply?

22   A.    Yes, that's right.  The person of skill being taught

23   by the patent how to make and use the claim should not have

24   to undergo undue experimentation.  They shouldn't have to do

25   undue experimentation in order to make and use the full

Steed - direct

1  scope of the patent's claims and the Wands factors is my

2  understanding of the law help us analyze whether the amount

3  of that expectation -- the amount of experimentation that

4  would be required to make and use the full scope of the

5  claim would be undoable.

6  Q.    Okay.  So let's go through each of those and if we

7  could go to the next slide.  And I want to start with the

8  rest of the claims and we talked about this a lot, so I

9  don't want to belabor it, but how would you describe the

10  breadth of claims 18 and 19 of the '548 patent?

11  A.    Incredibly broad, potentially unlimited.  You wouldn't

12  know if you found all of them that fall under that claim.

13  Q.    Okay.  And let's go to the next slide.  So given the

14  breadth of these claims, how would you describe the nature

15  of the invention here?

16  A.    So in this claim, I used the nature of the invention.

17  It's every single form of ibrutinib whether known or not as

18  we sit here today that has peaks in those one or two places

19  and is unsolved.

20  Q.    And so how does that mean you would describe the

21  complexity of the nature of the invention claimed?

22  A.    Well, that then becomes very complex.  So, one, a

23  person of skill knows how to do a crystallization.  They

24  wouldn't know which crystallizations to do in order to get

25  every single form, including ones that are not in science

Steed - direct

1    that might fall under this claim language.  That would make

2    it a very complex inquiry indeed, because we don't know when

3    to stop.

4    Q.    Okay.  And if we could turn to the next slide.  What

5    about the state of the art?  Was there anything in the art

6    related to either ibrutinib or crystallization generally

7    that helped with the complexity and breadth of the invention

8    here?

9    A.    Well, the patent itself teaches how to make six forms

10   of ibrutinib.  A person could do that.  Beyond that, there's

11   nothing else in the patent.  The skilled artisan would know

12   how to do crystallizations.  They would know the methods

13   I've described, so they could go crystallize ibrutinib in a

14   different way.  Just as long as they avoided the teachings

15   of the '548 patent, they could do something different and

16   might get lucky and get a new form.  They also might try

17   to not get a new form of '548.  There are already six of

18   them.

19           The point is they wouldn't know which

20   crystallization sayings to do, including crystallization

21   methods not yet invented, which might result in forms that

22   would be covered by the claims.  So, for example, I wouldn't

23   know from the prior art how to do a droplet crystallization,

24   because that hasn't been invented yet.

25   Q.    Okay.  And what about the predictability in the art?

Steed - direct

1  How would you characterize the level of predictability in

2  the art both in making new crystalline forms and knowing

3  what properties those forms are going to have?

4  A.     This is an empirical way, the way people can't predict

5  in advance what's going to happen.  They just try a

6  crystallization method or set of crystallization conditions

7  and then they see what happens.

8            So there really isn't any predictability other

9  than the predictability that if I bring about a high

10  solution, I might get crystal structures.

11           It is possible to try to calculate crystal

12  structures.  They typically give rise to hundreds, if not

13  thousands of possible crystal structures.  They give no

14  guidance how to actually make them.  The person is left just

15  trying to set the conditions, and in this particular case,

16  it would require the full scope of the claim.  That person

17  would be endlessly trying different crystallization

18  techniques and different crystallization variables, never

19  being really sure whether they explored the full scope of

20  the claim.

21  Q.     Okay.  And, in fact, have plaintiffs characterized

22  crystalline forms of ibrutinib as unpredictable?

23  A.     Yes, I believe we could.

24  Q.     If we could pull up PTX-2430.

25           Dr. Steed, what do you understand this document

1    to be?

2    A.    So this is a set of plaintiffs' responses to

3    defendants' interrogatories.

4    Q.    Okay.  And if we could go to the bottom of page 44

5    to the top of page 45.  If we could call out Section C

6    there.

7              All right.  So you see there the first line says

8    crystal structures and polymorphism are highly

9    unpredictable.  A POSA cannot predict whether a particular

10   crystalline form or polymorph can be made or what structure

11   or properties that a crystalline form or polymorph many

12   have.  That was true as of June 4th, 2012, and remains true

13   today.

14             Do you agree with that statement as plaintiffs

15   have set it forth there?

16   A.    Yes, that's right.  You don't know whether you could

17   make it in crystalline form because you don't know what

18   conditions it would be formed under, so they're just left

19   empirically trying potentially endlessly, maybe trying to

20   invent new crystallization methods because you don't know in

21   advance whether you will make it.

22   Q.    Now, the level of skill in this art is high.  Does

23   that compensate for the fact that this is an unpredictable

24   art?

25   A.    No, not really.  A person of skill, highly educated,

Steed - direct

1    as I would describe.  They would know how to do

2    crystallization.  They would know how to do polymorph

3    screening as it's done in industry, which has the goal of

4    identifying the most stable form and the more accessible

5    form, but that's very, very different than trying to

6    identify every single possible form with a particular set of

7    recited and unpredictable characteristics.  So a person

8    knows how to crystallize, but they don't know how to

9    crystallize every possible form.

10   Q.    All right.  If we could go to the next slide.  One

11   more after that, 48.  We've already discussed it

12   extensively, too.  I just want to touch on it for a moment.

13          Is there a specific direction or guidance given

14   in the specification or examples given in the specification

15   that would teach a person how to make all crystalline forms

16   of ibrutinib that are recited in claims 18 and 19?

17   A.    No, there is detailed guidance on how to make the six

18   forms that are disclosed in the patent and that's where the

19   patent stops.  There's no other guidance on this patent.

20   Q.    Okay.  And I want to conclude with the last one.  Go

21   to the next slide.  Quantity of experimentation.

22          Again, you've touched on this a little bit in of

23   some your last answers.  In your opinion, given the scope of

24   the claims here, how much experimentation would be necessary

25   in order for a highly skilled person to make and use the

Steed - direct

1   full scope of the claims that are at issue here?

2   A.     Yes.    The full scope is key here.    In the context of

3   experimentation, it's potentially unlimited.    You could go

4   on until you ran out of patience, money, or years of life

5   and never be sure you had made and used the full scope of

6   the invention.

7   Q.     In your background on the technology tutorial, you

8   discussed a variety of variables that can influence the

9   crystalline form of ibrutinib or any crystalline form that

10  you get.

11          Do you recall that testimony?

12  A.     I do.

13  Q.     And if we could bring up slide DDX-6-58 again.

14          So tell us, how do these variables influence the

15  amount of experimentation that would be required to practice

16  the full scope of the claim?

17  A.     Yes.    Well, there's a potential, very, very large

18  experimental space using -- it varies from parameter to

19  parameter that could result in a potential new form of

20  ibrutinib, particularly crystallization method.

21          Some crystallization methods are being invented

22  at the time.    Without knowing at the time of the filing of

23  the patent, it may not have been invented yet.    There could

24  always be a new crystallization method that gives rise to a

25  polymorph of the scope of the claims that a person would

Steed - direct

1    have to invent effectively and even coming to more ordinary

2    things like changing the solvents.

3              Again, they could keep changing solvent and

4    solvent mixtures with different temperatures, cooling rates,

5    concentrations, pH and so on, essentially endlessly.  They

6    might just keep getting the same form.  They will never know

7    whether they just assumed they have not explored the space

8    enough or whether there were no more forms to be had, and

9    not knowing whether you, whether you've finished.

10   Q.    And have plaintiffs also previously described the

11   amount of experimentation that is required to make

12   crystalline forms of ibrutinib?

13   A.    Yes, they have.

14   Q.    If we could go back to DTX-2430 again.  Turn to page

15   47 of this document.

16              Do you see where they say, a POSITA an

17   attempting to make a crystalline form or forms of ibrutinib

18   would have to have had performed extensive trial-and-error

19   experimentation, using an enormous number of variables and

20   conditions, and would not have been able to predict the

21   results of such experiments.

22              Is this what you were just describing here in

23   terms of the level of experimentation required in obtaining

24   crystalline form?

25   A.    Yes and no.  This is describing, attempting to make a

Steed - direct

1    crystalline form.  It may not be nothing to make a

2    crystalline form.  You may luck out and get one.  But

3    the crystalline part requires the full scope of the

4    invention.

5              So a person trying to make all possible

6    crystalline forms falling under these claims would have to

7    perform limitless trial and error experimentation as the way

8    things are described.

9    Q.    In sum, based on all the factors we just looked at,

10   what is your opinion whether it would require undue

11   experimentation to practice the full scope of claims 18 and

12   19 of the '548 patent?

13   A.    It would indeed require undue experimentation.  The

14   full scope is potentially unlimited.

15             MS. CLAYTON:  Thank you.  We'll turn the witness

16   over for cross-examination.

17             THE COURT:  Thank you very much.

18             Doctor, I don't know.  Did you want to take a

19   break before we begin cross?

20             THE WITNESS:  I'm happy to continue, Your Honor,

21   if you are.

22             THE COURT:  Mr. Sipes, how long do you think

23   you'll be?  I mean, if we take a break now, do you want to

24   take a break in the middle of your cross?  How do you want

25   to do this?

Steed - direct

1          MR. SIPES:  Your Honor, I'm happy to proceed

2     however you prefer.  The cross won't be too extended.  It

3     could be an hour.  This is a technical subject matter.  I'm

4     happy to take a break whenever Your Honor would want to take

5     a break.

6          THE COURT:  All right.  If the witness at any

7     point wants to take a bathroom break, that's fine, but,

8     you know -- actually, Doctor, assuming we're going to be

9     like another hour-and-a-half, are you set to go all the

10    way through an hour-and-a-half or would you rather have a

11    break?

12         THE WITNESS:  Maybe I will take Your Honor up

13    and I will take a break.

14         THE COURT:  I know it's late over there.  Is it

15    8:15 or 9:15?

16         THE WITNESS:  8:15.

17         THE COURT:  8:15.  So why don't we take a

18    ten-minute break.  All right?  We'll begin at 3:25.  All

19    right.  Thank you.

20         MR. SIPES:  Thank you, Your Honor.

21         THE WITNESS:  Thank you, Your Honor.

22         (Short recess taken.)

23              -   -   -

24         (Proceedings resumed after the short recess.)

25         THE COURT:  Okay.  Are we all here?

Steed - cross

1          MR. SIPES:  We're here Your Honor.

2          THE COURT:  Proceed then, Mr. Sipes.

3          MR. SIPES:  All right.

4                    CROSS-EXAMINATION

5    BY MR. SIPES:

6    Q.    Good evening, I guess, Mr. Steed.  My name is

7    Christopher Sipes.  I'm here on behalf of plaintiffs.  I'm

8    in Washington, D.C., so I appreciate you joining us from

9    England.

10          Let me start with something that I think

11   everyone agrees on.  Both you and Dr. Myerson agree that the

12   POSA here is highly skilled; correct?

13   A.    Yes.

14   Q.    And you agree that the '548 patent discloses all the

15   crystalline forms of ibrutinib that have been made prior to

16   the filing date for the patent; is that correct?

17   A.    That's my understanding, yes.

18   Q.    So the '548 patent disclosed all the crystalline forms

19   of ibrutinib that were known in the art at the time of the

20   filing of the patent; is that correct?

21   A.    That's my understanding.

22   Q.    And crystalline forms A through F are each enabled by

23   the disclosure of the '548 patent; correct?

24   A.    Yes, that's my understanding.  That's right.

25   Q.    And there is adequate written description for

Steed - cross

1    crystalline forms A through F in the '548 patent; is that

2    correct?

3    A.    Yes.

4    Q.    So which is to say that the '548 patent enabled a

5    person of ordinary skill in the art at the time to make an

6    use all of forms A through F; correct?

7    A.    Yes, I would agree with that.

8    Q.    Now, let's look a little bit at the scope of claims 18

9    and 19.  You understand that those are the claims that are

10   at issue in this proceeding, claims 18 and 19 of the '548

11   patent; correct?

12   A.    Yes, I do.

13   Q.    So let's turn, if we could, Mr. Brooks, to DDX-6-25.

14   DDX-6-25 is actually drawn from an exhibit, Exhibit 4 that

15   you put together in your expert report identifying

16   crystalline forms from after the '548 patent; is that right?

17   A.    Yes, that's right.

18   Q.    And if you go to DDX-6-25, there's a number of forms

19   and you've sorted the forms that, on the right-hand column,

20   the source.  You went into the literature and you surveyed

21   the literature to find additional crystalline forms of

22   ibrutinib; is that correct?

23   A.    Yes, that's right.

24   Q.    And you've identified a number of forms and then when

25   you get down to claim 18 and 19, there are two forms that

Steed - cross

 1    you've identified within claim 18 and that's form I and form

 2    S3.

 3                Do you see that?

 4    A.    That's right.

 5    Q.    And you note that those two forms are unsolvated;

 6    correct?

 7    A.    Yes.

 8    Q.    And of all the forms that are on this exhibit,

 9    DDX-6-25, those are the two forms that are unsolvated, form

10    I and form S3; is that correct?

11    A.    Yes.

12    Q.    So you're not aware of any crystalline forms of

13    ibrutinib that are not either disclosed in the '548 patent

14    or listed here on this exhibit that we're looking at now;

15    correct?  DDX-6-25?

16    A.    That's right, yes.  This wasn't an exhaustive search,

17    but these are the ones that I'm aware of.

18    Q.    So we can say that you and me and everyone else is

19    aware of five unsolvated forms of ibrutinib, forms A, B, C,

20    I and S3; correct?

21    A.    Yes, as far as I'm aware.

22    Q.    Now, we've talked a lot and you even in your testimony

23    earlier today have talked about unsolvated forms and you

24    agree that claims 18 and 19 are limited to unsolvated forms

25    of ibrutinib; is that correct?

Steed - cross

1    A.    Yes, that's right.

2    Q.    But I'm not sure you explained in your tutorial what

3    that means, an unsolvated form versus a solvated form, so

4    let's see if we can get to a little bit of that.

5                In a solvated form, solvent molecules are

6    incorporated into the crystal lattice along with the

7    molecule of interest, if you will; correct?

8    A.    Yes, that's the regular repeating part of the crystal.

9    Not just a wet crystal.  They're actually a tangible part of

10   the structure.

11   Q.    There's an intellectual concept called a unit cell,

12   which is really describing the repeating unit of the

13   crystal.  It's made up of the various molecules that are in

14   the crystalline lattice; is that correct?

15   A.    I wouldn't quite agree with that.  I know what you are

16   getting at.  It would be the mathematical concept about the

17   way we describe how they impact.  The units are not made up

18   of molecules.  Usually drawn as a box around the molecules.

19   I think I see what you mean that.

20   Q.    What's defining the unit cell is the structural

21   arrangement of the molecules in crystal.  Is that fair?

22   A.    No, absolutely not.  The structure of the molecules

23   comes from an attempt to see.  The unit describes the

24   periodicity with the heat in the crystal.

25   Q.    Are you really saying that the unit cell has nothing

Steed - cross

1    to do with the packing of the molecules in the crystal?

2    A.    The unit cells are a concept that describe the

3    symmetry, the way in which the molecules pack, but it

4    doesn't describe molecular structure.

5    Q.    Okay.  That's what I was getting at.  You are trying

6    to describe how the molecules and the crystals are packed.

7    A.    Yes.  It's how we describe the packing arrangement.

8    Q.    So in a solvate, in addition, in an ibrutinib --

9    excuse me.  In an ibrutinib solvate, you would have in a

10   repeating pattern not just ibrutinib, but one or more

11   additional solvents present; is that correct?

12   A.    Yes, that's right.

13   Q.    And a solvent could be as simple as water; right?

14   A.    Yes.  That would make it a hydrate, which is an

15   example of a solvate, yes.

16   Q.    It could be other solvents like toluene or acetone or

17   isopropyl alcohol.  There's a wide variety possible of

18   solvates?

19   A.    Yes, that's true.

20   Q.    And so it's not surprising to find more solvates of a

21   molecule than unsolvated forms; is that correct?

22   A.    It just depends completely on the molecule.  Some

23   molecules don't form solvates at all.  Others form a lot of

24   solvates.

25   Q.    So let's focus on -- this case is focusing on

Steed - cross

1    unsolvated forms.

2              Now, you pulled up an article and we can take a

3    look at it.  This was called ROY.  That's the name of the

4    compound, reclaimed its crown.

5              Do you recall that?

6    A.    I do.

7    Q.    And the reason that ROY is reclaiming its crown is

8    because it is the king of polymorphic forms that are

9    unsolvated; is that correct?

10   A.    Not quite sure what you mean by king.  The crown has

11   been referred to in the literature is having the most single

12   crystal X-ray structures of any -- of any particular

13   compound.  Of course, it's not surprising because ROY has

14   extensively studied, it's an attractive visual and it's a

15   great test.

16   Q.    In fact, ROY has 14, 14 unsolvated forms; is that

17   correct?

18   A.    Yes.

19   Q.    Now, in terms of your, the compounds that you've

20   worked with, you don't recall, when you were at the

21   deposition, you don't recall working on a compound with more

22   than four unsolvated forms; is that correct?

23   A.    I didn't initially recall, and then I remembered

24   carbamazepine.

25   Q.    And so that gives us a sense of unsolvated forms when

1    you start to get to, you know, the number of unsolvated

2    forms that you typically find in molecules.  ROY is unusual,

3    you would agree with that; is that correct?

4    A.    ROY is extensively studied, so any new method, they

5    try to try them out.  It's a popular example.

6    Q.    Well, I'm looking at the list of sources that you have

7    for crystalline forms of ibrutinib on DDX-625.  That's

8    looking like it's pretty extensively studied, too, is it

9    not?

10   A.    Not so much in the academic literature.  It's

11   obviously in the interests for commercial use of the

12   patent.

13   Q.    So let's come back to unsolvated forms because that's

14   really what's at issue in this case, correct, is unsolvated

15   forms?

16   A.    In terms of claim 19, yes.

17   Q.    And I think if we look -- keep looking at DDX-625.

18   You identify two additional unsolvated forms that are within

19   claim 18, form I and form S3.  We went through that; is that

20   correct?

21   A.    That's what we've learned so far.

22   Q.    And, of course, we know that two other unsolvated

23   forms, forms A and C, that are described and enable by the

24   '548 patent, also fall within claim 18; is that correct?

25   A.    That's my understanding, yes.

1    Q.    So what we know and what we can say is that there are

2    four known forms of ibrutinib that fall within claim 18; is

3    that correct?

4    A.    That's what we know about so far, yes.

5    Q.    Now let's look at your chart for claim 19.  For claim

6    19, you identified one additional form, form I.  Correct?

7    A.    Yes.

8    Q.    And, of course, we know that form A, which is

9    described in the '548 patent, also falls within claim 19; is

10   that correct?

11   A.    Yes.

12   Q.    So sitting here today, we know that there are two

13   unsolvated forms of ibrutinib that fall within claim 19?

14   A.    There are two that have been discovered so far that

15   are important.

16   Q.    So we can refer -- we can refer to claim 19 as a

17   genus, but it is a genus that at least to date is a genus of

18   two; is that correct?

19   A.    I wouldn't refer to a crystalline form in the context.

20   Q.    Okay.  There are two individuals within claim 19; is

21   that correct?

22   A.    Yes, and the way that these patents are, the claim

23   construction.

24   Q.    Now, I think we have talked about form I.  You

25   talked about it with your counsel, that it was relatively

1    stable.

2                    Do you recall that?

3    A.    Yes.

4    Q.    And, in fact, in your own rebuttal report, you have a

5    whole section about the fact that form I has polymorphic

6    stability; is that correct?

7    A.    Yes.  The phrase relatively stable obviously is

8    subjective.  As I explained, I find them to be stable --

9                    THE COURT:  Wait, wait.  Sorry.  He defined

10   relatively stable as, and then there was movement of the

11   microphone and we missed it.

12                    So relatively stable and what?

13                    THE WITNESS:  Stable enough to study.

14                    THE COURT:  Okay.  Thank you.

15                    THE WITNESS:  I wouldn't characterize the form

16   as unstable.

17                    MR. SIPES:  Actually --

18                    THE COURT:  No.  We missed your last sentence.

19   "I wouldn't characterize the form as unstable," and then

20   whatever you said.

21                    THE WITNESS:  If it's stable enough to study,

22   record a powder diffraction pattern?

23                    THE COURT:  Record a powder diffraction

24   something what?

25                    THE WITNESS:  Pattern.

Steed - cross

1        THE COURT:  Pattern.  All right.  Thank you.

2    BY MR. SIPES:

3    Q.    Now, in your rebuttal report, you actually went much

4    further.  You pointed out that form I is sufficiently

5    stable, that it does not change the polymorphic form during

6    manufacturing of the product, nor does it change its

7    polymorphic form during storage; is that correct?

8    A.    That's my understanding.  It does seem to be stable

9    under those conditions.

10   Q.    So rather than relatively stable, would you prefer the

11   term quite stable?

12   A.    I think these are all subjective terms.  My

13   understanding is it's less stable than form A, but it is

14   relatively stable, quite stable.

15   Q.    There are polymorph forms that turn out not to be

16   useful in pharmaceutical manufacturing because they do

17   change forms either in manufacture or storage; is that

18   correct?

19   A.    Yes, that's right.  Stability is a bit of a gray scale

20   from that point of view.

21   Q.    But one thing we know about both form A and form I is

22   they have an attribute of stability which enables them to be

23   manufactured into drug products and then stored long term

24   without changing polymorphic form; is that correct?

25   A.    I suppose if appropriately handled, you would have to

Steed - cross

1  do that.

2              THE COURT:  Hold up.  Sorry.  Mr. Sipes, I think

3  what's going on, too, I think when you move your notebook,

4  it takes over the microphone.  That's part of it.

5              MR. SIPES:  Right.

6              THE COURT:  So sorry to interrupt.  I don't like

7  to interrupt cross-examination, but we've got to get this on

8  the record.

9              So, Doctor, if you could maybe get closer.  It

10  was better before.  It's wherever you're positioned on the

11  mike.  You seemed closer actually than you were in your

12  direct.  Where is your microphone?

13              THE WITNESS:  It's just right above my -- I have

14  one pointing.  I have one above my screen.

15              THE COURT:  Now we can hear you, so let's repeat

16  what's the last question.  And maybe it's not Mr. Sipes,

17  but somebody is moving and then that interrupts the

18  microphone.

19              MR. SIPES:  I will take the blame for it, Your

20  Honor.  I don't know that it's me, but I am of a bit of a

21  fiddler.  It's probably me.

22              THE COURT:  All right.  So let me back up and

23  see where we lost it.

24              So your voice does tend to go down when you

25  answer.  All right.

Steed - cross

1           So the question that was put to the witness was:

2           "But one thing we know about, both form A and

3    form I, is they have an attribute of stability which enables

4    them to be manufactured into drug products and then stored

5    long term without changing polymorphic form.  Is that

6    correct?

7           "Answer:  I suppose if appropriately handled,

8    you would have to," and then we lost you.  All right.

9           THE WITNESS:  Have to carry on testing on any

10   given form to see what conditions it was to be stored under

11   in order to see whether it would transform into another form

12   under those conditions and typically, that's what's done

13   within pharmaceutical product development.

14   BY MR. SIPES:

15   Q.    And you may recall, you cite in your rebuttal report

16   the study that Sandoz did at different temperatures and

17   humidity conditions for at least three months and for

18   storage for at least one year showing that under those

19   conditions, it remained form I.  It was stable under those

20   conditions and that duration; correct?

21   A.    Yes.  Absolutely right.  Any pharmaceutical company

22   wanting to manufacture a drug product would attempt to

23   ensure that it's stable in storage.  That's an FDA

24   requirement.

25   Q.    In fact, the reason that Sandoz studied it under

Steed - cross

1  different temperatures and humidity conditions is because

2  FDA doesn't assume that everything is perfectly and properly

3  handled.  People store their drugs in their medicine cabinet

4  in their bathroom, possibly the worse place.

5           So, in fact, what we've shown is that both form

6  I and form A are pretty rugged and that they are

7  appropriately stable for use in the drug product that's

8  going to be in people's houses; correct?

9  A.    I'm not sure I quite characterize it like that.

10  Sandoz has developed a robust product which is stable

11  under the conditions of recommended storage.  We do know

12  that form A is more stable than form I.  Fortunately,

13  there's a sufficient kinetic barrier.  Form I doesn't

14  convert to form A under the recommended handling and storage

15  conditions.

16  Q.    It's not just that form I doesn't convert to form A,

17  it doesn't convert to a different crystalline form.  It

18  remains form I; is that correct?

19  A.    Yes, that's correct.  It remains as needed.

20  Q.    And I think you said Sandoz developed.  Sandoz did not

21  develop form I; is that correct?

22  A.    No.  I don't think they're the patentee.  I think they

23  license it.

24  Q.    They purchase form I from a manufacturer abroad; is

25  that correct?

Steed - cross

1    A.    I'm not super familiar with the commercial details,

2    but, yes, they do get it from another manufacturer.

3    Q.    And so the X-ray powder -- well, let's pull up

4    DDX-610 -- I'm sorry.  611.  So you're trying to show how

5    the X-ray powder diffraction pattern is coming out of sort

6    of this repeating arrangement of molecules and crystal; is

7    that correct?

8    A.    Yes, the X-ray powder diffraction, it's a

9    characteristic thing of the crystal structure.

10    Q.    So you can call it a fingerprint, but there's a big

11    difference between an X-ray powder diffraction pattern and a

12    fingerprint, and that is the X-ray powder diffraction

13    provides information relating to the structure of the

14    crystalline form; is that correct?

15    A.    Yes.  The whole pattern is determined by the crystal

16    pattern arrangement of the crystal structure.

17    Q.    And your fingerprints obviously don't say anything

18    about how tall you are or how wide you are or what you

19    weigh; correct?

20    A.    I guess not.  It's used for analogy, but it does fall

21    down at some point.

22    Q.    And the X-ray powder diffraction pattern is directly

23    related to the crystal structure in the substance; correct?

24    A.    Yes.  It comes in a what's called transposition from

25    the structure.  That doesn't mean to say you can recognize

Steed - cross

1    the structure by looking at the X-ray pattern.  You can't

2    really work backwards.

3    Q.    And the position of the peak in an XRPD pattern are

4    determined by the unit cells in the crystalline form; is

5    that correct?

6    A.    Yes, that's right.

7    Q.    And so the position of the peak in an XRPD pattern

8    stems directly from the size and shape of the unit cell and

9    it is the unit cell and only the unit cell that governs the

10   position of the peak; is that correct?

11   A.    Yes, that's correct.  The positions come directly from

12   the mathematical cell peak.  That's how we mathematically

13   treat peaks.

14   Q.    And when we refer to position of peak, that is

15   sometimes referred to as the 2-Theta values; is that

16   correct?

17   A.    Correct.

18   Q.    And I think as we discussed earlier, the unit cells

19   of crystalline form is a representative description of how

20   the molecules are packed to form the crystal; is that

21   correct?

22   A.    Yes.  Symmetry relationships between the crystal

23   packing arrangement.

24   Q.    I don't know if you were trying to show the lattice in

25   your diagram, but the distance between the lattice plane as

1    defined by the unit cells of the crystalline form is a

2    called the D spacing; correct?

3    A.    Yes, that's right.  The D spacing is the distance

4    between the planes.  It's a mathematical relationship.

5    Q.    And we're starting to get into some of the dimensions

6    of the unit cell when you start talking about the D spacing

7    for the lattice plane; is that correct?

8    A.    Yes, I suppose so.

9    Q.    And the 2-Theta peaks of the XRPD pattern is

10   equivalent to the D spacings; is that correct?

11   A.    Yes.  They are mathematically related.

12   Q.    So each 2-Theta peak position specifies a particular

13   d-spacing of the crystalline form; is that correct?

14   A.    Well, the unit cell tells you where the, where the,

15   where the particular reflections from each of the planes in

16   the crystal will come but it doesn't tell you about whether

17   there will be any intensity there, by the unit distribution.

18   The unit cell would tell you to go to look at a 2-Theta

19   position for that particular plane.  If they weren't on that

20   claim, you wouldn't get a peak.

21   Q.    But you can when you get the peak go back and

22   calculate sort of the D spacing; is that correct?

23   A.    Yes.  Each peak is mathematically related to D

24   spacing.  They are interchangeable.

25   Q.    So a 2-Theta peak position of 18.9 degrees corresponds

Steed - cross

1    to a 4.69-angstrom D spacing?

2    A.    I can't do the math as I sit here, but that sounds

3    about right.

4    Q.    And similarly, a 2-Theta peak position at 16.1 degrees

5    corresponds to a 5.5-angstrom d-spacing?

6    A.    Yes.  Those are mathematically equivalent.  You're

7    saying the same thing.

8    Q.    So claim 19 of the '548 pattern specifies unsolvated

9    crystallinity with interplanar spacing separated by 4.69 and

10   5.5 angstroms; correct?

11   A.    Yes.  That would be mathematically equivalent.

12   Q.    And, but by convention, a lot of people in the art

13   often identify crystalline forms by their XRPD pattern

14   rather than doing the mathematical calculation to try to

15   define the unit cell?

16   A.    Yes.  There would be no reason in doing that to just

17   look at a XRPD pattern.

18   Q.    The XRPD pattern is a unique signature that is

19   inherent in a crystalline form; is that correct?

20   A.    Yes, that's right.  The pattern as a whole could stem

21   from that particular pattern arrangement.

22   Q.    And the XRPD pattern is used to distinguish one

23   crystalline form from other crystalline forms of a

24   substance; correct?

25   A.    Yes, that's right.

Steed - cross

1    Q.    And a crystalline form of a substance is typically

2    identified by a list of characteristic peak positions in its

3    XRPD pattern; correct?

4    A.    Yes, with the sense that the United States

5    Pharmacopeia recommends the ten strongest peaks.  That is a

6    common shortcut.  As I have testified, it's the whole patent

7    that is really characteristic.  It's often a convenient

8    shorthand to shorten that down to a representative number of

9    peaks as long as you show those peaks, you need to find a

10   particular crystalline for it.

11   Q.    When you are dealing with a known substance rather

12   than an unknown substance, you can often use fewer

13   characteristic peaks to identify a particular crystalline

14   form because you're already starting with the information of

15   what the compound is; is that correct?

16   A.    Well, if you mean the chemical compound, then, no,

17   that would be dangerous, but if you know the universe of

18   crystal forms and you're trying to distinguish between them,

19   then you might count a small number of characteristic peaks

20   as long as you are sure there's no chance that something

21   untoward is able of happening.

22   Q.    Well, for example, the '548 patent identifies

23   crystalline form B using five 2-Theta peak positions;

24   correct?

25   A.    I don't recall a patent.  If it lists wide

1    characteristic peaks, then maybe it does.

2    Q.    And the '889 patent, what you testified this morning

3    that form I in claim 1 is identified form I using three

4    characteristic peaks; is that correct?

5    A.    Well, I think it tried, the claim language is written

6    such as the claim for three peaks.

7    Q.    And this is not out of the ordinary in the art that

8    when you are specifying a crystalline form, a known

9    crystalline form of a compound -- when you specify a

10   crystalline form of a known compound with use fewer peaks

11   than the ten that the USP recommended for unknown compounds;

12   correct?

13   A.    The USP isn't recommending any molecular compound.

14   It's saying when you are comparing an unknown sample that's

15   standard, then you should at least stand for these peaks.

16   What tends to happen, if you happen to know you've got two

17   different forms and you want to teach somebody how to

18   quickly and easily distinguish between them, then maybe you

19   might say, yes, just look at these particular peaks.  But

20   that's a well validated analytical experiment.  That's not

21   the same as producing a complete unknown and then saying,

22   this must be the same as this other form.

23   Q.    Now, it is possible for some crystalline forms to over

24   time, sometimes rapidly, convert from one form to another;

25   correct?

Steed - cross

1    A.    Certainly.

2              THE COURT:  All right.  Again, just let's slow

3    down a little bit, both of you.  Okay.  Sorry.  It's just so

4    hard to do this remotely.  Go ahead.

5    BY MR. SIPES:

6    Q.    In fact, one way with conversion sometimes happening,

7    during the crystalline process, a crystalline form may

8    go from one form, metastable form to another form while

9    it's crystallizing.  It changes its crystal lattice;

10   correct?

11   A.    Well, there are all kinds of different circumstances

12   under which less stable forms can convert to more stable

13   forms.  During the crystallization process, I suppose so,

14   yes, in the sense that one form can form and then -- yes.

15   Q.    And let's talk a little bit about crystallization

16   methods.  If we can turn to DDX-6-50.

17             THE COURT:  Hold on a second, please.  Okay.

18   Thank you.

19   BY MR. SIPES:

20   Q.    In DDX-6-50, you've given a number of examples of

21   crystallization methods.  Evaporation, cooling, melting,

22   milling.

23             Do you see that?

24   A.    I do.

25   Q.    Now, there is a very well-known crystallization method

Steed - cross

1    in the pharmaceutical arts that you don't identify there,

2    correct, known as seeding?

3    A.    I didn't list them all.  Seeding is certainly used,

4    yes.

5    Q.    Seeding, in fact, is a widely known crystallization

6    method; is that correct?

7    A.    It's what's called a secondary crystallization method.

8    If you want to generate a known crystal form from, for

9    example, a supersaturated solution, then you can add a seed

10   of that known in order to, in order to help it to form.

11   Q.    And, in fact, seeding is not new.  It's a very old

12   form of crystallization; is that correct?

13   A.    I suppose so, yes.

14   Q.    In your testimony, you had mentioned some method being

15   new.  Seeding is not.  Seeding is very old?

16   A.    Yes.  That's fine, and there are various kinds of

17   seeding.  We've known for awhile the technique of seeding

18   solids.

19   Q.    And seeding, what seeding is, if you have a solution

20   of a compound and you add a tiny amount of crystalline

21   material, that can trigger what's called nucleation,

22   starting to form a crystal lattice that will then quickly

23   grow and you'll get crystallization.  Is that a fair

24   description of seeding?

25   A.    No.  It doesn't assist nucleation.  The seed acts as a

Steed - cross

1    secondary nucleus.  It is the nucleus and that seed grows

2    into a crystal because it's already there as it were.

3    Seeding is 2020 very, very broad word.  For example, Jim

4    Weekes' seeding method is brand-new, 20202.  A type of

5    seeding that Jim invented.

6              So seeding certainly exists, was known, but

7    there is variations within seeding as well.

8    Q.    But the tiny crystal serves as a platform on which the

9    crystal grows or a template, however you want to describe

10   it?

11   A.    They bias the growth rate in favor of the pre-existing

12   seed rather than what we call primary nucleation, which

13   would be creating a new nucleus spontaneously.

14   Q.    Well, let's come back.  It's not always the case, is

15   it, that when you seed with a particular crystalline form,

16   what you get out of the solution is that crystalline form.

17   In fact, sometimes it will then convert to a different

18   crystalline form than the one you've seeded; correct?

19   A.    Well, there's all sorts of possibilities depending

20   upon conditions that typically, when one is seeding, you

21   want to get out the seeded form that you put in unless

22   you're doing something fancy, Jim Weeks did.

23              THE COURT:  Hold up.  Like Jim what?

24              THE WITNESS:  Jim Weekes hetero-seeding.

25              THE COURT:  Jim Weekes.  Hetero-seeding.  Thank

Steed - cross

1   you.

2   BY MR. SIPES:

3   Q.    Dr. Steed, let's look at a document, I think it's

4   actually in your direct binder.  It's one that you cited in

5   your report and that was identified for you during your

6   direct examination.  That's JTX-506.

7            THE COURT:  Hold on a second.  All right.  Go

8   ahead.

9   BY MR. SIPES:

10  Q.    Do you recognize JTX-506 as an article in the solid

11  state chemistry, I don't want to call it -- the crystalline

12  form literature that you cited and reviewed in forming your

13  opinions in this case?

14  A.    Yes, I do.  It has been a while, but, yes.

15  Q.    And it's about -- it's called disappearing polymorphs

16  revisited, but it's about polymorphism?

17  A.    Yes.

18  Q.    And if you will turn to JTX-0506-0003, which is to say

19  the third page, and let's blow up the first paragraph and

20  the heading 2.2, seeds and seeding.

21            Do you see there's a section on seeds and

22  seeding; is that correct?

23  A.    Yes.

24  Q.    And it says, the 1995 review also contains a section

25  headed seeding.  Intentional seeding is a well-known

Steed - cross

1    technique for inducing crystallization and is widely used,

2    especially in the pharmaceutical industry.

3              Do you see that?

4    A.    Yes, I see that.

5    Q.    And that is true, is it not?

6    A.    Yes.  It's often used in, for example, large

7    production batches to ensure that the same form comes out.

8    Q.    And then it even refers to unintentional seeding

9    arises from the presence of small amounts.  In indeed, in

10   principle, one particle is sufficient.

11             Do you see that.

12   A.    I do see that.

13   Q.    And you concede to create crystallization with very

14   trace small amounts of crystals and it will cause

15   crystallization; correct?

16   A.    Yes.  I'm not sure it's really known exactly what the

17   practical limit is.  It seems to be one or two percent from

18   testing that I've seen.

19   Q.    This is an article that you cited in your report;

20   is that correct?  It's a reliable article; is that correct?

21   A.    It's a -- it is a reliable article in the sense that

22   it's an anecdotal kinds of article.  They point out here no

23   one really knows how much is required.  Tests on seeding

24   generally fall between one and two percent.

25   Q.    Then if we turn to the next page, you'll see there's a

1    reference to a classic text by Wiberg.

2            Do you see that?  Pull that up.  That's you see

3    that?  Classic text by Wiberg?

4    A.    I see the words, yes.

5    Q.    And then let's see what he's quoting from Wiberg.

6    Wiberg is a well-known text in the art of crystallization;

7    is that correct?  In solid chemistry?

8    A.    I confess it's not a book that I'm familiar with.

9    Q.    Okay.  It notes, when a compound is prepared for the

10   first time in a laboratory, it is often observed that it is

11   relatively difficult to effect crystallization.  However,

12   once the compound has been obtained in the crystal state, it

13   is usually easy to effect crystallization, an it has been

14   suggested that after initial crystallization, and, crystal

15   nuclei are present in the laboratory and induce

16   crystallization?

17   A.    I do see that.

18   Q.    There is this idea of seeding and perhaps even

19   unintentional seeding; correct?

20   A.    Yes.  This is a hypothesis.  It has never really been

21   proven.  I think what it does, it reflects the

22   unpredictability of crystallization because it relies upon

23   an individual nucleation and sometimes it can, it can behave

24   in ways that are different to the rest of chemistry.

25            So this is a common anecdote that's told.

1    Nobody knows whether it's true or not, but it's an

2    attractive speculation.

3    Q.    It's an attempt to explain a common observation that

4    it seems relatively difficult to make the first crystal, but

5    once the compound has been crystallized, it seems easier to

6    make crystals after that?

7    A.    Yes.  It's anecdotal.  This is one speculation on it.

8    Q.    And let me ask you, and I want to be careful here.

9    You will recall there was some discussion about conversion

10   from form C.

11              Do you recall that?

12   A.    You'll have to fill me in with the context.

13   Q.    Did you discuss the possibility of starting with form

14   C and convert form C in ibrutinib -- we can take this down,

15   and converting to another crystalline form?

16   A.    Are you referring to the testimony in the context of

17   the production process for form I and form C was involved in

18   that?  Is that what you mean?

19   Q.    That would be one discussion, but, generally, yes.

20   Let's start with that.  There are times when one crystalline

21   form is converted to another synthetically; correct?

22   A.    I think in that particular case, form C is being

23   crystallized as form I.

24   Q.    Did counsel ask you whether you were aware, whether

25   the patent, the '548 patent teaches anything about

Steed - cross

1  converting from one form to another?

2  A.    I think counsel asked me whether the patent teaches

3  treating form C with methanol water results in form I.    I

4  answered that it did not.

5  Q.    The '548 patent does teach conversion of form C to

6  other forms, does it not?

7  A.    You'll have to refresh my memory.

8  Q.    That's quite all right.  Why don't we turn to JTX-0001

9  at 00062.

10           MR. SIPES:  Mr. Brooks, let's start with the

11  right-hand column and in form D, that's at column 66, lines

12  17 to 25 many.

13  BY MR. SIPES:

14  Q.    So there it refers to creating a dry mixture of two of

15  forms A, B or C, then a slurry with an amorphous MIBK and

16  ultimately, what you get is form B?

17           Do you see that?

18  A.    Yes.

19  Q.    So that's one way in which one can start with one

20  crystalline and crystalline form and form another; is that

21  correct?

22  A.    It looks like it doesn't matter what crystalline form

23  is started with here.  It can be any form, A, B or C or

24  amorphous.  This is C.

25  Q.    Okay.  Let's look at that.  We can turn to column 65,

Steed - cross

1    Mr. Brooks, and let's pull up from line 44 to 58.

2              Here, it refers to compound one, form A, that's

3    form A, ibrutinib; is that correct?

4    A.    Yes.

5    Q.    Was weighed into a vessel and dissolved in methanol;

6    is that correct?

7    A.    Right.

8    Q.    Water is later added; is that correct?  Two lines

9    down?

10   A.    Yes.

11   Q.    Then seeds of ibrutinib form C were added.  Correct?

12   Ultimately, at the bottom, what comes out is compound one,

13   form B?

14   A.    Yes.  Material converted to compound one, form D, B

15   conversion.

16   Q.    So seeding with form C in methanol water resulted in

17   form B, according to the teachings of the '548 patent; is

18   that correct?

19   A.    I don't think I would quite characterize it like that.

20   What it seems to be the case, seeding with form C produces

21   form C, but that converts to form B.  It shows the materials

22   are converted to form B.

23   Q.    It is -- so it is, in fact, a method that, a route

24   that's described, it's described as form B, Route one at the

25   top; right?

Steed - cross

```
 1    A.    Yes.

 2    Q.    And the route that's described is using a seeding with

 3    form C in a methanol water solution of ibrutinib, ends up

 4    with form B; is that correct?

 5    A.    It ultimately does end up with form B.  I think of it

 6    as a complex, multistage procedure.

 7    Q.    Now, methanol and ethanol are pretty similar, are they

 8    not?

 9    A.    It depends.  They have similar properties.

10    Q.    I don't recommend drinking ethanol, but they are both

11    common small chain alcohol solvents; is that correct?

12    A.    Yes.  They both have those features in common.

13    Q.    Methanol is a single carbon alcohol; is that correct?

14    A.    Correct.

15    Q.    And methanol is a two carbon alcohol?

16    A.    That's right.

17    Q.    In fact, sort of in order of alcohol it goes methanol,

18    ethanol, and then propanol; is that correct?

19    A.    Correct.

20    Q.    So the two smallest alcohols are methanol and ethanol?

21    A.    Yes.

22    Q.    And they have relatively similar solvent properties;

23    is that correct?

24    A.    It depends what you mean by relatively similar.  We're

25    back to the subjective words again, but they are different
```

Steed - cross

1    in their own way.  Have different boiling points.  Ethanol

2    is more lipophilic.

3    Q.    Now, let us look at what is done in manufacturing the

4    form I and I want to make sure I use exactly the same

5    exhibit that was used before or whichever exhibit Ms.

6    Clayton wants me to use.

7              MR. SIPES:  So, Ms. Clayton, is there a

8    particular exhibit that you would prefer me to pick up or

9    should I just -- I'm happy to use a different one if you

10   want or I just pull up JTX-573 and the question is do I need

11   to seal the courtroom?

12             MS. CLAYTON:  JTX-573, is that the Sandoz one?

13             MS. SIPES:  That's the close the courtroom one.

14   I will only look at the section that you looked at, but if

15   you want me to close the courtroom, I'm happy to do it.

16             MS. CLAYTON:  No.  I think if we just stick to

17   that one section we know that is already in Sandoz's

18   production, we don't need to close the courtroom.

19             MR. SIPES:  I've been handed a note that may

20   help, too.  I don't know that it's in the binder.  So it is

21   in the binds err.  Maybe in your direct binder, PTX-1407.

22   I'm told 1407 helps to avoid this problem.

23             MS. CLAYTON:  It does.

24             MR. SIPES:  Why don't we call up PTX-1407.

25   Then, you know what, go back to A and just focus on what we

Steed - cross

 1    need to focus on, JTX-573.  And I just want you to turn to

 2    the second page at the top, just that.  And I think we're

 3    okay so far.

 4                And let's blow up, if we will, the bottom row of

 5    the synthesis, the bottom row, just so we understand what

 6    we're talking about here.

 7    BY MR. SIPES:

 8    Q.    So, to be clear, this is the manufacture of form I,

 9    correct, that ultimately is in Sandoz's product; is that

10    correct?

11    A.    That's my understanding.

12    Q.    And as you say, the last step that makes ibrutinib is

13    the step that's labeled step 5 and the ibrutinib molecule is

14    then to the right of that and it's identified as ibrutinib

15    form E, is that correct, the toluene solvate?

16    A.    Yes.

17    Q.    And we're talking here form E.  That's one of the

18    forms that is described in the '548 patent?

19    A.    That's correct.

20    Q.    The crystal lattice has ibrutinib and toluene in it?

21    A.    Yes.

22    Q.    Toluene is a fairly unpleasant compound.  In fact,

23    cancer causing; is that correct?

24    A.    No.  I'm not sure I know that offhand.  It's normally

25    used instead of benzene.  I said I couldn't testify to it.

Steed - cross

1    Q.    Okay.  The point, you wouldn't want to use a toluene

2    solvate in a drug product if you could avoid it?

3    A.    I guess so.

4    Q.    But for whatever reason, they don't use form E and so

5    they've converted on; correct?  They convert the crystalline

6    form away from form E?

7    A.    Yes, that's right.

8    Q.    Now, they don't take form E directly to form I.

9    There's an intermediate crystalline form; is that correct?

10   A.    Yes, that's right.

11   Q.    Now, you've not explained in your testimony why they

12   don't go straight from form E to form I; is that correct?

13   A.    I can explain it if you would like.  It's because

14   toluene is not mixed with water.

15   Q.    So they have to take it to form, they take it to form

16   C first; is that correct?

17   A.    Well, they re-crystallize it to get rid of its --

18              THE COURT:  So there was a question.  So they

19   have to take it to form, they have to take it to form C

20   first; is that correct?

21              And then the professor answered, well, they

22   re-crystallize it to get rid of its, and then we lost you.

23              THE WITNESS:  Re-crystallize it to get rid of

24   its toluene.

25              THE COURT:  All right.  Sorry.  Go ahead.

1    BY MR. SIPES:

2    Q.    Of course, there's no toluene in form A or B or form I

3    as well; correct?

4    A.    That's my understanding.

5    Q.    They're all unsolvated forms, so they have no solvents

6    of any kind; is that correct?

7    A.    Correct.

8    Q.    But the manufacturer decides to go to form C and then

9    take form C to form I; correct?

10    A.    They do form C, yes.  Methanol and toluene are mixed

11    with each other.  They re-crystallize the solvent.  They're

12    mixed with the toluene.  They can filter that off and

13    redissolve it in the water.

14    Q.    Then they take form C to form I using an ethanol water

15    mixture; is that correct?

16    A.    It is using an ethanol water mixture.  It's a

17    recrystallization step.  Form C gets dissolved.  All traces

18    of form C disappear and it gets re-crystallized as form I.

19    Q.    Now, let's talk a little bit about -- we can take that

20    down now.

21         I think it was your testimony this morning that

22    to a person of ordinary skill in the art, it's routine to

23    distinguish one crystalline form from another once those

24    forms are known; correct?

25    A.    Yes.  You can compare X-ray powder diffraction

1    patterns, for example.

2    Q.    And so in terms of the analytic techniques to

3    determine whether or not a sample falls within claims 18 and

4    19, that would be routine to a POSA; correct?

5    A.    I suppose, yes, it would be relatively routine to

6    simply take a sample, run a powder diffractogram, identify

7    what peaks are there.  I assume you would have to do TGA to

8    determine whether it's solvated or not.

9    Q.    And you might do solution NMR to confirm that it was

10   ibrutinib?

11   A.    Yes.

12   Q.    And are all of the techniques to determine whether a

13   sample falls within claim 18 and 19 are within the knowledge

14   of the POSA and can be carried out in a manner of a few

15   hours; is that correct?

16   A.    You mean the characterization techniques?

17   Q.    Correct.

18   A.    Yes, depending on the amount of solid available, yes,

19   they're relatively fast.  I guess not always so, but it

20   generally is.

21   Q.    Now, let me ask you:  Was your testimony this

22   afternoon that you can't, you don't think that one can claim

23   a genus of crystalline forms; correct?

24   A.    Yes.  The genus concept doesn't really make sense to

25   me in the context of those two forms.

Steed - cross

1    Q.    Now, do you recall you were deposed in this case a few

2    months ago?

3    A.    I do.

4    Q.    And at your deposition, you testified, did you not,

5    that you certainly can claim more than one crystalline form

6    with a particular characteristic; is that correct?

7    A.    Yes.  But that's a little bit different, isn't it?

8    You could certainly, you could have a claim that says the

9    characteristic and then claim a different crystal form that

10   had that characteristic in common.

11   Q.    In fact, it was your position, your testimony at

12   deposition that it was not your opinion that it is

13   impossible to claim crystalline forms of the genus?

14   A.    Well, this genus concept is quite confusing.

15   Certainly, you can have more than one crystalline form with

16   a similar characteristic, PK in particular, but I wouldn't

17   characterize that as a genus.  It's the characteristics of

18   individual crystal forms.

19            MS. CLAYTON:  Your Honor, Mr. Sipes, can you

20   tell me what pages of his deposition transcript you are

21   referring to right now?

22            MR. SIPES:  I can.  In fact, let me see if I can

23   refresh his recollection on his testimony.  We don't have to

24   play the clip.  If we could pull up the transcript at page

25   138, line 16, through 139, 1.

Steed - cross

1          THE COURT:  I'm kind of confused by the

2    objection.  If you want to work it out, but there wasn't a

3    pending question.  But maybe it was the delay because of the

4    remoteness or something, Ms. Clayton.

5          MS. CLAYTON:  No.  I was just wanting to know

6    what portions -- he keeps referring to the deposition.  I

7    just wanted clarity on what portions of his deposition he

8    was referring to before he impeached him so I could make

9    sure it's proper impeachment.

10          THE COURT:  Okay.  But he answered yes to the

11    question.

12          MR. SIPES:  Right.  So it is not his position --

13    now he's saying you can call it a genus.  A genus, that's

14    fine.  I think you certainly claim more than one crystal

15    form of the particular characteristic and if you want to

16    call that a genus, then that's fine.  That's our point.  You

17    can, you can claim a genus.  He had said you could not call

18    it a genus.  He would not say it's a claimed genus.

19          THE COURT:  Well, I mean, now we're in -- sorry.

20    This is part of the problem because it's remote.  Now we're

21    just having attorney argument.  Let's go back.  I just want

22    to make sure.

23          What we've got is here --

24          MS. CLAYTON:  I would say his original --

25          THE COURT:  Wait.  I'm not faulting any counsel.

Steed - cross

1    Maybe it's me.  This is the problem with just we're all on

2    different continents or two of us are.  Here's what I've got

3    in the record.  And at your deposition, you testified, did

4    you not, that you certainly can claim more than one

5    crystalline form with a particular characteristic.  Is that

6    correct?

7              Answer:  Yes.

8              But that's a little bit different, isn't it?

9    You could certainly, you could have a claim that says the

10   characteristic and then claim a different crystal form that

11   had that characteristic in common.

12             "Question:  In fact, it was your position, your

13   testimony at your deposition that it was not your opinion

14   that it is impossible to claim crystalline forms of the

15   genus.

16             "Answer:  Well, this genus concepts is quite

17   confusing.  Certainly, you can have more than one

18   crystalline form with a similar characteristic, PK in

19   particular, but I wouldn't characterize that as a genus.

20   It's the characteristic of individual crystal forms."

21             Okay.  Now, at this point, I recognize Ms.

22   Clayton because she was standing and, again, because of the

23   delay, but there was no pending question.

24             So I'm going to let Mr. Sipes decide what you

25   want to do with that, sir.  Okay?

Steed - cross

1    BY MR. SIPES:

2    Q.    So at your deposition, you were fine with claiming

3    more than one crystalline form with the particular

4    characteristic and calling it a genus; correct?

5            THE WITNESS:  You're mischaracterizing my

6    testimony.  I said if you want to call that a genus, you

7    want to call that a genus, that's fine.  I wouldn't call it

8    that.  That's what it has been called to me.  If that's, if

9    that's Ms. Bharkhda's definition of a genus, that's what I

10   meant by that comment.  I wouldn't call it that.

11           MR. SIPES:  Well, all right.  Let's try then to

12   deal with it in terms of what is out there in the art.  We

13   can take that down.

14           You're aware that Dr. Myerson in his rebuttal to

15   your opening report identified a number of patents in the

16   art, including patents from the defendant and defendants'

17   experts that specify and claim a group of crystalline forms

18   on the basis of a single 2-Theta peak; correct?

19   A.    You'll have to refresh my memory.

20   Q.    Why don't we look in your reply report at paragraph

21   116.  So you say, Dr. Myerson also points to other patents

22   that recite a single 2-Theta peak.

23           Do you see that?

24   A.    Yes.

25   Q.    So do you recall Dr. Myerson identifying a number of

Steed - cross

1    patents in the art that specify and claim crystalline forms

2    on the basis of a single 2-Theta peak?

3    A.    I didn't look at them in detail.  As I said, I have

4    not analyzed these patents.  I do recall him mentioning it,

5    but as I said, it's possible they have similar written

6    description problems.  Single 2-Theta peak is not the way to

7    characterize crystalline form.

8    Q.    In fact, you chose not to look at those patents;

9    correct?

10   A.    Well, I kind of did everything, sir.

11   Q.    And, in fact, you didn't analyze those patents because

12   you weren't asked to analyze them by counsel?  Correct?

13   A.    Yes, that's right.  I don't doubt those claims are

14   missing things.  Of course, when you are writing a patent

15   claim, you're trying to make it seem as normal as possible.

16   They are what they are.  They may have written description

17   problems.

18   Q.    So you chose just not to look at examples to try to

19   understand how other entities had found it appropriate to

20   claim a group of crystalline forms using none, one or two

21   crystalline forms; is that correct?

22   A.    Well, as I said, I have not analyzed these patents in

23   detail, but to my knowledge, when people are drafting

24   patents, they try to make it as broad as possible.

25   Q.    And that really comes maybe to the heart of what's

Steed - cross

1    going on here.  In your view, should patent claims to

2    crystalline material always be limited to past forms, to

3    forms that have already been identified?

4    A.   Well, patentability is a matter for the USPTO and it

5    varies according to jurisdiction and region.

6              THE COURT:  Hold up, hold up.  We've got an

7    objection.

8              MS. CLAYTON:  The objection is it asks for a

9    legal conclusion, Your Honor.  He's not a lawyer.

10             MR. SIPES:  I'm asking his own opinion.  Not his

11   legal opinion, his opinion giving what he's saying he thinks

12   it would ever be appropriate to claim crystalline forms that

13   have been beyond filing the patent at issue.  He's

14   testifying about patents lacking written description and

15   enablement.  He's opining on what is appropriate.  I'd like

16   to find out if there are circumstances where he thinks you

17   can claim --

18             THE COURT:  We are getting into legal argument

19   at some level.  I will overrule the objection right now,

20   but I'm a little skeptical, so go ahead.  Answer the

21   question.

22             THE WITNESS:  Sir, I'm not a legal expert, but

23   my understanding is that a patent has to claim an invention

24   that's nonobvious, not anticipated and some way inventive.

25   So if claiming a crystal form fulfills those criteria, I

Steed - redirect

1    guess it would be patent able, but I would have to look at

2    the details of what is being claimed.

3    BY MR. SIPES:

4    Q.    And in this case, you have not challenged the fact

5    that the crystalline ibrutinib that's described in the '548

6    patent is novel and nonobvious; is that correct?

7    A.    I wasn't asked to form an obviousness opinion on the

8    patent.

9    Q.    All right.

10              MR. SIPES:  Your Honor, if I could just have a

11    moment to consult?

12              THE COURT:  Sure.  Yes.

13              MR. SIPES:  Your Honor, I have no further

14    questions at this time.

15              THE COURT:  Okay.  Thank you, Mr. Sipes.

16              All right, Ms. Clayton.  Any redirect?

17              MS. CLAYTON:  Just actually one question, Your

18    Honor.

19              Sorry.  One moment.  Our tech person has to get

20    reconnected.

21                         REDIRECT EXAMINATION

22    BY MS. CLAYTON:

23    Q.    I might be able to ask the question without the

24    document.  Dr. Steed, you recall the synthetic route for

25    form I that you were shown during your cross?

Steed - redirect

1    A.    Yes.

2    Q.    And do you -- Mr. Sipes asked you a number of

3    questions about seeding as well.  Do you recall that?

4    A.    Yes.

5    Q.    Is there any evidence of seeding going on in the

6    synthetic route used to arrive at form I?

7    A.    No, not at all.

8                MS. CLAYTON:  I have no further questions Your

9    Honor.

10               THE COURT:  All right.  I have one question for

11   the professor.

12               All right.  So if I look at the claim, let's

13   take 15, and it says, a crystalline form of one, and then it

14   has the formula, and then it says, that have an X-ray powder

15   diffraction, XRPD pattern comprising a 2-Theta peak at about

16   18.9, angstroms, I guess, right?

17               THE WITNESS:  Degrees.

18               THE COURT:  Degrees.  Sorry.  Okay.  Is there

19   any document that you've been shown or that you have talked

20   about that would visually depict a 2-Theta peak at about

21   18.9 degrees?  Could you just show me?  In other words, is

22   it something like a layman like me, you could say, hey,

23   Judge, here's an XRPD pattern comprising a 2-Theta peak at

24   about 18.9 degrees.

25               THE WITNESS:  Yes.  You could look at the patent

Steed - redirect

1    itself, look at the 18.9 degrees and see if there's a peak

2    thereof.

3                    THE COURT:  Were you shown one today?  I would

4    like to see one.  I would like to know what it looks like,

5    you know, so I actually understand what we're talking about.

6                    MR. SIPES:  Your Honor, perhaps if we turn to

7    the '548 patent, JTX-1 at JTX-0001-00014.  Can you pull that

8    up?  Can we get control?  There we go.

9                    THE COURT:  All right.

10                   MS. CLAYTON:  I they we have control.  We can

11   pull it up, JTX.

12                   Are you talking about Figure 1, Mr. Sipes?

13                   MR. SIPES:  Figure 1.

14                   MS. CLAYTON:  Yes.

15                   THE COURT:  Let him see that.

16                   MR. SIPES:  Yes.  There we go.

17                   If you want to blow up the central portion

18   there, that will make it easier to see where the peaks are.

19                   THE COURT:  Okay.  So --

20   BY MR. SIPES:

21   Q.    Dr. Steed, that tall peak right before what would be

22   19 on the scale, would that be a peak at 18.9?

23   A.    Yes.

24                   THE COURT:  All right.  So it has got one peak

25   there at about 18.9 degrees; is that correct?

Steed - redirect

1              THE WITNESS:  Yes, sir.

2              THE COURT:  I guess in layman's terms, and

3    maybe this is completely irrelevant, probably is, but since

4    I've got you here and, you know, what I am kind of confused

5    about is it seems undisputed that these XRPD's are the

6    analog of the fingerprint, although I think we've had some

7    testimony it's not a perfect analogy, but that there's some

8    there.

9              And what I'm confused about is, you know, we're

10   defining a pattern based on a single peak at a single degree

11   and I'm trying to figure out how that's helpful.  In other

12   words, this seems like a complicated pattern and based on

13   other testimony and comparison of the XRPD pattern, it seems

14   to me there's more than just looking at a single peak or two

15   peaks or three peaks.  I mean, and in this one, it looks

16   like there's a higher peak at, you know, four-and-a-half or

17   five degrees.

18              THE WITNESS:  Right.

19              THE COURT:  I will take the time on this.  I'm

20   not going to punish the parties.  Maybe I should.  Can

21   somebody explain to me what this is all about?  To a layman,

22   can you tell me how I read this chart?  I've seen a lot of

23   fingerprint experts.  They can explain to me how fingerprint

24   works.  Can you explain how this data term, XRPD, works that

25   makes sense to me?

Steed - redirect

1                THE WITNESS:  As I've described are, Your Honor,

2    one individual peak doesn't tell you very much at all.  The

3    whole pattern of peaks is determined by the whole structure.

4    The whole structure is kind of encoded in the whole pattern,

5    but individual peaks don't correlate with individual

6    structure in the sense that there's information about the

7    whole structure in every peak.  If you want to work

8    backwards, you get the whole pattern with the whole

9    structure.

10                THE COURT:  Right.  But we're saying that the

11    diffraction pattern has to comprise a peak.

12                THE WITNESS:  It doesn't make a great deal of

13    sense to me.

14                THE COURT:  Okay.  And, counsel, either side are

15    free to ask a question.  I'm sorry, but you can tell, I

16    mean, I'm ignorant about something, it seems pretty

17    fundamental.  But I will leave it up to you.  Mr. Sipes, do

18    you have any followup questions based on that?

19                MR. SIPES:  No, Your Honor.

20                THE COURT:  Ms. Clayton?

21                MS. CLAYTON:  I will ask one.

22    BY MS. CLAYTON

23    Q.    Is it possible -- strike that.  So can you identify a

24    particular polymorphic form using only one peak?

25    A.    No.  It's the whole pattern.

Steed - redirect

1   Q.    So does claiming a polymorphic form using a single

2   peak make sense in the science of XRPD?

3   A.    No.  The whole pattern really defines the form and

4   you're throwing away most of the information by just --

5                THE COURT:  Okay.  But what if the claim said it

6   is an XRPD pattern comprising ten Theta peaks?  Would you

7   know what they are talking about at that point?

8                THE WITNESS:  Yes.  You could have a much better

9   chance, in defining the peaks, they were the ten strongest

10  peaks, for example.

11               MR. SIPES:  Your Honor, I do have one followup.

12               THE COURT:  Yes.

13                         RECROSS EXAMINATION

14  BY MR. SIPES:

15  Q.    When the identity of the compound is known, it is not

16  uncommon to use fewer characteristic peaks, whether it's

17  five or three or some number; correct?

18  A.    Well, it depends on the nature of the experiment.  If

19  you are doing qualitative Theta indication, which is what

20  the USP describes, then the whole pattern can be shortened

21  using ten peaks.  If you know you've got one thing or the

22  other and one thing had a peak in a place and the other

23  doesn't, then you created a calibration just based on that

24  one peak.  Completely different experiment.

25  Q.    What you just referred to is Sandoz does what's called

Steed - redirect

1    a spiking experiment in which they put form A into form I

2    and they identify the presence of form A with just a single

3    peak; is that correct?

4    A.    Yes, that's right.  Very well defined experiment in

5    which two forms are present in the mixture and then you can

6    compare diffractograms based on the intensity of the peak

7    that correlated with how much you put in there.  Under those

8    defined circumstances where you're not trying to identify

9    either peak, you're just trying to quantify how much is

10   there, you can use them.

11   Q.    Depending on the context and the state of your

12   knowledge, you can use fewer peaks -- it just depends on

13   exactly what you are looking for.

14   A.    You said use fewer peaks.  In terms of identification,

15   no.  If there's a spiking experiment, one peak.  That's

16   about measuring how much material of a particular known

17   form is present, not identifying that known form.

18            THE COURT:  All right.  Thank you very much, I

19   appreciate your time.  And have a good evening.

20            THE WITNESS:  Thank you, Your Honor.

21            MR. SIPES:  Thank you, Dr. Steed.

22            THE WITNESS:  Thank you.

23            (Witness excused.)

24            THE COURT:  All right.  What's next?

25            MS. CLAYTON:  So, Your Honor, at this point we

1     have some deposition testimony that we are going to play

2     from the inventors.

3                    THE COURT:  Wait.  Okay.

4                    MS. CLAYTON:  Yes.

5                    THE COURT:  Incidentally, when you play -- I

6     don't know it's you, but when Alvogen played the inventor

7     testimony before, did you guys get together, both sides, to

8     figure out what the deposition would look like or was that

9     just the defendants playing?  And the same question is going

10    to apply what you are about to play.  Is this something that

11    was put together joint by the parties?

12                   MR. SIPES:  Yes.  It includes designations and

13    counter-designations.  I believe we submitted the clip

14    report that gives the time attributable to each party.

15                   THE COURT:  Okay.  That's in the PTO, is it?

16    Clips.

17                   MR. SIPES:  It's in the binder.

18                   THE COURT:  Okay.  I see many I was watching

19    them on the screen.  All right.  Thanks.

20                   MS. CLAYTON:  So, Your Honor, we'd like to

21    introduce the testimony of Mr. Erick Goldman.  He is one of

22    the named inventors on both the '548 and the '231 patent.

23    He was designated a 30(b)(6) witness by plaintiffs for

24    certain topics.

25                   There are 54 minutes and 47 seconds of his

1    deposition testimony.  38 minutes and 29 seconds will be

2    charged to the defendants and 15 minutes and 18 seconds will

3    be charged to plaintiffs.

4              THE COURT:  Okay.

5              MS. BHARKHDA:  Before we begin playing the

6    testimony, there is one issue that was crystallized by the

7    deposition clips that Sandoz wants to to play as well as the

8    opening slide, which are relevant to the testimony that will

9    be played and so if you would like to share that issue now,

10   we're happy to address it.

11             If you would like to put it off to later, we can

12   do that.  I did want to let the --

13             THE COURT:  Wait.

14             MS. BHARKHDA:  -- the start of the deposition

15   play.

16             THE COURT:  The ten second issue, what's the

17   issue about?

18             MS. BHARKHDA:  The ten second version is that we

19   understand Sandoz to be pursuing here at trial several

20   improper inventorship theories.

21             I believe there are three improper inventorship

22   theories.  One of those theories was not disclosed in

23   Sandoz's final contentions or in any expert reports.  Sandoz

24   put it for the first time in the pretrial order.  We

25   objected.

1              And so we are -- we have an interest with

2     respect to that theory and some of the testimony we believe

3     relates to that particular --

4              THE COURT:  Yes.  I do want to address it,

5     because I've got enough in my brain that I can only hold so

6     much and I don't want to be putting stuff in it that I don't

7     need to resolve.  All right.

8              Why don't you quickly address that issue?  Hold

9     on.

10             MS. CLAYTON:  Sure.

11             THE COURT:  Hold on.  It came up in your

12    opening.  Hold on.  I want to get your opening slide so we

13    can talk through this.

14             MS. BHARKHDA:  When it came up in the opening

15    slide, we flagged it as a dispute.  Sandoz changed the

16    slide, but indicated they were still pursuing this theory.

17    So the issue remains, but I don't think the slides are

18    necessarily going to solve the problem.

19             THE COURT:  Okay.

20             MS. BHARKHDA:  I can point you to the relevant

21    portion of the PTO if that would be helpful.

22             THE COURT:  Well, let's see.  Maybe they're not

23    even pursuing it.  Ms. Clayton?

24             MS. CLAYTON:  So, Your Honor, I mean, to be

25    clear, we are pursuing that defense.  So the specific

1    testimony they are objecting to though is testimony related

2    to what a company, Pharmorfix, did in discovering these

3    crystalline forms.

4              That testimony isn't solely relevant to the

5    inventorship issue.  It needs to come in for 112 purposes,

6    too, and even Dr. Myerson in his rebuttal has cited to

7    documents from Pharmorfix that are talked about in the

8    inventor's deposition, and nine paragraphs of his rebuttal

9    report on invalidity where, as Mr. Bharkhda mentioned,

10   inventorship wasn't an issue.

11             So in our opinion, regardless of that objection,

12   the testimony about what Pharmorphix has done in connection

13   with these molecules should come in because it also shows

14   the extensive polymorph screening they did before the filing

15   date, which never resulted in anything other than A through

16   F.

17             So regardless of the inventorship issue, we

18   think that, you know, these are relevant and should be

19   played and come into the record.

20             THE COURT:  Okay.

21             MS. CLAYTON:  So I don't know if that resolves

22   this issue.  I'm happy to address your argument that we have

23   not heard this first.

24             THE COURT:  Let me hear the response.

25             MS. BHARKHDA:  Your Honor, if Sandoz is

1    representing that they're going to be offering the testimony

2    for a different purpose, then I don't think we object to

3    them playing the testimony.  It still leaves the unresolved

4    issue of the undisclosed theory which we believe the

5    testimony is actually being played for and we don't think

6    that the Court should be entertaining the theory because it

7    wasn't properly disclosed at any point before the filing of

8    the PTO.

9            THE COURT:  Okay.  So here's what we will do

10   then.  Let's just play it.  Your objections are noted and

11   you preserve your ability to preclude consideration for

12   admissibility of the evidence for, if it's used for

13   inventorship issues.  Okay?

14           MS. BHARKHDA:  Thank you, Your Honor.

15           THE COURT:  That sounds good.

16           MR. HANNA:  Your Honor, with respect to certain

17   designations that are about to be played, some of them are

18   for the crystalline patents.  Alvogen's are in there as

19   well.

20           So, for example, we have Dr. Smyth, Phillip

21   Goldman.  They would include designations for Alvogen as

22   well because those are the inventors on the '455 patent.

23           THE COURT:  I'm sorry, Mr. Hanna.  It has been a

24   long day.  Basically, you and Sandoz, your designations are

25   for both of you is what you are saying?

1                    MR. HANNA:  Yes.

2                    THE COURT:  All right.  And then I don't have

3     the Goldman deposition designations, apparently, so we can't

4     find them.

5                    MS. CLAYTON:  We'll check on that, Your Honor.

6                    THE COURT:  We have the exhibits for Goldman,

7     but not the notebook with the deposition designations.

8     That's fine.  I with watch them, but you probably want to

9     send that to us.

10                    MS. CLAYTON:  Yes.  We'll make sure we do that,

11    Your Honor.

12                    THE COURT:  All right.  Thanks.

13                    (The videotaped deposition excerpt of Erick Alan

14    Goldman was played as follows.)

15                    "Question:  Good morning.  Please state your

16    full name for the record.

17                    "Answer:  Erick Alan Goldman.

18                    "Question:  Now, when you started out at

19    Pharmacyclics, what were your responsibilities?

20                    "Answer:  Process chemistry.

21                    "Question:  And since you started at

22    Pharmacyclics in May of 2010 to now, can you estimate how

23    many projects you worked on at Pharmacyclics.

24                    "Answer:  Can you clarify what you mean by

25    projects?

Goldman - deposition designations

1            "Question:  Sure.  Separate development --

2     of a certain -- well, put it this way.  At Pharmacyclics, do

3     they -- when they develop a certain drug or -- do they call

4     it a project?

5            "Answer:  Sure.

6            "Question:  Okay.  That's what I mean by

7     projects.

8            "Answer:  So for separate drug targets?

9            "Question:  Yes.

10           "Answer:  -- I have worked on -- give me a

11    minute here.

12           "Question:  Sure.

13           "Answer:  Could I ask for one clarifying

14    question.

15           "Anser:  So technically,, I worked on several

16    projects that didn't advance very far, so I guess I will

17    ask, to what level of progress are you specifically asking

18    about for these compound?

19           "Question.  Well, let me clarify.  I appreciate

20    that.  I'm asking about all projects, whether they

21    progressed very far or not, and I'm also just asking for an

22    estimation.  I'm not asking for, like, a specific number.

23           It seems like that might give you --

24           "Answer:  That's what -- that's really tough.

25           "Question:  Why don't I --

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 267 of 317 PageID #: 62396
848
Goldman - deposition designations

1      "Answer:  Well, over 20.

2          "Question:  Now, the ones that actually

3   progressed to a further development stage, how many projects

4   -- estimate -- have you worked on?

5          "Answer:  Over ten.

6          "Question.  Okay.  Out of those ten that you're

7   thinking of --

8          "Answer:  Again, it's an estimate, how many

9   involved working with polymorphic forms of the compound --

10  compounds?

11         "Answer of.  Most of them.

12         "Question:  Okay.  Is there a particular reason

13  why most of them would have been involving polymorphic forms

14  of compounds?

15         "Answer:  Okay.  So the particular stage of

16  development that I'm discussing for -- for these over ten

17  compounds that I mentioned, those are all, those were all on

18  track for clinical candidacy, so it's important to

19  understand the polymorphic landscape of those compounds

20  going into -- to IND-enabling activities.

21         "Question:  Why is it important to understand

22  polymorphic compound?

23         "Answer:  To establish control.

24         "Question:  Is part of it because you need to

25  report to the FDA that information?

Goldman - deposition designations

1              "Answer:  That's part of it.

2              "Question:  Okay.  Is there any other reasons?

3              "Answer:  Yes.  There are -- there are quite a

4     few.

5              "Question:  Okay.  Any come to mind right now?

6              "Answer:  As I had mentioned, control is very,

7     very important.  So it's very, very critical to understand

8     not only what you previously obtained, but what you expect

9     to obtain in developing a pharmaceutical route.

10             "Question:  Now, you're aware that this case

11    involves ibrutinib; correct?

12             "Answer:  Sure.

13             "Question.  And at Pharmacyclics, was that

14    referred to as a kinase project?  Is that accurate?

15             "Answer:  Yes.

16             "Question:  All right. And when did you start

17    working on the kinase project?

18             "Answer.  For this specific kinase project?

19             "Question:  At Pharmacyclics.  Correct?

20             "Answer:  For ibrutinib, I started working in

21    2010 at some point in time.

22             "Question:  I'm actually just generally asking

23    if you -- I'm generally asking what your responsibilities

24    were when you started, if you could list them, what comes to

25    mind.

Goldman - deposition designations

1          "Answer:  So impurity generation was part of

2     them.  Testing samples of critical starting materials,

3     different lots, that was a big one.  And -- and then getting

4     involved, yes, with the polymorph studies.

5          "Question:  Okay.  What has been handed you

6     has been marked deposition Goldman deposition Exhibit 3.

7     It's -- on the front of it, it says U.S. Patent 9,296,753

8     and I has Bates numbers IMBPCYC04446077 through 141.

9          "Do you have that document in front of you?

10          "Answer:  I do.

11          "Question:  Okay.  Are you familiar with this

12    patent?

13          "Answer:  Yes, I am.

14          "Question:  Okay.  And if you look at the page

15    that you're looking at, the second page.  There's a list of

16    inventors and the second name is Erick Goldman.  That's you.

17          "Answer:  That is me.

18          "Question:  Okay.  Can you tell me generally,

19    what's your contribution to this patent?

20          "Answer:  My general contribution would be

21    directing research and conducting experiments that help lead

22    to the elucidation of crystal forms as well as exploration

23    of others.

24          "Question:  And when you mean others, you mean

25    other crystal forms?

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 270 of 317 PageID
#: 62399
851
Goldman - deposition designations

1          "Answer:  Other crystal forms.

2          "Question:  Other crystal forms not in this

3     patent?  What -- sorry.  Let me clarify.  What do you mean

4     by others?

5          "Answer:  What I meant by others was in addition

6     to what under -- what had already been found prior to my

7     arrival at Pharmacyclics.

8          "Question:  Prior to your arrival at

9     Pharmacyclics, what polymorphic forms of ibrutinib were

10    known?

11         (Reporter requested clarification.)

12         "THE WITNESS:  Form A, form B, and form C.

13         "Question:  Now, the inventors, it lists Mark

14    Smyth.  You referred to him already.  Correct?

15         "Answer:  Correct.

16         "Question:  What was his contribution to this

17    patent?

18         "Answer:  He was in charge of process chemistry

19    and the ibrutinib project, specifically anything related to

20    the chemistry of ibrutinib.

21         "Question:  And there's David Wirth.  That's the

22    third name.  Do you see that?

23         "Answer:  Uh-huh.

24         "Question:  What was his contribution to this

25    the patent?

1      "Answer:  David Wirth, his research at Ceres

2  Laboratories led to the initial isolation of crystalline

3  forms of ibrutinib.

4      "Question:  And the last person is Norbert

5  Purro.  What was his contribution to this patent?

6      "Answer:  He is the one who formulated various

7  crystal forms.

8      "Question:  And for the kinase project, did you

9  have any involvement with the formulation of the product

10  that's sold at Imbruvica?

11      "Answer:  Outside of providing the crystalline

12  API that was used for the formulation, no, I did not.

13      "Question:  Have you had any involvement with

14  coming up with the formulation using ibrutinib?

15      "Answer:  Same answer:  Outside of providing the

16  API, no.

17      "Question:  Okay.  Let me direct your attention

18  to column 63.  Do you see the columns at the top, numbers?

19      "Answer:  All right.

20      "Question:  And specifically, I'm going down to

21  Example 1 there.  Do you see that?

22      "Answer:  I do.

23      "Question:  Okay.  And it says, "The

24  preparation of crystalline forms of, then it has a chemical

25  compound.

1        "That chemical compound, that's ibrutinib.

2   Correct?

3        "Answer:  Yes, it is.

4        "Question:  And if you go from column 63 to 64,

5   there's form A, and there's Route 1, Route 2, Route 3.

6        "Do you see those?

7        "Answer:  I do.

8        "Question:  Okay.  And then it continues to go

9   down, and you see form B and then form C, form D.  And then

10  if you turn the page, there's form E and form F.

11       "Do you see that?

12       "Answer:  I do.

13       "Question:  Okay.  So these are the different

14  polymorphic forms for ibrutinib.  Correct?

15       "Answer:  These are the ones described in this

16  patent.

17       "Question:  Okay.  Are there additional ones?

18       "Answer:  Sure.

19       "Question:  Okay.  But they're not described in

20  this patent?

21       "Answer:  Not in this patent specifically, no.

22       "Question:  Okay.  What's been handed to you has

23  been marked Goldman Exhibit number 5.  It has Bates numbers

24  IMBPCYC05392658 to 59.  At the top it says kinase project

25  team meeting minutes, 10/30/2007.

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 273 of 317 PageID
#: 62402
854
Goldman - deposition designations

1              "Do you have that in front of you?

2              "Answer:  I do.

3              "Question:  Okay.  Now, I want to go down to the

4      last bullet on the first page.  And you see 32765 solid form

5      (Erick, Alice, Greg, and Lee).

6              "Do you see that?

7              "Answer:  I do.

8              "Question:  And 32765, again, that's ibrutinib?

9      Correct?

10             "Answer:  Correct.

11             "Question:  Sure.  First of all, just -- do you

12     see the first sentence there where they're talking about

13     contract lab SSCI?

14             "Answer.  I do see that.

15             "Question:  Pharmacyclics did end up contracting

16     with SSCI to investigate polymorphs.  Is that correct?

17             "Answer:  That's accurate.

18             "Question:  Do you know why Pharmacyclics was

19     investigating polymorphic forms of ibrutinib at this time,

20     2007?

21             "Answer:  My understanding at the time is that

22     they were preparing for IND submission mid-2008, I believe.

23     And so it was -- per typical protocol, we wanted to

24     understand -- they wanted to understand the polymorphic

25     landscape a little bit as well as for purification, you

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 274 of 317 PageID
#: 62403
855
Goldman - deposition designations

1    know, processing and other benefits to a would be synthetic

2    process.

3              "Question:  If you look at the document, the

4    third light bullet down, it says:

5              "In order to meet a June IND goal, we plan to

6    develop PCI-32765 as a free base.

7              "Is this consistent with your understanding that

8    they were looking into polymorph forms because they were

9    preparing an IND?

10             "Answer:  That's correct.

11             "Question:  What has been handed to you has been

12   marked Goldman deposition number 6.  It has Bates number

13   IMBPCYC 05547529.

14             (Reporter requested clarification.)

15             "Question:  Do you have that document in front

16   of you?

17             "Answer:  I do.

18             "Question.  Okay.  It says Aptuit.com.  Aptuit,

19   is your understanding Aptuit is SSCI?

20             "Answer:  That would be consistent.

21             "Question.  Okay.  And this is consistent with

22   your understanding that Pharmacyclics used SSCI to do a

23   polymorph screen about 2008 time frame.  Is that right?

24             "Answer:  That is consistent with my

25   understanding, yes.

Goldman - deposition designations

1                   "Question:  And this would be the sample being

2     shipped to them to do that polymorph screen; correct?

3                   "Answer.  It looks like Mark was planning on

4     sending them some material, yes.

5                   "Question:  And the sample is labeled PIPR

6     203-R.  Is that right?

7                   "Answer:  Correct.

8                   "Question:  What's been handed to you has been

9     marked Goldman Exhibit No. 8, Bates numbers IMBPCYC05450807

10    to 965.  There's a letter on the front that says July 21st,

11    2008, to Mark Smyth from David Engers, and it identifies

12    SSCI at the top.

13                  "Do you have that document in front of you?

14                  "Answer:  I do.

15                  "Question:  And you see SSCI says, underneath,

16    an Aptuit Company.

17                  "Answer:  That's what it says, absolutely.

18                  "Question:  So it's consistent with your

19    understanding that there's a relationship between the two;

20    correct?

21                  "Answer:  Yes.

22                  "Question:  Do you recognize this document at

23    all?

24                  "Answer:  I have not seen this document in its

25    entirety before.  I have seen some parts, but not -- not

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 276 of 317 PageID
#: 62405
857
Goldman - deposition designations

1      this entire document.

2                "Question:  Okay.  But you're familiar -- well,

3      if you go to the next page, it's the first page of the

4      actual report.  It has a date, said report generated for

5      Pharmacyclics on 7/18/2008.

6                Do you see that?

7                "Answer.  I do.

8                "Question:  So you're familiar that

9      Pharmacyclics had SSCI conduct a polymorph screen around

10     that time, 2008.  Correct?

11               "Answer:  Yes.

12               "Question:  All right.  And just if you go to

13     page 9 of the report, do you see the results and discussions

14     section?

15               "Answer:  I do see that.

16               "Question:  All right.  In fact, if you go up to

17     the introduction, you see that in the second paragraph, the

18     second page, it says:

19               "For the Study 2 samples, lots PIPR-203-R and

20     PIPR-203 were received from Pharmacyclics and partially

21     characterized.

22               "Do you see that?

23               "Answer:  I do.

24               "Question:  Okay.  So the samples that were sent

25     to SSCI were indeed PIPR-203R and PIPR-203.  Right?

Goldman - deposition designations

1                   "Answer:  According to this introduction, yes.

2                   "Question:  And so the Route 3, do you know who

3        conducted that recrystallization?

4                   "Answer:  I don't recall for sure.

5                   "Question:  Okay.  Do you know who would know at

6        Pharmacyclics?

7                   "Answer:  Not specifically, no.

8                   "Question:  Okay.  And do you know whether that

9        recrystallization was done at Pharmacyclics or done by an

10       outside manufacturer?

11                  "Answer:  I don't recall.

12                  "Question:  And how good is melting point to

13       determine what polymorphic forms you have?

14                  "Answer:  Melting points is -- it is similar to

15       DSC.

16                  "Question:  DSC.

17                  Well, is XRD a better technique to determine

18       what type of polymorph the compound is?

19                  "Answer:  From my experience, XRPD is preferred.

20                  "Question:  Do you know who came up with the

21       acetone heptane/recrystallization?

22                  "Answer:  My understanding is David Wirth did.

23                  "Question:  And he's at Ceres?

24                  "Answer:  He was the scientist at Ceres.

25                  "Question:  Okay.  And do you know why that

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 278 of 317 PageID
#: 62407
859
Goldman - deposition designations

1    recrystallization was chosen?

2              "Answer:  Again, my understanding -- not being

3    there, I can't say definitively -- but my understanding is

4    this is the crystal form setting slurry.  This is the one

5    that consistently produce form A.

6              "Question:  Okay.  Well, and so we went over a

7    2008 SSCI polymorph screen.  Right?  We talked about that

8    earlier.  Correct?

9              "Answer:  Sure.

10             "Question:  After the SSCI polymorph screen,

11   Pharmacyclics did another polymorph screen done by a company

12   called Pharmorphix; is that right?

13             "Answer:  Pharmorphix.

14             "Question:  Pharmorphix.  Is that right?

15             "Answer:  That is correct.

16             "Question:  And now that screen was done when

17   you had -- after you had started at Pharmacyclics.  Correct?

18             "Answer:  Correct.

19             "Question:  Okay.  Were you involved with that

20   polymorph screen done by Pharm -- I'm going to screw that up

21   all day long now.  Pharmorfix, Pharmorphix?

22             "Answer:  Pharmorphix.

23             "Question.  Let me try again.  Sorry.

24             "Are you -- were you involved with the polymorph

25   screen done by Pharmorphix?

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 279 of 317 PageID
#: 62408
860
Goldman - deposition designations

1      "Answer:  Yes, I was.

2      "Question:  What's been handed to you has been

3 marked Goldman Exhibit No. 9.  It has got Bates numbers

4 IMBPCYC05277895, and it's an e-mail.  At the top it says,

5 from Mark Smyth and to Theirry Bonnaud, and it's dated

6 May 24th, 2011.

7      Do you have that in front of you?

8 A. I do.

9      "Question:  Okay.  And it says, samples for

10 P-1872.  Do you see that?

11      "Answer:  I do see that.

12      "Question:  All right.  Is that referring --

13 P-1872, does that refer to the polymorph screen that

14 Pharmorphix did for Pharmacyclics?

15      "Answer:  That's accurate.

16      "Question:  Okay.  And it's discussing a

17 shipment of a sample.  To your understanding, is this the

18 shipment of ibrutinib that was going to be used in that

19 polymorph screen?

20      "Answer:  So multiple samples were sent for

21 purposes of the screen.

22      "Question:  Okay.  And the e-mail is describing

23 that.  Correct?

24      "Answer:  Yes.

25      "Question:  And you were cc'd on the e-mail.

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 280 of 317 PageID
#: 62409
861
Goldman - deposition designations

1    Correct?

2                "Answer:  I am.

3                "Question:  Okay.  Now, Pharmorphix -- why did

4    Pharmacyclics choose them to run the polymorph study?

5                "Answer:  I had run a few projects with them in

6    my previous employment and liked their work.  Their -- if I

7    recall correctly, other folks at Pharmacyclics were familiar

8    with them as well.

9                "Question:  So you had input into the decision

10   to use Pharmorphix for the polymorph study?

11               "Answer:  I did.

12               "Question:  And who else had input into that

13   decision?

14               "Answer:  Mark.

15               "Question:  Dr. Smyth?

16               "Answer:  Dr. Smyth, yes.

17               "Question:  Okay.  How much experience did they

18   have in conducting the polymorph screens at the time this

19   was done in 2011?

20               "Answer:  They are considered to be experts in

21   the field of solid state chemistry.

22               "Question:  They're a company in -- as a

23   company, by 2011, they were regularly conducting polymorph

24   screens.  Is that -- is that accurate?

25               "Answer:  That is accurate.

1          "Question:  What's been handed to you has been

2    marked as Goldman deposition Exhibit No. 10.  It says Bates

3    numbers IMBPCYC05252966 to 3037.

4          "Do you recognize this document at all?

5          "Answer:  Yes, I do.

6          "Question:  Okay.  Is this the report from the

7    Pharmorphix on the polymorph study that they conducted for

8    Pharmacyclics?

9          "Answer:  Yes, it is.

10          "Question:  Okay.  And on the front, it's signed

11    and dated February 28, 2012, and one is February 30th, 2012.

12          "Does this report issue on or about that time?

13          "Answer:  This was approved on that time, yes.

14          "Question:  Well, actually, the report was

15    received -- does it comport with your understanding that the

16    report was received around February 2012?

17          "Answer:  At Pharmacyclics?

18          "Question:  Yes.

19          "Answer:  Yes.

20          "Question:  Okay.  When it was received at

21    Pharmacyclics, did you review -- did you review the report?

22          "Answer:  Yes.

23          "Question:  Okay.  And then if you go to the

24    next page, there's a Section 7.2, and it's initial

25    polymorphism screen.

1        Do you see that?

2            "Answer:  Yes.

3            "Question:  And that is the initial -- that is

4     one of the polymorph screens that Pharmorphix did for

5     Pharmacyclics for this project.  Right?

6            "Answer:  Correct.

7            "Question:  If you look at the next page,

8     there's a table 7, and it has a whole series of conditions

9     for the polymorph screens.

10           Do you see that?

11           "Answer:  I do see that.

12           "Question:  Okay.  So there's a table, and

13    there's a list of solvents.

14           "Did Pharmorphix propose what solvents to use in

15    this polymorph screen?

16           "Answer:  Pharmorphix provided an initial list,

17    and PCYC -- sorry, Pharmacyclics collaborated with

18    Pharmorphix to fine-tune the list a little bit.

19           "Question:  What was the fine-tuning that was

20    done?

21           "Answer:  Some solvents were removed; some were

22    added.

23           "Question:  Do you know how those solvents were

24    chosen?

25           "Answer:  I can state that for some of them,

Goldman - deposition designations

1    they were chosen based on their inclusion already in the

2    existing process.

3                In some cases, they were chosen because they

4    were considered to be Class 3 solvents, which means you can

5    have higher residual tolerance in your API, meaning --

6    meaning you don't have to get it down to ppm levels on -- in

7    terms of -- all API's have residual solvents, so there's a

8    little bit more tolerance with Class 3 solvents.  So that's

9    why some of those are used in final IPPI isolations.

10               And a couple of the conditions were known to

11   purify the material.

12               Question.  Well, your experience with -- with

13   working with polymorphs up to this point, 2012, were these

14   solvents common solvents that you'd use for a polymorph

15   screen?

16               "Answer:  Can you give me your definition of

17   common, please?

18               "Question.  You used -- used typically in

19   polymorph screen?

20               "Answer:  As I stated earlier, some of them

21   would be used based on their Class 3 characteristics.

22   Others you will see -- you will include or not include based

23   on what you know about the molecule itself, so that would

24   not be typical.

25               "Question:  Okay.  But the ones that proposed

Goldman - deposition designations

1    that Pharmorfix proposed, do you know how they chose those

2    particular solvents to use:

3                "Answer.  I don't, actually.

4                "Question:  Okay.  What's been marked as Goldman

5    deposition Exhibit 11, it got Bates numbers IMBPCYC05199288

6    and to -- to 298.  And it says on the front page,

7    polymorphism studies on PCI-32765-00.  Update 001.

8                "Do you have that in front of you?

9                "Answer:  I do.

10                "Question:  Okay.  Did Pharmorfix give

11    Pharmacyclics periodically updates, presentations?

12                "Answer:  They did.

13                "Question:  Okay.  And there's a Craig Boyle on

14    the front page.  Who is Craig Boyle?

15                "Answer:  Craig was a scientist who was

16    conducting a fair share of these experiments.

17                "Question:  Okay.  And would you review these

18    updates?

19                "Answer:  I don't know if I received them -- I

20    don't recall if I received them directly, but I did have the

21    opportunity to review them.

22                "Question:  And does this look like one of the

23    updates that Pharmorphix would give to Pharmacyclics on the

24    polymorph study?

25                "Answer:  Yes, it is.

1    "Question:  On the front page, there's a date,

2    May 6, 2011.  Does that comport with about the time when

3    Pharmorphix was starting this polymorph screen?

4    "Answer:  It's in the time frame.

5    "Question:  Okay.  And it says update 001.  So

6    this would have been the first update.  Right?

7    "Answer:  I think that's safe to assume, yes.

8    "Question:  So if you direct your attention to

9    page 3, the slide 3 of the update, do you see that?  It

10   says, "proposal" at the top?

11   "Answer:  Yes, I'm sorry.  I was trying to find

12   where the number was.  Here we go.  Yes, I see it.

13   "Question:  So it says proposal at the top.

14   Right?

15   "Answer:  Uh-huh.

16   "Question:  So this summarizes the proposal that

17   Pharmorfix had for this polymorph screen.  Correct?

18   "Answer:  Yeah, but this was honed from the

19   original proposal.  So the original proposal received was

20   fine tuned between Pharmacyclics and Pharmorphix.

21   "Question:  Okay.  Okay.  Well, let me go back

22   to the report.

23   "Answer:  Okay.

24   "Question:  It's Exhibit 10.  All right?  And

25   I'm -- again, I'm on the initial polymorph screen.  So it's

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 286 of 317 PageID
#: 62415
867
Goldman - deposition designations

1    page 24 of the report.

2                "Answer:  Okay.

3                "Question:  Okay.  And if you look at the next

4    page, which is Table 7, it reports XRP data.

5                Do you see that?  Or it has a column for XRPD.

6    Sorry.

7                "Answer:  Which column?

8                "Question:  It's the second to the right.

9                "Answer:  Okay.

10               "Question:  So you see it's XRPD after slow

11   cooling to zero degrees.  Right?

12               "Answer:  Yes.

13               "Question.  And that reports the form underneath

14   the column.  Right?

15               "Answer:  Correct.

16               "Question:  Okay.  And to the best of your

17   understanding, that is the form that was obtained from this

18   polymorph screen.  Is that right?

19               "Answer:  To the best of my knowledge, yes.

20               "Question:  Okay.  And if you could go to

21   Exhibit 3, right -- it's the patent, sorry.  It's the

22   patent.  And let's go to column 63.  All right?

23               And I'm looking at the Example 1 again.  Answer:

24   Okay.

25               "Question:  And it's form A, and now I'm looking

Goldman - deposition designations

1    at Route one.  Do you see that?

2                "Answer:  I do.

3                "Question:  Okay.  Does that Route one

4    correspond with this polymorph screen that we just discussed

5    on page 24 and 25 of the Pharmacyclics -- sorry, Pharmorphix

6    screen report?

7                "Answer:  If you'll give me a minute.

8                "Question:  Sure.

9                "Answer:  They do appear to correspond.

10               "Question:  And did you separately run

11   experiments that are described in Route one of the patent?

12               "Answer.  I don't remember if I ran these exact

13   procedures or not.

14               "Question:  Do you --

15               "Answer:  -- in house.

16               "Question:  Sorry.  Do you remember if anyone

17   ever at Pharmacyclics ran those procedures?

18               "Answer:  I don't recall.

19               "Question:  Let's go back to the polymorph

20   screen that's Exhibit 10.  I think you're on the right page,

21   25.

22               "Answer:  I have page 25.

23               "Question.  All right.  7.3, maturation screen.

24   Do you see that section?

25               "Answer:  I do.

Goldman - deposition designations

1                    "Question:  Okay.  And it goes to Table eight.

2      It's the next page, which describes the result of the

3      maturation; correct?

4                    "Answer.  That is correct.

5                    "Question:  All right.  Now, on page 26, did

6      Pharmorphix propose the solvents to be used in this

7      maturation screen?

8                    "Answer:  So similar to my answer before, this

9      list appears to be the same as the initial polymorph

10     screening list, if I'm not mistaking, which means that it

11     was a collaborative list between Pharmorphix and

12     Pharmacyclics.

13                   "Question:  And the procedure on page 25,

14     there's a procedure for the maturation screen.

15                   "Do you see that?

16                   "Answer:  I do.

17                   "Question.  Okay.  Did Pharmorfix propose this

18     procedure for the maturation screen?

19                   "Answer:  I don't recall that Pharmacyclics had

20     any input on this procedure.

21                   "Question:  Okay.  Do you know one way or the

22     other?

23                   "Answer:  One way or the other --

24                   "Question.  Oh.  You just don't recall --

25                   "Answer:  I don't recall.

Goldman - deposition designations

1          "Question:  And you don't recall that

2    Pharmacyclics had any input into the procedure.  Correct?

3          "Answer:  I don't recall.

4          "Question:  Okay.  Let's go back to the patent.

5          "Answer:  Okay.

6          "Question:  Which is in Exhibit Number 3, and

7    that same page we've been looking at; the column 63 -- now

8    this -- and I'm looking at form A, Route 2.  Do you see

9    that?

10          "Answer:  Okay.

11          "Question:  Is Route 2 the maturation screen

12   that was conducted by Pharmorfix for the polymorph screen

13   that Pharmacyclics had them conduct?

14          "Answer.  Route 2 from the patent appears to be

15   consistent with the maturation screen that you just

16   described for Pharmorphix.

17          "Question:  Look in the front.  There are some

18   figures.  They start at -- they start at Figure 1, and the

19   Bates number is 4,446,085.

20          "Answer:  Okay.

21          "Question:  Do you see that?

22          "Answer:  I do.

23          "Question:  Okay.  And it says XRPD pattern of

24   form A.

25          "Do you see that?

Goldman - deposition designations

1                "Answer:  I do.

2                "Question:  Okay.  And do you know who -- where

3     that data came from?

4                "Answer:  I believe this data came from

5     Pharmorfix.

6                "Question:  And -- but you don't know what -- do

7     you know a way to be able to link up this particular data

8     with what sample that it came from?

9                "Answer:  Pharmorphix sent us data to be

10    included in this.  I don't recall if the lot numbers were

11    listed on that data or not.

12               "Question:  Were you involved with sending that

13    data?

14               "Answer:  Sending?

15               "Question:  Giving it over so that it could be

16    put inside the patent application Dr. Hsu.  Right.  And

17    that's not what I'm trying to get to.  I just --

18               THE WITNESS:  Yeah, I believe I gathered

19    information from Pharmorphix and provided it to the IP

20    attorneys.

21               "Question:  Now, we were previously talking

22    about the 2008 SSCI polymorph screen that was done for farm;

23    right?

24               "Answer:  No.

25               "Question:  And we also discussed the

Goldman - deposition designations

1    Pharmorphix polymorph screen that was done for

2    Pharmacyclics; correct?

3                "Answer:  Yes.

4                "Question:  Okay.  And that was done about 2011,

5    2012, correct?

6                "Answer:  The Pharmorfix screen was 2011.

7                Question.  Correct.

8                "Answer:  -- was 2011.  Initiated 2011.

9                "Question:  And the report was issued 2012.

10   Correct?

11               "Answer:  This report was issued 2012, yes.

12               "Question:  So between the 2008 SSCI polymorph

13   screen and the 2011 Pharmorfix polymer screen, did

14   Pharmacyclics conduct any other polymorph screens?

15               "Answer:  Between those two reports?

16               "Question:  Yes.

17               "Answer -- and projects?

18               "Question:  Yes.

19               "Answer:  So part of the time predates my

20   arrival of Pharmacyclics.  Let's be clear about that.

21               "Question:  Yes.

22               "Answer:  I don't recall any.

23               "Question:  Not that you're aware of?

24               "Answer:  No.  That's okay.  Yeah.  Not none

25   that I'm aware of.

Goldman - deposition designations

1        "Question:  If we go back to the Pharmacyclics

2   polymorph screen that's Exhibit 10 in their report, was

3   David Wirth involved with this polymorph screen that was run

4   by Pharmorphix?

5        "Answer:  No, he was not.

6        "Question:  So that's the extent of your

7   involvement in the formulation development.  You helped

8   provide the API; is that correct?

9        "Answer:  That is correct.

10        "Question:  What has been handed to you has been

11   mark Goldman Deposition Exhibit 14.  It has Bates numbers

12   IMBPCY05000693 to 9849.

13        "And, again, I'm going to ask you -- the third

14   page in, it says, assigned to and then Erick Goldman.

15   That's you.

16        "Answer:  Correct.

17        "Question:  And it's dated assigned, this one is

18   clear, August 1?

19        "Answer:  Correct.

20        "Question:  I just want to be clear, does this

21   appear?

22        "Answer:  Again, from a request.

23        "Question:  A document the with the Bates

24   labeled IMBPCY04446822.

25        "I will turn you over to the second page,

1    Mr. Goldman.  Are you on the second page?

2                    "Answer:  I am.

3                    "Question:  This is the '549 patent.  Right?

4                    "Answer:  Yes.

5                    "Question:  What did Pharmacyclics make its

6    first ibrutinib solvate?

7                    "Answer:  My understanding is that the first

8    solvate was characterized during the initial Pharmorfix

9    polymorph screen.

10                   "Question:  And the date of that was?

11                   "Answer:  I believe we established that was

12   somewhere along the lines of mid-2011 through the end of the

13   year 2012.

14                   "Question:  Did Pharmacyclics make a solvate

15   using free base ibrutinib or a pharmaceutically acceptable

16   salt of ibrutinib using any of these solvents listed here?

17                   "Answer:  Yes.

18                   "Question:  Which solvent was used?

19                   "Answer:  So the ones I recall are toluene,

20   methylethyl ketone and methanol.

21                   "Question:  Anything else?

22                   "Answer:  During the time frame that you were

23   you --

24                   "Question.  Ever.

25                   "Answer:  Ever.  Okay.

1          There are others, but I don't remember which

2     ones they had were off the top of my head.

3          "Question:  The first polymorphic screening

4     assay, that was done by SCI; is that correct?

5          "Answer:  With regards to ibrutinib.

6          "Question:  Correct.

7          "Answer.  To the best of my knowledge, yes, the

8     first polymorphic screen on ibrutinib was performed by SSCI.

9          "Question:  And about four years later,

10    polymorphics goes on a second screening effort?

11         "Answers:  Polymorphics.  Thank you.

12         Do you know why Pharmacyclics decided to do more

13    polymorphics screening four years later?

14         "Answer:  To continue to research their API.

15         "Question:  Was there anything inadequate or

16    inconclusive about the first screening effort by SSCI?

17         "Answer:  I don't know as I was not there at the

18    time.  I would say the effort was more along the lines just

19    to be thorough.

20         "Question:  Do you know if it had anything to do

21    with the anticipated filing of an NDA?

22         "Answer:  So an NDA is always the goal.  Right?

23    But being familiar with the API to get to that goal is more

24    of a step than I would say a pathway.

25         "Question:  What do you mean by, it's a step?

Goldman - deposition designations

1           "Answer:  It's just part of the development of

2    your API.

3           "Question:  If you could turn back to

4    Exhibit 10.

5           "Are the solvents here Class 3 solvent?  Table

6    7?

7           "Answer:  No, they are not.

8           "Question:  Is there a listing that the FDA

9    has or somebody has that identifies what falls within Class

10   3?

11          "Answer:  Yes, there is.

12          "Question.  Handing you Exhibit 21.

13          "Answer:  Okay.

14          "Question:  Is that an e-mail from you dated

15   August 25th, 2012, and an attachment thereto?

16          "Answer:  Yes, it appears to be.

17          "Question:  The attachment all has the same

18   Bates number, it looks like.

19          "My question was:  Do you know with a that slide

20   deck concerns?

21          "Answer:  Yes, I do.

22          "Question:  What?

23          "Answer.  It is a presentation that I assembled

24   describing some of the research I did in-house.

25          "Question:  If you could turn to slide 3, which

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 296 of 317 PageID #: 62425
877
Goldman - deposition designations

1    is 450 on the top Bates number.

2                "Answer:  Okay.

3                "Question:  Under the first heading, it says,

4    forms and conditions that derive them.

5                "Do you see that?

6                "Answer:  I do.

7                "Question:  And it says, form C is typically

8    isolated neat methanol.  Is that correct?

9                "Answer:  That is.

10               "Question:  And form B is typically isolated at

11   room temp or cooler from aqueous methanol; is that correct?

12               "Answer:  That is correct.

13               "Question:  And form A is found in just about

14   any solvent matrix not containing methanol, asterisk.  Is

15   that correct?

16               "Answer.  That is what's written there.

17               "Question:  And the asterisk is indicating there

18   that metastable MIB K and toluene solvates were two solvents

19   that did not yield form A.  Is that correct?

20               Answer:  Yeah, that -- so it just -- it says,

21   metastable MIB K and toluene solvates accepted.

22               "Question:  What does that mean?

23               "Answer:  I believe at the time I was referring

24   to the Pharmorphix report.

25               "Question:  And those were two solvents that

Goldman - deposition designations

1    didn't yield form A?

2             "Answer:  No.  Those were the solvates that

3    Pharmorphix found.

4             "Question:  You're aware that the patents that

5    we have looked at today describe the form A through.  If of

6    ibrutinib.  Correct?

7             "Answer:  I am aware of that, yes.

8             "Question:  Are you aware of any other forms of

9    form A through F at ibrutinib?

10             "Answer:  Yes, I am.

11             "Question:  How are you aware of those forms?

12             "Answer:  Let's see.  Through research that was

13    conducted at Pharmorphix under our direction at

14    Pharmacyclics.

15             "Question:  Is there -- do you know if there's a

16    general or accepted rule of thumb as to how many peaks in an

17    XRPD spec you need to look at in order to identify a

18    particular polymorph versus another one?

19             "Answer:  I don't know of a set standard.

20             "Question:  Do you have a personal practice?

21             "Answer:  With regards to a number of peaks?

22             "Question:  Yeah.  How many you would want to

23    focus -- or would need to consider or identify in a pattern

24    to conclude that it is, in fact, the same polymorphic form?

25             "Answer:  That would be done on a case-by-case

Goldman - deposition designations

1    basis depending upon the compound itself.

2                "Question.  Okay.  How about for ibrutinib?

3                "Answer:  I personally don't have a second

4    number of peaks that I put, put forth.

5                "Question:  Do you believe you could identify a

6    polymorphic form with a -- of ibrutinib using just one

7    peak?

8                "Answer:  No.

9                "Question:  How about two peaks?

10               "Answer:  No.

11               "Question:  How about three peaks?  And that

12   will be the last one.

13               "Answer:  No.

14               "Question:  If you could pull out the '753

15   patent for me, which I think is Exhibit 3.

16               "Answer:  Okay.

17               "Question:  I think we've established multiple

18   times today that this patent references the crystalline

19   forms A, B, C, D, E, and F of ibrutinib.  Is that correct?

20               "Answer:  I believe that to be the case, yes.

21               "Question:  Who was the first person, to your

22   knowledge, to identify form A?

23               "Answer:  What do you mean by identify?

24               "Question:  Who was the first person to isolate

25   and then characterize the polymorphic form that is referred

Goldman - deposition designations

1    to in this patent as form A?

2              "Answer:  My understanding is David Wirth was

3    the first person to generate form A.  I cannot remember off

4    the top of my head how much characterization he was able to

5    do at the time at Ceres.  Characterization would likely have

6    been done by SSCI.

7              "Question:  Same question for form B."

8              MS. BHARKHDA:  Your Honor, we just paused.  It

9    sounds like somebody needs to mute their mike.

10             TRIAL TECH:  I just muted Jonathan Teppin.

11             THE COURT:  Okay.

12             "Question:  Same question for form B.  Who was

13   the first person who isolate and identify what is now

14   referred to as crystalline form B in the '753 patent?

15             "Answer:  I believe that to be David Wirth as

16   well.

17             "Question:  And the same question for

18   crystalline form C identified in the '753 patent?

19             "Answer:  Also David Wirth.

20             "Question:  What about crystalline form B?

21             "Answer:  Pharmorphix.

22             "Question:  Okay.  What about crystalline form

23   E?  Who first identified and isolated crystalline form E?

24             "Answer:  That should be Pharmorphix as well.

25             "Question:  And what about crystalline form F?

Goldman - deposition designations

1           "Answer:  That one's me, actually.

2           "Question:  When did you, to the best of your

3   recollection, first identify and isolate crystalline form F?

4           "Answer:  I don't remember the exact date.  I

5   could -- I could dig it.

6           "Question:  Is it fair to say that it was before

7   the filing of the patent application?

8           "Answer:  Yes.  That's a fair assumption.

9           "Question:  Are any of the crystalline forms A

10  through F solvates?

11          "Answer:  Yes.

12          "Question:  Which ones?

13          "Answer:  D, E, F.

14          "Question:  And then if you could turn to column

15  -- starting in column 63 of the '753 patent.  Answer:  63?

16          "Question:  Column 63, yes.

17          You see the examples start in column 63?

18          "Answer:  I do.

19          "Question:  And Example 1 starts in example 63

20  and continues all the way to column 65.

21          Do you see that?

22          "Answer:  Yes.

23          "Question:  And I will repeat my question for

24  you.

25          Is it fair to say that you performed the

Goldman - deposition designations

1   experiment listed in column 65 under form F?

2              "Answer:  Yes, it is fair to say that.

3              "Question:  Is it also fair to say that the

4   examples for form A, B, C, D, and E under Example 1 were

5   performed by the other people you previously identified as

6   first isolating and identifying those forms?

7              "Answer:  So for form D and E, I believe those

8   were Pharmorfix experiments.

9              "Question:  Okay.

10             "Answer:  But I would have to go back in here to

11  confirm to say positively --

12             "Question:  Okay.

13             "Answer -- but I believe that to be the case.

14             "Question:  And I believe for form A, you

15  previously testified that for routes 1 and 2, it was

16  Pharmorfix; and for Route 3, you weren't entirely sure.  Is

17  that correct?

18             "Answer:  That is correct.  That's still the

19  case.

20             "Question:  Okay.  And then what about forms B,

21  routes 1 and 2, and form C?

22             "Answer:  I'm not sure who performed those

23  experiments.

24             "Question:  Okay.  With regard to form F, was

25  anyone other than you responsible for isolating and then

Goldman - deposition designations

1   identifying that crystalline form?

2           "Answer:  So I produced I, and Pharmorfix

3   characterized it.

4           "Question:  I believe you said that --

5   previously testified that SSCI is the entity who

6   characterized form A.  Is that correct?

7           "Answer:  They did an initial characterization

8   of form A, yes, prior to Pharmorphix.

9           "Question:  Was Pharmorphix the first company to

10  characterize form B?

11          "Answer:  No.

12          "Question:  Who was the first company to

13  characterize form B?

14          "Answer:  SSCI, to the best of my knowledge.

15          "Question:  And what about form C?  Which

16  company was the first company to characterize form C?

17          "Answer:  SSCI, to the best of my knowledge.

18          "Question.  And what about form D?  Which

19  company was the first company to characterize form D?

20          "Answer:  Pharmorphix.

21          "Question:  And what about form E?  Which

22  company was the first company to characterize form E?

23          "Answer:  Pharmorphix.

24          "Question:  Mr. Goldman, I just have a few

25  questions for you.

1                  Of the current employees at Pharmacyclics, who

2      is the person who is most knowledgeable about the

3      development of the crystalline form of ibrutinib?

4                  "Answer:  Likely myself.

5                  "Question:  And with regard to the work that

6      Pharmorphix did with respect to crystalline forms of

7      ibrutinib, who supervised that work?

8                  "Answer:  Myself and Dr. Smyth.

9                  (End of videotaped deposition.)

10                 MS. BHARKHDA:  And, Your Honor, I'm going to let

11     my colleague, Mr. Abhyankar here, talk about the next

12     deposition we intend to introduce.

13                 THE COURT:  Okay.

14                 MR. ABHYANKAR:  Thank you, Your Honor.  And if

15     plaintiffs don't have an objection, we're going to go a

16     little out of order than what we had presented to them based

17     on the time we have left, which I believe we only have about

18     15 minutes left, and play the testimony from Janet Dailey,

19     plaintiffs' prosecuting attorney.  It's only 11 minutes

20     total.

21                 THE COURT:  Okay.

22                 MR. ABHYANKAR:  Thanks.  Ms. Dailey was deposed

23     by defendants on December 10th, 2019.  You will hear

24     11 minutes and 33 seconds of her deposition testimony, nine

25     minutes and 11 seconds for defendants and two minutes and

1    22 seconds for plaintiffs.

2              THE COURT:  All right.

3              MS. BHARKHDA:  Your Honor, I'm sorry.  I was on

4    the other side of the room, so I apologize.  It took me a

5    moment to get over here.

6              THE COURT:  No problem.

7              MS. BHARKHDA:  I think we do have one request

8    with respect to the testimony that's being played.  You may

9    recall this was -- we would ask if we could for the

10   courtroom to be sealed or for the Court to be able to watch

11   this testimony without the public.  This is for the reason

12   that was raised by Mr. Sipes in his opening statement about

13   wanting to protect Ms. Dailey.

14             THE COURT:  I mean, I'm confused by this.  This

15   person is employed by one of the defendants who is seeking

16   to play the testimony.  Right?

17             MR. ABHYANKAR:  Your Honor, to be clear, she was

18   Pharmacyclics' prosecuting attorney at the time of his

19   deposition of the relevant time frame.

20             She is currently --

21             THE COURT:  Right.  I'm saying she's currently

22   an employee of one of the defendants.  Right?

23             MR. ABHYANKAR:  Of one of the defendant's parent

24   companies, yes.

25             THE COURT:  Ms. Bharkhda, I mean I don't

```
 1    understand.  In terms of protecting her reputational

 2    interest, because that's what we're talking about, you would

 3    think that, for all I know, she'll have a cause of action

 4    against the defendant if it's as bad as you say.  I just

 5    don't really understand.

 6              Do you understand?  I mean --

 7              MS. BHARKHDA:  Your Honor, if you -- you know,

 8    we can, we can withdraw the request and let it be played,

 9    but given, you know, we wanted to -- we were, we wanted to

10    raise the issue in the interests of protecting her.

11              THE COURT:  Yes.  And I mean, like, I don't

12    know, you know.  I feel funny in a way about it because I

13    like to protect people who are just innocent by stand errs,

14    but she's affiliated with one of the parties and they want

15    to play it, so I'm going to overrule the objection.  All

16    right.

17              I do have a notebook for it, so I can follow it.

18    Thank you.  I take it back.  I don't have a transcript.  I

19    just have exhibits.  You'll need to provide that is a well.

20    Thanks.

21              MR. ABHYANKAR:  We will.  Thank you.

22              (The videotaped deposition of Jana Dailey was

23    played as follows.)

24              "Question:  Please state your name for the

25    record.
```

Dailey - deposition designations

1              "Answer:  Jana Dailey.

2              "Question:  Is that your full name?

3              "Answer:  If you need a middle name, I can give

4      you a middle name.  Jana Sook-Dailey.

5              "Question:  Now, did you previously go by Jana

6      Lewis?

7              "Answer:  Yes, that's correct.

8              "Question:  And when did your name change over

9      from Jana Lewis to Jana Dailey?

10              "Answer:  September 21st of this year, 2019.

11              "Question:  Are you aware that Alvogen submitted

12      a paragraph IV notice letter relating to ibrutinib?

13              "Answer:  Yes.

14              "Question:  Have you seen the paragraph IV

15      notice -- Alvogen's paragraph IV notice letter?

16              "Answer:  Yes.

17              "Question:  Besides yourself, do you know if

18      anyone else at Foley has seen Alvogen's paragraph IV notice

19      letters?

20              "Answer:  Yes.

21              "Question:  Who?

22              "Answer:  Hathaway Russell.  And I'm not sure

23      about anyone else for that particular letter.

24              Question.  Who sent you Alvogen's paragraph IV

25      notice letters?

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 307 of 317 PageID #: 62436
888
Dailey - deposition designations

1    "Answer:  I don't remember.

2    "Question:  Is it someone at Foley?

3    "Answer:  I don't remember.

4    "Question:  Is it someone at Covington?

5    "Answer:  I don't remember.

6    "Question:  Is it someone at Janssen?

7    "Answer:  I don't remember.

8    "Question:  So you don't know what company or

9    law firm sent it to you?

10    "Answer:  No, I don't remember which one it was.

11    "Question:  Do you know why the paragraph IV

12    notice letter -- Alvogen's paragraph IV notice letter was

13    sent to you?  Yes or no?

14    "Answer:  Yes.

15    "Question:  Why was Alvogen's paragraph IV

16    notice letter sent to you?  I don't think I don't think I'm

17    going to instruct the witness not to answer that question on

18    the grounds that it would call for disclosure of attorney

19    client communications.

20    Q.    Are you going to follow your counsel's objections?

21    A.    Yes.

22    Q.    Could you have answered that question if it weren't

23    for your counsel's objection and instruction?

24    "Answer:  I think it might be privileged.

25    Question.  But if it weren't privileged, you would be answer

Dailey - deposition designations

1    to answer:

2              Answer.  Yes.

3              "Question:  I've handed the witness a copy of

4    second preliminary amend under 37 C.F.R. Section 1.115

5    marked as Exhibit 16.

6              "Have you seen Exhibit 16 before?

7              "Answer:  Yes.

8              "Question:  When is the last time you've seen

9    Exhibit 16?

10             "Answer:  I don't remember the last time I saw

11   this other than today.

12             "Question:  Would you have seen it when you

13   prosecuted the '660 application?

14             Answer:  Yes.

15             "Question:  Do you know if you've seen this

16   exhibit after the patent issued?

17             "Answer:  I don't remember.

18             "Question:  Exhibit 16 is a preliminary

19   amendment submitted in connection with the 660 application

20   identified is on Exhibit 1.  Correct:

21             "Answer:  Yes.

22             "Question:  And this was -- this amendment was

23   submitted on April 4, 2018?

24             "Answer:  That's what the filing receipt and the

25   date says on the document.

Dailey - deposition designations

1           "Question:  Exhibit 6 is a submission of an

2   amendment of claims; correct?

3           "Answer:  Yes.

4           "Question:  And Exhibit 16 -- 16 identifies new

5   claims that were submitted in connection with this 660

6   application, correct?

7           "Answer:  Yes.

8           "Question:  And those are identified on the

9   bottom of page 3 starting at claim 44 through 58, correct?

10          "Answer:  So you're asking about the new claims?

11          "Question:  Yes.

12          Answer:  New claims, yes, 44 through 58 are

13  identified in the document.

14          "Question:  Do you know who drafted the

15  claims -- the new claims of Exhibit 16?

16          "Answer:  I don't know.

17          "Question:  Do you know who would know?

18          "You can answer that yes or no if you know.

19          "Answer:  Not for certain, no.

20          "Question:  Are you aware that Sandoz has

21  submitted an ANDA for ibrutinib?

22          "Answer:  Yes.

23          "Question:  And are you aware of -- or do you

24  have any knowledge of the formulation of the ANDA product

25  described in Sandoz's ANDA?

Dailey - deposition designations

1      "Answer:  Yes.

2      "Question:  And how did you learn that?

3      "Answer:  From the paragraph IV letter from

4   Sandoz.

5      "Question:  And which paragraph IV letter?

6      "Answer:  I don't remember the exact date, but

7   one from Sandoz to Pharmacyclics.

8      "Question:  Have you ever drafted or amended a

9   claim in response to a paragraph IV notice letter?

10     "MR. YOUNKIN:  Objection.  I'm going to instruct

11  the witness not to answer.  That calls for attorney/client

12  privileged communications.

13     "Question:  Are you going to follow your

14  counsel's instruction:

15     "Answer:  Yes.

16     "Question:  And, of course, since we're asking

17  this question, and had there not been an instruction and

18  objection, would you have answered that question?

19     "Answer:  Yes.

20     "Question:  Exhibit 21 is entitled crystalline

21  form of Bruton's tie row sign kinase inhibitors.  It's

22  marked with Bates number IMBPCYC04591386, and it continues

23  on the last page until 4591486.

24     "I'm going to direct your attention to the last

25  three pages of this document, starting on what's marked on

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 311 of 317 PageID
#: 62440
892
Dailey - deposition designations

1    the PDF as page 99 at the bottom, and the claims are at --

2    begin at the top of the page there.

3                    "Are you there?

4                    "Answer:  Yes.

5                    "Question:  All of these claims required 2-Theta

6    angles -- claim 1 we're looking at.

7                    "And claim 1 is describing a crystalline form A

8    of the chemical name for ibrutinib, that has an X-ray powder

9    diffraction XRPD pattern comprising 2-Theta peaks at 5.7

10   plus or minus 0.1 degrees, 18.9 plus or minus 01 degrees and

11   21.3 plus or minus 0.1 degrees.

12                   "Do you see that?

13                   "Answer:  Yes, I see that.

14                   "MR.  BASS:  Now I'm going to introduce the

15   amendment to this, which is -- I will introduce the second

16   preliminary amendment as the next exhibit, which is now --

17   that goes to you.

18                   (Dailey Exhibit 22 was marked for

19   identification.)

20                   "Question:  This is the second preliminary

21   amendment under 37 C.F.R., Section 1.115.

22                   Do you see that at the top on the first page

23   there?

24                   "Answer:  Yes.

25                   "Question:  Okay.  I'm sorry.  This bears the

Case 1:18-cv-00192-CFC-CJB    Document 550    Filed 02/01/21    Page 312 of 317 PageID
#: 62441
893
Dailey - deposition designations

1    Bates number of IMBPCYC04591519, and this is for application

2    No. 15/900,660.

3                    "Do you see that at the top in the caption

4    there?

5                    "Answer:  Yes.

6                    "Question:  Okay.  Now, if you will flip to the

7    last page of this document -- or, no, excuse me -- if you

8    flip to where on the bottom it says 4591522, your signature

9    is on this document, correct?

10                   "Answer:  Yes.

11                   "Question:  Now, you'll see in the amendments to

12   the claim, which is on the next page, that claims 1 to 13

13   were canceled and that 14, which had been previously

14   presented, states -- because this is the second preliminary

15   amendment -- states, a crystalline form of the chemical name

16   for ibrutinib that has a differential scanning calorimetry

17   DSC thermogram having an endotherm with a peak of about 157

18   degrees Celcius.

19                   "Do you see that?

20                   "Answer:  Yes, I do.

21                   "Question:  And you'll notice that it has a

22   crystalline form of and the chemical name for ibrutinib?

23                   "Answer:  Yes.

24                   "Question.  This is marked as IMBPCY0669461.

25                   "Answer:  Yes, I see that.

Dailey - deposition designations

1              "Question:  Flip to the claims on the next

2      page.  It says 101, 99, 100 on just the order it was

3      produced in.

4              "Do you recognize these claims?

5              "MR. YOUNKIN:  That's a yes or no.

6              "Answer:  I mean outside of today, I'm reminded

7      of these claims today, yes.

8              "Question:  And what reminds you have these

9      claims today?  Something I've introduced earlier?

10             "Answer:  Yes.

11             "Question:  What specifically?

12             "Answer:  Exhibit 21.

13             (Dailey Exhibit 26 was marked for

14     identification.)

15             "Question:  So this eventually became what is

16     U.S. patent No. 10, 294, '231, and this is the second

17     preliminary amendment under 37 C.F.R. to that patent.

18             Now --

19             "MR.  YOUNKIN:  The application -- okay.

20             "Question:  -- if you flip over to this document

21     that I've just handed you, which is IMBPCYC0699612, you see

22     on the page on the bottom right that says -- ends in 618,

23     your signature is on that page, correct?

24             "Answer.  Yes.

25             "Question:  So that being said, if you look at

Dailey - deposition designations

 1   the claims, they're not about a crystalline form of

 2   ibrutinib any more, correct, in Exhibit 26?

 3           "Answer:  The claims are no longer about a

 4   crystalline form.

 5           "Question:  Now, you see in 28, claim 14 (D) has

 6   a limitation about 0.2 weight percent to about 1.0 weight

 7   percent of lubricant.

 8           "Do you see that?

 9           "Answer:  Yes.

10           "Question:  And then you see on Exhibit 26,

11   14 -- claim 14 E is just lubricant.  Do you see that?

12           "Answer:  Yes, I see that the on page.

13           "Question:  Now, you prosecuted both of these

14   patents, as I've asked you; correct?

15           "Answer:  Yes.

16           "Question:  Do you recall why one specifies the

17   concentration of lubricant and the other does not?

18           "Answer:  No."

19           (End of videotaped deposition.)

20           THE COURT:  Okay.

21           MR. ABHYANKAR:  Your Honor, a little

22   housekeeping at the end of the day to introduce some

23   exhibits that were not introduced at the end of Dr. Steed's

24   examination.

25           THE COURT:  Okay.

Dailey - deposition designations

1          MR. ABHYANKAR:  As well as the exhibits from the

2    golden deposition clips and Ms. Dailey.

3          THE COURT:  All right.

4          MR. ABHYANKAR:  If I could proceed with that?

5          THE COURT:  Yes.

6          MR. ABHYANKAR:  For Dr. Steed we have DTX-1352,

7    JTX-322, JTX-1, DTX-2232, JTX-41, JTX-34, JTX-13, JTX-57,

8    JTX-68, JTX-56, DTX-07, DTX-1308, JTX-3, DTX-1304 and

9    DTX-2430.

10         THE COURT:  All right.  Any objection?

11         MR. SIPES:  I believe that's missing one as

12   well.  There's also JTX-506.

13         THE COURT:  Okay.

14         MR. SIPES:  And we probably should do PTX-14 owe

15   seven.  That's the replacement for the one that was used

16   that's less confidential.

17         THE COURT:  Okay.

18         MR. ABHYANKAR:  Turning to Mr. Goldman's

19   testimony, we identified JTX-eight, DTX-66, JTX-557, DTX-68,

20   JTX-551, DTX-69 and DTX-73.

21         THE COURT:  All right.  Any objection?  Wait.

22   Hold on.  Any objection to those?

23         MR. SIPES:  Your Honor, that was Goldman, I

24   think?

25         MR. ABHYANKAR:  Right.

1      THE COURT:  We need the deposition transcripts

2  introduced, too.  Right?

3      MR. ABHYANKAR:  One second, Your Honor.  We're

4  pulling those numbers.

5      THE COURT:  Well, why don't we do this.  Why

6  don't you all confer about it tonight and then come in

7  tomorrow morning and do this so that --

8      MR. ABHYANKAR:  Okay.

9      THE COURT:  It sounds like there were some joint

10 exhibits and I think it's probably best to coordinate on it.

11      Does that make sense?

12      MR. ABHYANKAR:  Okay.  Yes.

13      MR. SIPES:  That makes sense, Your Honor.

14      THE COURT:  All right.

15      MR. SIPES:  We'll need to confer and we'll do

16 the same procedure for Dr. Swift's testimony because I think

17 we never got around to doing those as well.

18      THE COURT:  Right.  That would be good.  All

19 right.  Why don't you coordinate tonight.  I think you tend

20 to jointly agree on these things.

21      MR. HANNA:  That sounds good, Your Honor.

22      THE COURT:  Anything else?

23      I said I would let Mr. Gutman respond later in

24 the day.  I don't know if he still wanted to put anything on

25 the record.  No?

Dailey  - deposition designations

1                    MR. HANNA:  Right now there's nothing.

2                    THE COURT:  Okay.  That sounds good.  All right.

3       So then we're on for 8:30 tomorrow.  Okay?

4                    Anything else before the end of the day,

5       plaintiffs?

6                    MR. SIPES:  Nothing from plaintiffs, Your Honor.

7                    THE COURT:  Sandoz?

8                    MR. ABHYANKAR:  Nothing from Sandoz, Your Honor.

9                    THE COURT:  Alvogen?

10                   MR. HANNA:  Nothing for Alvogen.

11                   THE COURT:  Everybody have a good night.

12                   MR. SIPES:  Thank you.

13                   (Court recessed at 6:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25