1                          - VOLUME D -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4
     PHARMACYCLICS LLC and          :    CIVIL ACTION
5    JANSSEN BIOTECH, INC.,         :
                                    :
6                   Plaintiffs,     :
                                    :
7         vs.                       :
                                    :
8    CIPLA LIMIGTED, et al..,       :
                                    :
9                   Defendants.     :    NO. 18-192 (CFC)
     --------------------------     :
10   PHARMACYCLICS LLC and          :    CIVIL ACTION
     JANSSEN BIOTECH, INC.,         :
11                                  :
                    Plaintiffs,     :
12                                  :
13        vs.                       :
                                    :
     ALVOGEN PINE BROOK LLC and     :
14   NATCO PHARMA,                  :
                                    :
15                                  :
                    Defendants.     :    NO.  18-275 (CFC)
16

17
                              - - -
18
                         Wilmington, Delaware
19                       Friday, October 16, 2020
                         8:30 o'clock, a.m.
20
                              - - -
21
     BEFORE:   HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
22
                              - - -
23

24                            Valerie J. Gunning
                              Official Court Reporter
25

1    APPEARANCES:

2
                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
3               BY:   JACK B. BLUMENFELD, ESQ. and
                      JEREMY A. TIGAN, ESQ.
4

5                   Counsel for Plaintiffs

6

7               COVINGTON & BURLING LLP
                BY:   CHRISTOPHER SIPES, ESQ.,
8                     ERICA N. ANDERSEN, ESQ.,
                      ALEXA HANSEN, ESQ.
9                     BRIANNE BHARKHDA, ESQ. and
                      CHANSON CHANG, ESQ.
10                    (Washington, D.C.)

11
                    Counsel for Plaintiff
12                  Pharmacyclics LLC

13

14              KRAMER LEVIN NAFTALIS & FRANKEL
                BY:   IRENA ROYZMAN, ESQ.
15                    (New York, New York)

16
                    Counsel for Plaintiff
17                  Janssen Biotech, Inc.

18

19
                HEYMAN ENERIO GATTUSO & HIRZEL LLP
20              BY:   DOMINICK T. GATTUSO, ESQ.

21
                        -and-
22

23

24

25

1   APPEARANCES (Continued):

2

3               ALSTON & BIRD
                BY:  NATALIE CLAYTON, ESQ. and
4                    (New York, New York)

5
                         -and-
6

7               ALSTON & BIRD
                BY:  SHRI ABHYANKAR, ESQ.
8                    (Atlanta, Georgia)

9
                    Counsel for Defendants
10                  Sandoz Inc. and Lek Pharmaceuticals d.d.i

11

12
                YOUNG CONAWAY STARGATT & TAYLOR LLP.
13              BY:  MELANIE SHARP, ESQ.

14
                         -and-
15

16              PROSKAUER ROSE
                BY:  SIEGMUND Y. GUTMAN, ESQ. and
17                   DAVID MICHAEL HANNA, ESQ.
                     (Los Angeles, California)
18

19                  Counsel for Defendants.
                    Alvogen Pine Brook LLC and Natco Pharma
20                  Ltd.

21
                         -   -   -
22

23

24

25

1                **P R O C E E D I N G S**

2

3          **(Proceedings commenced in the courtroom**

4 **beginning at 8:30 a.m.)**

5

6          **THE COURT:  All right.  Good morning, everyone.**

7          **MS. ANDERSEN:  Good morning.**

8          **THE COURT:  I guess, Ms. Clayton, are you up**

9 **first?**

10          **MS. CLAYTON:  Yes, Your Honor.  You asked us to**

11 **confer on exhibits last night, so we have agreed upon them,**

12 **ready to enter.  I don't know if you want to do that now or**

13 **later in the day?**

14          **THE COURT:  Why don't we go ahead and do it now**

15 **before we forget to take care of it.**

16          **MS. CLAYTON:  For Dr. Steed, the exhibits the**

17 **parties agreed were entered into evidence are DTX-1352,**

18 **JTX-0322, JTX-1, DTX-2232, JTX-41, JTX-34, JTX-13, JTX-57,**

19 **JTX-58, JTX-56, DTX-1307, DTX-1308, JTX-53, DTX-1304,**

20 **DTX-2430, JTX-573, PTX-147 and JTX-506.**

21          **THE COURT:  That's all agreed to?**

22          **MS. CLAYTON:  Yes.**

23          **THE COURT:  Go ahead.**

24          **MS. CLAYTON:  For Mr. Goldman's deposition, the**

25 **admitted exhibits are JTX-8, JTX-66, JTX-557, JTX-68,**

1    JTX-551, JTX-69, JTX-73 and DTX-264.  I thought they had

2    agreed.  I was told they have not formally responded yet.

3              THE COURT:  Okay.

4              MS. BHARKHDA:  I think we were still checking,

5    because I believe Ms. Clayton may have missed, I believe,

6    507 was -- JTX- -- 506?

7              MS. CLAYTON:  That was the last one I said.

8              MS. BHARKHDA:  I'm sorry.  I believe that's

9    right.  We will note for the record whether that's incorrect

10   later in the day.  I apologize.  We were still checking.

11             THE COURT:  All right.

12             MS. CLAYTON:  For Ms. Dailey, it was just four

13   exhibits, DTX-1266, DTX-1263, DTX-79 and DTX-1230.

14             MS. BHARKHDA:  Your Honor, I don't believe

15   that's correct.  We only have three exhibits for Ms. Dailey.

16   If you can let me pull it up.  Not 1230.

17             MS. CLAYTON:  1230, Your Honor, is the actual

18   deposition transcript.

19             MS. BHARKHDA:  Your Honor, we don't think it's

20   appropriate to enter the deposition transcript because we

21   have clip reports.  An entire deposition transcript, we have

22   a general practice of entering those in the case.  The

23   deposition clips that were played will be in the record, but

24   there's no cause for entering the entire deposition

25   transcript.

1          THE COURT:  Well, I do think we should have the

2    transcript that was played.

3          MS. BHARKHDA:  Correct.

4          THE COURT:  We should not have any transcript

5    for speaking that was not actually introduced in trial.

6          MS. CLAYTON:  Understood, Your Honor.  We

7    misunderstood what the Court wanted in that record, so we

8    can enter -- we will substitute those for, I guess, the clip

9    reports or we could just excerpt the full transcript,

10   whatever the Court finds easier to read.

11         THE COURT:  I don't know what clip reports are.

12   I just need a transcript, and, in fact, going forward, I

13   also want a notebook.  Ideally, I would have a notebook in

14   front of me while the deposition is being played so I can

15   read through that if you wanted going forward.

16         MS. CLAYTON:  Yes.

17         THE COURT:  That's what needs to be put in the

18   record.

19         MS. CLAYTON:  Okay.  We'll come into agreement

20   on the excerpts to the transcript for DTX-264 and DTX-1230

21   that should come in the record and were played at trial and

22   resubmit that to the Court.

23         THE COURT:  Right.  Okay.

24         MS. BHARKHDA:  Your Honor, I believe there were

25   some left off from Mr. Goldman as well.  DTX-264, DTX-67,

1  DTX-546 and JTX-1.

2          MS. CLAYTON:  No objection, Your Honor.

3          THE COURT:  All right.  Does that take care of

4  all of the exhibits from yesterday?

5          MS. BHARKHDA:  I think we're still conferring on

6  Mr. Steed to make sure our list aligns with defendants'.

7          THE COURT:  All right.

8          MS. CLAYTON:  I believe Alvogen had some

9  exhibits to enter from Dr. Swift.  Is that right?

10          THE COURT:  Let's do that.

11          MR. GUTMAN:  Yes Your Honor.  We conferred with

12  plaintiffs and have an agreement regarding the exhibits.

13  We're getting those printed out currently that were agreed

14  upon.  Perhaps just before the next break we can move those

15  into evidence.

16          THE COURT:  That sounds good.

17          MR. GUTMAN:  Your Honor.

18          THE COURT:  All right.  Any other housekeeping

19  before we start?  No?  Okay.  Who is next then?

20          MS. CLAYTON:  Your Honor, we're going to play

21  two more deposition clips this morning.  The first is Dr.

22  Smyth.

23          I believe plaintiffs have the same objection to

24  Dr. Smyth as they did for Mr. Goldman yesterday, but I hope

25  we can come to the same resolution, because they're just

1    inventorship.  We can discuss at a later date the issue

2    plaintiffs have related to their argument, which we disagree

3    with, that the theory was late.

4                MS. BHARKHDA:  Correct, Your Honor.  We have the

5    same objection with respect to the inventorship theory.

6    With respect to both Mr. Smyth and Mr. Wirth whose

7    depositions will be played this morning, we have no problem

8    with the proposal that we reserve our objection now and we

9    can proceed with playing the clips and save the objections

10   for later.

11               THE COURT:  All right.  We'll do that.  Hold on

12   one second.

13               MS. CLAYTON:  Your Honor, I believe you should

14   have a binder with Dr. Smyth's transcript in it that we had

15   delivered to the Court.  There should be a clip report, Your

16   Honor, in the pocket of the portions we're going to play.

17               THE COURT:  Sounds good.  Thank you very much.

18               Ms. Bharkhda, did you have anything else you

19   wand to add?

20               MS. BHARKHDA:  I don't believe so.

21               MS. CLAYTON:  Your Honor, at this time

22   defendants will play the deposition of Dr. Mark Smyth.  He

23   is a named inventor on both the '548 and the '231 patents.

24               He was deposed by defendants on November 21st,

25   2019, at which time he was employed by Pharmacyclics.

1          You will hear 57 minutes and 24 second of his

2    deposition testimony.  Thirty minutes and 48 second will be

3    charged to defendant and 26 minutes and 36 seconds will be

4    charged to plaintiff.

5          MR. ABHYANKAR:  And, again, Your Honor, this

6    would be for the inventor of the '455 patent as well.

7          THE COURT:  Okay.  Off the record.

8          (Discussion held off the record.)

9          THE COURT:  We're back the on record.  Let's

10   play the deposition.  Thank you.

11         (The videotaped deposition of Dr. Mark Smyth was

12   played as follows.)

13         "Question:  Good morning, Dr. Smyth.

14         My name is Jayita Guhaniyogi, and I am from the

15   Kasowitz firm.  I represent the Zydus defendants in this

16   case and I will be asking you some questions today followed

17   by -- some of my co-counsel might ask you some questions

18   later.

19         "Could you please state your full name for the

20   record?

21         "Answer:  Mark Steven Smyth.

22         "Question:  Who is your current employer?

23         "Answer:  Pharmacyclics.

24         "Question:  If you start with -- in 1984 you

25   received a bachelor's degree in chemistry from Indiana

1   University of Pennsylvania; correct?

2           "Answer:  Correct.

3           "Question:  That degree -- that was chemistry;

4   correct?

5           "Answer:  Yes.

6           "Question:  After your bachelor's degree,

7   according to your C.V., Exhibit 2, you received a Ph.D in

8   1989 in synthetic organic chemistry from the State

9   University at New York at Buffalo; correct?

10           "Answer:  Yes.

11           "Question:  After 2007, after you left

12   Proteolix, you joined Pharmacyclics; is that correct?  In

13   2007?

14           "Answer:  Yes.  Correct.

15           "Question:  What month was that?  Do you recall?

16           "Answer:  November 2007.

17           "Question:  Okay.  When you joined Pharmacyclics

18   in November 2007, you joined as a principal scientist in the

19   process chemistry department of Pharmacyclics; is that

20   correct?

21           "Answer:  Correct.

22           "Question:  What was your role when you joined

23   as a principal scientist in process chemistry at

24   Pharmacyclics?

25           "Answer:  I was responsible for all technical

1    aspects of the ongoing development projects; so I was lead

2    scientist.

3              "Question:  What type of development projects

4    that you were involved in when you joined as the principal

5    scientist?

6              "Answer:  We were working on chemical

7    development of a factor VIIa inhibitor, the protease

8    tyrosine kinase inhibitor, and the h-stack inhibitor

9    programs.

10             "Question:  When you say that you were

11   responsible for all technical aspects of the ongoing

12   development projects, what do you mean by all technical

13   aspects?

14             "Answer?  I was responsible for all the

15   chemistry activities related to those programs -- from lab

16   work, up through manufacturing.

17             "Question:  Okay.  As part of your role as the

18   project leader, were you involved as a polymorph analysis at

19   Pharmacyclics?

20             "Answer:  Yes.

21             "Question:  What did that involve?

22             "Answer:  Can you be more specific, please?

23             "Question:  What did your role in polymorph

24   analysis involve when you were project leader at -- when you

25   were principal scientist at Pharmacyclics?

1    "Answer:  I was responsible for setting up and

2    leading the technical interactions with a third party --

3    with the CMO that we had worked with and then, also, with a

4    third party analysis lab.

5          "Question:  Did anybody in your team in

6    Pharmacyclics run polymorph analysis?

7          "Answer:  Not in-house, no.

8          "Question:  Okay.  You were collaborating with

9    the third party, the manufacturing -- the contract

10   manufacturer and the third-party analysis lab; correct?  On

11   polymorph analysis?

12         "Answer:  I was working with the two parties.

13   Yes.

14         "Question:  You were reviewing their reports; is

15   that correct?

16         "Answer:  Yes.

17         "Question:  When you joined Pharmacyclics in

18   2007, as part of the BTK project, did that involve the

19   ibrutinib project?

20         "Answer:  Yes.

21         "Question:  The involvement you had with the

22   third party contract manufacturing organization and the

23   third-party analysis lab at that time you were a principal

24   scientist when you signed Pharmacyclics -- can you elaborate

25   on your role on that collaboration on polymorphic analysis?

1    "Answer:  My role was to identify and set up a

2   collaboration with an external party to perform analysis of

3   materials we had generated, as well as to conduct additional

4   studies for further understanding of the solid state

5   properties of the materials we were preparing.

6    "Question:  When you say your role was to

7   identify, were you involved in the identification of the

8   third party analysis lab who were involved in the polymorph

9   analysis of the projects that you were working on at that

10   time?

11    "Answer:  Yes.

12    "Question:  When you were promoted between 2010

13   and 2012, according to your C.V. Exhibit 2, you were

14   promoted to director of process development and

15   manufacturing at Pharmacyclics; correct?

16    "Answer:  Correct.

17    "Question:  How did your role change at that

18   time?

19    "Answer:  I had -- I continued on as the

20   technical lead on all the programs we were working on, as

21   well as I had hired a couple of process chemists that I was

22   in charge of their day to day operational functions.

23    "Question:  Progressing to when you -- in 2012,

24   according to your C.V., you got promoted to a senior

25   director of process development and manufacturing at

1    Pharmacyclics between 2012 and 2014; is that right?

2              "Answer:  Yes.

3              "Question:  How did your role change when you

4    became senior director of process development and

5    manufacturing?

6              "Answer:  Increased responsibilities for

7    external activities of manufacturing of API.

8              "Question:  Did that role involve polymorph

9    analysis of the API -- of API that you were involved in?

10             "Answer:  Yes, it included that.

11             "Question:  Were you involved in any

12   collaboration with third-party analysis labs on polymorph

13   analysis?

14             "Answer:  Yes.

15             "Question:  Did anybody on your team perform

16   polymorph analysis at Pharmacyclics?

17             "Answer:  No.

18             "Question:  Okay.  Focusing on particularly your

19   work on ibrutinib projects -- ibrutinib, i-b-r-u-t-i-n-i-b,

20   I think you said earlier that when you joined Pharmacyclics

21   in 2007.

22             "Is that when you also started working on the

23   ibrutinib project?

24             "Answer:  Yes.

25             "Question:  Okay.  November 2007 is when you

1    started working on the ibrutinib project?

2              "Answer:  Yes.

3              "Question:  On that project, particularly on the

4    ibrutinib project, what were your responsibilities when you

5    joined as a principal scientist back in 2007 -- November of

6    2007?

7              "Answer:  My job was to take the lead role in

8    the scientific and technical discussions with our third

9    party manufacturer who was doing the development work.

10             "Question:  What was the name of the third-party

11   manufacturer at that time you joined?

12             "Answer:  Seres Laboratories.

13             "Question:  If I refer to Seres, you understand

14   I am referring to the same third party?

15             "Answer:  Yes.

16             "Question:  When you joined November 2007, was

17   Seres also identified and engaged as the third-party

18   contract manufacturer for Pharmacyclics on ibrutinib?

19             "Answer:  Yes.

20             "Question:  When did you first get involved with

21   polymorph analysis of ibrutinib after you joined in

22   November 2007?  Joined Pharmacyclics?

23             "Answer:  It was early 2008.

24             "Question:  What did that role involving

25   polymorph analysis of ibrutinib involve when you started the

1  analysis in early 2008?

2  "Answer:  Working with the third-party

3  manufacturer, we had encountered different solid forms and

4  materials that were behaving differently than what we

5  expected when he was examining a recrystallization process,

6  and this led to a realization that -- and the discovery that

7  we had these different polymorphic forms that needed to have

8  some analysis performed.

9  "Question:  When you say the third-party

10  manufacturer, you are referring to he was examining a

11  recrystallization process, who specifically are you

12  referring to?

13  "Answer:  Dr. David Wirth.

14  "Question:  Dr. David Wirth was from Seres?

15  "Answer:  He worked at Seres, yes.

16  "Question:  Was Dr. David Wirth your primary

17  contact at Seres?

18  "Answer:  Yes.

19  "Question:  Who directed Dr. David Wirth to

20  examine the recrystallization process at Seres?

21  "Answer:  Me.

22  "Question:  I am going to hand you what has been

23  marked as Smyth Exhibit 3, a document bearing production

24  numbers, and, Dr. Smyth, by production numbers, I am

25  referring to these numbers that have been stamped at the

1   bottom of each page on the right-hand side, which we call

2   Bates numbers:

3           "The production number IMBPCYC05002488 to

4   IMBPCYCO5002482.

5           "Question:  Dr. Smyth, do you recognize

6   Exhibit 3?

7           "Answer:  Yes.

8           "Question:  If you turn over from the -- on the

9   first page it says No. 678; correct?

10          "Answer:  It says that, yes.

11          "Question:  If you turn it over, on the second

12  page it says assigned to and that is a handwritten name.

13  Mark S. Smyth; is that right?

14          "Answer:  Correct.

15          "Question:  That's you; correct?

16          "Answer:  Yes.

17          "Question:  Does this lab notebook between the

18  dates that we just went through -- 26 November of 2017 to

19  April 27, 2010, -- does this time period reflected in the

20  lab notebook accurately reflect the work that you personally

21  performed in the lab on the BTK project?"

22          THE COURT:  All right.  Can we stop for a

23  second?  Can we stop this for a second?

24          I don't see this exhibit in the notebook I have.

25  Maybe it is, but I'm at a loss to see it.

1    I don't see this exhibit in the notebook that I

2  have that has been identified as Smyth deposition testimony.

3  What is the exhibit?

4    MR. ABHYANKAR:  Which exhibit is it?  One

5  second, Your Honor.  Sorry.

6    (Pause.)

7    MR. ABHYANKAR:  Your Honor, I think what

8  happened is the affirmative designations from defendants,

9  those are the exhibits we prepared to send to the Court.

10  This may be an exhibit that was designated by plaintiff in

11  their counters, but we can try and get that exhibit over to

12  you as soon as possible.

13    MS. BHARKHDA:  Your Honor, I apologize.  We

14  understood the parties that were submitting the binders were

15  going to include all of the appropriate exhibits, so we will

16  make sure that you have them.  I apologize.

17    THE COURT:  Okay.

18    MS. BHARKHDA:  We thought the party offering the

19  testimony was going to include them.

20    THE COURT:  How many more exhibits are we

21  talking about that aren't going to be in the notebook?

22    MR. ABHYANKAR:  Your Honor, I will have to check

23  on that to compare, because I just have the list in front of

24  me that we identified for admission into evidence after the

25  deposition was over, but I can get that to you quickly.

Smyth - deposition designations

1          THE COURT:  All right.  So I think what we

2    should do is maybe stop this deposition and move on to

3    something else because I don't think it's fair to plaintiffs

4    that I don't get to see the exhibits as I'm listening to his

5    deposition.

6          MR. ABHYANKAR:  Understood.

7          THE COURT:  So I guess, Sandoz, why don't you

8    adjust and we'll come back to it.  What's next?

9          MR. ABHYANKAR:  Okay.  Your Honor, the next

10   deposition is Mr. Wirth, but I believe that we may have the

11   same issue for Mr. Wirth.  Not all of the exhibits are going

12   to be in the binder that is with a sent to the Court this

13   morning.

14          I believe after Mr. Wirth is Mr. Hostetler.  Is

15   that correct?  Okay.  And that is going to be played by

16   Alvogen's counsel, so I don't know, Mr. Hanna, if you have

17   you sent all of the exhibits for that witness?

18          MR. HANNA:  Yes.  I understand, Your Honor, you

19   should have the exhibits for Mr., Dr. Hostetler.

20          THE COURT:  And that would be for both sides

21   since we're playing the joint transcript.  Right?

22          MR. HANNA:  Yes.  That's my understanding.

23          THE COURT:  All right.  Just so you'll know,

24   I've got a notebook that was Hostetler deposition, Hostetler

25   clips.  It has DTX-01 and DTX-1436.  That's it.  There are

1    just two exhibits discussed in Hostetler?

2              MR. HANNA:  That's correct.  I don't think there

3    are any for plaintiffs for this one.

4              THE COURT:  All right.  Let's move on.  We'll

5    play Hostetler.

6              MR. HANNA:  Thank you, Your Honor.  And Dr.

7    Hostetler, he is an attorney who prosecuted the compound

8    patents, for example, the '309 patent and the '444 patent

9    for context.

10             THE COURT:  All right.  Thank you, Mr. Hanna.

11             Ms. Bharkhda, did you have something?  You were

12   at the mike.

13             MS. BHARKHDA:  No, Your Honor.

14             THE COURT:  Maybe you can figure out how to get

15   me these things.  I don't know how many exhibits you're

16   talking about.  You can print them out maybe, but I don't

17   think it's fair.

18             Going forward, if you're going to be the person

19   presenting a joint deposition, you've got to present both

20   sides in the notebook of all of the exhibits.

21             MS. BHARKHDA:  Your Honor, may I ask, is Sandoz

22   preparing the missing exhibits now?

23             THE COURT:  I do think the burden is on

24   Sandoz.

25             MR. HANNA:  We are.  Just so Your Honor

1    knows, the next deposition after Dr. Hostetler, for

2    Mr. Wirth, there's only one exhibit is our understanding,

3    and Brianne, you can confirm.  That one we can play and you

4    will have that exhibit and we'll work on the Smyth missing

5    exhibits.

6              THE COURT:  Okay.  And when it comes to Wirth,

7    like I said, somebody can e-mail chambers.  I don't know how

8    long this exhibit is, but if it's not unduly lengthy, you

9    can print it out.  All right?

10             So let's do Hostetler.  Thanks.

11             (The videotaped deposition of Dr. Michael Jon

12   Hostetler was played as follows.)

13             "Question:  Can you state your full name for the

14   record, please?

15             "Answer:  Michael Jon -- it's J-o-n --

16   Hostetler.  My primary office is in the South of Market, or

17   SoMa office, in San Francisco.  I am also listed as being in

18   the San Diego office.

19             "MR. GUTMAN:  Thank you.  I'll ask the court

20   reporter to mark as Hostetler Exhibit 6 -- I'm sorry.

21   Exhibit 3.  I apologize -- a document bearing Bates numbers

22   IMBPCYC04444954 through -028 or -5028.  Sorry.  And it's a

23   U.S. Patent No. 7,514,444.

24             "Question:  Do you recognize Exhibit 3?

25             "Answer:  I'm assuming this is a complete copy,

1    or should I look through it?

2            "Question:  I believe it's a complete copy.

3    That's how it was produced to us.

4            "Answer:  I see a document, U.S. Patent

5    7,514,444.  I could take the time to look through it to make

6    sure that it's a complete copy; but other than that, I

7    recognize it as U.S. Patent 7,514,444.

8            "Question:  Did you -- were you involved in

9    prosecuting and obtaining issuance of -- if we called this

10   the '444 patent, will you understand what I mean?

11           "Answer:  I will understand what you mean, Dr.

12   Gutman.

13           "Question:  Okay.  Were you involved in

14   obtaining the issuance of the '444 patent that is Exhibit 3?

15           "Answer:  I was involved in the prosecution of

16   the patent application and the issuance of the '444 patent.

17           "Question:  Okay.  And what do you mean by the

18   'physical form of a structure'?

19           "Answer:  The physical form of a structure is

20   very broad.  It's how it appears.  And it could be

21   everything from a gas, a liquid, a solid, an amorphous

22   material, a crystalline material.  It would refer to

23   something that's in a bottle.  It can refer to something as

24   it's dissolved in a solution.  It's whatever physical form

25   that it takes.

1          "The word 'compound' is interchangeable with

2     both chemical structure and the physical form of -- of -- of

3     a material.

4          "Question:  And so what did you intend to convey

5     when you wrote, a compound of formula D having the structure

6     depicted in claim 1?

7          "Answer:  As I mentioned before, a compound

8     refers to a chemical's structure as well as a physical form

9     that that material is present.  It's -- it's -- the term is

10    -- refers to both the chemical, and the physical aspect of

11    that chemical.

12         "Question:  So is it your testimony that you

13    intended claim 1 to cover all physical forms?

14         "Answer:  All physical forms of compounds having

15    the structure of formula D.  Yeah.  All physical forms.

16    Correct.

17         "Question:  So it's your testimony that the

18    compound of claim 1, as you wrote it, as you understood what

19    you were writing, covers amorphous forms of the compound

20    having formula D.  Correct?

21         "Answer:  Covers -- claim 1 covers the amorphous

22    forms of -- of compounds having the structure of formula D.

23    Yes.

24         "Question:  And I think you also mentioned that

25    it's -- it was your intent as you wrote claim 1 that it

1   would cover crystalline forms also of the compound having

2   formula D.  Correct?

3             "Answer:  It covers compound -- claim 1 covers

4   crystalline forms of compounds having the structure of

5   formula D.

6             MR. GUTMAN:  I will ask the court reporter to

7   mark as Exhibit 23 a document bearing Bates Numbers

8   IMBPCYC00035120 through 145.

9             "Question:  And can you identify Exhibit 23 for

10  me, Dr. Hostetler?

11            "Answer:  I recognize Exhibit 23 as a response

12  to a non-final office action dated July -- on June 11th,

13  2015 for the '949 patent application that I filed and signed

14  electronically on August 24th, 2015.

15            "Question:  And this is responding to the office

16  action that is Exhibit 22.  Correct?

17            "Answer:  Yes, that is correct.

18            "Question:  And starting on the page ending with

19  Bates number 5129 and continuing through 5132, you address

20  the -- you respond to the double patenting rejection based

21  on the '444 patent that was provided in the office action

22  that is Exhibit 22.  Correct?

23            "Answer:  I will review that and tell you.

24  Question.

25            So, Dr. Gutman, starting at the bottom of Bates

1  number 129 versus double patenting rejections, through what

2  appears to be Bates number 132, bottom of the first full

3  paragraph -- that's all based on the foregoing reasons, that

4  appears to be where I address the double patenting rejection

5  of the '444 patent.

6          "Question:  That wasn't my question.  My

7  question was whether you believe, in view of the statement

8  that you made here, that the '444 patent claims are enabled

9  with respect to polymorphs of the disclosed compound.

10         "Answer:  As a polymorph is a type of physical

11 form of the -- the category of -- the category of physical

12 forms is enabled in the '444 patent for compounds of

13 formula D.  And I believe it is my view that it is enabled.

14         This is a slightly different statement here.  In

15 fact, it's a substantially different statement here in

16 regards to enablement of the '444 -- the '444 patent, in

17 terms of polymorphs.

18         "Question:  So it's your testimony that the '444

19 patent claims are enabled with respect to polymorphs?  Is

20 that your testimony?

21         "Answer:  It's enabled in terms of -- compounds

22 of formula D, including structure -- I mean, physical forms

23 of formula D; and that includes polymorphs.

24         "Question:  Well, I'm not asking you to change

25 your answer.  I'm asking you to respond to my question,

1    which you haven't yet done.  So let me try it again.

2              "I'm not asking you whether the '444 patent

3    claims are enabled broadly, I'm asking you whether -- in

4    view of the statement you made here, whether it's your

5    understanding that the '444 -- '444 patent claims are

6    enabled with respect to specifically polymorphs of the

7    disclosed compound that's referenced here.

8              "Answer:  One of skill in the art would not be

9    able to predict what the polymorphs of that compound would

10   look like.  And that is different from whether or not it is

11   enabled to make or use physical forms, including polymorphs

12   of that compound."

13             (End of videotaped deposition.)

14             THE COURT:  All right.

15             MR. ABHYANKAR:  Your Honor.  And we're working

16   on the slides.  I think the disconnect was that plaintiffs

17   didn't identify what exhibits they had countered with, so

18   we're pulling those and we'll send them over to the Court as

19   soon as possible.

20             We'll move on to the deposition of Mr. David

21   Wirth.  He is a named inventor on both the '548 and the '231

22   patents asserted against Alvogen.

23             He was deposed by defendants October 30th, 2019.

24   You'll hear 34 minutes and four seconds of his deposition

25   testimony.  Seventeen minutes and 26 seconds will be charged

1    to defendant and 15 minutes and 38 seconds will be charged

2    to plaintiff.  And you should have one exhibit, JTX-8, Your

3    Honor.

4                THE COURT:  All right.  Before you do that, why

5    don't each side put a lawyer up and explain to me the

6    significance of the deposition testimony I just heard.

7                MR. ABHYANKAR:  I believe that was Alvogen's

8    witness.

9                THE COURT:  But I'm going to want somebody from

10   plaintiffs to respond.  All right.  Briefly, Mr. Gutman.

11   What was the significance of what I just heard?

12               MR. GUTMAN:  I apologize, Your Honor.  I was on

13   mute.

14               THE COURT:  That's okay.

15               MR. GUTMAN:  I think it has broad significance.

16   You may recall yesterday we were talking about whether

17   Pollyea was enabled for polymorphs.  The '444 patent is

18   prior art that was available prior to the crystalline form

19   patents.  It's the compound patent.

20               You may recall from the opening statement that

21   we provided that the compound patents were filed earlier and

22   published before the filing date of the crystalline form

23   patents, and so this is significant to whether crystalline

24   forms and polymorphs were actually enabled prior to the

25   filing date of the crystalline form patents.

1                So that issue impacts a few issues in the case.

2    One is --

3                THE COURT:  So, wait.  So you are saying -- so

4    what is the one-sentence summary here of the testimony is

5    that the '444 patent claims enable what?

6                MR. GUTMAN:  Polymorphs of ibrutinib which

7    contributes to the obviousness of the crystalline form

8    patents.

9                THE COURT:  Okay.

10               MR. GUTMAN:  Because -- and also helps establish

11   that the prior art references that we're relying on as

12   anticipatory under the theory of inherency were enabled as

13   of the time, of the relevant time period.

14               THE COURT:  And is it your position that the

15   '444 patent enabled all polymorphs of ibrutinib?

16               MR. GUTMAN:  I think that's what Dr. Hostetler

17   testified to, Your Honor.

18               THE COURT:  Okay.

19               MR. GUTMAN:  So, yes.  Our position is that it

20   enabled, and I think it's plaintiffs' position that it

21   enabled all polymorphs, including form A.

22               THE COURT:  Okay.  All right.  Thank you.

23               Ms. Bharkhda?

24               MS. BHARKHDA:  Your Honor, we don't actually

25   think that his testimony has any relevance to any issue in

1   the case.  The '444 patent is not asserted in the case.

2   Alvogen is not relying on the '444 patent as an anticipatory

3   reference.  We don't think it's highly relevant.  Also, I

4   think it's an improper attempt to use prosecution counsel's

5   opinion as an attempt to get in some kind of expert

6   testimony that's improper expert testimony.

7               And --

8               THE COURT:  Hold on.  There's no objection to

9   the term.

10              MS. BHARKHDA:  We didn't because we don't think

11  it's relevant.

12              THE COURT:  Okay.  But, you know, that objection

13  was waived to the extent that its expert said it's

14  inappropriate because it touches on anything.  The only

15  objection -- frankly, I don't think   you -- I don't

16  remember you voicing a relevance objection.  I don't think

17  there has been an objection to the admission of this

18  testimony.

19              MS. BHARKHDA:  We didn't.  We didn't object to

20  it.  We just don't think it has any bearing on any issue.

21              THE COURT:  Let me ask you this:  Do you agree

22  that the '444 patent enables all polymorphs of ibrutinib?

23              MS. BHARKHDA:  I don't think that is a proper

24  phrasing of the inquiry.

25              THE COURT:  Okay.

1          MS. BHARKHDA:  The question is whether the '444

2     patent enabled the compound that it claims and we believe it

3     enables the compounds in all physical forms.

4          THE COURT:  All right.

5          MS. BHARKHDA:  That does not mean it discloses

6     any polymorph or enables particular polymorphs.  It is not

7     directed to crystalline forms or polymorphs of ibrutinib.

8     It is directed to --

9          THE COURT:  That's not my question.  Just answer

10    the question.  Whether you think it's relevant or whether

11    it's the right inquiry or not, does the '444 patent enable

12    all forms, all polymorphs of ibrutinib?

13         MS. BHARKHDA:  No, Your Honor.

14         THE COURT:  Why not?

15         MS. BHARKHDA:  Because it -- that's not the

16    subject matter of the claim.  It enables the compounds that

17    are in the claims and it does not disclose all polymorphic

18    forms or any for that matter polymorphic forms.

19         THE COURT:  Okay.  Thank you.  All right.

20         Thank you, counsel.  Anything else?  We'll go

21    with the next one.

22         MR. GUTMAN:  Thank you, Your Honor.

23         MR. ABHYANKAR:  So, Your Honor, we'll begin the

24    deposition of Mr. Wirth now, which I said will last about

25    34 minutes and four seconds.

1    THE COURT:  Okay.  This one -- wait.  Sorry.

2  And I apologize.  You probably said this, sir, before.  I do

3  have all the exhibits for this now?

4    MR. ABHYANKAR:  You do.  There's actually only

5  one, JTX-8.  It's the '753 patent.

6    THE COURT:  Thank you very much.  I apologize I

7  had to ask that question again.  Go ahead.

8    MR. ABHYANKAR:  No problem.

9    (The videotaped deposition of David Dale Wirth

10  was played as follows.)

11    "Question:  Could you please state your full

12  name for the record?

13    "Answer:  David Dale Wirth.

14    "Question:  What was your graduate degree in?

15    "Answer:  Chemistry.

16    "Question:  Okay.  And did you have a particular

17  specialty in chemistry?

18    "Answer:  Organic chemistry.

19    "Question:  Okay.  Did you receive a Ph.D.?

20    "Answer:  Yes.

21    "Question:  In organic chemistry?

22    "Answer:  Yes.

23    "Question:  As part of your graduate work, did

24  you have experience working with polymorphic forms of

25  compounds?

1              "Answer:  No.

2              "Question:  Any experience working with

3     formulations, pharmaceutical formulations?

4              "Answer:  In graduate school you mean?

5              "Question:  Uh-hum.

6              "Answer:  No.

7              "Question:  Okay.  Did you ever receive a

8     medical degree?

9              "Answer:  No.

10             "Question:  Okay.  After graduate school, what

11    did you do?

12             "Answer:  I did some post-doctoral research.

13             "Question:  And where did you do that?

14             "Answer:  Dartmouth College.

15             "Question:  Okay.and at what -- when was that?

16    When did you conduct this post-doctoral research?

17             "Answer:  So began in the fall of 1980 through

18    all or most of the following year, 1981.

19             "Question:  What did you do after your

20    post-doctoral research at Dartmouth?

21             "Answer:  Then I accepted a position at Eli

22    Lilly and Company.

23             "Question:  At -- when was that, approximately?

24             "Answer:  It began January 1982.

25             "Question:  Okay.  And where did you get -- get

1  your job in California?

2          "Answer:  So I was employed by Seres

3  Laboratories in Santa Rosa.

4          "Question:  What is Seres Laboratories?

5          "Answer:  Seres Laboratories was a small

6  development and manufacturing company that worked with -- in

7  the pharmaceutical area, basically.

8          "Question:  And what was your role at Seres when

9  you joined?

10          "Answer:  I was I believe the title was

11  director, director of chemistry or director of laboratory

12  operations, one of those wordings.

13          "Question:  And what were -- what were your

14  responsibilities as director of chemistry at Seres?

15          "Answer.  So the -- the working chemists that

16  worked in the laboratory reported to me.  So there was some

17  management kind of responsibility for the other chemists.

18  Then I was also responsible for doing chemistry.  Actually

19  did chemistry in the laboratory.  And I was responsible for

20  interactions with clients as well.

21          "Question:  What types of projects did you do at

22  Seres?

23          "Answer:  The projects were of the development

24  and the manufacturing, really, of intermediates and active

25  drug substances.

1          "Question:  And what specifically did you do to

2     assist with the development and manufacturing of

3     intermediates and active drug substances at Seres?

4          "Answer:  So all the things I just mentioned,

5     such as working with the clients to discern what was

6     needed, what the project goals were.  And then working

7     with the rest of the chemists and the staff to decide who

8     was going to perform those activities and make some

9     assignments with respect to responsibilities and activities

10    that we were going to do.  And I performed some laboratory

11    work myself.

12         "Question:  Or -- or, you know, that you used

13    third parties to run specific tests for projects that you

14    were asked to assist with from your clients?

15         "Answer:  We did use some external analytical

16    laboratories, yes.

17         "Question:  Okay.  Did Seres have the capability

18    to run XRD analysis on a compound?

19         "Answer:  No, we had no X-ray capabilities.

20         "Question:  Were you ever involved in running an

21    XRD test for a compound when you were at Seres?

22         "Answer:  I -- I did not run the instruments

23    myself.

24         "Question:  Did you direct others to run XRD

25    analyses for your clients while you were at Seres?

1    "Answer:  So this was done by external

2    laboratories.  So there was, yes, direction sent to the

3    external laboratory to run a sample.

4          "Question:  Right.

5          But you didn't provide direction on how to run

6    the sample, correct?

7          "Answer:  No.

8          "Question:  Okay.  Have you ever run an XRD

9    analysis, just generally?

10         "Answer:  In terms of using the instrument

11   myself?

12         "Question:  Uh-hmm.

13         "Answer:  No.

14         "Question:  All right.  So after Seres -- or

15   when did you leave series?

16         "Answer:  It was early in the year 2010.

17         "Question:  Are there -- are there known

18   solvents that are traditionally used to discern whether you

19   have a crystal or not?

20         "Answer:  So I don't really know what people

21   traditionally use.  It was your word.  What I use, I -- I

22   have experience with a -- with designing the solvent system

23   based upon the particular task, meaning that every molecule

24   is different because it's different in structure.

25         And you often have different goals in mind.  So

1    there's -- there's no list that I would use over and over,

2    typically, because of that.

3              "Question.  Dr. Wirth, before the break we were

4    talking about your time at Seres.

5              "Are you familiar with ibrutinib?

6              "Answer:  Yes.

7              "Question:  Okay.  And how are you familiar with

8    ibrutinib?

9              "Answer:  It's -- it's a compound with the

10   name -- that name was adopted after I worked on it, but I

11   know it -- now that it does have that name.  At the time

12   when I was at Seres, we worked on that molecule, which we

13   knew by the number, not -- not that name, right.

14             "Question:  Right.

15             "Do you recall when you first became aware of

16   that, the ibrutinib molecule?

17             "Answer:  It was shortly after I joined Seres.

18   So it was, I believe, in -- in -- some time during '06 or --

19   or early '07, in that time frame.

20             "Question:  How -- how did you become aware of

21   the molecule?

22             "Answer:  So we were approached -- the company,

23   Seres, was approached by people from Pharmacyclics with a --

24   a request.  We typically call these requests for a proposal.

25   Basically they asked us to evaluate the chemistry and decide

1    if we could provide a quote to -- you know, to provide

2    services to them.

3              "So that's how we first heard of the molecule, I

4    think.

5              "Question:  And when you say they asked you to

6    evaluate the chemistry, what specifically did they ask you

7    to do?

8              "Answer:  So they presented us with some of

9    their -- their goals, meaning that they needed some material

10   made, they needed some -- they needed process chemistry and

11   process development.  And ultimately they needed

12   manufacturing, but probably in -- in phases, some initially

13   and then some later, potentially.

14             "So in the -- in the initial discussion, I don't

15   remember whether it -- we included all of those or whether

16   we really just talked about the chemistry.  They were

17   primarily interested in process chemistry, making

18   manufacturable processes.

19             "Question:  What information did Pharmacyclics

20   provide you at the outset?

21             "Answer:  About this molecule?

22             "Question:  Or about the molecule in asking you

23   to help evaluate the chemistry.

24             "Answer:  So they provided either initially or

25   after the contract -- I'm not sure when this came -- but the

1    data that they would -- they provided was really

2    experimental procedures that had been used earlier in --

3    within Pharmacyclics to prepare the molecule, basically.

4    Experimental procedures was primarily where -- the

5    information that we got.

6              "Question:  Did Pharmacyclics ask -- ask you to

7    evaluate their synthetic route and improve it?

8              "Answer:  Yes.

9              "Question:  Okay.  Did they ask you to do

10   anything else?

11             "Answer:  Yes.  But I don't -- again, it was in

12   stages.  So there were -- because they ultimately needed

13   material delivered as well.

14             "Question:  Who was your main point of contact

15   at Pharmacyclics on the Ibrutinib project?

16             "Answer:  Mark Smyth.

17             "Question:  What was Mark Smyth's role in the

18   ibrutinib project?

19             "Answer:  My understanding was that Mark was the

20   -- in charge of the process chemistry.

21             "Question:  How was he in charge of the process

22   chemistry?

23             "Answer:  By -- as -- as we just said, his --

24   his interaction then with us was to manage -- manage the

25   process chemistry, and he was the key person that interacted

1  with -- with me at Seres.  So from the standpoint that we

2  were doing process research and process chemistry, that

3  seemed to be his function, as I understand it, at

4  Pharmacyclics.

5          "Question:  Are you familiar with a lab called

6  SSCI?

7          "Answer:  I am.

8          "Question:  Okay.  Who is SSCI?

9          "Answer:  They're a solid state chemistry firm

10  located in West Lafayette, Indiana.

11          "Question:  Did you ever use them as part of

12  your work at Seres?

13          "Answer:  So I -- I do not specifically recall

14  which laboratory we used.  I -- my recollection was that we

15  did send samples to a solid state chemistry laboratory.  But

16  I -- I cannot remember which laboratory we used.

17          "Question:  Okay.  All right.  Well, do you

18  remember why you sent samples to a solid state chemistry

19  laboratory?

20          "Answer:  Yes.  We -- we were asking -- we were

21  having analysis done to determine the -- really the crystal

22  form of the materials that we had.

23          "Question:  With respect to the ibrutinib

24  project?

25          "Answer:  Yes.

1    "Question:  Okay.  And why were you doing that?

2    "Answer:  As part of the development of a drug

3    substance, it's important to understand what solid state

4    form you have to characterize the -- the drug substance that

5    you have as fully as you can.  And that's one of the things

6    that is wise to do, in my opinion, to discern whether the

7    material you have is crystalline or not crystalline.  And

8    then if it is crystalline, to record, you know, the

9    characteristics of it, such as its XRPD pattern and just to

10   fully characterize the material that you have.

11   "As part of the ibrutinib project, you,

12   yourself, did not characterize the crystalline form of the

13   ibrutinib molecule that you received from Pharmacyclics?

14   "Answer:  The compound that we received from

15   Pharmacyclics is what you're asking?

16   "Question:  Uh-hmm.

17   "Answer:  I did not characterize that.

18   "Question:  Okay.  You sent -- you sent some

19   samples to the third-party lab, right?

20   "Answer:  We did.

21   "Question:  Okay.  Which samples were those?

22   "Answer:  Those were samples that I had produced

23   in the laboratory.

24   "Question:  Were they labeled with a -- with a

25   number or some sort of designation?

1             "Answer:  I certainly don't recall specifically

2   what any one was, but the practice was to label them with

3   the notebook number from -- that describes their

4   preparation.  So any sample that went out would have had

5   a -- a notebook number assigned to it and affixed to the

6   label.

7             "Question:  All right.  Do you recall what types

8   of analytical tests were run by the third-party lab in

9   determining the crystalline form of the samples that you

10  prepared?

11            "Answer:  I -- I recall that XRPD was our -- was

12  of our primary interest, and so we certainly had that test

13  run.

14            "Question:  Just to confirm, you had nothing to

15  do with the formulation or the -- the -- the design of the

16  making of a formulation of the capsule itself, correct?

17            "Answer:  No.  My only involvement was producing

18  the drug substance that was used.

19            "Question:  Dr. Wirth, I've handed you what's --

20  of you've been handed what's been marked as Defendants'

21  Exhibit 5.  If you could take a look at it.  This is a copy

22  of U.S. Patent 9,296,753.

23            "Answer:  Okay.

24            "Question:  All right.  Have you seen this

25  patent before?

1          "Answer:  Yes.

2          "Question:  If you turn to the second page, you

3     see under inventors it lists Mark Smyth, Erik Goldman,

4     yourself and Norbert Purro.

5          "Do you see that?

6          "Answer:  Yes.

7          "Question:  So you were listed as a named

8     inventor of this patent?

9          "Answer:  Yes.

10         "Question:  All right.  Are you, in fact, an

11    inventor on this patent?

12         "Answer:  Yes.

13         "Question:  Okay.  And what -- what is -- what

14    were your contributions to this patent as far as the

15    invention is concerned?

16         "Answer:  So my contribution was in the -- in

17    the initial discovery and isolation of some polymorphic

18    forms of this compound.

19         "Question:  What did you do to discover or

20    isolate polymorphic forms of the compound that is claimed in

21    the patent?

22         "Answer:  So I designed some laboratory

23    experiments and executed some laboratory experiments to --

24    to try to crystallize the compound and was successful in

25    crystallizing the compound.  And then those were -- were

1    analyzed externally.  And it was, in fact, found that they

2    were crystalline.

3              "Question:  Right.

4              "You said that your contribution was the

5    discovery and isolation of polymorphic forms of the

6    compound.  Any specific polymorphic forms?

7              "Answer:  So I'm not -- I'm not clear on how

8    many of the polymorphic forms I actually discovered.  I -- I

9    do believe that at least one of them -- well, at a minimum,

10   one, but there -- there seemed to be several here that --

11   that are in the examples.  And there were several that I

12   found.

13             "Question:  So you're not clear on how -- on

14   the -- how many of the polymorphic forms you discovered,

15   but there were several that you found; is that your

16   testimony?

17             "Answer:  So the -- I think several is probably

18   an incorrect word since what -- what you have refreshed

19   my memory from looking at the prior reports was that we had

20   two forms in particular, which is what I do recall, that

21   there were two forms that had been found and that we had --

22   we were dealing with those particular batches that we

23   reviewed.  So my memory is that I was working primarily with

24   two forms.

25             "Question:  What forms were those?

1      "Answer:  So those were the forms that -- one

2   was the high melting form, 155, roughly, melting form that

3   was in this document is -- appears to be called form A and

4   in this report was called form A.

5      "Question:  And what was the other form?

6      "Answer:  It was referred to as B, I think,

7   lower melting form B.

8      "Question:  You didn't perform any experiments

9   regarding XRPD (sic) at Seres to identify a particular

10  crystalline form of ibrutinib, correct?

11     "Answer:  So we -- we did not have the

12  capability of performing XRPD at Seres because we lacked the

13  instrument.

14     "Question:  Uh-hum.

15     "Answer:  So I didn't run XRPD myself.

16     "Question:  And you did not direct the XRPD

17  testing that the third-party lab ran on the ibrutinib

18  compound?

19     "Answer:  I directed it because I sent samples

20  to them and told them to run XRPD.

21     "Question:  And did you direct them as to how

22  to run the XRPD analysis that were run by the third-party

23  lab?

24     "Answer:  No.

25     "Question:  If you could turn to column 63 of

1    the patent.  If you see there in example 1, under example 1,

2    it says preparation of crystalline forms and it has a

3    compound.

4                   "Do you see that?

5                   "Answer:  Yes.

6                   "Question:  And it's compound 1.  That is -- is

7    that ibrutinib?

8                   "Answer:  I believe it is, yes.

9                   "Question:  Okay.  And under that there are

10   listed three routes for Form A:  Form A route 1, form A

11   route 2, and Form A route 3.

12                  "Do you see that?

13                  "Answer:  Yes.

14                  "Question:  You did not identify any forms other

15   than form A or form B, according to your earlier testimony,

16   during your work on the ibrutinib project, correct?

17                  "Answer:  So what I'm -- what I recall doing was

18   focus -- the focus was on those two forms.  I only really

19   dealt from a manufacturing perspective with form A and form

20   B.  Those were the forms that were the most relevant to the

21   manufacturing.

22                  "So that's why they're in my memory as to the

23   forms that we used at the time, that we had both of those

24   relevant forms because we actually had made them.

25                  "Question:  And you don't remember identifying

1   or finding form C through F, correct?

2               "Answer:  I do not.

3               "Question:  What is the invention of the '753

4   patent?

5               "You're an inventor on the patent.  I'm asking

6   for what you believe the invention to be.

7               "Answer:  The -- the invention is related to

8   crystalline form.

9               "Question:  What specifically about crystalline

10  forms is the invention related to?

11              "Answer:  So the patent identifies crystalline

12  forms of ibrutinib.

13              "Question:  I -- I'm just asking what you

14  believe your invention to be.

15              "Answer:  Crystalline forms of ibrutinib.

16              "Question:  Okay.  Anything else?

17              "Answer:  As -- as directed in this patent?  No.

18  It's -- it's around the crystalline forms.

19              "Question:  Fair to say that you did not

20  contribute to the pharmaceutical formulation of ibrutinib?

21              "Answer:  So my contribution was really to

22  discover and produce ultimately when we manufactured

23  crystalline forms of ibrutinib that are available to use in

24  the pharmaceutical formulation.  So from that aspect, yes, I

25  contributed to the formulation.

1        "Question:  Did you contribute to what was in

2    the formulation?

3        "Answer:  Only the active drug substance

4    portion.

5        "Question:  You have no experience in

6    formulation generally, correct?

7        "Answer:  I'm not trained in pharmaceutical

8    formulations.

9        "Question:  For example, you were not involved

10   in the selection of what excipients to use in the ibrutinib

11   capsule formulation, form; right?

12       "Answer:  That's correct.

13       "Question:  All right.  When did you come up

14   with the invention that is disclosed in the '753 patent?

15       "Answer:  So the -- the research we did at Seres

16   was mostly in 2007.

17       "Question:  Is that it, just in 2007?

18       "Answer:  Oh, no, it continued.  I mean, we did

19   certainly laboratory work in 2008, and then -- and we did

20   manufacturing work again in 2009.  So we -- we were doing

21   work on that process throughout that.

22       "In -- in terms of specific experiments or when

23   we did specific things, I would have to look at the

24   laboratory notebooks to -- to try to identify, you know, a

25   more specific date for a particular event.

1     "Question:  What was Mark Smyth's contribution

2     to the invention?

3             "Answer:  So Mark -- Mark Smyth was the person

4     at Pharmacyclics that I interacted with on a routine basis.

5     And he and I discussed all aspects of the projects,

6     including the solid state forms when we got to that point.

7     So he was involved in the discussions.

8             "Question:  He was involved in the discussions

9     regarding what?

10            "Answer:  All aspects of the project.  So that

11    would include the -- the crystalline forms that -- that we

12    were working with and found, yes.

13            "Question:  Okay.  So what was his contribution

14    to the invention?

15            "Answer:  That I don't know.

16            "Question:  Because it was that you discovered

17    the crystalline form, correct?

18            "Answer:  I believe I was the first person to

19    run the experiments that I identified that -- that formed

20    the crystalline forms.  So I -- I first ran those

21    experiments.

22            "Question:  Okay.  When was Erick Goldman's

23    contribution to the invention of the '753 patent?

24            "Answer:  I don't know that.

25            "Question:  Okay.  Norbert Purro, who is that?

1    "Answer:  I do not know him.

2    "Question:  And I -- I then assume you do not

3  know what his contribution to this -- the invention of the

4  '753 patent is?

5    "Answer:  That's correct.

6    "Question:  If you could pull out Exhibit -- I

7  think it's Exhibit 5 now or -- 5 or 6 of the patent, '753

8  patent.  Thank you.

9    "And if you look at column 66, line 20, there is

10  a reference to the X-ray powdered diffraction for Form A,

11  which is displayed in Figure 1.

12    "Do you see that?

13    "Answer:  Yes.

14    "Question:  And it mentions characteristic

15  peaks, which include -- and then they refer to a number of

16  peaks.

17    "Do you see that?

18    "Answer:  Yes.

19    "Question:  You were not involved in identifying

20  those peaks as characteristic of form A with respect to your

21  work on the ibrutinib project, correct?

22    "Answer:  That's correct.

23    "Question:  All right.  And you did not actually

24  identify these peaks as characteristic of form A as part of

25  your responsibility or roles in the ibrutinib project,

1  correct?

2          "Answer:  Correct.

3          "Question:  Did you speak with Dr. Smyth after

4  that e-mail exchange?

5          "Answer:  About that subject?

6          "Question:  Or just generally.

7          "Answer:  I spoke to him, yes.  I have spoken to

8  him since, yes.

9          "Question:  About what?

10          "Answer:  About the Heroes of Chemistry Award.

11          "Question:  And what is the Heroes of Chemistry

12  Award?

13          "Answer:  It's a national award given by the

14  American Chemical Society for -- it's given to industrial

15  chemists as -- as opposed to academic chemists for a

16  particular project that was, I guess, deemed worthy of

17  recognition.

18          "Question:  And why were you talking to Dr.

19  Smyth about the Heroes of Chemistry Award?

20          "Answer:  So he contacted me to tell me that

21  Pharmacyclics was planning to apply for it, and -- and

22  that was some time before this.  But this year it actually

23  occurred.  So the actual awards ceremony was in late August

24  this past summer, and I attended in person.  And Dr.

25  Smyth was there.  So I spoke with him at the -- at the

1    ceremony.

2              "Question:  Okay.  What were -- what were the

3    award -- strike that.

4              "Were you nominated for an award?

5              "Answer:  So the -- the -- the award goes to

6    individual chemists, I think, so the chemists were listed by

7    name and then it was related to a particular project.

8              "So, yes, I -- I was part of the team -- there

9    were several -- that were associated with this project at

10   Pharmacyclics, several chemists that were at the -- you

11   know, simultaneously received this award.

12             "Question:  Okay.  And this was for the

13   ibrutinib project that we're talking about?

14             "Answer:  It was, yes.

15             "Question:  Okay.  Did you win the award?

16             "Answer:  We did win, yes.

17             "Question:  Would you -- and has it been routine

18   in your practice that for any drugs that you're working with

19   that exist in crystalline form, that you or someone else

20   involved with the development of that drug would perform a

21   polymorphic screen in order to control for that issue?

22             "Answer:  In -- in the very early days of my

23   career, no.  But within the past 15 to 20 years, yes, it --

24   it has become common -- more commonly understood and brought

25   to my attention having, again, worked on a couple at Lilly

1    many years ago.  So I would now consider it part of the

2    normal work that one would do to develop a pharmaceutical

3    product.

4              "Question:  And that's been the case throughout

5    the last 15 to 20 years?

6              "Answer:  Yes.

7              "Question:  When you began working with

8    ibrutinib, was there anything known about the crystallinity

9    of batches of ibrutinib that had been prepared to that

10   point?

11             "Answer:  So my recollection is the first time

12   that we discussed this with Mark Smyth, he indicated that

13   they felt the material they had was amorphous.

14             "Question:  When you first synthesized

15   ibrutinib, was it using a process that was provided to you

16   by PCYC?

17             "Answer:  You're -- are you speaking about the

18   entire synthetic sequence or -- or individual steps or --

19             "Question:  To start with, I'm referring to the

20   entire synthetic sequence.

21             "Answer:  So the -- the sequence that they

22   provided and the experimentals that they provided were the

23   basis for the beginning of my research.  So I don't

24   remember, again, detailed experiments from that long ago

25   without contacting the notebook pages.  But I -- I would

1    have started with running experiments either the way that

2    they ran them or in a very similar manner.

3              "Question:  And what was the -- the purpose of

4    your -- your work on ibrutinib in that time frame?

5              "Answer:  So the -- in the initial beginning of

6    the project, the -- the first challenge was around the

7    process selection for the entire sequence.

8              "So began, of course, at the beginning where we

9    had purchased starting materials and then began to work

10   through sort of step at a time to see if this -- the first

11   reaction would work and could it be performed well as was

12   written, did it need modification and sort of would make an

13   evaluation as you go along.

14             "So the -- the first step, and decide whether it

15   needed improvements and what and how much and what the goals

16   would be, and then moved on to the next step with a similar

17   kind of evaluation and worked down the synthetic chain,

18   really.

19             "Question:  So effectively, you were tasked with

20   refining the synthetic process for preparing ibrutinib?

21             "Answer:  Yes.

22             "Question:  During your efforts to refine the

23   process, what is the first instance you recall with respect

24   to the crystallinity of the finished ibrutinib product?

25             "When -- what was the first issue that came

1    about with respect to the crystallinity of that product?

2              "Answer:  I don't recall there was an issue

3    other than the fact that having known from Mark that they

4    didn't have a crystalline form.  I knew that when we got to

5    that point, we didn't have a preset form to make.

6              "So we were -- I would have needed them to

7    evaluate forms, look for forms or try to make forms,

8    basically, because there was no -- there was no prior

9    history of crystalline forms.  So that was just the -- the

10   work waiting to be done.  And as I say, until we had some

11   significant quantities.

12             "Question:  Was it -- did you consider it

13   preferable to have a crystalline form as opposed to an

14   amorphous form of ibrutinib for the drug product?

15             "Answer:  Yes.

16             "Question:  Why is that?

17             "Answer:  The -- in -- the advantage to the --

18   to a crystalline form in and in general in -- in a -- as a

19   pharmaceutical product, not necessarily anything specific

20   about ibrutinib, but the general reasons one would use a

21   crystalline form would be to enhance stability.  And that's

22   both physical and chemical.

23             "So physical stability would relate to things

24   like hygroscopicity.  Typically amorphous materials are

25   often more hygroscopic, and their water content varies as a

1    function of the relative humidity of their environment.

2              "And so that means that -- especially in some

3    countries in the world where it's quite humid or some places

4    where it's quite humid could be difficult to maintain a

5    consistent form or potency of the material just because of

6    the level of hydration going up and down.

7              "So physical stability would be one.  Chemical

8    stability is -- is another primary reason that traditionally

9    in a lot of instances crystalline materials are just more

10   stable chemically.  Their rates of oxidation would be lower,

11   for instance, reaction with -- with oxygen or with just

12   thermal degradation.  They tend to be faster in an

13   amorphous or a glassy material than they do in a crystalline

14   material.

15             "Question:  Would you consider a polymorph of an

16   API to be pure with respect to the API?

17             "Answer:  In -- in my knowledge, purity has

18   nothing to do with the form, per se.

19             "Question:  But if I give you a polymorph of an

20   API, would you -- strike that.

21             "If I give you a polymorph of an API, would you

22   expect there to be any other chemical entity in the

23   polymorph other than the API?

24             "Answer:  So there's -- there's no such thing as

25   a completely hundred percent pure compound anywhere in the

1    universe, to my knowledge.

2              "Question:  Right.

3              "But I asked you about a polymorph, not a

4    compound.

5              "Answer:  So there is no substance that is a

6    hundred percent pure polymorph or any other substance that

7    is a hundred percent pure, just as a matter of scientific

8    principle.

9              "Question:  But you use recrystallization to

10   remove impurities from your -- from your API, right?

11             "Answer:  I have used recrystallization to

12   improve the purity of a compound.

13             "Question:  But in your experience, you're not

14   able to completely remove impurities, right?

15             "Answer:  Again, I would say when you say

16   complete, that implies to me a hundred percent purity,

17   meaning nothing else is possibly present.  And that never is

18   possible."

19             (End of videotaped deposition.)

20             MR. ABHYANKAR:  Your Honor, a quick update.  I

21   understand that the missing exhibits have been sent to the

22   Court and they are being printed.

23             THE COURT:  I got them.

24             MR. ABHYANKAR:  Sure.

25             THE COURT:  All right.  Ms. Bharkhda, anything?

1    You're on mute.

2              MS. BHARKHDA:  I'm sorry.  Who are we proceeding

3    with next?  I'm not sure I am clear on that.

4              MR. ABHYANKAR:  If the Court has the printed out

5    exhibits, then we can start.  We might back up again unless

6    the Court would like to start from the beginning.

7              THE COURT:  No.  Go ahead.

8              MS. BHARKHDA:  I was going to say, as long as

9    the Court has the exhibits that it needs, we've been rolling

10   that out behind the scenes, that would be fine with us.

11             THE COURT:  You might have to back up like three

12   or four lines where we were.

13             MR. ABHYANKAR" okay.

14             THE COURT:  With the introduction of Smyth 3.

15             MR. ABHYANKAR:  Have you got it?

16             THE COURT:  Hold on one second.  All right.

17             MR. ABHYANKAR:  Thank you, Your Honor.

18             (The videotaped deposition of Dr. Mark Smyth was

19   played as follows.)

20             "Question:  When you say the third-party

21   manufacturer, you are referring to he was examining a

22   recrystallization process, who specifically are you

23   referring to?

24             "Answer:  Dr. David Wirth.

25             "Question:  Dr. David Wirth was from Seres?

1          "Answer:  He worked at Seres, yes.

2          "Question:  Was Dr. David Wirth your primary

3     contact at Seres?

4          "Answer:  Yes.

5          "Question:  Who directed Dr. David Wirth to

6     examine the recrystallization process at Seres?

7          "Answer:  Me.

8          "Question:  I am going to hand you what has been

9     marked as Smyth Exhibit 3, a document bearing production

10    numbers, and, Dr. Smyth, by production numbers, I am

11    referring to these numbers that have been stamped at the

12    bottom of each page on the right-hand side, which we call

13    Bates numbers.

14          The production number IMBPCYC05002448 to

15    IMBPCYC05002482.

16          "Dr. Smyth, do you recognize Exhibit 3?

17          "Answer:  Yes.

18          "Question:  If you turn over from the -- on the

19    first page, it says No. 678; correct?

20          "On the first page it says No. 678; correct?

21          "Answer:  It says that, yes.

22          "Question:  If you turn it over, on the second

23    page it says assigned to, and that is a handwritten name:

24    Mark S. Smyth; is that right?

25          "Answer:  Correct.

1    "Question:  That's you; correct?

2    "Answer:  Yes.

3    "Question:  Does this lab notebook between the

4    dates that we just went through -- 26 November of 2017 to

5    April 27, 2010, -- does this time period reflected in the

6    lab notebook accurately reflect the work that you personally

7    performed in the lab BTK project?

8    "Answer:  Yes.  It reflects the time period.

9    "Question:  I am just going to mark the patents

10   all together.

11   "I'm handing you, Dr. Smyth, a document bearing

12   production numbers IMBPCY04446283 to 352, which is U.S.

13   patent No. 9,725,455.

14   "I am handing you a document which has been

15   premarked as Smyth Exhibit 6, bearing production numbers

16   IMBPCYC04446822 to 6892, which is U.S. Patent No.

17   10,106,548.

18   "I am marking as -- I am handing you, Dr. Smyth,

19   what has been premarked as Smyth Exhibit 7, a document

20   bearing production numbers IMBPCY04446893 to 6961, which is

21   Patent No. 10,125,140.

22   "Dr. Smyth, looking at -- we can start with

23   Exhibit 4, which is U.S. Patent No. 9,296,753 patent;

24   correct?

25   "Answer:  Yes.

1       "Question:  For the purposes of this deposition,

2   if I refer to this as '753 patent, you'll understand what I

3   mean; correct?

4               "Answer:  Yes.

5               "Question:  Do you recognize this patent -- '753

6   patent?

7               "Answer:  I don't recognize it by number.

8               "Question:  Okay.  If you turn over to the

9   second page of the patent which has a production number, the

10  last three digits end at 078.

11              "Do you see on the top upper right hand there is

12  a line within parentheses that says 72, and it says

13  inventors?

14              "Do you see that?

15              "Answer:  Yes.

16              "Question:  Your name is listed on the top, Mark

17  Smyth; is that correct?

18              "Answer:  Correct.

19              "Question:  You are listed as an inventor on

20  this '753 patent; correct?

21              "Answer:  Correct.

22              "Question:  How are you involved with this

23  patent concerning -- that is titled crystalline forms of

24  ibrutinib?

25              "Answer:  I was responsible for leading all the

1  technical work on the project from both in-house efforts, as

2  well as the third parties.

3          "Question:  Okay.  Your description of the

4  contribution that you made to this patent, '753 -- your

5  contribution was to lead the technical work on the project

6  from in-house efforts, as well as third parties; is that

7  correct?

8          "Answer:  That was a significant part of it.

9          "The other part was to help make decisions on

10  what to do next in the work.

11          "Question:  I am just asking if you contributed

12  to what has been described on this page on column 63 under

13  form A, route 1.

14          "Answer:  I can't recall specific contributions

15  to what I would have done for this part or what I would have

16  contributed for this particular excerpt.

17          "We did have discussions around which solvents

18  to use in this aspect of the work; so I was involved in

19  those discussions.

20          "Question:  Do you recall where these solvents

21  that are listed on route 1 from what we are looking at,

22  column 63 under form A, route 1 -- where this list of

23  solvents came from?

24          "Answer:  They would have resulted from the

25  discussions we had with everyone working on the project

1    about what to use to try and accomplish crystallizations

2    based on the work that we had already performed with David

3    Wirth or in-house efforts.

4                "Question:  There was work performed on in-house

5    efforts outside of David Wirth who was at Seres; correct?

6                "Answer:  Correct.

7                "Question:  Who performed those in-house

8    efforts?

9                "Answer:  Erick Goldman.

10               "Question:  Okay.  This is Dr. Erick Goldman,

11   who is also listed as an inventor on the patent, '753;

12   correct?

13               "Answer:  Erick Goldman is listed as an

14   inventor, yes.

15               "Question:  Who is Erick Goldman?

16               "Answer:  Erick Goldman is a scientist that I

17   hired at Pharmacyclics to do process chemistry.

18               "Question:  If you go back to your lab notebook,

19   Exhibit 3.

20               "If you go to page 3 of your lab notebook, which

21   has a production number ending in '458.

22               On the top of that page -- that page, on the

23   left top is dated March 20, 2008; correct?

24               "Answer:  Correct.

25               "Question:  On the top of that page, the title

1    of this page that we are looking at -- that says generate

2    acetone solvate of PCI-32765?

3

4                    "Answer:  I see that.

5                    "Question:  Do you recognize that as the

6    registration code for ibrutinib that was used at

7    Pharmacyclics?

8                    "Answer:  That is the internal code we used for

9    the ibrutinib molecule.  Yes.

10                    "Question:  By the efforts that you just

11   mentioned, the in-house efforts that you mentioned, that you

12   ran yourself, would that include what is reflected -- the

13   in-house crystallization efforts that you ran yourself --

14   does this page reflect some of those efforts?

15                    "Answer:  Yes.

16                    "Question:  If you turn to page -- of your lab

17   notebook page 10, which is -- the production number ends in

18   465.

19                    "That page on the top left corner -- the date is

20   October 17th, 2008; correct?

21                    "Answer:  Correct.

22                    "Question:  On the top of that page, the title

23   is growth of X-ray quality crystals of PCI-32765, and within

24   parentheses, it says lot 082032, and it says DMC/HEX.

25                    "Do you see that?

1          "Answer:  I see that.

2          "Question:  Hex -- that would be hexane?

3          "Answer:  Yes.

4          "Question:  Does this page reflect some of the

5    in-house crystallization efforts that you personally

6    performed as part of the ibrutinib project that you just

7    mentioned?

8          "Answer:  This is a part of it.  Yes.

9          "Question:  Similarly, if you turn the page

10   over to page 11, that is dated also October 17th, '08;

11   correct?

12         "Answer:  Yes.

13         "Question:  That says on the top title X-ray

14   crystals of 32765, EtOAc/Hex.

15         "Do you see that?

16         "Answer:  I see that.

17         "Question:  This would also reflect the part of

18   the work that you did in-house on crystallization efforts of

19   ibrutinib?

20         "Answer:  Yes.

21         "Question:  Similarly, the next page over, page

22   12, that's ending in production number 467.

23         "The start date is October 17th, 2008 on the

24   top; correct?

25         "Answer:  October 17th, yes.

1    "Question:  That says X-ray crystals of 32765.

2    Acetone/hex.

3          "Do you see that?

4          "Answer:  I see that.

5          "Question:  This page would reflect some of the

6    in-house crystallization efforts that you performed on

7    ibrutinib; correct?

8          "Answer:  Correct.

9          "Question:  Do you recall what SSCI is?

10          "Answer:  That's the third-party lab that we had

11   contracted through the work with Seres, as well as

12   separately, to do some analysis of the solid state

13   properties.

14          "Question:  Were you involved in engaging SSCI

15   for the work on ibrutinib?

16          "Answer:  Yes.

17          "Question:  When you say that SSCI, the

18   third-party lab that was contracted the work at Seres, what

19   do you mean by that?

20          "Answer:  Initially, SSCI was used as an

21   analysis lab, analytical lab by Seres.  David Wirth had

22   experience working with them before on other programs, and

23   he recommended that we have samples sent through there with

24   no other identifier other than a lab notebook number from

25   him to get some data.

1          At a later date, we contracted SSCI separately.

2     Question.  I see.  Thank you for that clarification.

3          At the time, initially, did Seres send any

4     samples to SSCI by themselves for analysis?

5          "Answer:  Not by themselves.  It was always

6     under my agreement or direction.

7          "Question:  Other than those crystallization

8     efforts that were intended for single crystal analysis, do

9     you know if anyone at Pharmacyclics performed any

10    crystallization efforts for powder diffraction analysis?

11         "Answer:  During what period?

12         "Question:  Before Dr. Goldman's work in 2010.

13         "Answer:  Not that I can recall, no.

14         "Question:  Do you know what Dr. Goldman's

15    contribution was to this patent?

16         "Answer:  As part of the project team, Erick had

17    responsibilities for coordinating activities around solid

18    state analysis once he joined the company.  That was a part

19    of his responsibilities.

20         "Question:  You mentioned some in-house

21    crystallization efforts that were conducted by Dr. Goldman;

22    correct?

23         "Answer:  He did a few experiments.  Yes.

24         "Question:  Okay.  If you look at the -- again,

25    the second page of your patent '753 and list of inventors,

1   also listed is Dr. David Wirth.

2              "Do you see that?

3              "Answer:  Yes.

4              "Question:  That's the same Dr. David Wirth that

5   we were just talking about from Seres labs; is that right?

6              "Answer:  Correct.

7              "Question:  Do you know what Dr. Wirth's

8   contribution was on the '753 patent?

9              "Answer:  I can only comment on what his role in

10  the project team was.

11             "Question:  What was that?

12             "Answer:  He was responsible for the experiments

13  related to the process development activities and that led

14  to the crystallization/recrystallization studies that led to

15  the discovery of the polymorphs of ibrutinib.

16             "Question:  Then other -- the fourth inventor

17  listed on the '753 patent is Norbert Purro?

18             "Do you see that?

19             "Answer:  I see that.

20             "Question:  Do you know who Norbert Purro

21  is?

22             "Answer:  I know Norbert.

23             "Question:  Who is Dr. Purro?

24             "Answer:  Mr.

25             "Question:  Mr. Purro?

1    "Answer:  He is a scientist that worked on the

2    pharmaceutical sciences portion of the project.

3         "Question:  Do you know what Mr. Purro's

4    contribution was to the '753 patent?

5         "Answer:  I can only comment on what Norbert's

6    role was in the project as a whole.

7         "Question:  What was that?

8         "Answer:  His role was to develop the

9    formulation of the ibrutinib for clinical studies.

10        "Question:  In terms of your role, your

11   contribution with respect to the '753 patent, you were not

12   involved in the formulation aspect; correct?

13        "Answer:  No.  As I already stated, I had

14   nothing to do with the actual formulation work other than

15   supplying API.

16        "Question:  Okay.  Going back to our discussion

17   about your involvement on the polymorph analysis of

18   ibrutinib at Pharmacyclics, when you mentioned that you were

19   working through Dr. Wirth, you were working with SSCI at

20   that time early after you had joined on the polymorph

21   analysis of ibrutinib; correct?

22        "Answer:  That's not entirely accurate.  No.

23        "Question:  Can you let me know what was

24   inaccurate?

25        "Answer:  David had, with our agreement and

1 direction, sent samples to SSCI when he first started doing

2 the recrystallization work in early 2008 and encountered

3 materials that looked and based differently than what we had

4 seen before.

5        "He proposed it.  We talked about it, and I

6 agreed to have him send samples without any identifier other

7 than a lab notebook number to SSCI.

8        "Later, in 2008, Pharmacyclics engaged SSCI

9 directly to perform a solid state analysis.

10        "Question:  Okay.  Do you recall, other than

11 SSCI, if any other third party performed polymorph analysis

12 before SSCI did in early 2008 after you joined

13 Pharmacyclics?

14        "Do you have that recollection?

15        "Answer:  I don't recall anyone else doing any

16 analysis of polymorphs prior to 2008.

17        "Question:  Were you aware -- do you recall if

18 anyone at Pharmacyclics had performed polymorph analysis on

19 ibrutinib before you joined Pharmacyclics in November of

20 2007?

21        "Answer:  I was not aware of anything that had

22 been done.

23        "Question:  Okay.  Do you remember if anyone at

24 Pharmacyclics had engaged a third party analysis lab to

25 perform any polymorph analysis of ibrutinib prior to

1   joining -- you joining in November of 2007?

2           "Answer:  I don't recall any activities in that

3   area prior to my joining.  No.

4           "Question:  Okay.  I am going to hand you, Dr.

5   Smyth, what has been marked as Smyth Exhibit 10, which is an

6   e-mail that has production number IMBPCY05289693, and then

7   this e-mail has an attachment, which has been marked as

8   Smyth Exhibit 11, and that has production numbers

9   IMBPCYC05289694 to IMBPCYC05289712.

10          And what is the GMP lot?

11          "Answer:  A good manufacturing practice.  That

12  is a designation associated with material prepared for

13  dosing humans in clinical trials.

14          "Question:  Would the GMP lot be associated with

15  certain specifications?

16          "Answer:  GMP lots are released according to

17  accepted specifications.

18          "Question:  How are those specifications set?

19          "Answer:  In my personal experience, it is based

20  or previous experience making that material and working in

21  collaboration with the quality assurance, quality control,

22  analytical chemistry, and the toxicology teams to define

23  acceptable limits.

24          "Question:  The GMP specification would be sent

25  by -- the GMP specifications for ibrutinib would be sent

1  internally by Pharmacyclics personnel of these departments

2  that you mentioned?

3  "Answer:  They would have been involved in QC

4  and analytical technology, quality assurance, and the

5  manufacturing teams.

6  "Question:  Would the GMP specification include

7  a specification for crystal form?

8  "Answer:  Not all GMP materials are intended

9  for -- require a solid form analysis.

10  "Question:  In your experience, what determines

11  why a solid state specification is added to a GMP

12  specification?

13  "Answer:  In my experience, it has been added

14  into a specification when control of a crystal form is

15  desired for managing the properties of the solid.

16  "Question:  In your experience, is a solid state

17  specification for GMP included if there are issues

18  encountered with crystal form -- with a crystal form?

19  "Answer:  I don't know that I would characterize

20  it as a problem on an issue.  I believe I said it was used

21  to help assure control and manage the solid state

22  properties.

23  "Question:  Now, after you engaged SSCI in doing

24  the solid state analysis and polymorph analysis, do you

25  recall reviewing reports from SSCI?

1          "Answer:  Yes, as part of my job.

2          "Pharmacyclics engaged SSCI to conduct a

3  polymorph screen about 2008; right?

4          "Answer:  Correct.

5          "Question:  Okay.  Later on it -- you are aware

6  of a polymorph screen that was conducted by a company called

7  Pharmorphix; is that right?

8          "Answer:  Yes.

9          "Question:  Okay.  What I'm handing you is a

10  Smyth Deposition Exhibit 20.  It has got Bates numbers

11  IMBPCYC05275591 to 92.

12          "Do you have that in front of you?

13          "Answer:  Yes.

14          "Question.  Okay.  And it is a letter.  If you

15  look at the back of the second page, it has your name and

16  your signature on it; right?

17          "Answer:  Yes.

18          "Question:  Okay.  The front page is dated

19  March 9th, 2011, and it's to Paul Hirst.  It says SAFC

20  Pharmorphix.

21          "Do you see that?

22          "Answer:  Yes.

23          "Question:  Okay.  If you look at the second

24  page of the letter, at the top there's a sentence that

25  discusses another potential polymorph has been observed.

1          "Do you see that?

2          "Answer:  Yes.

3          "Question:  Okay.  It is referred to as unknown

4     B material.

5          "Do you see that?

6          "Answer:  I see the phrase unknown B material.

7          "Question:  Okay.  Do you know whether

8     Pharmacyclics referred to that Unknown B material ultimately

9     as polymorph form B of ibrutinib?

10         "Answer:  I don't believe so.  I believe that

11    the DSC onset at 135 degrees -- that that polymorph was, I

12    think, designated form C.

13         "Question:  Okay.  Are you -- how good is your

14    recollection?

15         "Answer:  As I said, I think.  I am not

16    100 percent sure.

17         "Question:  Did Pharmacyclics provide you with

18    those proposed tests and studies for the polymorph study?

19         "Answer:  As I stated about our work with SSCI,

20    we always after a submission of request for proposal -- we

21    would have a teleconference to discuss the project and start

22    aligning on the tests, the solvents, anything else related

23    to the project that we felt was needed to be discussed and

24    agreed upon.

25         "Question:  I've handed you what has been marked

1    Smyth Deposition Exhibit Number 24.  It has Bates number

2    IMBPCY05252966 to 037.

3                    "Do you have that in front of you?

4                    "Answer:  I do.

5                    "Question.  Thierry Bonnaud?  Do you see the

6    name to the right?

7                    "Answer:  Yes.

8                    "Question:  Do you know who he is?

9                    Answer.  Thierry was one of the project leaders

10   on most of the studies we conducted with Pharmorphix.

11                   "Question:  You interacted with him when it came

12   to the polymorphism studies; correct?

13                   "Answer:  We had interactions with him, yes.

14                   "Question:  That one is dated February 28, 2012.

15   That is actually a real date; right?

16                   "Answer:  Yes.

17                   "Question:  Do you recognize this as a report

18   that Pharmorphix gave to Pharmacyclics detailing the

19   polymorph study that Pharmorphix ran?

20                   "Answer:  This is a report on one of those

21   studies that they conduct over the years.  Yes.

22                   "Question:  Okay.  Let me ask you again to go

23   back to the patent.

24                   "Do you have that?

25                   When I say the patent, I mean Exhibit 4, the

1   '753 patent.

2               "Do you have that?

3               "Answer:  I see Exhibit 4.  Yes.

4               "Question:  In the front, there's -- when I say

5   the front, it is a few pages in.  There's a Figure 1.

6               "Do you see that?

7               "Answer:  I see Figure 1.  Yes.

8               "Question:  There's a number of figures after

9   that, Figures 2 through 16.

10              "Do you see those?

11              "Answer:  Yes.

12              "Question:  Do you know who supplied the data

13  that went into those figures?

14              "Answer:  We gathered data from reports and

15  submitted them to the patent agents.  Erick and I did.

16              "Question:  Do you know where the data came

17  from?

18              "Answer:  The data was -- not all of it.  I

19  expect that a majority of it came from the Pharmorphix work,

20  if not all, but I don't know.

21              "(Exhibit 25 was marked for identification.)

22              "Question:  What I'm handing you is Smyth

23  deposition Exhibit Number 25, and it has Bates numbers

24  IMBPCYC05316316 to 320.

25              "Do you have that in front of you?

1        "Okay.   It is an e-mail chain, but I am

2   focusing on the second e-mail on the front page from Thierry

3   Bonnaud to Erick Goldman.

4        "Do you see that?

5        "Answer:  Yes.

6        "Question:  Dear Erick, find attached the data

7   as requested for the patent.

8        "Do you see that?

9        "Answer:  Yes.

10        "Question:  That is from Pharmorphix; right?

11        "Answer:  Yes.

12        "Question:  That is consistent with what you

13   thought, which is Pharmorphix supplied the data for the

14   figures inside the patent?

15        "Answer:  I didn't state that I believe they had

16   submitted all of the data.  I said they likely submitted

17   most of it, if not all, but I don't know how much they

18   submitted or when the data went into the actual application.

19        "Question:  What I'm handing you is marked Smyth

20   Deposition Exhibit 26, and it has Bates numbers

21   IMBPCYC05316321 to 329.

22        "Do you have that in front of you?

23        "Answer:  Yes.

24        "Question:  If you go back to the previous

25   exhibit, do you see that there's an attachment to the e-mail

1    at the top?

2              "Do you see underneath e-mail, it says

3    attachments?

4              "Answer:  Yes.

5              "Question:  Do you see the document in front of

6    you, the Exhibit 26?

7              "Answer:  I see Exhibit 26, yes.

8              "Question:  Okay.  This is data that Pharmorphix

9    would have supplied to you; correct?

10             "Answer:  They would have supplied to Erick, and

11   we would have -- we would have reviewed it together.

12             "Question:  I am handing you a document marked

13   as Smyth Exhibit 28.

14             "Is that an e-mail chain that you were part of

15   on June 6th, 2008?

16             "Answer:  It looks that way, yes.

17             "Question:  I'd like to focus on the first

18   e-mail in the chain.

19             Is that an e-mail from you to Dave Engers, Brett

20   Cowant and Jing Teng?

21             "Answer:  It looks that way, yes.

22             "Question:  Those individuals were from SCSI; is

23   that correct?

24             "Answer:  SSCI.

25             "Question:  Sorry.  SSCI.

1              "Aptuit owned SSCI; is that correct?

2              "Answer:  SSCI was an Aptuit company based on

3     the e-signature of Brett Cowans, so, yes.

4              "Question:  In your e-mail you refer to an IND

5     for PCI-32765.  Is that Investigational New Drug filing with

6     the FDA?

7              "Answer:  Yes.

8              "Question:  You then state as such, we are

9     working on the CMC sections which discuss crystal forms.

10             "Do you see that?

11             "Answer:  Yes.

12             "Question:  Why were you discussing crystal

13    forms in the CMC section of the IND?

14             "Answer:  I don't have an exact answer other

15    than it was a section that we included since it was likely a

16    specification of the material to control for crystal form.

17             "Question:  Why was Pharmacyclics interested in

18    controlling for the crystal form of ibrutinib?

19             "Answer:  Because we found that there were

20    multiple polymorphs during our development work, and we

21    wanted to make sure we controlled for the most stable form.

22             "Question:  Why did Pharmacyclics want to have

23    the most stable crystalline form for ibrutinib in its drug

24    product?

25             "Answer:  I didn't say anything about drug

1    product.  I only worked on the API.  The goal was to have

2    the most physically and chemically stable form, and that's

3    what our goal was.

4              "Question:  Obviously, you were going to use it

5    in a drug product for trials; right?

6              "Answer:  It was going into drug product for

7    trials.  Yes.

8              "Question:  That's why you file an IND -- is to

9    do a trial; is that correct?

10             "Answer:  You file an IND to get into clinical

11   trials, yes.

12             "Question:  Why was Pharmacyclics interested in

13   including the most stable crystalline form of ibrutinib in

14   the product used in its clinical trials?

15             "Answer:  We wanted the most stable crystal form

16   possible, both chemically and physically, so that there was

17   no degradation in storage.

18             "Question:  Would you agree that the desire to

19   have an active drug ingredient that has good stability

20   during storage is generally considered desirable to drug

21   developers in that time frame?

22             "Answer:  In my experience, that is a common

23   goal of projects I've worked on.

24             "Question:  Do you know when in time you came to

25   call a particular form as form A?

1          "Answer:  It was, I believe, after the SSCI work

2     was done that we had contracted with them.

3          "Question:  Why did you ascribe whatever form

4     you ascribed form A to that name?

5          "Answer:  I believe that came out of their

6     internal nomenclature for a sample.  I don't know where that

7     originated other than that.

8          "Question:  In 2008, Pharmacyclics had SSCI

9     perform that polymorphic screen; correct?

10         "Answer:  That was in 2008, yes.

11         "Question:  During that time, they identified

12    what they called form A; is that correct?

13         "Answer:  They labeled something it was

14    identified, yes, later as form A.  They're the ones who gave

15    that designation.

16         "Question:  The Pharmorphix polymorph screening

17    was intended to be a more robust polymorphic screen relative

18    to the SSCI screen; is that correct?

19         "Answer:  Our intention was to do a more

20    thorough study, yes.

21         "Question:  You are in Exhibit 24?

22         "Answer:  I have that in front of me.

23         "Question:  It is hard when you are coordinating

24    with different -- okay.  That's why.

25         "Let's turn to page 972.

1          "Answer:  In Exhibit 24?

2          "Question:  Yes.

3          If you could turn to the last paragraph on page

4   972, it states the polymorphic screen -- paren -- including

5   cooling, maturation, anti-solvent, addition, and slow

6   evaporation -- end paren -- consistently yielded form A,

7   other than one sample which gave an XRPD diffractogram

8   pattern differing slightly to form A -- period.  This

9   converted to form A readily at ambient temperature so was

10  not fully studied.

11          "Do you see that?

12          "Answer:  I see that.

13          "Question:  Is it consistent with your

14  recollection that the screening of ibrutinib performed by

15  Pharmorphix consistently yielded form A?

16          "Answer:  I gathered that from reading this

17  paragraph.  Yes.

18          "Question:  If we could turn to the next page.

19          In the second paragraph, second sentence, it

20  states form A was shown to be prepared easily and readily at

21  elevated temperatures -- paren -- above 25 degrees Celsius

22  and almost in all cases at 50 degrees Celsius end paren --

23  however, the other forms -- paren -- B and C and newly

24  identified mono-MIB K solvate -- end paren -- were isolated

25  when the slurries were exposed to sub-ambient temperatures.

1          "Do you see that?

2          "Answer:  Yes.

3          "Question:  Do you agree that form A was

4     prepared easily and readily?

5          "Answer:  Based on what they state here, yes.

6          "Question:  Is that consistent with your

7     experience in working with crystalline forms of ibrutinib?

8          "Answer:  Form A tended to be the predominant

9     form that was generated.  Yes.

10          "Question:  In the next paragraph, they say that

11     form A was easily prepared from numerous solvents.

12          "Do you see that?

13          "Answer:  Yes.

14          "Question:  Is that also consistent with your

15     experience in dealing with crystalline forms of ibrutinib in

16     varying solvents?

17          "Answer:  Based on the study and the report

18     here, yes.  It says that.

19          "Question:  Is that also consistent with your

20     experience and recollection of polymorphic screening of form

21     A for executing of ibrutinib?

22          "Answer:  Form A was always the predominant form

23     that we saw, so, yes.

24          "Question:  Was the purpose of this study to try

25     and get as many -- identify as many polymorphic forms of

ibrutinib as they could?

"Answer:  That was a stated purpose, yes.

"Question:  To do that, they used an amorphous form of ibrutinib at the beginning of the studies; correct?

"Answer:  Correct.

"Question:  With that same goal of identifying new and different polymorphic forms of ibrutinib, they also used multiple solvents under various conditions; is that correct?

"Answer:  Yes.

"Question:  Do you know if there's any other reason to use an amorphous state of the drug as a starting point for polymorphic screens beyond improving the likelihood that you get a variety of forms?

"Answer:  I recall the discussions around making sure that the amorphous form was used to reduce the chance of crystalline forms acting as seeds in these studies.

"Question:  Would a crystalline form, acting as a seed, tend to end up with that finished product from the test being the same thing you started with?

"Answer:  Seed would likely result in that form being generated.

"Question:  If the sample fully dissolved, would that still be a concern?

"Answer:  You would have to determine how

1  completely dissolved it was to have confidence that there's

2  nothing left behind.

3          "Question:  If you could jump down to page 011,

4  the conclusions section of the report, in the first

5  paragraph in the second sentence, they state, form A was the

6  most readily prepared crystalline form, prepared from

7  numerous solvents using various techniques; is that correct?

8          "Answer:  It reads as such.

9          "Question:  You agree with that statement;

10  correct?

11          "Answer:  I recall from the work that I've just

12  reviewed in here and seen and what I remember is, yes, that

13  was accurate.

14          "Question:  The next paragraph they indicate in

15  the last sentence the ease to controllable produce form A

16  was also a significant advantage over forms B and C, which

17  were difficult to reproduce confidently and would risk

18  conversion to the more stable form A; is that correct?

19          "Answer:  That's what it reads.

20          "Question:  Do you agree with that sentence?

21          "Answer:  From what I remember of this study,

22  that was correct.

23          "Question:  In the last paragraph they state

24  form A was proven to be the most easily prepared with

25  control when using the appropriate solvents and was stable

1    with the highest melting temperature of all the forms

2    identified; therefore, form A was recommended as the ideal

3    crystalline form to progress with in development, in the

4    solvents and conditions previously stated.

5              "Do you see that?

6              "Answer:  I see that.

7              "Question:  Do you agree with that conclusion?

8              "Answer:  Yes.

9              "Question:  Do you recall forms B and C

10   converting to form A during storage or during the

11   experiments that were performed involving forms B and C?

12             "Answer:  I'd have to review the data.  I think

13   there may have been some conversion studies that saw that

14   occurring.

15             "Question:  Do you recall any issues of form A

16   converting to a different form?

17             "Answer:  Not that I recall.

18             "Question:  Outside of that, do you recall you,

19   David Wirth, or Mr. Goldman ever trying to identify peaks

20   that differentiated between the different forms of ibrutinib

21   that you had identified?

22             "Answer:  As a practice, we did not focus on

23   single peaks as identifiers alone.

24             "Question:  How about two or three peaks?

25             "Answer:  It was our -- my practice for sure to

1   use as many peaks as possible in a comparison to a known

2   standard to identify whether a sample was a certain form or

3   not.

4           "Question:  Okay.  For the record, Dr. Smyth is

5   looking at Exhibit 5, the '455 patent.

6           If we could turn to column 3, in the paragraph

7   beginning at about line 10 -- 9 or 10 in the second

8   sentence -- in that paragraph there's a reference to

9   characteristic peaks of form A.

10          "Do you know who identified those peaks as being

11  characteristic of form A?

12          "Answer:  I don't know what individual would

13  have called those as such.

14          "Question:  Do you think it was any of you,

15  David Wirth, or Mr. Goldman?

16          "Answer:  As I said, I don't know who actually

17  identified those as characteristic.

18          "Question:  Did you have any involvement with

19  forms D through F?

20          "Answer:  I was involved in the technical team

21  interacting with the third party that labeled those as D, E

22  and F at the time.

23          "Question:  You are referring to form A when you

24  refer to the free base polymorphic form; right?

25          "Answer:  That is the form that we went forward

1    with in the clinical studies.

2              "Question:  All right.

3              Dr. Smyth, I've just handed you Smyth

4    Exhibit 37.  It is labeled Bates IMBPCYC05622162.

5              "Do you have the document in front of you?

6              "Answer:  Yes.

7              "Question.  Have you seen this document before?

8              "Answer:  It looks somewhat familiar.  Yes.

9              "Question:  Is it an internal Pharmacyclics

10   report; correct?

11             "Answer:  It is an internal of document, yes.

12             "Question:  Okay.  It reads micronized ibrutinib

13   form A is the active ingredient in ibrutinib capsule, 140

14   milligram, which is in clinical development at

15   Pharmacyclics.

16             "Do you see that?

17             "Answer:  Yes.

18             "Question:  Do you agree with that statement?

19             "Answer:  At the time it appears to have been

20   accurate, yes.

21             "Question:  We looked at Exhibit 17 before.

22             "My understanding from your explanation was that

23   this was a proposed research protocol from SSCI that you

24   placed comments on.

25             "Do you recall that?

1          "Answer:  Yes.

2          "Question:  Let me ask you to turn to the Bates

3    numbered, labeled page ending in 621.

4          "Answer:  Okay.

5          "Question:  Now, under goal one, where it

6    says perform analytical characterization of material as

7    received -- do you see that?

8          "Answer:  Yes.

9          "Question:  The proposal that you received from

10   SSCI did not include XRPD or DSC as a proposed analytical

11   technique; is that right?

12         "Answer:  Not at that stage, no.

13         "Question.  You added them here on the side?

14         "Answer:  Yes.  That's my handwriting.

15         "Question:  Okay.  Ultimately, those experiments

16   were performed; is that correct?

17         "Answer:  Yes.

18         "Question:  You added those to the experimental

19   protocol for the studies that you engaged SSCI to do in the

20   spring of 2008?

21         "Answer:  From that part of the study, yes, I

22   added those analytical techniques.

23         "Question:  Finally, let me have you look at

24   Exhibit 16.

25         "Answer:  Okay.

1    "Question:  If you -- Exhibit 16 was the work

2    order from SSCI -- excuse me -- for SSCI that we were

3    looking at earlier; is that right?

4            "Answer:  As I recall, this was the work order

5    that resulted in that proposal.

6            "Question:  Okay.  Let me turn you to the page

7    ending in Bates number 20 -- 020.  Excuse me.

8            "Answer:  Okay.

9            "Question:  Under changes, do you see the

10   paragraph that says, since this protocol is research based,

11   minor changes in the experimental approach or scope can be

12   made based on scientific judgment?

13           "Do you see that?

14           "Answer:  Yes.

15           "Question:  Such changes can be agreed to by

16   SSCI and Pharmacyclics' scientific contact person via

17   telephone, facsimile, or e-mail discussions, which will be

18   recorded at SSCI in the form of contacted reports.

19           "Do you see that?

20           "Answer:  Yes.

21           "Question:  SSCI I could not make minor changes

22   to the experimental approach without your approval; correct?

23           "Answer:  Correct."

24           (End of videotaped deposition.)

25           THE COURT:  Okay.  Thank you.

1    All right.  What's next?  Thank you.  All right.

2  What's next?

3    MR. ABHYANKAR:  Thanks, Judge Connolly.  We're

4  now done with the deposition clips for the polymorph

5  patents.  We are going to move to a different technology

6  area now.

7    THE COURT:  Okay.

8    MR. ABHYANKAR:  And Sandoz intends to call Dr.

9  Maureen Donovan.  We're going to talk about the

10  pharmaceutical formulation patent and specifically the '231,

11  which is asserted against Sandoz.

12    If I may suggest, I believe it is 10:40.  If

13  this is a good time for a break, we can break and then start

14  up or we can proceed.

15    THE COURT:  What I'm going to do is, we're going

16  to take a 15-minute break, but what I would like is, I would

17  like counsel from both sides to give me a five-minute

18  summary of why what I've heard is significant to the case?

19  All right.

20    MR. ABHYANKAR:  Thank you.

21    THE COURT:  We'll be back at 5 of 11:00 Eastern

22  time.  Thanks.

23    MR. ABHYANKAR:  Understood.  Thank you.

24    (Short recess taken.)

25    -  -  -

1                    (Proceedings resumed after the short recess.)

2                    THE COURT:  All right.  Are you all there, I

3        think?  Can you hear me?

4                    All right.  Ms. Clayton, tell me very, very

5        briefly.  What is the significance of what I've heard this

6        morning?

7                    MS. CLAYTON:  What you've heard this morning is

8        from two of the inventors on the '548 patent, Your Honor, a

9        Dr. Smyth and a Dr. Wirth.

10                    We believe that that testimony is relevant to

11        two different issues in this case.  The first is related to

12        the 112 issue -- actually, three issues.  112 issue on

13        written description.  We believe that the testimony shows

14        that plaintiffs conducted extensive polymorph testing in

15        advance of filing what eventually became the '548 patent

16        which has a priority date of June 4, 2012, and that despite

17        that significant testing, they only discovered and had

18        identified forms A through F.  So the only forms they

19        actually were in possession of was those forms as of that

20        date.

21                    Secondly, Your Honor, there was some testimony

22        related to enablement from I believe Dr. Smyth, related to

23        some seeding experiment testimony, and maybe a couple of

24        other nuggets in there that I'm forgetting.  So there were

25        maybe a handful of comments that were relevant to enablement

1    and obtaining new crystalline forms.

2              And then, third, we believe that that testimony

3    shows that for forms A through C of ibrutinib, the

4    characterization and thus the peaks that are recited in the

5    '548 patent were not discovered by either Dr. Smyth or

6    Mr. Wirth.  Instead, they were done by a company called

7    SSCI, and so unknown employees from SSCI should be named as

8    inventors on the patent.

9              And then, additionally, for forms D and F, which

10   plaintiffs belatedly in Dr. Myerson's expert report noted

11   for the first time they thought came within certain of the

12   claims.

13             THE COURT:  Hold up.  See, sorry.  Go back.

14   Avoid the clauses.  Just get to the right point.

15             MS. CLAYTON:  Yes.  So --

16             THE COURT:  You distracted me.  I had it and I

17   went off.  So what's the point?

18             MS. CLAYTON:  Yes.  So for Pharmorphix, another

19   third party invented and identified forms D and E and so

20   they should also be named as inventors on the '548 patent

21   and they are not.

22             THE COURT:  Okay.  Your first point is a 112

23   point.

24             MS. CLAYTON:  Correct.

25             THE COURT:  And 112 with a couple clauses.

1    What's the first 112 point?

2              MS. CLAYTON:  112, written description.

3              THE COURT:  Right.

4              MS. CLAYTON:  This testimony shows the only

5    forms they were in possession of, which is the standard for

6    written description as of June 4th, 2012, were forms A

7    through F.

8              THE COURT:  Okay.

9              MS. CLAYTON:  A through F.  Yes, Your Honor.

10             THE COURT:  Your second 112?

11             MS. CLAYTON:  Our second point on enablement,

12   Your Honor, there are just some admissions in these and,

13   frankly, Your Honor, I apologize.  I can't remember them off

14   the top of my head.

15             THE COURT:  That's okay.

16             MS. CLAYTON:  That go to establishing some of

17   the factors related to undue experimentation and showing

18   that there would be undue experimentation required.

19             THE COURT:  That makes sense.  Okay.  All right.

20             Mr. Gutman, do you have anything to add to that?

21             MR. GUTMAN:  Yes, I do, Your Honor.  So

22   yesterday you heard testimony from Dr. Swift that the claims

23   of the '455 crystalline form patents are obvious in view of

24   the prior art, including the '444 patent.

25             The testimony that you heard today from doctors

1    Smyth and Wirth, who are both named inventors on the '444

2    patent, are consistent with and further support Dr. Swift's

3    opinions that the claims of the '455 patent are invalid for

4    obviousness.

5    More particularly, you heard testimony from Drs.

6    Smyth and Wirth that consistent with Dr. Swift's testimony,

7    that a person of ordinary skill in the art would have been

8    motivated to do a polymorph screen, especially for

9    pharmaceutical products in order to obtain and identify the

10   most stable crystal form.

11   You also heard testimony from Drs. Smyth and

12   Wirth that the most stable crystalline form was form A and

13   that it was easily and consistently obtained, and that even

14   when they obtained other crystalline forms, such as forms B

15   and C, those converted to form A.

16   So the argument is in total, that testimony

17   supports the analysis conducted by Dr. Swift with respect to

18   obviousness, that one of ordinary skill in the art would

19   have been motivated to obtain form A, and they would have

20   had a reasonable expectation of success at obtaining form A.

21   THE COURT:  Okay.  Thank you.  All right.  Mr.

22   Sipes?

23   MR. SIPES:  Your Honor, we disagree on the

24   significance.

25   THE COURT:  Go ahead.

1          MR. SIPES:  To begin, we do agree on one thing.

2     This is the testimony of the inventors and that's very

3     important because the law is quite clear that, in fact, the

4     path that the inventors took to the invention is never a

5     proper analysis for obviousness.  That's just basic law and

6     it make makes a lot of sense.  Otherwise, nothing would be

7     obvious.

8          What it is relevant to, we believe, is

9     understanding what they did and what they thought they were

10    putting into their patent application, and in particular,

11    you heard testimony, one, I think, that they developed a

12    very robust path for the production of particularly

13    crystalline form A, which I think, I tend to agree, does

14    tend to show understand enablement that the patents clearly

15    enable the production of A, but also that they worked with

16    their form that they developed.

17         Once they had achieved crystalline forms --

18    you heard a reference, for example, for seeding and whatnot,

19    that once they had a crystalline form.  Remember, the time

20    frame is very important.  Before you have any crystalline

21    material and after once you've developed the crystalline

22    material, they worked with the crystalline material to

23    then develop new crystalline forms, and that is what was

24    in the literature, too.  So it shows, and that they

25    described that.

1          But candidly, for purposes of 103, the proper

2     analysis is to look at the prior art, not what the inventors

3     say.  And even for 112 issues such as enablement and written

4     description, I must disagree with Ms. Clayton.  It would be

5     nice if we could do a written description invention by

6     peering into the heads of inventors and just examining

7     what's in their mind.  That's not the law.  The law is you

8     read the patent specification and you understand what it

9     communicates to a person of ordinary skill in the art.

10          So we're not going so far to say because they

11    said that they really thought of themselves as the inventor

12    of crystalline ibrutinib, that is there was no crystalline

13    ibrutinib until they made it.  That's not the test.  The

14    test is what the patent application describes.

15          We do think it's significant that as they

16    recognized, they were the first to crystallize ibrutinib,

17    but we recognize the focus is on on the application.  It's

18    important that they were the inventors of crystalline

19    ibrutinib, but we need to look at the application.

20          The reference to these contract laboratories we

21    think candidly, Your Honor, is a distraction.  It is, of

22    course, true that as a small company, Pharmacyclics did

23    contact with other companies to assist with the work, but

24    the question here for invention versus conception and is

25    everyone is agreeing, we're hearing from the inventors on

1    that.

2              So we actually think, A, the direction, and, B,

3    it's not really a theory that is properly in the case, but

4    we don't need to address that now.  But we don't deny the

5    fact that they worked with contract labs in developing

6    crystalline forms.

7              THE COURT:  Let me follow up on that idea of

8    conception.  Okay.  So I take it, I mean, it's undisputed

9    that under patent law, you can patent the genus of a

10   molecule.  Right?

11             MR. SIPES:  That's correct, Your Honor.

12             THE COURT:  Right.  Ms. Clayton, you agree with

13   that?

14             MS. CLAYTON:  I agree with that, Your Honor.

15             THE COURT:  Mr. Gutman, you agree with that?

16             MR. GUTMAN:  If you have appropriate support.

17   Yes, Your Honor.

18             THE COURT:  All right.  So, now, the conception

19   that a molecule could be embodied in a crystalline form,

20   right?

21             Are you saying, Mr. Sipes, that just having the

22   idea, the conception that a particular drug molecule could

23   have a crystalline form, that that is an invention?

24             MR. SIPES:  Not, not alone conceding that

25   it could be crystalline.  I'm saying if you have an

1   invention --

2                  THE COURT:  Sorry.  Let me step back.  I'm

3   asking in the abstract.  I'm not asking about this

4   particular thing.  I just want to make sure.  Is it your

5   position that, you know, you've got a molecule and everybody

6   agrees, you can patent a molecule.

7                  MR. SIPES:  Right.

8                  THE COURT:  Let's say the molecule was already

9   patented, but then somebody said, hey, I just thought about

10  this.  I think that this molecule can take a crystalline

11  form.

12                  Are you telling me that conception is

13  patentable?

14                  MR. SIPES:  Yes.  If it is the case that the

15  molecule has been made but only amorphously, so that, in

16  fact, achieving a crystalline form is an accomplishment and

17  if it proves that the crystalline form has useful

18  properties, the invention has to be useful so that you, in

19  essence, came up with the first crystalline form of a

20  material that had useful properties, yes.

21                  THE COURT:  You get the patent?

22                  MR. SIPES:  You are entitled to a patent on

23  crystalline material.

24                  THE COURT:  So hold on.

25                  MR. SIPES:  The opening --

1          THE COURT:  Hold on.  I'm sorry.  Look, you're

2     all very good, you know.  I'm only cutting to the chase

3     because I'm not -- it takes me awhile to get things.  I

4     think that's pretty clear and I'm sorry about that, but a

5     lot to master for me.

6          I want to cut to where I'm thinking, if you

7     don't mind, because I think it has taken me probably a lot

8     longer than it took you all to figure out the nub of the

9     dispute, at least some of them here.

10          Let's posit again.  I've got a molecule and it

11     has been patented and it's in amorphous form, but then I

12     came up.  I'm like, wait, wait a second.  I can crystallize

13     this.  And I think, as I understand it, the plaintiffs'

14     position is, hey, if I'm the one who comes up with the first

15     crystalline form and I get a patent for -- I can get a

16     patent at that stage for all crystalline forms of that

17     molecule, that is your position.  Right?

18          MR. SIPES:  Yes, that is our position, but

19     there's an important point here.  Not only did you conceive

20     of the crystalline form and make the crystalline form, but

21     you recognized its useful properties.

22          THE COURT:  You know, I'm getting -- I'm giving

23     you that.  That's fine.  We'll just posit that.  Okay?

24          MR. SIPES:  Yes.

25          THE COURT:  I don't think that's the nub of the

1     dispute, frankly.  I think the defendants will agree with

2     you.  You've got to have usefulness.  Right, Ms. Clayton?

3               MS. CLAYTON:  Yes.  I agree.

4               THE COURT:  That is a distraction, frankly, I

5     think.  I want to focus on what I think I have to decide.

6               MR. SIPES:  Yes.

7               THE COURT:  And I think whereas the defense is

8     saying, hey, you know what, if you come up with a specific

9     crystalline form of a patent, you get to get a patent on

10    that, but you don't get it for any and all crystalline

11    forms.  Is that correct?

12              MS. CLAYTON:  That's correct, Your Honor.  They

13    should only be entitled to a patent on the exact crystalline

14    forms they had discovered as of the filing date.

15              THE COURT:  Mr. Gutman, you agree with that?

16              MR. GUTMAN:  Not if the prior art says that --

17              THE COURT:  That's not the question.  This is an

18    abstract.  This is a hypothetical.  I'm going to then,

19    frankly -- I think I know where the law is on that.

20              Okay.  So, of course, Mr. Gutman, I'm positing

21    that it's not obvious.  This is a discussion to get to the

22    heart of the matter.

23              MR. GUTMAN:  Yes, Your Honor.  Theoretically, I

24    agree with that.

25              THE COURT:  Okay.  Thanks.

1             MR. SIPES:  Your Honor, here's an analogy that

2    may help a little bit and if not, I apologize, but I think

3    it's helpful.

4             Let's go back to the original invention of

5    ibrutinib or any drug molecule.  It's uncontested when they

6    made it, it came out amorphous, but what they found is it's

7    a useful molecule.  And the claim covers that useful

8    molecule even if it's used in forms beyond what they found.

9    For example, crystalline form of the molecule.

10            THE COURT:  When you said useful molecule, the

11   molecule can exist in amorphous or polymorphous form.

12   Right?

13            MR. SIPES:  Correct.

14            THE COURT:  There was at some point a patent for

15   ibrutinib that did not limit it to amorphous or

16   polymorphous.  Is that correct?

17            MR. SIPES:  That's the patent at issue in this

18   case.  Claim 10 of the '309 patent claims ibrutinib

19   regardless of form.  You can think of it in one sense as a

20   genus patent.  That molecule, ibrutinib, in any physical

21   form.  It would cover ibrutinib gas.  It would cover

22   ibrutinib liquid.

23            THE COURT:  Wait.  But I thought -- the way I

24   broke this down in my own brain was, no, the '309 is

25   broader.  '309 is the compound.

1    MR. SIPES:  Correct.

2    THE COURT:  The '548 patent -- and I am focusing

3    right now, at least in my brain, and I'm going to guess Ms.

4    Clayton agrees with the way I'm focusing.  I was focusing on

5    the '548 patent, the crystalline form patent.

6    MR. SIPES:  Correct, Your Honor.  I'm trying to

7    make an analogy, and maybe it was a bad one.  You understand

8    the '309 patent to cover ibrutinib molecules in any physical

9    form.

10   THE COURT:  Again, see, I don't think their

11   defense is going to dispute that.

12   MR. SIPES:  Correct.

13   THE COURT:  Hold on, because if you think they

14   are, but I didn't think they were.

15   MR. SIPES:  I don't think so either, Your Honor.

16   THE COURT:  Okay.  Well, then, we're good, but

17   I'm focusing on the '548 patent.

18   I think what's going on if I really want to cut

19   to the heart of the dispute is that you want to say, Mr.

20   Sipes, that you can not only patent the molecule as a genus,

21   but you get the patent as a genus, all crystalline forms of

22   the molecule.  That's what you are saying.  Right?

23   MR. SIPES:  I would say that's a possible claim.

24   This claim here is more limited than that, but, yes.  I'm

25   saying you're the inventor of crystalline ibrutinib, you get

1   all forms.

2            THE COURT:  You get all forms even if you only

3   disclose in the written description six forms.  You're

4   saying you get all forms if the claim says a crystalline

5   form.  Right?

6            MR. SIPES:  Right.  There are examples that

7   we'll put in the record that show that the art recognizes

8   that.  That as the inventor of a crystalline material,

9   you're entitled to claim a crystalline material.

10           THE COURT:  So here's what I want to understand.

11  So is there case law, you know?  I mean, for instance, let's

12  me ask you this:  When did the idea of crystalline form,

13  when was -- does anybody know when the first crystalline

14  form was patented?

15           MR. GUTMAN:  It was decades ago, Your Honor,

16  decades.  And you only really, I think, you know, as far as

17  pharmaceutical products have existed because there has been

18  a motivation to search for crystalline forms.  You heard the

19  inventors themselves say that people were doing polymorphic

20  screens, you know, over the last 20 years, so --

21           THE COURT:  Right.

22           MR. GUTMAN:  It has been decades.

23           THE COURT:  I'm just curious when you say

24  decades.  I didn't get the impression it has been 50 years.

25  I got the impression it might be more like 25 years when

1  somebody maybe first started actually patenting crystalline

2  forms of a molecule.  You think it's 50 years?  Okay.

3          I've got -- has the Federal Circuit dealt with

4  this issue of whether you can patent specific crystalline

5  forms versus any and all crystalline forms?  Is there a case

6  that addresses that issue?

7          MR. SIPES:  The leading case, Your Honor, is the

8  Gruenthal case, which we've talked about, but that was a

9  different issue.  That was really the nonobviousness of

10  making the first crystalline form.

11          I'd have to -- I'm not aware of a Federal

12  Circuit case specifically on a genus of crystalline forms.

13  There are other Federal Circuit cases on genuses of other

14  things, like antibodies.

15          THE COURT:  Right.  I get that.

16          MR. SIPES:  But this seems -- well, it's true

17  that crystals themselves are old.  In fact, we're enmeshed

18  in it now.  The idea of different crystalline forms and

19  polymorphs is actually relatively recent.

20          THE COURT:  That's what I thought.  In fact, you

21  know, I read somewhere, and, you know, I'm not going to base

22  my ruling on it unless one of you brought it up.  I've read

23  actually it wasn't until the HIV drug that somebody realized

24  that the drug product could exist in various crystalline

25  forms.

1    Am I way off on that?

2    MR. SIPES:  I believe it's Ritonavir.

3    THE COURT:  Exactly.  I think it's in the mid

4    '90s, isn't it?  It's the mid nine tease?

5    MR. SIPES:  Correct.  And I wouldn't say that

6    people didn't know before then that you had different

7    crystalline forms, but that emphasized the importance of

8    developing a first form that was stable.

9    THE COURT:  Right.

10   MR. SIPES:  That's when polymorphic stability in

11   the pharmaceutical art became a real focus and ibrutinib

12   talked about this.

13   THE COURT:  Okay.  So --

14   MR. SIPES:  The achievement of the first stable

15   form.

16   THE COURT:  You said Gruenthal you were talking

17   about.  Was that in your opening?

18   MR. SIPES:  It's in our opening slides.  I

19   apologize.

20   THE COURT:  You don't have to apologize.  That's

21   the problem.  I can only digest so much.  I think what I'm

22   digesting now is -- obvious is a very bad word.

23   Let me go back and ask the others.  Mr. Gutman,

24   Ms. Clayton, is there a Federal Circuit case that you would

25   recommend that I read that addresses either directly or

1  indirectly this idea of can you patent any and all

2  crystalline forms versus specific crystalline forms only?  I

3  will let Ms. Clayton go first.

4          MS. CLAYTON:  So, Your Honor, we have looked.

5  There is not a single Federal Circuit case that talks about

6  crystalline forms as a genus, and we actually think that

7  that demonstrates why this concept makes no sense in the

8  crystalline art.

9          Now, there are cases where we can draw analogies

10  even in the antibody context.  For example, there's a case,

11  AbbVie v. Janssen, which is ironic, those are the two

12  plaintiffs in this case, that we think is very instructive

13  in terms of why there is lack of written description here.

14  Again, it's not exactly in this art.  Basically, we do think

15  it's instructive to the Court in terms of how the written

16  description analysis should be conducted here.

17          THE COURT:  Okay.  Mr. Gutman, any case that you

18  would point to me?

19          MR. GUTMAN:  None that says as a matter of law,

20  someone is entitled to a genus.

21          THE COURT:  Okay.

22          MR. GUTMAN:  Of a crystalline form.  I think

23  it's a sense of inquiry.  I think it just depends on the

24  facts.

25          THE COURT:  All right.  Now, the other thing

1  was, I was kind of recalling back to one of the Markman

2  hearings.  The problem is there were multiple ones in this

3  case.  And was there an '889 patent involved in the case at

4  one point?

5            MS. CLAYTON:  Not in the Sandoz case, Your

6  Honor.

7            MS. ANDERSEN:  Yes, Your Honor, but it has been

8  quite a while since that patent was involved in the case.

9            THE COURT:  All right.  Well, I don't know if it

10  was the '889 patent, and I thought this was Sandoz, not

11  Alvogen.  But I thought at some point, one of the defendants

12  wanted me to limit my construction of crystalline form to

13  crystalline form A.

14            MS. CLAYTON:  The defendants collectively

15  previously asked to limit to form A because the two peaks

16  that are recited in those claims are only listed as

17  characteristic for form A.

18            Your Honor said that because it talked about

19  other embodiments, namely, A through F, you didn't think

20  that that limitation was appropriate.

21            THE COURT:  Right.  I didn't think it was clear

22  and unequivocal and I still don't.  What I want to ask you:

23  If I had adopted your construction, that we would not be

24  in -- you would not have a 112 argument.  Is that right?

25            MS. CLAYTON:  Correct, Your Honor.  That's

1    correct.

2              THE COURT:  All right.  I'm just curious.  You

3    think that's the better construction?  I should have

4    construed the patent to limit it to form A than deal with

5    this invalidity issue?  That would take the invalidity issue

6    off the table.  Right?

7              MS. CLAYTON:  So I do believe that form A is

8    the correct construction because the only form that has

9    those two characteristics identified in the specification

10   is form A.

11             Plaintiffs have pointed to little blips on the

12   patterns to say that other forms, namely, forms D, F and C

13   also have some of those peaks.  We didn't think that that

14   was an issue really worth disputing here, so I do think the

15   better construction is A, but certainly, it shouldn't be

16   broader than A through F.

17             THE COURT:  And I'm just wondering, the

18   plaintiffs, you have not changed your position, have you,

19   during the course of this trial?  Maybe we would be better

20   off construing the patent as limited to form A.

21             MR. SIPES:  No.  And, in fact, Your Honor, we

22   think this is an important issue and it's an important issue

23   in this case and, candidly, I think, ultimately, it's an

24   important issue for the pharmaceutical industry.

25             THE COURT:  That's my sense.  Always my

```
 1    instincts are not to have to decide something I don't have
 2    to decide.  Okay.
 3              MR. SIPES:  Your Honor, I wish I could make the
 4    case earlier.  Unfortunately, it turns out to be a very
 5    important case.
 6              THE COURT:  No.  That's all right.  Okay.  Well,
 7    look, that was very helpful to me.  Again, my apologies.
 8    You know, there's a lot of good advocacy, but sometimes it's
 9    just too much to digest.  And I harken back to your
10    openings.  I'm sure you gave me tons of stuff that is only
11    now becoming apparent to me, the significance of it.
12              So all right.  Where do we go next?
13              MR. SIPES:  Thank you, Your Honor.
14              MS. CLAYTON:  Your Honor, at this time Sandoz
15    would call Dr. Maureen Donovan to the stand.  And Mr.
16    Abhyankar will be conducting that examination.
17              THE COURT:  All right.  Thank you.
18              ... DR. MAUREEN DONOVAN, having been duly
19    affirmed as a witness, was examined and testified as
20    follows ...
21              THE COURT:  Go ahead, counsel.
22              MR. ABHYANKAR:  Thank you, Your Honor.
23    BY MR. ABHYANKAR:
24    Q.    Good morning, Dr. Donovan.
25    A.    Good morning.
```

1    Q.    By whom are you employed?

2    A.    The University of Iowa.

3    Q.    And what is your current position at the University of

4    Iowa?

5    A.    I'm currently Professor of Pharmacy.

6    Q.    And before we discuss your opinions, I'd like to talk

7    a little bit about your background.  Could you please put up

8    DTX-2391.

9          Dr. Donovan, what is this document?

10   A.    This is a copy of my C.V. submitted in this case.

11   Q.    Does this accurately reflect your academic and

12   professional history?

13   A.    Yes, it does.

14   Q.    Great.  And have you prepared demonstratives that will

15   assist with your testimony today?

16   A.    Yes, I have.

17   Q.    Can we pull up slide 2?  Dr. Donovan, can you briefly

18   give us the highlights of your education?

19   A.    Sure.  I completed my Bachelor's degree in Pharmacy

20   from the University of Minnesota.  I went on to my graduate

21   studies at the University of Michigan and completed a Ph.D.

22   in pharmaceutics and then went on to my first academic

23   position at the University of Iowa.

24   Q.    Great?

25          THE COURT:  Dr. Donovan, sorry to interrupt.

1   Have you testified in my courtroom before?

2           THE WITNESS:  To be honest, I can't remember.  I

3   don't -- I don't think I have.

4           THE COURT:  Okay.  All right.  Thanks.  Sorry to

5   interrupt.

6           MR. ABHYANKAR:  No problem.

7   BY MR. ABHYANKAR:

8   Q.   So what academic positions have you held at the

9   University of Iowa up you until now?

10  A.   I started as an assistants professor.  I worked my way

11  up the ranks to professor and that's the title I currently

12  hold.  And during the time that I've been at the University

13  of Iowa, I've had several administration -- administrative

14  positions also.

15          So for a period of time I was division head of

16  the Division of Pharmaceutics and Translational

17  Therapeutics.  I most recently served as the associate dean

18  for undergraduate education in College Pharm.

19  Q.   In your work as a professor, have you had a particular

20  area of research that you've been more interested in than

21  others?

22  A.   Yes.  So my research interests all the way from

23  actually undergraduate studies is in the mechanisms of drug

24  absorption, and as a pharmaceutical scientist, I joined my

25  interest in material sciences and formulation with that

1  interest in drug absorption to defining and determining ways

2  of optimizing formulations to improve or control drug

3  absorption.

4  Q.   And is one of those research areas in the internasal

5  field?

6  A.   Yes.  My Ph.D. dissertation was on an effective nasal

7  absorption, and I've continued to do research in the area of

8  nasal formulation, nasal absorption.  And I do that -- in

9  many ways I look at a number of delivery sites, routes of

10 administration, each of them different.  Each of them have

11 particular characteristics that make them interesting and

12 useful and sometimes compare the positive or negative

13 aspects of a particular site to any other site.   In

14 particular, most commonly delivered sites like the

15 gastrointestinal tract or like IV therapy.

16 Q.   And when you say delivery sites like the

17 gastrointestinal tract, are you referring to oral

18 pharmaceutical formulations or drugs?

19 A.   Yes.  So anything -- anything that gets to the

20 gastrointestinal tract, typically, that's through the mouth.

21 But gastrointestinal tract involves the stomach and

22 intestines.  Oral delivery is actually broader than that

23 because it involves the oral cavity, too.

24 Q.   But that has been a part of your research since you

25 start at the University of Iowa?

1  A.    Yes, it has.  I mean, again, I typically compare -- if

2  I'm working in nasal delivery or topical, oftentimes I'm

3  going to be comparing my results to the absorption

4  characteristics of a similar compound, gastrointestinally or

5  or transporters or cells, what we're look at.

6            Just compare gastrointestinal absorption in many

7  cases, not all, because it's not relevant in all.  But as a

8  comparator site, there's a lot of information that

9  gastrointestinal absorption in particular, so it makes it a

10 prime candidate for comparison.

11 Q.    Throughout the course of your career, have you

12 presented at lectures and seminars related to pharmaceutical

13 formulations?

14 A.    Sure.  I've given invited presentations at

15 international national meetings and national meetings and

16 academic institutions, both internationally and in the

17 United States, in the pharmaceutical industry numbers of

18 times, so, yes, I've given a number of presentations.

19 Q.    What about published articles in peer-reviewed

20 journals?  Have you published any papers related to

21 pharmaceutical formulation?

22 A.    Yes, I've published over 50 papers that are related to

23 drug absorption or pharmaceutical formulation.  I have over

24 100 published abstracts in the same area.

25 Q.    And are you the member of any national committee?

1  A.    Yes, I am.  Right now I serve as a member of the FDA

2  Advisory, Advisory Committee on Pharmaceutical Sciences and

3  Clinical Pharmacology.

4  Q.    Approximately how many years of experience do you

5  have in the study and the design of pharmaceutical

6  formulations?

7  A.    I have about 35 years of experience.

8  Q.    And that includes experience with, as we discussed,

9  oral pharmaceutical formulations?

10  A.    Yes.

11  Q.    Have you had experience formulating capsules and

12  tablets and other types of oral pharmaceutical formulations?

13  A.    Yes, I have.

14  Q.    And are you familiar with formulation design of drugs

15  that have different crystalline forms?

16  A.    I am familiar with the need to understand crystalline

17  form of the drug substance and that there are formulation

18  issues involved in formulating drugs that are, that have

19  polymorphic form.

20  Q.    And in your experience, do you also have experience

21  with formulating drugs that are considered poorly soluble?

22  A.    Yes.  I have a propensity to pick poorly soluble

23  compounds when I'm choosing model compounds for my own

24  experimental system, so I've had a lot of experience with

25  poorly soluble materials.

1    Q.    And have you consulted with pharmaceutical companies

2    on formulation design or development?

3    A.    I have.  A number of times I've been invited to meet

4    with the pharmaceutical industry at times where they just

5    want general information about routes of administration and

6    selection of routes.  When they have a particular project in

7    mind, we may be discussing formulation aspects or selection.

8    That would be appropriate for a formulation.

9    Q.    Thank you.

10            MR. ABHYANKAR:  At this time, Your Honor, Sandoz

11   would like to tender Dr. Donovan as an expert in the area of

12   pharmaceutical formulation.

13            MS. ANDERSEN:  No objection, Your Honor.

14            THE COURT:  All right.

15            MR. ABHYANKAR:  Let's move to the next slide, 3.

16   BY MR. ABHYANKAR:

17   Q.    Dr. Donovan, let's start with an overview of your

18   testimony.  Can you briefly walk through what we'll be

19   discussing today?

20   A.    Sure.  What I'm going to start out with is a bit of a

21   background on pharmaceutical formulations, the preparations

22   described as formulations and their outcome as dosage forms

23   just to give the Court some idea of what it is these terms

24   mean.  And then I'm going to talk a little bit about the

25   person of ordinary skill in the art, the typical training

1    and background and so forth of somebody who is considered a

2    pharmaceutical formulator.  And then I'm going to discuss my

3    opinions about the '231 patent and that my opinion that it's

4    invalid for lack of written description and that it's

5    invalid for lack of enablement.

6    Q.    So let's start with the background on formulations,

7    and for the benefit of those like me who are not trained as

8    formulators, can you just describe for us what a

9    pharmaceutical formulation is?

10   A.    So a pharmaceutical formulation is the drug substance

11   itself, the molecule that is the active drug, and all of the

12   other materials that we combine with that drug substance to

13   give the final, if you call package of drug that we're going

14   to administer to the human.  So the final tablet or capsule

15   or cream or patch or gel or any number of various types of

16   ways that we present the drug substance so that it works and

17   gives the effect that is desired.

18   Q.    Did you create a demonstrative that walks through the

19   development process that we just discussed?

20   A.    Yes, I did.

21   Q.    If we can pull up slide 5, please.

22              Dr. Donovan, can you walk us through what we're

23   seeing here on this slide?

24   A.    Sure.  So this slide is meant to give an idea, sort of

25   the general category of activities that are used when

1  somebody is going to take a drug substance and formulate it

2  into the drug product.

3            And there are, you know, there are lots of

4  things that go in each of those steps.  And at this point,

5  really what I want to make clear is that formulation design

6  is actually -- and formulation itself is actually an

7  iterative process and that's why the arrows go both ways

8  between all of the boxes.

9            And we could have made this even more

10 complicated by having them move all over the place.  But I

11 step forward.  I do testing.  I get information about what

12 I'm doing and that may cause me to either say that was what

13 I expected and that's the characteristic I'm trying to build

14 into my formulation and drug products, and I'm going to keep

15 moving forward or it may cause me to say, that's not going

16 to work.  That's not going to meet my drug product needs,

17 and as a result I am going to have to go back, get different

18 information, test different things to then come up with a

19 next step.  So it's a very iterative process is really what

20 the main point of the slide at this time is.

21 Q.    And I notice the title of the slide refers to oral

22 formulations.  Is there a reason you have focused on oral

23 formulations for this development process?

24 A.    Yes.  I focused on oral formulations because the '231

25 patent is focused on oral formulations.

1    Q.    So let's walk through each of these.  Let's start with

2    the top.

3             Can you explain the design process at the

4    beginning?

5    A.    Sure.  So as a formulator, I get involved in drug

6    product development when there's a drug substance identified

7    that has a particular therapeutic effect that is desired.

8    And we need to be able to present it to humans.  And so the

9    formulator again is in charge of taking that drug substance,

10   turning it into a material, a product that somebody can

11   actually administer or take.

12             And so we find out about things, well, first,

13   what's the dose of this intended agent?  How much of drug

14   substance do we need to deliver?  And the disease state

15   might tell us which of the dosage forms are most practical

16   or impractical to select.

17             And then, finally, what's the patient population

18   that's going to be using this or intended to use it, because

19   that, again, is going to potentially reduce the number of

20   likely dosage forms that we would select.

21             So as an example, if I -- if my drug substance

22   and my intended disease state is only a disease of small

23   children, I have limited numbers of dosage forms that small

24   children are able to accommodate and so I just, I focus on

25   those.

1          If I have a broader choice, there's more work

2     that goes into selecting, but at some point in time, I'm

3     going to select the likely dosage form I'm going to work on

4     first or a couple back ups or whatever.

5     Q.    And let's turn to slide seven.  Can you explain what

6     we're seeing here with respect to oral formulations?

7     A.    Yes.  What I -- I wanted to make the point that a drug

8     product and the dosage form is a distinct composition.  So

9     with these three pictures, three forms of Advil.  The same

10    drug substance, ibuprofen in all three, but they're

11    presented in different forms.

12         So the Advil tablets, the liquid gel system or

13    soft gelatin capsule system and the children's suspension

14    system.  And there are different materials that get used to

15    bring about each of those, different production sequences,

16    different quality assurance characteristics for each of

17    them.

18         And we'll notice that the tablet and the capsule

19    even have the same doseload.  Both have 200 milligrams of

20    ibuprofen, but the dose load in the suspension is different.

21    Different patient population, different dose.  It actually

22    lends itself to be able to give different doses.

23         And I apologize that my phone is ringing.

24              THE COURT:  Do you want to go put it on hold?

25              THE WITNESS:  Different doses based on weight

1    because you can give different volumes.

2              THE COURT:  Do you want to just put it into

3    voicemail or something or you can answer it and have a

4    conversation in front of us.

5              THE WITNESS:  I live in Iowa.  I know what that

6    call is about.  No.

7    BY MR. ABHYANKAR:

8    Q.    Just to confirm, on the slide we're looking at here,

9    these are all considered oral dosage forms or oral

10   pharmaceutical formulations?

11   A.    Yes, they are.

12   Q.    And are there more than these kinds of oral dosage

13   forms available for a formulator to consider when they're

14   designing drugs?

15   A.    There are.  There's a tremendous number of potential

16   oral dosage forms.  Again, just a selection of what I refer

17   to as immediate release dosage forms, they're intended to be

18   administered and act relatively rapidly.

19              There's a whole -- there's a whole bunch of

20   other formulations where we use more of the dosage form

21   itself to control the rate at which the drug gets absorbed

22   and so forth.  So there are far beyond tablet, soft gel and

23   suspensions or solutions.  There's controlled release

24   tablets.  There's a tremendous number of possible oral

25   dosage forms.

1  Q.    Let's just focus with these three examples for now,

2  but is the approach to designing these different

3  formulations going to change depending on what they are, the

4  tablet versus a liquid versus a gel or capsule?

5  A.    Certainly, because we use different material joined

6  with the drug substance to bring about each specific dosage

7  form, so the approaches are different.  Sometimes the

8  testing is different, the final manufacturing is different

9  to bring each.  To bring each dosage form about requires

10 different activities and different considerations and

11 different materials.

12 Q.    So let's go back to slide A, the design pathway.

13 Let's say we go ahead and select our oral dosage form.  What

14 do we do next?

15 A.    So the design and the choice of dosage can be done

16 initially, and then we have to know something about the

17 chemistry of the drug substance itself, and we're going to

18 rely on that we probably know some things about the

19 chemistry already of the materials we're likely to choose to

20 join with that.

21        So we spend time actually understanding the

22 chemistry of the drug substance.  So we know which

23 characteristics we might have to build around that not every

24 drug compound, all of the perfect characteristics that we

25 need to have it well absorbed and so forth.

1    So we try to add material into the dosage form

2  that might help with that or we might add materials into the

3  dosage form that make it even better than it already is.  A

4  number of things that we might be able to consider to do.

5  But we still need to know the basics about the drug

6  substance itself.  So we conduct what's called

7  pre-formulation testing.

8    Before we even get to formulation, we're going

9  to understand the chemical properties and the physical

10 properties of our drug substance as best we can so that we

11 know how to design the best acting formulation for the

12 desired use.

13 Q.    So let's talk about some of these pre-formulation

14 studies.  Turn to slide 9, please.  What type of testing do

15 you consider as a formulator?

16 A.    Okay.  So what I've put on the slide is a variety of

17 what people would consider pre-formulation tests commonly

18 get done to evaluate the chemical or physical properties of

19 the drug substance.

20    There are others, but these are certainly the

21 most -- many of the most common activities and I'm just

22 going to highlight a couple of them starting with the

23 aqueous solubility of the material itself.  And that's a

24 really, really important thing for a formulator to know

25 because one of the cardinal rules of drug absorption is that

Donovan - direct

1    the drug molecule itself has to be in solution in order for

2    it to get absorbed.

3           So for gastrointestinal absorption or for nasal

4    absorption for that matter.  My drug molecule has to be in

5    solution in the liquids that are present at that absorbed

6    surface, the mucosal surface, my nose or gastrointestinal

7    tract, wherever.  It has got to be in solution.

8           And so the contents of the gastrointestinal

9    tract are primarily water, some other substances, but we're

10   going to worry about aqueous water solubility.  And because

11   the gastrointestinal tract has different pH's, stomach, very

12   acidic in most individuals, and as we move through the rest

13   of the intestinal tract, more neutral, light in character.

14   The solubility of drug substances changes as a function of

15   pH, so I'm going to want to know what the solubility is in

16   those major characteristic regions of the gastrointestinal

17   tract also.

18          So solubility is very important.  Dissolution

19   rate is how fast does that material actually dissolve,

20   because, again, if I want a rapidly acting drug, I like my

21   dissolution rate to be fast so I can accomplish that.  I

22   want it to go in solution quickly in the environment where

23   it's going to be absorbed.

24          The partition coefficient tells us the relative

25   solubility between a liquid-like substance and an

aqueous-like substance.  So it tells us something about how
well the drug might be absorbed once we present it to the
absorptive membrane.

Polymorphism.  We've been hearing a lot about
polymorphism.  It's certainly important to know about the
drug substance, whether there are polymorphs, which
polymorph is being used.  Crystallinity, also an important
characteristic.

I'm going to move through the rest of those
details and studies.  They're important, but I really want
to focus on chemical stability as a formulator.  That's one
of my cardinal goals, is I like my drug product to be stable
and give a product lifetime shelf life of several years,
again, for convenience of our users, that they don't have to
go and get their prescription filled every day because we
didn't make it chemically stable.

So chemical stability of the drug itself is
something that that I interrogate during pre-formulation
testing because there may be material that I can include in
my dosage form, inactive ingredients or excipients that we
call them that I can include in the dosage forms itself that
slow down those degradation pathways.  It would be nice if
we believe they would eliminate them, but at least slow them
down enough, limit their current that I can actually have
that long shelf life that I desire from my pharmaceutical

1    product.

2    Q.    Thanks.

3           And we talked, you talked about polymorphism and

4    crystallization and aqueous solubility.  Is it your

5    understanding based on your experience that the aqueous

6    solubility of one crystal form of a drug product, or drug

7    substance can be different than another?

8    A.    Absolutely, certainly.  That's a characteristic of

9    different polymorphic forms, is they have different

10   solubility characteristics.

11   Q.    And based on those differences, does that impact the

12   design of the formulation that you are looking at?

13   A.    Certainly, certainly, because, you know, we need

14   adequate solubility in the time frame that the drug product

15   and drug itself are present at the absorptive site so they

16   can get absorbed.  So they can go into solution and get

17   absorbed.  Yes, it's an important part of formulation.

18   Q.    Right.  So let's go back to the pathway slide, slide

19   10.  You selected the dose form, we've conducted the

20   pre-formulation tests and now we move to the next step.

21          Can you explain for us what we're doing here?

22   A.    Sure.  So in the next step, I start to combine my drug

23   substance with some of the inactive ingredients or the

24   excipients again that I think might be useful in my

25   formulation.  And the reason I do that, I do that -- I may

1  start to build up multiple components and so forth.  Each of

2  my inactive ingredient or excipients is also accountable.

3  It has properties, too.  It has chemical reactivities, too,

4  and I want to make sure both that my excipients are

5  compatible with my drug substance, they don't cause things

6  to happen with my drug substance that I don't want to have

7  happen and that they're actually adding in the

8  characteristics that I want them to add into my formulation

9  and to get me to the desired characteristics of my final

10 dosage form.

11         So I do some work where I'm identifying

12 excipients, I'm looking at the combination and what their

13 behavior is and I'm still thinking about stability and so

14 forth, but in the combined stage, I'm essentially

15 interrogating the excipients and the ability to make the

16 dosage form that I want to be able to make.

17 Q.   And can these inactive ingredients or excipients, can

18 they serve different purposes in a formulation?

19 A.   Oh, absolutely.  You know, even each material itself

20 might be able to serve multiple purposes.  We have a variety

21 of excipients that we have choices of and they each have

22 particular characteristics.

23         Unfortunately, some of them even have

24 limitations that we then also have to formulate with or

25 around, that they act so well in one aspect, we continue to

1    include them in the formulation, but we know they have some

2    negative aspect and so we actually have to add some others

3    potentially or do something with our formulation to try to

4    counteract that as best as possible.

5    Q.    So claim 27 identifies some excipients; right?

6    A.    Yes, it does.

7    Q.    And so why don't we just pull up JTX-11 and turn to

8    claim 1.

9          Can you walk us through the types of excipients

10   that are claimed here?

11   A.    Yes.  So in claim 1, we'll look at B, C, D and E.

12   Those are the excipient classifications that are being

13   described by the claims.

14         So there's a diluent classification and a range

15   of amounts of materials that we would add a diluent and then

16   disintegrating agents is another category.  Surfactants is a

17   third category and lubricant as a fourth category.  Each of

18   those categories has multiple agents that are reported to

19   act in those ways, but in claim 1, it's just describing the

20   categories of excipients that should be included.

21   Q.    So let's talk about those categories.  So we can move

22   to slide 11.

23         Let's start from the top, the diluents.  Can you

24   explain for us what a diluent is and what its function is in

25   a pharmaceutical formulation?

Donovan - direct

A.     Sure.  So the diluent itself, and they have it
described on the slide as a filler.  It's essentially meant
to bulk up my drug substance into my dosage form.  The drug
substance is oftentimes high potency.  A few milligrams
worth of drug substance is what I want to administer to my
user, and a few milligrams is way less than a quarter of a
teaspoonful.

So those very small amounts of material are very
hard for individuals to manage and dose accurately.  We add
some bulk so that they're physically easy to handle and
manipulate and manufacture.  The diluent serves that
purpose, to dilute up the active drug substance to give
us enough mass or volume in the dosage form so that it's
handleable and manufacturable and that we can assure that
we have equal doses of drug, too, for each unit that we
desire.

Q.     How about the next one, disintegrants.  What are they
used for in a pharmaceutical formulation?

A.     So disintegrants are used to help with drug
dissolution, and so in the case of an orally administered
drug for the gastrointestinal tract delivery system or
dosage form, we'll take a tablet as an example.

You know, I've taken a solid, I've taken
powders, I've compressed them and somebody has swallowed
them.  Once it's in the GI tract again, do I want that to be

1  rapidly acting?  I'd like all of the drug to dissolve a lot

2  of that as quickly as possible, but in my compact and solid

3  tablet, that doesn't necessarily happen very quickly off of

4  the surface of the tablet.

5           So what I do, I include material that causes the

6  tablet once ingested to break apart into much smaller

7  pieces.  Lots of smaller pieces give me lots of more surface

8  area and interaction and my drug can dissolve out of those

9  smaller pieces.  Total amount of drug can dissolve.  You get

10  more and faster dissolution from the smaller pieces than

11  from a single tablet.

12          So we disintegrate the tablet or whatever dosage

13  form that we put that in to again accomplish that making

14  smaller pieces so that the drug is more available to be put

15  into solution.

16  Q.   All right.  What about surfactants?  I see a Dawn

17  bottle there.  Can you explain what surfactant is?

18  A.   The Dawn bottle is to show we're all very familiar

19  with surfactants and we're more and more familiar with

20  surfactants.  They are the materials that are in soaps and

21  they are included in soaps because in my dish washing

22  example, they take the grease off my dishes and allow the

23  grease to be dispersed in water and go away in the case of

24  Dawn.

25           In the case of a drug substance, a

1    low-solubility, hydrophobic water-hating drug substance, my

2    surfactant is able to interact with that hydrophobic drug

3    substance and it's able to disperse it into the water

4    content that in my gastrointestinal tract, for example, and

5    thus it allows me to get the drug to the -- the absorptive

6    surface as a molecule that can be absorbed instead of as an

7    insoluble solid that will just pass through the

8    gastrointestinal tract.

9    Q.    Finally, I see lubricant at the bottom.  Can you talk

10   about what the purpose of a lubricant in a pharmaceutical

11   formulation is?

12   A.    The lubricant is primarily a manufacturing aid.  We

13   make our pharmaceutical dosage forms on sophisticated piece

14   of equipment.  We oftentimes like to make lots of them

15   rapidly so we can provide the world supply of our drug

16   product.

17            And the lubricant is added to allow the colors

18   to flow through those processing pieces of equipment and not

19   jam them, not get stuck on edges, not jam up the production

20   equipment and so forth, to leave from being compressed

21   potentially as a, as a full beautiful tablet compared to a

22   chipped mess.

23            A number of reasons why we want to keep material

24   that would have the ability to seize up or gather together

25   because of frictional forces, we'll add the lubricant in

1    there just to keep the process moving.

2    Q.    How many different types of lubricants are there?

3    A.    Oh, there's quite a few.  At least a couple of dozen

4    types of lubricants that commonly get used and there's

5    surprising material that we use as pharmaceutical

6    lubricants.  They're not -- they're not -- they're typically

7    not similar to the kind of lubricants we think of for

8    automobiles or anything else like that.  They're other

9    substances that give lubricating processes characteristics

10   in most of our pharmaceutical processing equipment.

11   Q.    And if we could pull up slide 12.

12            Are these examples here of lubricants that are

13   described in the '231 patent?

14   A.    Yes.  This is a section in the specification that

15   identifies some suitable lubricants or glidants.  You can

16   see there's a set of long list of materials that have been

17   identified as having lubricant properties.

18   Q.    Do all of these lubricants behave the same way

19   when included in the same amount in a pharmaceutical

20   formulation?

21   A.    No, they don't, because, again, each one of these is a

22   different chemical substance.  They may, in a general

23   mechanistic standpoint, some of them may act similarly to

24   others, but, again, each individual material has its own

25   characteristics and needs to be evaluated based on its own

1  characteristics, both its lubricant characteristics and

2  whether they are sufficient enough at what concentration we

3  need and potentially on whether that build in any other

4  characteristics to our dosage form.

5  Q.    And if we can go back to slide 11.  Can the choice or

6  even the combination of these excipients here have an impact

7  on how the drug ultimately will behave in the body?

8  A.    Absolutely.  I mean, that is formulation design and

9  drug dosage form development.  It's determining what the

10  combinations of materials are and the quantities of each of

11  those materials and maybe even the manufacturing steps, the

12  order of addition of those to allow us to make the final

13  product that we desire, that gives the characteristics that

14  we identify on our drug product to have.

15  Q.    And can using different levels or amounts of these

16  various excipients have an effect on the drug product as

17  well?

18  A.    Sure, absolutely.  It's the relative amount of

19  materials relative to the other material potentially, or the

20  absolute amount of a specific material also.  They all again

21  lend to the overall characteristics of the now mixture, but

22  each one of them contributes characteristics and those

23  characteristics certainly are influenced by the amount that

24  we include.

25  Q.    And focusing on the lubricant at the bottom, can

1   varying the amount of the lubricant, can that have an impact

2   on the properties of a formulation?

3   A.    Certainly.   The amount of lubricant is potentially one

4   of the challenges that pharmaceutical formulators face.

5   Again, we need the lubricant.   They're a manufacturing aid.

6   They allow us to actually produce the dosage form that's

7   designed, but a number of the lubricants are hydrophobic in

8   nature, so, again, water-hating in nature.   It helps them

9   maybe act well as a lubricant, but they also can give a

10  hydrophobic nature to our dosage form, and as a result we

11  start building in a water-hating into the dosage from, which

12  in most cases is a negative, because, again, we want it to

13  interact with water so the drug can go in solution so the

14  drug can get absorbed.

15  Q.    Let's go back to the pathway slide again.   Now that

16  we've identified our excipients in the dosage form, what do

17  we do next?

18  A.    So we've identified the excipient and we actually

19  develop and design and test the prototype formulation

20  combinations that we identify.   We make them and we make

21  them because they're multicomponent mixtures.   They often

22  contain materials that have multi-functions to them and we

23  actually need to test them to make sure we built in the

24  performance characteristics that we had intended, and so we

25  make our formulations, the ones that we think are going to

1  be the best.

2              We learn from the results and we may need to go

3  back to our combination state and re-evaluate, select

4  different excipients potentially, or we may be able to move

5  forward.  It's very much a process of testing and evaluating

6  the results based on what the performance characteristics of

7  the dosage forms desired had been identified to be.

8  Q.    If we can move over to slide 14.  Are these some of

9  the testing criteria that you look at this stage?

10 A.    Yes.  There's only a few identified.  There's more.

11 Some of them are testing criteria.  But these are some of

12 the key aspects that we almost always look at in a prototype

13 formulation as we're determining whether we can move

14 forward.

15             The first one, if it's a dosage form that we

16 want to disintegrate to enhance the ability of the drug to

17 dissolve, we're going to look at the disintegration rate.

18 We do that in the lab.  We have systems that have been

19 developed and accepted that we think have some meaning

20 regarding how the drug product itself is actually going to

21 perform and disintegrate in the body.  So we need laboratory

22 testing equipment for the disintegration.

23             The dissolution profile is the rate at which the

24 drug substance dissolves out of those particles.  We have

25 disintegrants, if we don't include a disintegrant for doing

1    a controlled release.

2            Oral dosage form, we have different criteria for

3    the rate of drug dissolving that one would look at.  But

4    common testing to evaluate, to make sure that our

5    formulation is going to give us the solution of drug at the

6    absorption site that we desire and we also are looking at

7    evaluating the chemical stability of the drug substance and

8    of the components we've now added to that to make the dosage

9    form.

10           And we're also making sure that the whole

11   composite in the material are physically stable.  We don't

12   want the -- want form changes of our material during the

13   shelf life.  That has been a problem for a number of drug

14   products, and so we continue to monitor and test the

15   physical stability of the components in addition to their

16   actual chemical stability.

17   Q.    And, finally, if we can go back to the pathway slide.

18   Can you briefly describe what the last step is and what we

19   look to there as formulators?

20   A.    Sure.  So I've developed a formulation and now I've

21   developed a formulation that is meeting my test criteria

22   dissolution rate, disintegration rate, so forth, and

23   chemical stability for the period of time that I need.

24   Well, I need to actually test that in my, hopefully, my

25   human subjects because my laboratory test systems, again,

1    are somewhat reflective of what we think might happen, but

2    we actually need to test that the formulation as made

3    actually gives the desired performance, that it meets the

4    blood concentrations that I need at the time I need them to

5    treat the disease that this whole dosage form and drug

6    substance are intended for.

7           So we oftentimes end up having to reformulate

8    based on what we've learned once we've administered the drug

9    product, that we need to change the formulation, to change

10   some of the behaviors to actually give the therapeutic

11   desired performance.

12   Q.   Right.

13          MR. ABHYANKAR:  Your Honor, we're concluding the

14   background section.  It looks like lunch might be a good

15   place for a break.

16          THE COURT:  Here's what I'm thinking, looking at

17   your PowerPoint.  Do you want to briefly hit definition of

18   POSA, because I guess you're going to tell me at the end of

19   the day, it doesn't matter.

20          MR. ABHYANKAR:  That's exactly right.

21          THE COURT:  Why don't you do that.  If you could

22   do that in less than five minutes?

23          MR. ABHYANKAR:  We think we should be able to do

24   that.  Can we move onto the next slide.

25   BY MR. ABHYANKAR:

1    Q.    And, Dr. Donovan -- actually, let's us pull up slide

2    17.

3              Do you offer a definition for a person of skill

4    in the art in this case?

5    A.    Yes, I did.

6    Q.    Is this a summary?

7    A.    Yes.    The background of the POSA that I designed and

8    the POSA has a significant amount of technical and

9    scientific education, so education in chemistry or

10   engineering or pharmaceutical sciences primarily, experience

11   in formulating pharmaceutical products, and then a

12   familiarity with the excipients or inactive ingredients, so

13   that they can act as an independent formulator and we can go

14   back and forth about level of education versus experience

15   and so forth, but it's that combination of basic education,

16   experience, understanding of the materials that could be

17   selected that makes a formulator.

18   Q.    And are you aware of plaintiffs' expert, Dr. Williams'

19   definition of a POSA?

20   A.    Yes, I am.

21   Q.    And let's pull up the next slide, please.    And does

22   this reflect a summary of his definition in the case?

23   A.    It does.    It's my summary of his definition, slightly

24   different than mine.

25   Q.    Although different, do your opinions turn on which

1  definition of a POSA the Court adopts?

2  A.    No, my opinions do not depend on the other definition.

3  Q.    And would you qualify as a POSA?  Would you qualify as

4  a POSA under either definition?

5  A.    Yes, I would.

6  Q.    Great.

7         THE COURT:  Okay.  That's a great place to stop.

8  Good timing.  And I will see you all at 1:00 o'clock.

9         MR. ABHYANKAR:  Thank you.

10        (Luncheon recess taken.)

11              -   -   -

12        Afternoon Session, 1:00 p.m.

13        THE COURT:  Okay, everyone.  Are you all there?

14        MR. ABHYANKAR:  Yes, Your Honor.

15        THE COURT:  Great.  All right.  Mr. Abhyankar?

16        MR. ABHYANKAR:  Thank you.

17  BY MR. ABHYANKAR:

18  Q.    Dr. Donovan, in we could pull up slide 19.  I would

19  like to turn to your opinions regarding written description,

20  and first I would like to briefly discuss the standards you

21  applied in this case with respect to written description.

22        So if we could pull up slide 20, please.

23        I understand you are not a lawyer, Dr. Donovan,

24  so in your own words, can you explain for us what you

25  understand the standard to be and how you applied it in your

1  analysis in this case?

2  A.    Sure.  So my understanding of the standard for written

3  description is that the patent specification has to tell a

4  POSA that the inventors had invented or possessed the full

5  scope of the invention or the claim.

6  Q.    Right.  So let's talk about that invention.  If we

7  could pull up JTX-11, please, of the '231 patent.

8           And I'd like to pull up -- actually, let's just

9  go to slide 21.  Let's pull up claim 27.  Thank you.

10          And, Dr. Donovan, just to confirm, is it your

11  understanding that this claim, claim 27, is the sole claim

12  of the '231 asserted against Sandoz in this case?

13 A.    Yes, that's my understanding.  It's a dependent claim

14 on claim 1.

15 Q.    And is claim 27 a dependent or independent claim?

16 A.    Yes, it's a dependent claim.

17 Q.    What claim does it depend from?

18 A.    Claim 1.

19 Q.    Looking at this claim here, how would you describe the

20 scope of this claim?

21 A.    Extremely broad.  Just reading the first line tells me

22 that it's very broad, pharmaceutical formulation for oral

23 administration.

24 Q.    So let's start there.  If we can move to the next

25 slide.

1    Can you explain why a pharmaceutical formulation

2    for oral administration makes this claim broad?

3    A.    Well, it allows for any possible dosage form or

4    delivery form administered via the mouth orally.  So all

5    forms of tablets and capsules and gels potentially and, you

6    know, controlled release, immediate release, any possible

7    dosage form that I would put into the mouth could be or is

8    part of the invention.

9    Q.    And does the '231 patent list a number of examples of

10   oral dosage forms that would fall within the scope of claim

11   27?

12   A.    Sure.  They give, you know, twentyish or so examples

13   and some of their examples are broad categories, that there

14   would be far more subsets of those from a formulator's

15   definition of the dosage form.

16   Q.    So if we could pull up JTX-11, the '231 patent, column

17   43.    JTX-11, please, column 43.

18        Is this the description you were referring to,

19   Dr. Donovan, about the dosages of oral dosage forms that

20   would fall within the scope of 27, claim 27?

21   A.    Yes, it is.

22   Q.    Are these all of the oral dosage forms that would have

23   been available to a POSA as of June 4th, 2012?

24   A.    No.  There are plenty of additional possible oral

25   dosage forms beyond what's listed in this column.

1    Q.    All right.  And if we could turn back to slide 22,

2    please.  Is there anything else about this claim apart from

3    the fact that it covers any oral dosage form that makes it

4    broad in your opinion?

5    A.    Yes.  Even the following points A through E also add

6    to the breadth of the claim.  So the description of

7    component A ibrutinib also broadens the claim because it

8    allows for any form of ibrutinib.  So any crystalline form,

9    amorphous form, any other form that ibrutinib is available

10   as or could be available as is covered or included in the

11   claim.

12   Q.    So without limiting it to any particular form of

13   ibrutinib, and I believe you testified about this earlier,

14   but does the form of ibrutinib, will that impact how a

15   formulation will act or how you would design a formulation

16   for a particular drug?

17   A.    Certainly, especially ibrutinib with polymorphic

18   forms.  Each of those polymorphic forms has its own chemical

19   property.  Solubility is one of the most important ones and

20   solubility differs among the polymorphic forms as could

21   stability, as could a number of other characteristics that

22   we need to manage or manage around in drug, in drug

23   formulation.

24   Q.    Great.  Apart from the fact that this claim covers any

25   oral dosage form and any form of ibrutinib, is there

1  anything else about this claim that indicates that it is

2  broad to you?

3  A.   Sure.  Even, even in claim 27, where the diluent has

4  been identified as microcrystalline cellulose, where the

5  disintegrating agent has been identified as croscarmellose

6  sodium and the surfactant has been identified as sodium

7  lauryl sulfate.  Even with the identification of those three

8  compounds, each of them is able to be used in a broad range

9  of composition in the dosage form, and so, again, it lends

10  to being able to do multiple different combinations, other

11  combinations and so forth along with all of the other forms

12  of ibrutinib and we're just continuing to span the breadth

13  and the number of potential formulations that claim 27

14  describes.

15  Q.   So is your understanding that Dr. Williams has opined

16  that because claim 27 identifies specific excipients for the

17  diluent, disintegrating agent and surfactant, that this

18  claim is actually narrow?

19  A.   I'm aware Dr. Williams has stated that.  I don't agree

20  with that just because we've identified three of the

21  materials to be included in the formulation, there are still

22  a vast variety of possible formulations, all of the oral

23  administration formulations, for example, that it doesn't --

24  it is still extremely broad.

25  Q.   Is there anything else about this claim that makes it

1  broad to you?

2  A.    If you go back to claim 1, claim 1 requires one or

3  more lubricant, and so I both have the opportunity to bring

4  together a combination of lubricants, which, again, expands

5  the potential number of formulations that are covered by the

6  claim and it doesn't claim a range for lubricants.

7           So I could utilize any amount of lubricant

8  within the context of the rest of the claim.  And you can

9  calculate that there would be a maximum range based on the

10  definitions of the amounts of the other compounds, but one

11  or more lubricant at a range of levels, broad possibilities

12  for formulations that would -- that are defined by this

13  claim.

14  Q.    And as of June 4, 2012, would a POSA have had, I

15  believe you said dozens of lubricants available to them for

16  use in a formulation as described in claim 27?

17  A.    Yes, they would have.  There are dozens of materials

18  that could be used as lubricant.

19  Q.    Now, you said there is no calculation range specified.

20  You've been able to calculate one, the maximum range.  I

21  would like to turn to the next slide, slide 27.  And can you

22  walk us through how you came up with this number?

23  A.    Sure.  So claim 1 and claim 27 give ranges for the

24  materials that are to be contained in formulation, meaning

25  the components of claim 27, and what I did was take the

1    lowest amount of each one of those ingredients, so the

2    lowest amount of ibrutinib, the lowest amount of

3    microcrystalline cellulose, croscarmellose, sodium lauryl

4    sulfate, and I can account for 85 percent of my formulation.

5         So at least amount of formulation, the diluent

6    is forty percent.  The least amount of ibrutinib that can be

7    contained in the formulation is 40 percent -- two percent

8    for the surfactant, three percent for the disintegrating

9    agent.

10        So 85 percent of the formulation has been

11   accounted for by those, those materials, which leaves up to

12   15 percent that a formulator can add one or more lubricant

13   to the formulation up to that amount and be within the

14   claim.

15   Q.   So you've established that claim 27 allows for

16   15 percent.  Does the specification of the '231 patent

17   disclose anywhere a formulation that could have 15 percent

18   lubricant in it?

19   A.   No, the specification doesn't, doesn't describe

20   anything close to 15 percent lubricant in a formulation.

21   Q.   And for purposes of formulations that match the

22   elements of claim 27, what is the maximum amount of

23   lubricant that's used in those example formulations?

24   A.   One percent.

25   Q.   One percent.  Well, let's take a look at that and the

1    examples described in the patent.  Let's pull up slide 28,

2    please.

3              Dr. Donovan, can you explain for us what we're

4    looking at here?

5    A.    Sure.  And this is a rather complicated slide and

6    the slide that follows is in the same format, so I will take

7    a few moments to describe in general what's being shown

8    here.

9              So we'll look at the columns first, the column

10   labeled ibrutinib formulation, column labeled crystalline

11   ibrutinib, crystalline form A of ibrutinib.  Underneath

12   those in the column are general formulation example

13   descriptions that are in the specification.

14             So there's one set of example descriptions that

15   utilize ibrutinib as the drug substance.  There's another

16   set that are formatted and almost exactly the same except

17   require crystalline ibrutinib and then there's finally

18   another step that, again, formatted almost entirely the same

19   that requires the use of crystalline A as the ibrutinib

20   component.

21             So that's what I have in the rows.  So if we

22   look at the lightly shaded background row, you'll see that

23   the description of the pharmaceutical formulation is the

24   same in each column within that row except for the ibrutinib

25   or crystalline ibrutinib or crystalline form A, and all the

1  rest of the examples are set up the same way, that all of

2  the rows, the descriptors of the general formulation are the

3  same across the types of ibrutinib, just differ by types of

4  ibrutinib.

5          Then what I also added was a highlight for the

6  amount of lubricant that was described in each of the

7  examples, so in the case of the first row, one percent of a

8  lubricant.  In the second set of examples, one percent of

9  magnesium stearate, which is a well-known lubricant

10 material.

11 Q.    And to confirm, do any of these examples limit the

12 type of oral dosage form that is being described?

13 A.    No.  They all describe a pharmaceutical formulation

14 for oral administration.  So all possible oral formulations

15 or oral delivery systems.

16 Q.    All right.  And then if we could turn to slide 29,

17 please.

18          And similarly, what are we looking at here?

19 A.    So the table is set up the exact same way.  The column

20 about crystalline is the drug substance.  Crystalline form A

21 is the drug substance.  And then across the row, the same

22 generalized formulation example.  And it has highlighted the

23 amount of lubricant that is included in that particular

24 example.

25          So the first example, one percent of magnesium

stearate. The second example, .5 percent magnesium

stearate. And in the third example instead of percent, the

actual math values of the particular component is described

in that example, but it describes a formulation for oral

administration and its component.

Q. And to confirm, for this slide, for these examples,

again, is there any specific oral dosage form that's recited

in any of the examples?

A. No. In all of the examples that are described in this

table, they are all described as a pharmaceutical

formulations for oral administration comprising these

components, all possible dosage forms.

Q. And as a reminder, you know, you've talked about how

some of these examples pertain to crystalline ibrutinib or

crystalline form A. Claim 27 is not limited to any

particular form, whether crystalline, amorphous or anything

else; right?

A. That's correct, ibrutinib in any form.

Q. Right. I'd like to turn to Table 5 in the patent.

Dr. Donovan, what are we looking at here with respect to

Table 5 and what it's telling us about the formulation?

A. Okay. So Table 5 is describing capsule formulation

and the way Table 5 is set up, it gives the materials that

are included in the formulation in that left column, so

crystalline compound 1, crystalline ibrutinib,

1   microcrystalline cellulose, croscarmellose, sodium, sodium

2   lauryl sulfate, magnesium stearate.  The exact same

3   materials that were in that when the materials were

4   specified, the same material identical to the previous set

5   of examples.  And in this case, what is being described is

6   specific capsule formulation containing different amounts of

7   ibrutinib.  And so 40 milligrams ibrutinib, 140, 140, 200,

8   and then the component of component of the formulation both

9   described in weight percent and also described in absolute

10  math of that specific material included in that capsule.

11  Q.   Right.  So let's turn to slide 30.

12       How many of these formulations actually match up

13  with claim 27?

14  A.   Okay.  And there's actually only one of these

15  formulations from Table 5 that matches the specification in

16  claim 27 or the sub-claim in claim 27.  And I highlighted a

17  bit on Table 5 to make it a little bit easier to follow what

18  I'm talking about.

19       And so the light blue background column, that's

20  the formulation that met the requirements of claim 27 and

21  the boxes that I've placed over the table are a reminder of

22  what the, what the claim tells us we can include.

23       So the claim specified between 40 and 50 percent

24  diluent is possible in the formulation.  The shaded 140

25  capsule meets that.  The other examples do not.  And then

1  the -- claim 27 and claim 1 allow for any amount and if you

2  do the calculation, up to 15 percent of the lubricant, in

3  this case, magnesium stearate, and the blue shaded example

4  is the only example that contains a lubricant and it

5  contains it at a level of 0.5 percent.

6  Q.   And if we could turn to Table 6, please, in the '231

7  patent.

8            THE COURT:  Can you do me a favor?  Can you hold

9  for one second?

10            MR. ABHYANKAR:  Yes.  Yes, Your Honor.

11            THE COURT:  Okay.  Thank you.  Sorry about that.

12            MR. ABHYANKAR:  No problem.

13  BY MR. ABHYANKAR:

14  Q.   Dr. Donovan, let's turn to Table 6 in the '231.  We'll

15  blow that up for her.

16            What are we looking at here?

17  A.   So this is an example provided in the specification

18  that describes a general formulation, describes a general

19  formulation, components for a tablet.

20  Q.   Okay.  And so Table 5 was about capsules and Table 6

21  is about tablets.

22            Table 6, the formulation described here, does it

23  match up with claim 27?

24  A.   No, it doesn't.

25  Q.   And --

1   A.    It --

2   Q.    Sorry.  Why not?

3   A.    Claim 27 requires the inclusion of sodium lauryl

4   sulfate.  There is no sodium lauryl sulfate contained in

5   this example formulation.

6   Q.    And, in fact, there's no surfactant listed at all.

7   Correct?

8   A.    Right.

9   Q.    And although this particular formulation doesn't match

10  up, what is the high end range of a lubricant that's

11  included in the formulation?

12  A.    So they specified up to 2.5 percent magnesium

13  stearate, which is again lubricant material.

14  Q.    All right.  Now, other than the examples that we've

15  just talked about, are there any other formulation recipes

16  that are identified in the specification?  So other than

17  Table 5 and Table 6, any specific formulation recipes

18  identified in the specification of the '231?

19  A.    No, there aren't.

20  Q.    The description in the example that we have looked at,

21  are they broader or narrower than claim 27?

22  A.    They're all narrower than claim 27.

23  Q.    And why is that?

24  A.    Well, they're either specifying that it's a capsule or

25  a tablet or they limit or don't even include a lubricant.

1    Much lower components of the lubricant compared to the

2    15 percent.  That's what the claim specified.

3    Q.    And does claim 27 permit up to 15 times the amount of

4    lubricant than the highest amount that's described for the

5    formulations that match claim 27 in the '231?

6    A.    Essentially.  So the one formulation, the specific

7    formulation declaring the components and their amounts

8    describes one percent magnesium stearate lubricant.  So you

9    can have up to 15 percent, essentially 15 times.

10   Q.    So based on this -- well, let me ask you this

11   question:  Does the specification of the '231 patent

12   describe any oral pharmaceutical formulation of ibrutinib

13   that includes a lubricant that is up to 15 percent --

14                THE COURT:  Actually, can I stop you for a

15   second?  Hold on.  I'm confused.

16                MR. ABHYANKAR:  Sure.

17                THE COURT:  I thought that the amount that you

18   identified on slide 30 had .5 percent lubricant.  How do you

19   get one percent?

20                MR. ABHYANKAR:  Oh, sorry.  Your Honor, as we

21   established earlier, if you can go back one more slide.

22                THE COURT:  Those are one percent.  Right?  I

23   get that.

24                MR. ABHYANKAR:  Yes.  So --

25                THE COURT:  But it's as low as .5 percent in

1    Table 5.  Right?

2              THE WITNESS:  Can I -- would you like -- can I

3    explain, Judge?

4              THE COURT:  Yes.  Could you, please?

5              THE WITNESS:  Sure.  If you at the slide deck as

6    it appears right now, the top row also discloses components

7    that would -- it also discloses components, but what it's

8    disclosing is one percent magnesium stearate.

9              THE COURT:  And I get that, but I thought he

10   asked you the most that's disclosed in the patent and I

11   thought you said one percent.  Am I missing something?  I

12   probably am.  I'm probably missing something, so what am I

13   missing?

14             THE WITNESS:  The specific table in Table 5 is

15   really a specific example, a dosage form plus the component,

16   and they meet the requirements of claim 27, and you are

17   correct, it's at .5 percent.

18             More general, yet still could meet the

19   requirements of claim 27, up to one percent is described in

20   the specification in the example.

21             THE COURT:  Okay.  All right.

22             THE WITNESS:  You are correct, the exact

23   specific example that's provided is .5 percent.

24             THE COURT:  Okay.  Sorry.  Go ahead.

25             MR. ABHYANKAR:  Sorry, Judge Connolly.

1    THE COURT:  No.  Go ahead.

2    BY MR. ABHYANKAR:

3    Q.    To follow up and to make the record clear, what is the

4    difference between this formulation that we're seeing here

5    at the top and the formulation, the specific example that's

6    in Table 5?

7    A.    So in the, the -- the example that has been pulled out

8    on the opposite slide, it allows for any oral formulation or

9    any pharmaceutical formulation for oral administration.

10   Table 5 is limited to capsules only.

11                 THE COURT:  All right.

12   BY MR. ABHYANKAR:

13   Q.    All right.  And just to confirm, the specification

14   does not describe any oral pharmaceutical formulation with a

15   lubricant content up to 15 percent; right?

16   A.    Correct.  There's no description of a formulation with

17   a lubricant up to 15, at the level of 15 percent.

18   Q.    And is there any evidence in the specification in your

19   opinion that shows that the inventors actually invented a

20   formulation of ibrutinib that had lubricant up to

21   15 percent?

22   A.    No, there's no description in the specification that

23   would lead a POSA to understand that they had invented a

24   formulation with that high a level of lubricant, the

25   15 percent.

Q.    All right.  I'd like to -- and so what is your

conclusion, what is your ultimate opinion regarding lack of

written description with respect to claim 27 of the '231

patent in view of all of this?

A.    Well, I view that claim 27 is invalid based on the

lack of written description provided in the specification.

Q.    So let's turn to slide 34 and your enablement opinion.

       So let's start again and I will reiterate, I

know you're not a lawyer, but just in your own words, can

you explain, we'll turn to slide 35, can you explain what

you understand the enablement standard to look at or

analyze?

A.    Sure.  So the enablement standard requires that the

specification has to communicate to a POSA how to make and

use the full scope of the claim, and then without undue

experimentation, that there has to be information provided

that assists the POSA to, with their knowledge, make the

invention.

Q.    And did you analyze the number of factors called the

Wands factors to determine whether undue experimentation

would be required to practice the full scope of claim 27?

A.    I did, yes.

Q.    All right.  Let's look at these factors.  Go to the

next slide, please.

       So let's -- are these the factors that you

1    analyzed, Dr. Donovan?

2    A.    They are the factors I've come to know as the Wands

3    factors.

4    Q.    All right.  And we've spent a fair amount of time on

5    the breadth of the claims, so maybe let's start there.

6              We'll highlight that.  And just a reminder, how

7    does the breadth of this claim suggest to a POSA whether

8    undue experimentation is required to practice the scope?

9    A.    As I discussed, claim 27 is extremely broad, contains

10   a world of possible oral formulations, and as a result to

11   actually bring about all of those oral formulations under

12   all the variables that they could address.

13             You know, any oral dosage form, any form of the

14   ibrutinib, the ranges of multiple of the components, it

15   would just take a huge amount of experimentation to address

16   the breadth of the claim.

17   Q.    And let's turn now to the nature of the invention.  Go

18   back to slide 38 -- sorry.  36, 36.

19             So could we highlight number four, please?

20   Let's talk about the nature of the invention.

21             How would you characterize the nature of the

22   invention that's recited in claim 27?

23   A.    Well, it's pharmaceutical formulations for oral

24   administration, extremely broad to begin with.  Lots of

25   possibilities, containing ibrutinib material that contains

1    or is known to be in multiple polymorphic forms.  So it's a

2    complex invention, broad and multifaceted.

3    Q.    If we could turn to slide 40.  We've already discussed

4    this at length.  Are these two of the reasons why you

5    believe the nature of the invention is complex?

6    A.    Right.  It covers, again, all of the dosage, all of

7    the possible oral dosage forms, any form containing

8    ibrutinib, and specifically leading to or could contain up

9    to 15 percent of a lubricant.  It adds to the complexity of

10   the formulation.

11   Q.    And why does adding up to 15 percent of the lubricant

12   add to the complexity?

13   A.    Because, again, many of the lubricants that are used

14   in pharmaceutical composition have some negative aspects to

15   them also, limit some of the performance characteristic of

16   the final dosage form, so magnesium stearate in specific has

17   some limitations that would make including 15 percent of

18   that difficult and still have the dosage form to be able to

19   be utilized and deliver the drug that is contained within

20   it.

21   Q.    These issues that you are talking about with respect

22   to the lubricant, are they reported in the scientific

23   literature?

24   A.    Yes, they are.

25   Q.    If we could turn to DTX-2261, please.  What are we

1  looking at here, Dr. Donovan?

2  A.    So we are looking at the cover of a reference text

3  called the Handbook of Pharmaceutical Excipients, and this

4  is a commonly used reference text used by formulators, used

5  by educators.  I use this with my students.  It contains

6  monographs, short descriptions, several pages of description

7  about commonly used excipients and gives us the highlights

8  of their physical properties, how they get used, things that

9  are -- information that will be useful to the formulator

10 when selecting an excipient to use.

11 Q.    If we could turn to page 404 of this text.  Can you

12 describe what we're seeing here?

13 A.    Sure.  We're seeing the first page of about a four

14 page monograph describing magnesium stearate, the lubricant

15 that has been used in the example in the patent.

16 Q.    And if we could turn to page 405, I would like to call

17 out the comments on the bottom right.

18         Can you -- what does it say about magnesium

19 stearate as used as a lubricant in a formulation?

20 A.    So this is communicating what POSAs are familiar with

21 about magnesium stearate.  It's a hydrophobic material.  It

22 has some water-disliking characteristics.  As a result, you

23 put it in a dosage form, solid dosage a form in the

24 description here, that you should use the lowest possible

25 concentration to do that because it will give what people

1    tend to often refer to as a waterproofing characteristic to

2    the dosage form.  It makes the dosage form hydrophobic.  It

3    doesn't interact with water as well.  The drug doesn't

4    dissolve as well, and it goes on to describe capsule

5    dissolution in particular being sensitive to the amount of

6    magnesium stearate.  Again, use the lowest amount possible.

7            And then the mixing time.  Mixing the powders to

8    make sure they're all evenly mixed and everything is evenly

9    distributed before we actually make the capsule requires

10   some time.  The longer we do that, the more the magnesium

11   stearate is able or presents itself in that hydrophobic

12   manner and then decreases the dissolution of the drug

13   substance in the final capsule.

14   Q.   So based on all of this, the fact that the claim

15   covers any oral dosage form and covers up to 15 percent

16   lubricant, once again, how would you describe the nature of

17   the invention here?

18   A.   Complex.  To be able to manage to meet the, the claim

19   requirement and be able to formulate a 15 percent lubricant,

20   for example, and all of the possible ibrutinib forms, the

21   polymorphic forms described in the patent, it's just -- it's

22   difficult and complex.

23   Q.   What is the practical effect of a lubricant being in

24   such a high amount in a formulation?

25   A.   Well, it usually causes the formulation to fail.  And

1    those are, you know, formulator criteria that if it won't

2    allow my drug to release or be dissolved at a rate that will

3    give me the blood concentrations needed, my dosage form has

4    failed.  In many cases, that high a level of lubricant,

5    depending on with an oral dosage form I would be making, I

6    might not even be able to make it correctly.  It might -- it

7    might segregate.  It might not compact well.  It might cause

8    coating material to not adhere.

9            There are a variety of problems that could be

10   encountered with that high a level of lubricant in the, in

11   the formulation.

12   Q.   Okay.  Thank you.

13           Let's turn to slide 36 again, and we'll move to

14   the next, and I'm going to group these together because they

15   are pretty related.  Numbers 2 and 3, the amount of

16   direction or guidance presented and the presence or absence

17   of working examples.  We talked a little bit about this

18   earlier.

19           But can you identify for us, what guidance in

20   the specification is there to a POSA to practice the full

21   scope of claim 27 without undue experimentation?

22   A.   Well, again, extremely limited guidance provided by

23   the specification.  The claim allows for, again, any

24   possible oral formulation and there isn't any direction

25   provided about almost all of the possible oral formulations

1    or oral -- formulations for oral administration.

2              And as we just discussed, there's one working

3    example provided, the capsule with the exact content.  One

4    single working example provided.  It provides an example

5    that doesn't come anywhere close in lubricant level to the

6    lubricant level described by the claim.

7    Q.   And that working example is only one of the many oral

8    dosage forms that are otherwise covered by claim 27?

9    A.   Right.  It describes capsules, but, again, there's at

10   least 20 identified by the, in the specification and there's

11   more, quite a few more if you really would have a formulator

12   to find all of the possible oral formulations.

13   Q.   And if we could pull up slide 43 and 44, Mr. Ferrare.

14             Just to confirm, these other disclosures that we

15   looked at, did they help provide guidance to a POSA as to

16   how to make and use the full scope of the formulations that

17   fall within claim 27?  Please start with 43.  Sorry.

18   A.   No.  Again, they allow for a pharmaceutical

19   formulation for oral administration and they, again, repeat

20   the components, the ranges of the claim, and when they do

21   get specific about the material and the amount, they end up

22   being the exact same material as given in the capsule

23   example in Table 5.  And so they don't do anything more

24   besides open up the possibility of every pharmaceutical

25   formulation for oral administration as compared to Table 5,

1    which are capsules.

2    Q.    And given what we've learned about the properties of

3    lubricants and formulations and their use, what kind of

4    guidance would you need as a POSA to develop a formulation

5    that has 15 percent lubricant?

6    A.    I would need a lot of guidance actually.

7    Fifteen percent of a lubricant, 15 percent of any lubricant,

8    15 percent of any combination of lubricant, that information

9    is not available in the art of how to formulate and develop

10   a dosage form with lubricants at that level.

11            And so that's the information I would need in

12   the specification, how would I make a compact product that

13   would stick together or would dissolve correctly or how can

14   I make sure that all of my coating material will stick to

15   the surface or, you know, again, a whole variety of other

16   problems that we know can be associated with lubricant

17   inclusion in a formulation, I need to know as a POSA at

18   15 percent how do make that, how to -- yes, how to make

19   that.

20   Q.    Are you aware that plaintiffs' expert, Dr. Williams,

21   suggests that there are physicochemical properties disclosed

22   in the '231 that would help to fill in the gap for the lack

23   of guidance in the specification?

24   A.    I'm aware that he is -- has --

25            MS. ANDERSEN:  Your Honor.

1    THE COURT:  Hold up.  Okay.  Hold on.  Hold on.

2    THE WITNESS:  Judge, are you waiting for me to

3 answer?

4    THE COURT:  No, I'm not.  I'm trying to do

5 something myself.

6    Okay.  Go ahead, Ms. Andersen.

7    MS. ANDERSEN:  Dr. Williams will be testifying

8 later in this trial.  Mr. Abhyankar, I believe this is the

9 second time is characterizing his testimony in a certain

10 way.  I don't think it's appropriate to do that before the

11 testimony comes in.

12    THE COURT:  So this has been actually the

13 practice to date for the first two days of trial.  Everybody

14 was doing that without objection.

15    Are we planning on having rebuttal in this

16 trial?

17    MS. ANDERSEN:  Well, Your Honor, you had offered

18 defendants a fourth round and you had mentioned true

19 rebuttal on objective indicia only, I believe, so it would

20 not be directed to these issues.

21    MR. ABHYANKAR:  And that --

22    THE COURT:  No, wait.  I limited rebuttal -- so

23 I said there was no rebuttal in this case except for

24 secondary considerations of obviousness?

25    MS. ANDERSEN:  Yes, Your Honor.  In the fourth

1    round.

2                THE COURT:  In the fourth what?

3                MS. ANDERSEN:  The fourth round of testimony.

4                THE COURT:  That's where you're confusing me.

5    Fourth round sounds like it's -- I mean, rebuttal is third

6    round.  That's why I'm confused.

7                MS. ANDERSEN:  Sorry Your Honor.  Let me be

8    clear.  So I'm talking about first round is plaintiffs'

9    infringement.  Second round is defendants' response on

10   infringement and invalidity case.  Third round is

11   plaintiffs' response on validity.  Fourth round Your Honor

12   had limited to rebuttal on objective indicia.

13               THE COURT:  Yes.  I'm not sure why I did that.

14   Did I allow for, in the pretrial conference, did I say there

15   would be rebuttal on infringement?

16               MS. ANDERSEN:  No, you did not, Your Honor.

17               THE COURT:  Is there some reason in patent cases

18   that there's not a rebuttal case the way there would be in a

19   normal case?

20               MS. ANDERSEN:  Your Honor, it is very common in

21   my experience in bench trials in pharma cases in Delaware

22   for the judges to request that the defendant sort of

23   pre-rebut.

24               THE COURT:  That's a different question.  Sorry.

25   That's just a different question.

1  I'm just trying to figure out if I'm missing

2  something.  I mean, I'm going to let this testimony in just

3  because it's more efficient, but I also want to make sure.

4  You know, I'm trying to figure out why I said what I did.

5  Sometimes I say things that are really not very bright.

6  I think what I was thinking about was secondary

7  considerations was just I am certainly of the view that, and

8  I've written about this in the one obviousness opinion I

9  spent time on, I mean, I think it's confusing.

10  I think the Federal Circuit case law, you can

11  read a lot of cases to suggest that you don't get to bring

12  in evidence of secondary considerations until there has

13  been a prima facie case and you get to rebut it.  And I

14  have come up with a view that, no, I think you have to

15  permit secondary considerations.  It all comes in at once

16  is where I've come out on this.  I think that's the better

17  view.  I think that's why I may have said what I did, Ms.

18  Andersen.

19  MS. ANDERSEN:  Yes, Your Honor, and we're okay

20  with -- because of the way the rounds are set up, we'll drop

21  our objection.

22  THE COURT:  Okay.  I mean, as far as I'm

23  concerned, I didn't know that I ruled out a rebuttal, but I

24  would rather avoid rebuttal.  We've got to watch the time.

25  So let's just move forward.

1    MS. ANDERSEN:   Thank you, Your Honor.

2    BY MR. ABHYANKAR:

3    Q.    Dr. Donovan, I will restate my question, which is:

4    Are you aware whether Dr. Williams has argued that the '231

5    describes physicochemical properties of ibrutinib that help

6    fill in the gap, the gaps and guidance to a POSA from the

7    specification?

8    A.    Yes, I'm aware that Dr. Williams made those types of

9    statements.

10              MR. ABHYANKAR:   If we could pull up JTX-11, the

11   '231 patent at column 71.

12   BY MR. ABHYANKAR:

13   Q.    Is it your understanding that this is the only

14   physicochemical property that Dr. Williams identified with a

15   patent related to ibrutinib?

16   A.    I believe this is the area that he cites.  Yes, it's

17   the solubility of form A and form B, the two polymorphic

18   forms, form A.

19              THE WITNESS:   Form B and the solubility of form

20   A at two pH's, the lower pH, 1, 2, 3 areas for information

21   about solubility in the stomach potentially and then the

22   higher pH's around six or so for information in the

23   gastrointestinal tract.  That's how a formulator would use

24   that information and then provides one solubility value for

25   form B at a high pH relative to the pH's in the

1    gastrointestinal tract.  So 7.4.

2    BY MR. ABHYANKAR:

3    Q.    Is this information here sufficient to tell or to

4    guide a formulator to practice the full scope of claim 27?

5    A.    No, it's not.  It isn't telling me anything about the

6    solubility about any of the other forms, the amorphous form

7    to start with, so, no, not enough.

8    Q.    And has Dr. Williams identified any specific

9    physicochemical properties other than the aqueous solubility

10   of forms A and B recited anywhere in the '231 patent?

11   A.    I believe he has made statements that there are other

12   pieces of information, but they're not in a format useful to

13   a formulator.

14   Q.    Let's turn to slide 34, please.  No.  Go to slide 32,

15   please.

16             Are these the purported physicochemical

17   properties of ibrutinib that Dr. Williams pointed to?

18   A.    Some of them, so he points to or states low bulk

19   density, for example, and there are two densities reported,

20   one for, you know, one for each form and not form A and B

21   and I right now can't remember the forms that are

22   associated.  I think it's E and F, and it's a calculated,

23   simulated density calculation that was, that was done based

24   on structure.  And there's no information about partition

25   coefficient in the specification.

1    And then the aqueous solubility with only for

2    form A and one value for form B.

3    Q.    And even if a formulator had all of this information

4    and it was disclosed in the '231, would that change your

5    opinion as to whether a POSA, as to whether the '231 patent

6    guides a POSA to fill in the gaps from what is otherwise not

7    disclosed in the specification?

8    A.    No.    The -- what little information is presented in

9    the specification doesn't provide anywhere, doesn't provide

10   sufficient information to give a formulator the information

11   they actually need to develop or -- to formulate all

12   possible formulations for oral use.

13   Q.    And, Dr. Donovan, is there any specific information in

14   the '231 patent that you are aware of that references

15   specifically that ibrutinib suffers from poor

16   bioavailability?

17   A.    I don't recall seeing anything in the specification

18   that describes anything about ibrutinib's bioavailability.

19   Q.    So let's go to the state of the art, back to slide 36,

20   Mr. Ferrare.

21        In your opinion, Dr. Donovan, if you could

22   highlight number 5, please, does the state of the art help

23   fill in the gaps with the lack of guidance in the

24   specification?

25   A.    No, it doesn't.    There isn't any further art about

1    ibrutinib in particular than what is in the specification

2    and the rest of the art is not adequate, especially, you

3    know, and you can go back to the art about all of the

4    pharmaceutical formulation, the art about the lubricant and

5    so forth.  The state of the art doesn't, doesn't supply the

6    information necessary.

7    Q.    And is that because the claim covers any oral dosage

8    form?

9    A.    That's certainly one of the reasons, that all possible

10    oral dosage forms and the specification doesn't provide the

11    information that a formulator would need to not need to --

12    to conduct an accepted number of experiments that would

13    actually be able to accomplish the scope of the claim.

14    Q.    And if we could go to DTX-2430, please.  And, Dr.

15    Donovan, what is this document?

16    A.    This is a discovery document that the plaintiffs wrote

17    and presented.

18    Q.    And if we could turn to the top of page 42.  Plaintiff

19    states here that ibrutinib was a particularly challenging

20    compound to formulate for numerous reasons.  For example,

21    ibrutinib is nearly insoluble in water.

22            Do you see that?

23    A.    I see that, yes.

24    Q.    And what does plaintiffs' own statement suggest with

25    start of the regard regarding ibrutinib?

1    A.    The statement is telling us that the state of the art

2    was that there would be -- the plaintiffs recognize there

3    would be challenges to formulating ibrutinib.

4    Q.    Well, let's turn back to slide 36, Mr. Ferrare.  If we

5    could next turn to the skill in the art.

6              Do you believe that the skill in this particular

7    formulation art is high?

8    A.    Yes, I do.  Even my definition of POSA describes an

9    educational level and experience level that would be

10   considered high.

11   Q.    Does that high level of skill in your opinion overcome

12   the challenge and the obstacles that we've seen with respect

13   to the various factors you've analyzed?

14   A.    Not, not in light of the breadth of the claim, no.

15   Q.    And if we could turn to the predictability or

16   unpredictability of the art, number seven, I think we've

17   touched on this a bit, but briefly, how would you

18   characterize the predictability of the art as relates to

19   claim 27?

20   A.    I would characterize it as unpredictable, relatively

21   unpredictable in almost all of the cases.  For all possible

22   oral formulations, and when we're dealing with

23   multicomponent mixtures, so the required specific material

24   and the variability among the polymorphs is specific in the

25   dosage forms.  It becomes very difficult to predict the

1    behavior and the result of formulations in almost all

2    cases.

3    Q.    And so, finally, if we could turn to the first factor,

4    quantity of experimentation necessary.

5              Given your analysis of the factors and the scope

6    of claim 27, how much experimentation would be necessary to

7    practice the full scope of claim 27?

8    A.    To practice the full scope of the claim, a tremendous

9    amount of experimentation would be necessary because -- I

10   will go back to my introductory slide with all the arrows on

11   it.

12             There would be a tremendous amount of iterative

13   processes for each possible dosage form that was going to be

14   formulated at each level of -- with each polymorph of

15   ibrutinib and containing those vast ranges of material that

16   are specified for the formulation.  So just a huge amount of

17   experimentation would be required to practice the full

18   scope.

19   Q.    And I think we touched on this in your background

20   discussion, but do even small changes to a formulation

21   impact the functioning of that formulation?

22   A.    Sure, they can, especially, especially small changes

23   in lubricant.  It's well-known in the art that small changes

24   in lubricant can cause significant changes in the

25   performance of the formulation.

1   Q.   And does the fact that small changes can affect the

2   performance of a formulation also affect the amount of

3   experimentation that's required?

4   A.   Yes, sure, because you both need to do a lot of

5   experiments to arrive at the value or values of components

6   in the formulation that you would want, and then you have to

7   understand if you have small variabilities in those, to what

8   extent that's going to impact your final formulation and

9   will it impact the actual therapeutic use or outcome in the

10  intended patient population.

11  Q.   So to conclude, Dr. Donovan, what is your opinion on

12  whether or not it would require undue experimentation to

13  practice the full scope of claim 27?

14  A.   It's my opinion it would require undue experimentation

15  to practice the full scope.

16  Q.   And as a result goes is it your opinion that claim 27

17  is invalid for lack of enablement?

18  A.   Yes.  My opinion is that claim 27 is invalid for lack

19  of enablement.

20           MR. ABHYANKAR:  Thank you, Your Honor.  I tender

21  the witness for cross.

22           THE COURT:  All right.  Thank you.

23           Can we hold up, Ms. Andersen?

24           MS. ANDERSEN:  Yes, Your Honor.

25           THE COURT:  Okay.  Thank you.  Go ahead.

1    **CROSS-EXAMINATION**

2    BY MR. ANDERSEN:

3    Q.   Good afternoon, Dr. Donovan.  I'm Erica Andersen.  I

4    will be asking you some questions today.

5    A.   Good afternoon.

6    Q.   Did you receive a box, maybe a couple boxes of

7    documents that --

8    A.   Yes.

9    Q.   -- we sent you?

10   A.   I received two boxes.

11   Q.   Okay.  Do you have those with you?

12   A.   I do.

13   Q.   Okay.  Great.  And they're open and --

14   A.   No, they are not.  I was instructed not to open them,

15   so I did not.

16   Q.   You can open them now if you wouldn't mind.

17   A.   I will step away for just a moment, open both of them

18   and I will be right back with you.

19   Q.   Great.  Thanks.

20            (Pause.)

21            THE WITNESS:  All right.  Thank you.  I have

22   them opened now.

23   BY MR. ANDERSEN:

24   Q.   Great.  And, Dr. Donovan, I'd like to turn first to

25   PTX-965, Sandoz's overall quality summary.

1    MR. ABHYANKAR:  Ms. Andersen -- Your Honor, I'm

2    not sure this document was even cited in Dr. Donovan's

3    report.

4              THE COURT:  And it's cross-examination.

5              MR. ABHYANKAR:  This is a -- this is our -- this

6    is our ANDA, Your Honor, that she didn't analyze.  I don't

7    think she has ever seen this document.

8              THE COURT:  Well, so let's wait to see what the

9    question is.  I mean, I assume Ms. Andersen is saying, get

10   ready, look at the document.  I'm going to start asking.

11   Let's hear what the question is.

12   BY MR. ANDERSEN:

13   Q.   And I would like to go to page 80, to the section

14   called '10.  What is the rationale for excipient selection?

15   Let me know when you are there.

16   A.   So is it page 80 -- never mind.

17             THE COURT:  Hold up.  Ms. Andersen, I mean, I

18   don't think it's appropriate cross-examination just to have

19   a witness read a document.  What's the question?

20             MS. ANDERSEN:  The question is:  Looking at this

21   section, Sandoz looks at our reference product, they reverse

22   engineered it and they looked at the literature data in

23   order to formulate their product.  Correct?

24             MR. ABHYANKAR:  Again, Your Honor, I renew our

25   objection.  She hasn't established the witness has ever seen

1    this document.

2                    THE COURT:  Okay.  So, look, I think it's an

3    appropriate question if she wants to say, isn't it true that

4    Sandoz was able to formulate or, you know, whatever, Sandoz

5    formulated a drug.  That's okay if she knows, if the witness

6    knows.

7                    I am at a loss, though.  I mean, I don't

8    understand.  I mean, the document is what it document is.

9    If this witness isn't authenticating it, I don't understand

10   why we're having essentially a witness just confirm what's

11   in a document.

12                   MS. ANDERSEN:  Yes, Your Honor.  The point is,

13   and I will get to that, the specification of the '231 patent

14   is the very source of data that a POSA, that a company like

15   Sandoz could use to formulate.

16                   THE COURT:  Okay.  Why don't you get to that?

17   Why don't you just go there without having her read a

18   document?

19                   MS. ANDERSEN:  Okay.

20   BY MR. ANDERSEN:

21   Q.   The specification, Dr. Donovan, of the '231 patent is

22   a source of data a company like Sandoz could look to for

23   information about the reference product; is that correct?

24   A.   I -- they could look to the, the '231 for information

25   about the crystal forms of ibrutinib, but there is no

1    specific information about what I define as the reference

2    product that I'm aware of that's contained in the '231.

3    Q.    Dr. Donovan, I would like to take a look at your slide

4    DDX-7-9.  And there you list pre-formulation testing a POSA

5    would want to perform in order to characterize the active

6    ingredient; is that correct?

7    A.    That's correct, yes.

8    Q.    And i would like to discuss some of the information

9    provided about ibrutinib in the '231 patent specification.

10   Two of the items you have up here is polymorphism and

11   crystallinity?

12   A.    That's correct.

13   Q.    Let's take a look at JTX, column 30, starting at --

14             THE COURT:  JTX what?

15             MS. ANDERSEN:  JTX-11, column 30.

16             THE COURT:  Thank you.

17   BY MR. ANDERSEN:

18   Q.    And starting at line 44 --

19   A.    And can I ask, do I have a hard copy of the '231

20   included in any of these materials?

21   Q.    Yes.  There should be a copy included in the binder of

22   materials, yes.

23   A.    Can you guide me?  I have three binders.  Can you

24   guide me what the DTX-number is?

25   Q.    JTX-0011.

1    MR. ABHYANKAR:  Dr. Donovan, maybe tab one.

2    THE WITNESS:  I found it in the

3  cross-examination material.  Thank you.  Can you tell me

4  what column you highlighted?

5  BY MR. ANDERSEN:

6  Q.    Column 30, starting at line 44.

7  A.    Okay.

8  Q.    And that states, in some embodiments, compound 1 is

9  amorphous and anhydrous; correct?

10  A.    That's what this says, yes.

11  Q.    And compound 1 is ibrutinib; is that correct?

12  A.    That's my understanding, yes.

13  Q.    And from column 30 to 36, those columns discuss

14  particular properties of crystalline form A, B, C, D, E and

15  F of ibrutinib; is that correct?

16  A.    Well, they describe the -- refresh my memory about

17  these columns.  And they're primarily focused on the X-ray

18  diffractograms and IR spectra, and they do have information

19  about from DSC and some about TGA on some of the compounds.

20  Q.    Okay.  And let's turn to Example 2 in column 66

21  starting around line 50.  That example is entitled X-ray

22  powder diffraction XRPD; is that correct?

23  A.    Which lines in column 66?

24  Q.    Starting around line 50.

25  A.    Okay.

Donovan - cross

1  Q.   Example 2, X-ray powder diffraction.

2  A.   Okay.

3  Q.   And so the example is entitled X-ray powder

4  diffraction; right, Dr. Donovan?

5  A.   It's titled X-ray powder diffraction, yes.

6  Q.   And looking at column 66, starting there, you agree

7  that Example 2 provides a protocol for how to determine XRPD

8  patterns performed with ibrutinib; correct?

9  A.   Yes, you know, from line 54 to the end of that column,

10  certain it's describing how one would set up the X-ray

11  powder diffractogram.

12  Q.   And then continuing on, continuing on in that example

13  in column 67, starting at line 37, there are six XRPD peaks

14  for form A.

15  A.   Described, you mean?

16  Q.   Yes.

17  A.   Yes, that's what's given.

18  Q.   And then right under that, line 41 through 42, it

19  states that the crystallinity of form A was unaffected

20  after one week under two different sets of storage

21  conditions.

22       Do you see that?

23  A.   I see that.

24  Q.   And then right under that, there are five XRPD peaks

25  for form B; correct?

1   A.   Yes.

2   Q.   And under that, it says, the crystallinity of form B

3   was unaffected after one week under two different sets of

4   storage conditions; is that correct?

5   A.   That's what it says.

6   Q.   Column 67 at lines 50 through 55 provides nine XRPD

7   peaks for form C; is that correct?

8   A.   Maybe I can't count.  No.  I seem to be only counting

9   eight.

10  Q.   I got nine, but eight or nine peaks for form C?

11  A.   I got -- right.  I'm sorry.

12  Q.   And column 67, lines 56 through 57 states:  The

13  crystallinity was unaffected after one week under two

14  different sets of storage conditions?

15  A.   That's what it says.

16  Q.   If you look at the figures in the patent, XRPD

17  patterns are provided there for forms A through F; is that

18  correct?

19  A.   My recollection, let me -- yes.

20  Q.   And on your slide -- DDX-7-9, you also identify

21  melting point; is that correct?

22  A.   Yes.

23  Q.   Let's go to Example 5, column 69 where that example

24  begins.  And this example discusses DSC data; is that

25  correct?

1    A.    I'm sorry.  The sound cut out.  What did you say?

2    Q.    The example discusses DSC data; correct?

3    A.    Yes, it does.

4    Q.    And Example 5 reports a peak at about 157 degrees for

5    Form A?

6    A.    Yes.

7    Q.    And looking at the top of column 70, Example 5

8    identifies a peak in the DSC at about 115 to 118 degrees for

9    form B?

10   A.    Yes.

11   Q.    And starting at around line 8 of column 70, a peak in

12   the DSC at about 137 to 139 degrees for form C?

13   A.    Yes.

14   Q.    And Figure 3 in the patent is the DSC for form A?

15   A.    Yes.

16   Q.    Figure 7 is the DSC for form B?

17   A.    Yes.

18   Q.    And Figure 10 is the DSC for form C?

19   A.    Yes.

20   Q.    And Figure 15 has the DSC for form E?

21   A.    Yes.

22   Q.    Turning back to your slide DDX7-9, you also identify

23   hygroscopicity?

24   A.    Yes, I did.

25   Q.    Now, let's turn to Example 6 in the patent, columns 70

1   through 71.  And that example sets forth parameters for

2   determining hygroscopicity; is that correct?

3   A.    Yes, it does.

4   Q.    And at the bottom of column 70, the patent further

5   reports that form A is not hygroscopic.

6   A.    Under the conditions that were used to measure, yes.

7   Q.    That means form A under those conditions doesn't

8   absorb water; right?

9   A.    As measured, it was not shown -- as measured, it was

10  not deemed to be hygroscopic.

11  Q.    Your slide DTX7-9 also discusses aqueous solubility?

12  A.    Yes.

13  Q.    On direct you said that's a very important property to

14  know; is that correct?

15  A.    Correct.

16  Q.    Turning to example seven in the patent in column 71,

17  that is entitled thermodynamic aqueous solubility?

18  A.    Yes.

19  Q.    It provides an HPLC method for analyzing ibrutinib;

20  correct?

21  A.    Well, I think it provides the HPLC method used for the

22  solubility measurements described in that section, which

23  were for form A and likely used for form B, but I'm not sure

24  that's entirely clear.

25  Q.    And so that HPLC method in example 7 was used to

1  assess the solubility of ibrutinib for different pHs?

2  A.    That, that would be what the reader would bring from

3  that information in the column, that HPLC method measures

4  the solubility under the conditions described for --

5  Q.    And at the bottom of column 71, it also says that the

6  solubility, it also provides the solubility of form B at a

7  pH of 7.42?

8  A.    It states something about the solubility of form B, a

9  pH, yes.

10  Q.    Let's turn to example eight at the top of column --

11  top of column 72.  And that example provides a method for

12  determining chemical purity; correct?

13  A.    That's what that example states, yes.

14  Q.    And chemical purity can be information on stability;

15  is that right?

16  A.    I think only indirectly.  If you're using the chemical

17  purity assay as your material assay when you are conducting

18  a stability study, I guess it could, but purity and

19  stability are not necessarily -- chemical purity

20  determinations are not always utilized in stability

21  analyses.

22  Q.    But you could use it to determine, for example,

23  whether there were degradation products of ibrutinib?

24  A.    I don't know actually.  I don't know enough about this

25  chemical purity determination to determine whether it was

1  able to identify degradant products of ibrutinib or not.

2  Q.    Your slide DDX-7-9 also lists density; is that

3  correct?

4  A.    Yes.

5  Q.    And in 2012, a POSA would have been able to perform

6  testing to assess the bulk density of a compound; is that

7  right?

8  A.    Yes, they could have.

9  Q.    And DDX-7-9 also lists particle size, particle

10  morphology and surface area; is that right?

11  A.    That's right.

12  Q.    And in 2012, a person of skill would have been able to

13  perform testing to assess those characteristics as well; is

14  that right?

15  A.    Potentially.  Sometimes it's compound dependent, but,

16  yes, potentially.  There were technologies and

17  instrumentation available to the POSA to conduct those

18  experiments.

19  Q.    And let's go to your slide DDX-7-13.  That's one of

20  your slides entitled formulation design pathway for oral

21  formulation.  And here you've highlighted the text; is that

22  correct?

23  A.    That's correct.

24  Q.    Design and test prototype formulations and modify

25  approach or materials based on results.

1    And I would like to go to column 44 of the '231

2  patent, line 14 through 22.  Just let me know when you are

3  there, Dr. Donovan.

4  A.    I'm there.  I'm just reading.

5  Q.    And that portion of the patent provides the

6  manufacturing techniques; correct?

7  A.    They may be used as manufacturing techniques.  They

8  may just be used as preparation techniques, but they're,

9  they're a method that are used to treat material in

10  pharmaceutical preparations.

11  Q.    I'd like to turn to Example 12 now, which starts at

12  column 74, line 55.

13    Example 12 is entitled, safety and tolerability

14  study of compound 1 in chronic lymphocytic leukemia.

15    Do you see that?

16  A.    I see that.

17  Q.    It provides a clinical study for all humans using an

18  orally administered dose of 420 milligrams; correct?

19  A.    It provides a protocol.  It provides no information

20  about whether that study was ever conducted or what the

21  results were.

22  Q.    And I'd like to turn to example 13 in example 75, and

23  that's entitled, safety and efficacy of compound 1 in

24  subjects with relapsed refractory mantle cell lymphoma.

25    Do you see that?

1    A.    Yes.

2    Q.    And Example 13 as well provides a clinical study for

3    in humans using a 560 milligram dose of ibrutinib

4    administered in multiple capsules; is that correct?

5    A.    Can you point out what line it describes multiple

6    capsules?

7    Q.    Compound 1, line 53.  Compound 1, 560 milligrams a day

8    in the form of capsules.

9    A.    Okay.  I'm not sure that that tells me that it's in

10   multiple capsules.

11   Q.    But capsules were administered in Example 13?

12   A.    It was administered in the form of capsules, yes.

13   Q.    And finally, let's go to example 14 entitled Phase 2

14   study of combination of compound 1 and rituximab in high

15   risk chronic lymphocytic leukemia and small lymphocytic

16   lymphoma patients.

17             Example 14 provides a Phase 2 study using an

18   orally administered dose of three times 140 milligrams of

19   ibrutinib capsules.  You see that?

20   A.    I do see that.  Yes, again.  It is the first conducted

21   and data being obtained.

22   Q.    You looked at Example 11 in the '231 patent in your

23   direct; correct?  I believe that's Table 6.

24   A.    Yes.

25   Q.    And in your opening report, you called Example 11 a

1   working example.

2           Do you recall that?

3   A.    Not specifically.

4   Q.    Okay.  If we could go to your opening report at

5   paragraph 29, please.  And I believe you should have a

6   binder with your report, Dr. Donovan, but we'll bring that

7   up as well.  29.

8   A.    Okay.  Which report is it that we're looking at?

9   Q.    Your opening report?

10  A.    Okay.  What page?

11  Q.    Paragraph 29.  29.  Yes.

12  A.    Okay.  So I see on the screen as what I've seen in the

13  hard copy.  I'm in the same place.

14  Q.    And you called Example 11 a working example of the

15  patent; is that correct?

16  A.    I called them working examples that were given in the

17  patent, but they might not meet the, all of the description

18  of claim 27.

19  Q.    But a person of skill would look to the entire

20  specification, including the working example of Example 11;

21  right?

22  A.    Well, they, they would -- they would see that in the,

23  in the specification, certainly.

24  Q.    And Example 11 contains .25, 2.5 percent as a range of

25  magnesium stearate as a lubricant; is that correct?

1  A.    It's describing the level of magnesium stearate in

2  that general tablet formulation between .25 and 2.5 percent,

3  yes.

4  Q.    And you testified on direct that 15 percent of

5  lubricant could cause issues with the formulations; is that

6  correct?

7  A.    Yes.   15 percent of lubricant, you're going to have

8  characteristics of the lubricant now giving characteristics

9  to your final dosage form and those could be negative.

10  Q.    And a POSA would have understood that in 2012; is that

11  correct?

12  A.    A POSA was aware of issues caused by lubricants in

13  particular and other formulation components in 2012.

14  Q.    And a POSA would have known that if too high of an

15  amount of lubricant is used, the formulation could fail;

16  right?

17  A.    They would be aware that there have been manufacturing

18  and performance problems with high levels of lubricant.

19  Specific materials have specific properties and too much of

20  them in a formulation may lead to negative performance

21  attributes.

22  Q.    You looked at the Handbook of Pharmaceutical

23  Excipients and specifically the magnesium stearate portion,

24  the portion that stated the lowest possible concentration

25  should be used.

1    Do you recall that?

2    A.    I recall that, yes.

3    Q.    And a POSA would have known that as well in 2012; is

4    that right?

5    A.    That was known to POSAs in 2012, yes.

6    Q.    And a POSA in 2012 similarly would have understood

7    that effective lubrication could result in waterproofing of

8    tablets or delayed dissolution of the drug substance;

9    right?

10   A.    That had been reported in other formulations, yes.

11   Q.    I'd like to turn to DTX-2223, pharmaceutical

12   pre-formulation and formulation, Dr. Donovan, which is a

13   document you cited in your reply report; is that correct?

14   A.    Yes, it is.

15   Q.    And this is a book that a person of skill would have

16   had available in June of 2012?

17   A.    I believe the copyright that we infringe on this is

18   about 2002, so, yes, this would have been available to a

19   POSA.

20   Q.    Let's turn to page 413 of this reference.  And I would

21   like to look at table 11.9.  This is a list of lubricants

22   and their uses.

23           Do you see that?

24   A.    I see that.

25   Q.    Polyethylene glycol, 4,000 and 6,000 are listed.

1   A.   Mm-hmm.

2   Q.   And the level required listed as two to ten percent?

3   A.   I see that.

4   Q.   And looking in the '231 patent, JTX-11, column 5,

5   starting at line 63 and going over to column 36, that's the

6   list of different lubricants in the patent you looked at on

7   direct; right?

8              Column 45, please.  45.  No worries.  Starting

9   at line 63 and over to the top of 46.

10             And that's the list of lubricants you looked at

11  on direct; right, Dr. Donovan?

12  A.   It is, yes.

13  Q.   And polyethylene glycol 4,000 and 6,000 are listed in

14  the patent as well; right?

15  A.   Yes, they are.

16  Q.   I want to look back at the table on 413 of DTX

17  (inaudible).  There we go.  And there stearic acid is also

18  listed; is that correct?

19  A.   Yes.

20  Q.   And the level required is .25 to 2 percent; is that

21  right?

22  A.   That's what's reported in the table.

23  Q.   And if we could look back at the list of lubricants in

24  the '231 patent, stearic acid is also listed as a lubricant;

25  is that right?

1  A.    Yes.

2  Q.    And turning back again to the table on 413, sodium

3  sterile fumarate is also listed?

4  A.    It's listed in the table, yes.

5  Q.    And that's a lubricant used by Sandoz?

6  A.    I don't know.

7  Q.    And the level required column is .5, 2 percent?

8  A.    That's what the table says.

9  Q.    And looking at the '231 patent, at the bottom of 45,

10  sodium sterile fumarate is listed in the patent as suitable

11  lubricant as well?

12  A.    Yes, it is.

13  Q.    I'd like to go to your slide DDX-7-25, please.  And

14  there you indicated that claim 27 provides a range of

15  ibrutinib and the excipients; right?

16  A.    A range of the amount in the formulation and the

17  excipients?

18  Q.    Yes.

19  A.    Yes.

20  Q.    Including a 40 to 50 percent weight by weight range of

21  ibrutinib?

22  A.    Yes.  From claim 27, yes.

23  Q.    And it was your testimony these ranges are broad; is

24  that right?

25  A.    Yes.

1    Q.    I want to take a step back and I want to talk about

2    drug content for a moment.

3              Even for an approved drug product, some

4    variability in the amount of ingredient in each dosage form

5    is allowed; correct?

6    A.    Typically, yes.

7    Q.    For example, not every 140-milligram capsule made by

8    Sandoz is going to have exactly 140 milligrams of ibrutinib;

9    right?

10   A.    That's the usual understanding, yes.

11   Q.    And drug companies typically provide specification for

12   drug content uniformity to the FDA; is that right?

13   A.    Yes.

14   Q.    And they provide specifications for drug assay at the

15   FDA?

16   A.    What do you mean by drug assay?

17   Q.    Drug uniformity assays to the FDA.

18   A.    Can you -- can you be more specific about that?

19   Q.    Looking at the content of drug uniformity in the

20   product.

21   A.    I still don't understand what you're asking me --

22   Q.    Sure.

23   A.    What information is provided to the FDA.

24   Q.    So companies provide information on drug content

25   uniformity specifications to FDA; correct?

A. **They do.**
Q. **And those specifications can vary by as much as ten percent; right?**
A. **It depends.**
Q. **But they can vary by as much as ten percent; is that right?**
A. **Under the, under the general USP chapter on content uniformity, I suspect that it's about ten percent. I don't remember the exact numbers.**
Q. **Okay. I want to talk about what that means practically if it's about ten percent.**
**So let's say I have a formulation that's supposed to have about 45 percent weight by weight of ibrutinib. Okay?**
A. **Okay.**
Q. **And an assay measure that only reported 90 percent of that 45 percent would still fall within the specification; right?**
A. **It may. I don't know what the specification is, but if we're going to do plus or minus ten percent --**
Q. **And similarly, if you have a ten percent tolerance, you could have up to 110 percent of that 45 percent and still fall within the specification?**
A. **For the drug content, yes.**
Q. **Correct. So, in other words, if you did the math, the**

1  assay could report as low as 41.5 percent of ibrutinib and

2  as high as 49.5 percent of ibrutinib and still be within the

3  specification; is that right?

4  A.  I need to do the math, but what you have said strikes

5  me as being correct, yes.

6  Q.  And that would be the range that is tolerated for a

7  single formulation; is that correct?

8  A.  Not necessarily, because what is being described in

9  claim 27 and the amount, there's a situation where the

10  amount of ibrutinib measured in the tablet or whatever

11  tablet, a fine dosage form to think about, that the whole

12  tablet weight was lower by ten percent.  All the other

13  components were there, present in the correct proportion,

14  it's just the entire tablet weight was low.

15            Those content uniformity tests don't say

16  anything about the content, directly say anything exactly

17  about the content ratio of each of the components unless you

18  actually measure each of the components.

19  Q.  Right.  But the ultimate amount of ibrutinib could

20  be as high as 49.5 percent and still be in the

21  specification?

22  A.  I -- I'm not sure I know that I could agree with

23  that.

24  Q.  Okay.

25  A.  Because that would require me to assume that there

1  was, you know, some other combinations were too low by ten

2  percent and I'm not as familiar with that situation

3  occurring in manufacturing and testing.

4  Q.   Okay.  But if you had 110 percent drug content

5  uniformity specification, you could have an overage of up to

6  ten percent of active ingredient and still be within the

7  specification; is that right?

8  A.   What do you mean by overage?

9  Q.   The highest end of the range.  If you have a dose

10 content uniformity specification that varies from 90 to

11 110 percent of the amount, then you could have a tolerance

12 up to 110 percent of the active ingredient and still be

13 within the specification.

14 A.   Under some circumstances, that could be the case.

15 Q.   You talked about a number of different oral dosage

16 forms in your direct.

17 A.   Yes.

18 Q.   And I would like to look at your slide DDX7-22,

19 and there you state that the claims cover any oral dosage

20 form.

21       Do you see that?

22 A.   Yes.

23 Q.   When we look at claim 27, the claim requires

24 microcrystalline cellulose, croscarmellose sodium, sodium

25 lauryl sulfate and a lubricant.

1  A.    Yes, or a combination potentially.

2  Q.    And it's your opinion that the combination of

3  microcrystalline cellulose, croscarmellose sodium,

4  sodium lauryl sulfate and a lubricant like magnesium

5  stearate are standard terms for solid oral formulations

6  in particular?

7  A.    Those materials get used in a lot of formulations

8  intended for administration at a variety of sites, and so

9  the -- I don't agree in particular.  They are certainly used

10  in oral pharmaceutical formulations, but they are also used

11  in many other pharmaceutical formulations.

12  Q.    And, Doctor, you were deposed in this case?

13  A.    Yes, I was.

14  Q.    And you gave truthful testimony at that deposition?

15  A.    Yes, I did.

16  Q.    And I'd like to pull up your transcript, 118:16

17  through 119:6.

18            MS. ANDERSEN:  And I believe the deposition

19  transcript should be in her binder as well.

20            THE WITNESS:  Do you know the DTX number?

21            MS. ANDERSEN:  It should just be in your binder

22  with expert reports and have your transcript.

23            THE COURT:  So can I -- this is not the first

24  time this has happened.  I'm not used to the way folks, some

25  of the folks are referring to deposition transcripts.

1    You've got -- what's the pending question?

2             MS. ANDERSEN:  The pending question was:  It's

3    your opinion the combination of microcrystalline cellulose,

4    croscarmellose sodium, sodium lauryl sulfate and a lubricant

5    like magnesium stearate are standard materials for solid

6    oral dosage forms in particular.

7             THE COURT:  Okay.  She answered the question.

8    All right.  And then you say, you were deposed in this case.

9             Are you suggesting that the answer to the

10   question is inconsistent with what she testified at her

11   deposition?

12            MS. ANDERSEN:  Yes.  She just said she wouldn't

13   call them standard and at her deposition she said these are

14   standard materials for solid formulations in particular.

15            THE COURT:  Okay.  So why don't you just ask

16   her.  She said here, what she said is, these materials get

17   used in a lot of formulations.  I don't agree in particular.

18   They're certainly used.

19            So then why didn't you say, didn't you testify

20   that they were standard when you testified in your

21   deposition and she what she said?  I mean, I guess is that

22   what we're getting at?

23            MS. ANDERSEN:  That's what we're getting at.

24            THE COURT:  Let's do it that way.  We'll save

25   everybody a lot of time if that's how we do these instead of

1    going through the exercise of reading depositions.

2              THE WITNESS:  Thank you, Your Honor.

3              MS. ANDERSEN:  Yes.  Of course, Your Honor.  I

4    would like to go to DDX-261 --

5              THE COURT:  Ms. Andersen, I'm not saying you

6    should abandon this.  She might just admit that she said

7    something different in her deposition and maybe she won't.

8    If she won't, then you can confront her with her deposition.

9              I'm not telling you to move on.  It's just

10   confusing to me what -- I'm not even sure her answer is

11   exactly inconsistent with what she said, so why don't you

12   just ask her.

13   BY MR. ANDERSEN:

14   Q.   Dr. Donovan, at your deposition you testified that

15   solid formulations in particular contain combinations of

16   microcrystalline cellulose, croscarmellose sodium, sodium

17   lauryl sulfate and magnesium stearate; is that correct?

18   A.   In the context of that portion of my deposition, yes,

19   that those combinations are seen in topical oral dosage

20   forms.  Those materials are also seen in many other dosage

21   forms designed for administration at other relative

22   administrations.

23   Q.   I'd like to go to DTX-2261, the Handbook of

24   Pharmaceutical Excipients.  And you talked about the

25   handbook on direct; is that correct, Dr. Donovan?

1    A.    Yes, I did.

2    Q.    And a person of skill would have had access to the

3    handbook in 2012; is that right?

4    A.    Yes, they do.

5    Q.    I would like to turn to page 129 and this is the

6    monograph for crystalline -- microcrystalline cellulose;

7    correct?

8    A.    That's what it looks like on the screen.  Do I have a

9    hard copy of that?

10   Q.    I think it's in your direct binder, Dr. Donovan?

11   A.    I've got to get my direct binder then.

12   Q.    And let me know when you are there.

13   A.    My direct binder, I can find the monograph for

14   magnesium stearate, but not the monograph for

15   microcrystalline cellulose.  Are you sure it's in my

16   binder?

17   Q.    It should be.  We have it on the screen if it's not,

18   if it's not there.

19   A.    Okay.  Well, I will use the screen version because I

20   don't find it in my materials.

21   Q.    Thank you.

22              So if you turn to section seven of the

23   microcrystalline cellulose, applications in pharmaceutical

24   formulation of technology?

25   A.    Yes, okay.

1    Q.    It states, microcrystalline cellulose is widely used

2    in pharmaceuticals primarily as a binder/diluent in oral

3    tablet and capsule formulation.

4              Do you see that?

5    A.    I see that.

6    Q.    And that is something a POSA would have known in

7    2012?

8    A.    A POSA would have understood that microcrystalline

9    cellulose is used in oral tablet and capsule formulations,

10   yes.

11   Q.    Okay.  And I'd like to look at the monograph for

12   croscarmellose sodium, please.

13   A.    Okay.  I'm going to ask you in my answer that

14   regardless of what the monograph literally states,

15   microcrystalline cellulose is in plenty of other dosage

16   forms, nasal spray dosage forms in particular that I'm most

17   familiar with.

18   Q.    But to be clear, Dr. Donovan, this portion, the

19   applications in pharmaceutical formulations in technology

20   says microcrystalline cellulose is widely used in

21   pharmaceuticals primarily as a binder/diluent in oral tablet

22   and capsule formulations; right?

23   A.    That's the way the author chose to write that.  It's

24   used in a lot of pharmaceutical formulations.

25   Q.    I'd like to look at page 206.  I apologize if you

1    don't have it.  We thought you did.  That's on the screen.

2    That's the monograph for croscarmellose sodium?

3    A.    Can the person in charge of video increase the size of

4    that because I'm reading on a small screen.

5    Q.    And can you see that, Dr. Donovan?

6    A.    Yes, thank you.

7    Q.    And, again, looking at section seven, applications in

8    pharmaceutical formulation or technology states,

9    croscarmellose sodium is used in oral pharmaceutical

10   formulations as a disintegrant for capsules, tablets, and

11   granules.

12            Do you see that?

13   A.    Yes.  That's telling us how it's used in oral

14   pharmaceutical formulations.

15   Q.    And that's something that a POSA would have known in

16   2012; right?

17   A.    Yes.  It can be used in oral pharmaceutical

18   formulations as a disintegrant in capsule, tablets and

19   granules.  It can be used in other formulations also.

20   Q.    But the reference provides that it's used specifically

21   in capsules, tablets and granules; is that right?

22   A.    No, it doesn't provide that specifically.  It just

23   says, in oral formulations, it's used as a disintegrant.

24   Q.    In oral formulations?

25   A.    Well, it's used in oral formulations as a

1  disintegrant.

2  Q.    And continuing with disintegrants, I'd like to look

3  back at the '231 patent, JTX-11, column 44, line 63 through

4  65.

5        And this passage provides that disintegrants

6  help rupturing the dosage form matrix by swelling or

7  capillary action when moisture is absorbed into the dosage

8  form.

9        Do you see that?

10  A.    I see that.

11  Q.    And not all oral dosage forms are going to require

12  rupturing the dosage form matrix by swelling or capillary

13  action when moisture is absorbed; right?

14  A.    Can you repeat that again.

15  Q.    Not all oral dosage forms are going to require

16  rupturing the dosage form matrix by swelling or capillary

17  action when moisture is absorbed into the dosage form;

18  right?

19  A.    They might not require that and that characteristic

20  might be -- you know, it's a matter of the amount of

21  croscarmellose that's included, exactly how much swelling

22  and how much, whether we get to rupturing or not occurs.

23  Q.    For example, a solution wouldn't require rupturing

24  the dosage form matrix by swelling or capillary action

25  when moisture is absorbed into it; right?

1    A.    In its final composition as the solution, all of

2    the material in solution, no, it won't require that, but

3    during production or something, I don't know.  There's

4    nothing to tell me that -- stuff like that might not have

5    occurred.

6    Q.    Right.  But as a final solution, you agree it would

7    not occur?

8    A.    The disintegration action wouldn't occur, but the

9    substance that could act as a disintegrant might still be

10   in the solution.

11   Q.    But the disintegrating action would not occur; is that

12   correct?

13   A.    In the final composition in its final state, the

14   disintegrant would no longer be acting to rupture the

15   material, but it may have acted in the manufacturing or

16   formulation stage.

17   Q.    Turning from disintegrants to lubricants, you agree

18   that lubricants typically help with the handling and

19   manufacturing of the composition by reducing frictional

20   forces between formulation components and contact surfaces

21   of manufacturing equipment; right?

22   A.    In general, that's their most, that is their typical

23   primary purpose, yes.

24              THE COURT:  Hold on.  I'm sorry, Ms. Andersen.

25   I think Mr. Abhyankar is standing up.  Hold on.  Let me

1    switch my screen here.

2              Is there an objection?  You're standing?

3              MR. ABHYANKAR:  Oh, no.  I don't have an

4    objection, Judge Connolly.  I'm just standing here watching.

5              THE COURT:  You just popped up on my screen.

6              All right.  Sorry, Ms. Andersen.  I disrupted

7    your flow.  Sorry.

8              MS. ANDERSEN:  Not a problem, Your Honor.

9    BY MR. ANDERSEN:

10   Q.   And you would agree, Dr. Donovan, that frictional

11   physical forces between formulation components and contact

12   surfaces of manufacturing equipment are common for capsules

13   and tablets; right?

14   A.   In particular, on most of the high speed manufacturing

15   equipment, yes.

16             MS. ANDERSEN:  I have no further questions at

17   this time.

18             THE COURT:  All right.  Thank you, Ms. Andersen.

19             All right, Mr. Abhyankar, do you have any

20   followup, redirect?

21             MR. ABHYANKAR:  Just a few questions.  Can we

22   have a five-minute break, Your Honor, if that's okay?

23             THE COURT:  Well, if you have a few questions,

24   why don't we finish it out?

25             MR. ABHYANKAR:  Fair enough.

1    THE COURT:  Dr. Donovan, you're good to go for a

2 couple more minutes?

3    THE WITNESS:  Yes.  I'm fine, Your Honor.  Thank

4 you.

5    THE COURT:  All right.  Let's go ahead.

6    MR. ABHYANKAR:  Could you pull up JTX-11, column

7 3, beginning at line 62, column 4.  Column 3.  Column 3.  I

8 think it was line 62, column 4, line 25.

9                    REDIRECT EXAMINATION

10 BY MR. ABHYANKAR:

11 Q.    Dr. Donovan, do you recall Ms. Andersen directed you

12 to these portions or this portion of the specification

13 regarding the crystalline forms of ibrutinib described in

14 the '231?

15 A.    Yes, I remember.

16 Q.    Are these properties listed here, are those properties

17 of the crystalline form that a formulator is focused on

18 typically when designing a formulation?

19 A.    No, not typically.  The formulator anticipates that

20 the material that they have been given as the active

21 substance to formulate has been characterized somehow and

22 that there may be reasons during formulation to then use

23 X-ray powder diffraction to then evaluate the crystal form

24 of the material, but having the X-ray powder diffraction

25 parameters themselves as a guide, the crystal structure

1  itself is not typically a useful -- you know, the 2-Theta

2  angles and so forth don't directly tell a formulator about

3  compatibility with other materials or much of anything else

4  really about the substance.  But it's certainly important as

5  far as assuring and being able to test that you still have

6  the crystal form at the end of your formulation and

7  manufacturing process.

8  Q.    Got it.  And Dr. Williams did not point to any of

9  these properties, you know, for purposes of his opinions

10 regarding the '231 patent; is that right?

11 A.    Not that I recall.

12 Q.    And to confirm, the only aqueous solubility

13 information as disclosed in the '231 patent are forms A and

14 B?

15 A.    That is what I have found, that there's pH dependent

16 solubility information on form A and one solubility measure

17 for form B.

18 Q.    And I think, I think you testified about this earlier

19 with Ms. Andersen, but is aqueous solubility one of the more

20 important physicochemical properties a formulator would look

21 at when designing formulation?

22 A.    It's certainly a very important property because just

23 on a general basis, I have to be able to understand how or

24 project how the total dose that was administered is going to

25 go into solution at the site I'm going to administer at and

1  it doesn't necessarily have to do that all of the time, but

2  I need an environment where it's possible to have that

3  happen and so I need to know about the solubility even to

4  begin to identify an appropriate dosage form and then

5  knowing about the solubility tells me things about how that

6  drug substance may likely be absorbed or conditions I need

7  to try to put it into to have it.

8  Q.    And do you recall your question with Ms. Anderson

9  regarding using an amount of lubricant up to 15 percent

10  formulation?

11  A.    Somewhat vaguely.

12  Q.    In your opinion, would a POSA know what the dividing

13  lines would be between the amount of lubricant that would

14  work in a formulation versus the amount of lubricant that

15  wouldn't?

16  A.    No, because formulations are multicomponent mixtures

17  with material that performs multiple functions.  So just

18  knowing a value, no, they wouldn't know.

19  Q.    And if I could have Mr. Ferrare pull up slide, I think

20  it's 26, please.  And just to confirm, is claim 27 limited

21  to a capsule?

22  A.    No.  Claim 27 allows for any pharmaceutical

23  formulation for oral administration.

24  Q.    And it's not limited to a tablet?

25  A.    No.  It's limited to the formulations that we could

1  deliver orally.

2  Q.   A continued oral dosage form?  In your, any oral

3  dosage form?

4           THE COURT:  Just to be clear, Dr. Donovan, are

5  you sure it's any oral dosage form?

6           THE WITNESS:  Well --

7           THE COURT:  I'm saying that facetiously.  I

8  think we've established it three times.  Okay?  All right.

9  We're good.  Thank you very much for your testimony.

10          MR. ABHYANKAR:  All right.  Thank you.

11          (Witness excused.)

12          THE COURT:  All right.  We could take a break

13  now.  What's going to be next?

14          MR. ABHYANKAR:  I believe we have more

15  deposition testimony for Your Honor from one of the

16  inventors on the '231 patent and as well as the -- actually,

17  the main inventor on the '548 as well.

18          THE COURT:  And how long is that going to be?

19          MR. ABHYANKAR:  I believe it's around

20  30 minutes.  Is that right?  Forty, 40 minutes.

21          THE COURT:  Then what's after that?

22          MR. GUTMAN:  The direct examination of Dr.

23  Fassihi for the Alvogen matter.

24          THE COURT:  We'll take a ten-minute break.  When

25  we come back at 3:00, each side be ready to have a lawyer

1   talk about the significance of the testimony we've just

2   heard for the last couple hours to answer some questions I

3   might have about enablement law and written description law.

4   Okay?  It won't be long, but just designate somebody,

5   please.

6              All right.  I will talk to you at 3:00.  Thanks.

7              (Short recess taken.)

8                    -  -  -

9              (Proceedings resumed after the short recess.)

10             THE COURT:  All right.  So let's see.  Here are

11  my questions.  I'm trying to understand just as a matter of

12  law.  I never had a written description or enablement case.

13             So does everyone agree that the written

14  description must convey that the inventors were in

15  possession of the full scope of the invention at the filing

16  date?

17             Ms. Andersen, alphabetical order, you're first.

18             MS. ANDERSEN:  I think the full scope language

19  really comes from enablement law, not written description.

20  Certainly, it has to describe the invention, show the

21  inventors we're in possession of it, but the full scope

22  language I think really comes from enablement.

23             THE COURT:  Frankly, that's the language that's

24  hanging me up and I wanted to talk about it.

25             So the bottom line is you're saying you don't

1  agree, that that is not a fair statement of the law, that

2  it's overstating it for written description?

3          MS. ANDERSEN:  I think that to the extent they

4  are saying that every single possible conceivable

5  formulation has to be described in the patent, which is what

6  the full scope sounds like, that is certainly not the law.

7          THE COURT:  Okay.  Ms. Clayton, it was your

8  slide.

9          MS. CLAYTON:  Yes.  Your Honor, I do believe

10  that's the language that is used.  I don't -- I don't

11  disagree that, you know, if you were to do a combination

12  permutation calculation of that claim, you would come up

13  with, I don't know, tens of thousands of formulations.  Not

14  every single formulation would have to be explicitly set

15  forth, but you do have to at least set forth, for example,

16  the ranges, right, of the lubricant that you are claiming.

17  And here they have not even come close to setting forth that

18  particular range.

19          THE COURT:  All right.  Well, let me stop you

20  there.

21          So for starters, are you telling me that at some

22  point you're going to show me a case which is going to say

23  point blank that for the written description to pass muster,

24  it must convey that the inventors were in possession of the

25  full scope.  There's going to be some case law that says it

1    has to be the full scope of the invention?

2            MS. CLAYTON:  Yes, I believe that's true, Your

3    Honor.  I think I can have a cite for you in just a moment.

4            THE COURT:  Okay.  All right.  But even you as

5    you acknowledge, let's assume some of the case law says

6    that.  I mean, it strikes me, I also know there are cases

7    out there that say, hey, ranges are permissible.  Right?

8    You can have a range.

9            MS. CLAYTON:  Right.  We don't disagree with

10   that.

11           THE COURT:  At some point, to Ms. Anderson's

12   point, if you have a range, you have an infinite number of

13   points within the range.  Right?  You agree with that?  It

14   can't just be the law that you have to prove every single --

15   that just wouldn't make sense.  The law can't be that.  But,

16   on the other hand, I'm inferring from something you said,

17   that you are going to take the position, and I guess the

18   question is:  Does the case law support this, that you do

19   have to at least in the written description convey both ends

20   of the range that's claimed.

21           Is that your position?

22           MS. CLAYTON:  That is certainly our position.

23   Yes, Your Honor.

24           THE COURT:  And you think there's case law out

25   there that says that?  The minimum and the maximum of the

1  claims range has to be taught or conveyed in the written

2  description?

3          MS. CLAYTON:  I don't know if it specifically

4  talks about ranges, about the language that's used, but I do

5  believe there is case law that supports that general

6  proposition.

7          THE COURT:  Ms. Andersen, what's your reaction

8  to that?

9          MS. ANDERSEN:  My reaction is that this shows

10  possession commensurate with the scope.  It doesn't require

11  what Ms. Clayton is suggesting.  I mean, the Ariad cases

12  said you don't even need an example to have written

13  description, so I don't think it's the case that, you know,

14  you have to show both ends of the range of some working

15  example.  You just have to show possession of, that the

16  inventors possessed formulations commensurate with the claim

17  and I think we have done that.  We've shown our working

18  examples and that a POSA could work from them.  We've also

19  shown there are a lot of properties of the active compound

20  and so I don't agree with what Ms. Clayton is saying.

21          THE COURT:  Mr. Gutman, do you have anything to

22  add?

23          MR. GUTMAN:  I do, Your Honor.  With respect to

24  ranges, I think I can clarify that issue.

25          You don't need to -- in order to claim a range,

1  a range is defined by the endpoint, and so you really have

2  to have possession of the defined range, which means in the

3  specification, you must say that the range is set out with

4  these end points.

5  So you can't say, like, let's say there's a

6  range 1 to 100, but you set out in the, in the specification

7  5 to 23.  You can't claim a range of 1 to 100 if you don't

8  have a description in your specification that defines the

9  claimed range.

10  THE COURT:  All right.  I get it.  You and Ms.

11  Clayton are on the same page.  This is going to be a legal

12  question.  But I will tell you what I will do is, I don't

13  want briefs, but if anybody wants to get me, you know,

14  Monday or Tuesday, like, the best case or two that you think

15  supports these two different positions, because I think I

16  understand the positions, and I will take a case.  You can

17  do a cover letter that says, hey, here are the cases that we

18  think best address the issue of what is required to

19  establish the full scope of the invention for the written

20  description requirement.  Okay?  All right.

21  MR. GUTMAN:  Your Honor --

22  THE COURT:  Yes?

23  MR. GUTMAN:  May I just address the second point

24  very briefly about possession of a genus?

25  THE COURT:  I didn't ask --

1    MR. GUTMAN:  The full scope, the full scope of

2  the claim, what that means in the context of written

3  description law.

4    THE COURT:  Well, I think I kind of asked for

5  that.  For me, I just want this, this is what I'm looking

6  for.  Do you want to show me the range?  I don't want to get

7  into this genus thing.  I think that's a bigger question and

8  we've got to tackle that before lunch.  And I just think

9  we'll never finish this evening.  So let's save that.  I'm

10  going to come back to that incidentally.  I think that's a

11  huge issue.

12    So I've got a quick question for you all.  There

13  was some testimony in the depositions this morning that

14  refer to crystal structure.  I'm going to assume crystal and

15  crystalline are synonymous when we're talking about crystal

16  structure and crystalline structure.

17    Do you agree, Mr. Gutman?

18    MR. GUTMAN:  Yes Your Honor.  A crystal is

19  crystalline.

20    THE COURT:  Do you agree, Ms. Clayton?

21    MS. CLAYTON:  Yes, I agree, Your Honor.

22    THE COURT:  Mr. Sipes, do you agree?

23    MR. SIPES:  For purposes of this case, if you

24  want to hear to something referred to as crystalline

25  ibrutinib, it's means it's in a crystal form.  That's

1  correct.

2       THE COURT:  There was deposition testimony from

3  the inventors.  They start talking about crystal structure

4  and nobody said anything about it.  I'm just assuming that

5  is the exact same thing as crystalline structure.

6       MR. SIPES:  Without having it right in front of

7  me, I believe that would be the case.  I've hate to speak

8  for the inventors without having the exact passage in front

9  of me, but I believe that would be the case.

10      THE COURT:  Okay.  All right.  Then last thing,

11  I'm going to let you, both sides, submit cases.  And I'm not

12  looking for argument and I won't read argument.  Here's what

13  I'm inviting a submission of cases for.  And basically, it's

14  this.  Is a POSA precluded from considering information that

15  was disclosed in a patent application or patent that should

16  not have been disclosed in that application or patent under

17  the applicable regulations that govern patent applications

18  and patents in the PTO?  All right?  Does that make sense?

19  You are looking a little perplexed, Mr. Sipes.

20      MR. SIPES:  I will confess I'm not quite sure

21  what it's germane to.

22      THE COURT:  Well, here's what it's germane to.

23  I thought you would know exactly what it's germane to.

24      I've got an expert witness who says even though

25  he's not a lawyer, he's a POSA, he's a scientist, he

1    wouldn't look at an international patent that's referenced

2    by incorporation because he has got a slide that tells him

3    some patent regulation says it shouldn't have been in that

4    application.

5            And when I heard this, as you can probably tell

6    from my questioning of him, I thought that sounded -- it was

7    incredible to me that a POSA would be precluded from looking

8    at what is in a public document.

9            And so like I'm thinking to myself, so if the

10   Patent Examiner made a mistake and allowed something to be

11   put publicly in a patent, I'm going to be shocked if the

12   case law says that we should go back and pretend it was not

13   disclosed in the patent, and a POSA wouldn't have considered

14   it.

15           But maybe Alvogen has a different view.  I mean,

16   I think they must have a different view, so I don't want

17   argument on it, but what I want is case law.  Not that I

18   expect anybody to be able to find a case, but if there's a

19   case out there that says somehow we're supposed to pretend

20   that it doesn't exist in the mind of a POSA in a public

21   document because apparently it didn't comport with.  And

22   it's not clear to me it did not comport with the disclosure

23   of the IPO, but putting that aside for the moment, we'll get

24   that in post-trial briefing perhaps.  Let's at least follow

25   through on that.

1    So does everybody understand the mission if you

2 have a case?  Mr. Gutman, you are the one I think that's

3 actually going to have to come up with a case that says

4 this.

5        Do you understand the question?

6        MR. GUTMAN:  I believe so, Your Honor.

7        THE COURT:  Okay.

8        MR. SIPES:  Your Honor, and we will do our best

9 to find cases that address -- you know, our position is they

10 were not forbidden from using the priority application to

11 address the -- but I understand the question.

12        THE COURT:  Yes.  It's just hard for me to

13 think, you could probably come up with a hypo, something.

14 Maybe there's a case that some trade secret was disclosed

15 publicly and should that be considered by a POSA, you know,

16 something like that.

17        MR. SIPES:  I understand.  We will, we will look

18 for something.

19        THE COURT:  Okay.

20        MR. SIPES:  Your Honor, as well as long as we're

21 making case law submissions, if we find a case addressing a

22 genus of crystalline form, we will submit that as well.  If

23 we find a case.

24        THE COURT:  Mr. Gutman should have and Ms.

25 Clayton as well.  I mean, yes.  I mean, I'm not looking for

1  briefing, but I'll saying if you find a good case, that you

2  say, hey, this might help me as I listen to the rest of the

3  evidence, yes, that's fine.

4          MR. SIPES:  We will look for that, Your Honor.

5          THE COURT:  All right.  That goes for everybody.

6  Okay.

7          MS. CLAYTON:  Your Honor, just to be clear,

8  you did mention enablement, but on enablement, you would be

9  interested in that type of case law?  We believe we have a

10  case that's literally on all fours with the '231 patent.

11          THE COURT:  Here's the thing.  I notice Ms.

12  Andersen, you know, I opened up by saying I had some

13  questions on written description, enablement, and I asked

14  did anybody disagree with your slide definition of written

15  description and what Ms. Andersen said was, full scope

16  she thought really was enablement law, not written

17  description law, and so because of that, I thought, it

18  sounds like, and I thought let's tackle this written

19  description thing first.

20          MR. SIPES:  We can submit cases on enablement,

21  too, Your Honor, just so that you have it.

22          THE COURT:  That's fine.  Mr. Gutman, Ms.

23  Clayton, go ahead.  You guys can do the same thing.

24          MS. CLAYTON:  You just want the cases,

25  nothing else, just the cases that you think are best for

 1   the issues?

 2            THE COURT:  When say issues, I was really trying

 3   to narrow the issues.

 4            MS. CLAYTON:  Yes.  Written description and

 5   enablement with respect to Sandoz and I guess there's

 6   another issue with respect to Alvogen.

 7            THE COURT:  Right.  But keep in mind, it's not

 8   just with respect -- it's not like your entire case.

 9            MS. CLAYTON:  Understood, Your Honor.

10            THE COURT:  All right.  So then here is the last

11   thing I'm going to do and I know it's a lot of work, but you

12   know what, I'm going to have to work all weekend.  So what

13   I'm going to allow you to do is this.  With the claims that

14   have been put in issue to date for both infringement and

15   invalidity, I'm going to let you, the three of you submit to

16   me on Monday essentially a decision tree and it's going to

17   be, you know, you take the claim and for infringement or

18   validity.  You just, you say, here are the questions and in

19   the order I should answer them.  All right?  That if you

20   were me, if you were making -- I don't want you to provide

21   substantive answers.  I just want you to ask the questions.

22   And, you know, so the question, let's say, number one, you

23   know, did Alvogen infringe, you know, whatever claim -- I'm

24   sorry, they are all jumbled in my head right now.

25            I don't mean I want the law.  What I mean is I

1     want specifically, you know, did Alvogen do this?  I would

2     like you to narrow.  I would be very intrigued by the three

3     of you for every claim when it comes to infringement or

4     invalidity that's at issue giving me the order of the

5     specific question I ought to ask.

6              Again, if you start just quoting me from the law

7     and all of that, I probably won't even read it.  I am

8     looking for the specific, hey, here's what you'd better

9     focus on to answer this question.

10             Does that make sense?

11             MS. CLAYTON:  Yes, Your Honor.

12             MR. SIPES:  It does Your Honor.  You may know

13     from my opening, I like decision trees.  We'll put them

14     together.

15             THE COURT:  Thank you, all.  Any other questions

16     on that, Mr. Gutman?  Do you have a question?

17             MR. GUTMAN:  No.  I understand your last point,

18     Your Honor.  One thing that I wanted to suggest because

19     most of the issues that are being submitted to Your Honor

20     are with respect to questions that you had concerning,

21     for example, Sandoz's patents at issue, you had raised

22     some questions yesterday regarding inherency.  I mean, we

23     can submit cases to you that answer some of your questions

24     regarding inherency because I think that would be of

25     value in considering the issues pertaining to the '455

patent as opposed to the '548 patent, which only applies

to Sandoz.

THE COURT:  But I thought you basically -- I

thought the plaintiffs backed off on that position about

inherency, whether I should consider the ANDA.

I thought --

MR. GUTMAN:  Oh, yes.  No.  I was talking

more -- I apologize, Your Honor.  I was speaking more to

Your Honor's questions regarding what is the law of

inherency with respect to anticipation.

You seem to --

THE COURT:  Inherency and anticipation.  Oh, I

see.  No briefing, but if you have a good case that you

think really explains -- the issue I was grappling with is,

you know, basically, it just seems to me there's at least

some intersection of the idea of inherent anticipation with

obviousness and trying to figure out how do you -- how do

you distinguish between those two.  If you've got a case

that helpfully discusses that, I will read that case.

I don't want to read just kind of cases

generally about anticipation and that kind of thing.  All

right.

MR. GUTMAN:  I understand, Your Honor.

THE COURT:  All right.  Thanks.  All right.

Thank you, all.

1      MR. SIPES:  Thank you.

2      THE COURT:  Let's go forward.

3      MS. CLAYTON:  Your Honor, at this time we're

4  going to introduce the deposition testimony of Mr. Norbert

5  Purro.  He is one of the named inventors on both the '548

6  and '231 patents as well as the '455 patent.

7      Mr. Purro is a former employee of Pharmacyclics

8  and was one of their 30(b)(6) witnesses.  He was deposed by

9  the defendants on November 12th, 2019.

10     You will hear 46 minutes and 26 seconds of

11  testimony.  Twenty-three minutes and 10 seconds will be

12  charged to defendants and 23 minutes and 16 seconds will be

13  charged to plaintiffs.

14     THE COURT:  All right.  Thank you.

15     (The videotaped deposition of Norbert Purro was

16  played as follows.)

17     "Question:  Thank you, Mr. Purro.  Good morning.

18  Could you please state your full name and address for the

19  record?

20     "Answer:  My full name is Norbert Maximilian

21  Purro.  I live at 15460 Corrine Drive in Los Gatos,

22  California.  Zip, 95032.

23     "Question:  Mr. Purro, let's just go through

24  your background.  Can you tell me about your educational

25  background?  Did you get an undergraduate degree?

1    "Answer:  I have an undergraduate degree from

2  Switzerland where I went to school.  I graduated in 1979,

3  which is what -- what would be roughly equivalent to a

4  bachelor's degree in the U.S.

5    "Question:  What degree did you graduate with?

6    "Answer:  Chemistry.

7    "Question:  Any particular discipline or just

8  chemistry generally?

9    "Answer:  I did a -- I also studied

10 pharmaceutical sciences, which is called ganik in German.

11   "Question:  Sorry, sir.  Could you say that

12 again?

13   "Answer:  Ganik, G-A-N-I-K.

14   "Question:  And did you receive a degree in

15 pharmaceutical sciences?

16   "Answer:  I got a certificate for finishing my

17 school as a chemist.

18   "Question:  Did you have any experience working

19 with pharmaceutical formulations as part of your course

20 work?

21   "Answer:  Yes, I did.

22   "Question:  Okay.  Can you provide some

23 background on with a types of --

24   "Answer:  The way my schooling was structured,

25 that I was actually working for Ciba-Geigy as I was

1      attending school and I was doing intern work at Ciba-Geigy

2      for three years at different disciplines.  One was solid

3      oral dosage forms.  One was semi-liquids.  And the third one

4      was parenteral formulations.  So I received training and

5      schooling in these three disciplines.

6               "Question:  Where did you go after that?

7               "Answer:  I joined Pharmacyclics.

8               "Question:  Is that in 1993?

9               "Answer:  I left Hybritech in January of 1994,

10      to be precise.

11               "Question:  Okay.

12               "Answer:  I joined Pharmacyclics in February of

13      1994.

14               "Question:  What was your role at Pharmacyclics

15      when you joined in 1994?

16               "Answer:  I joined as a formulation scientist.

17      I was to formulate our parenteral products and find contract

18      manufacturers that can manufacture them for us so we can

19      use them as clinical trial materials for our -- for our

20      studies.

21               "Question:  Let's go back.  How long were you at

22      Pharmacyclics?  From 1994 to your until when?

23               "Answer:  Until 2012.

24               "Question:  What were your responsibilities for

25      these lead development candidates?

1    "Answer:  The main responsibility was to a --

2    come up with a suitable formulation so they perhaps could be

3    evaluated in pre-clinical research and then develop that

4    into a suitable formulation that could be used in the human

5    clinical trials.

6         "If you find manufacturers that could

7    manufacture the clinical trial materials for us, and all

8    associated documentation, regulatory, specification

9    generation, et cetera, that would make it into a clinical

10   trial material.

11        "Question:  And when you say you came up with

12   suitable formulations, did you work with third-party

13   companies to do so?

14        "Answer:  We had in-house capabilities to

15   prepare formulations and to conduct animal studies.  So most

16   of that work was done by myself with my hands, okay.  At

17   times we used the contract laboratories for analytical

18   purposes for maybe methods that we didn't have in-house.

19        "Question:  Were you the only one at

20   Pharmacyclics that was responsible for formulating these

21   drugs?

22        "Answer:  Yes.

23        "Question:  Can you give me some background as

24   to your recollection of 2006 and what led to your

25   involvement with the BTK inhibitor that ultimately became

1    **ibrutinib?**

2    **"Answer. I was responsible for formulation**

3    **development. The company decided that we are going to**

4    **formulate all these BTK inhibitors, so I responded to that**

5    **by starting developing the compounds, as I stated initially**

6    **for a preclinical work.**

7    **"Question: What did you do when you started**

8    **developing the compounds? You can answer.**

9    **"Answer: I personally prepared formulations**

10    **that could be used in animal studies that the company**

11    **decided to conduct.**

12    **"Question: How did you prepare these**

13    **formulations?**

14    **"Answer: I was responsible for the formulation**

15    **development. I also had responsibility of my formulation**

16    **laboratory that allowed me to prepare formulations.**

17    **"Question: Did you -- were you responsible for**

18    **selecting the excipients that were incorporated into the**

19    **formulations, for example?**

20    **"Answer: I would choose the excipient -- the**

21    **excipients that were appropriate for the preclinical**

22    **studies, yes.**

23    **"Question: Were you responsible for choosing**

24    **the excipients that were used in the human clinical trials ?**

25    **"Answer: Yes.**

1    "Question:  Were you working with others in

2    developing the formulation for ibrutinib?

3    "Answer:  I was responsible for the development,

4    so I had some assistants from research assistance, some that

5    may have worked for me for a time or two.  But I drove the

6    development.

7    "Question:  Mr. Purro, I've handed you what's

8    marked as Defendants' Exhibit 3.  Let me know if you

9    recognize this document?

10    "Answer:  This is the e-mail that I wrote, so.

11    "Question:  Can you tell me what this e-mail is

12    about?

13    "Answer:  This was written on or about the time

14    when we were going to initiate the clinical trial

15    manufacturing.  I had worked with Pharmatek.  They were

16    my -- they were going to go to be my clinical trial

17    manufacturers, right.

18    "So I'm giving them some guidance on a -- what

19    appears to be a project plan.  They used to split up the

20    project plans into Phase 1, 2, 3, so forth.  So it looks

21    like I had reviewed the project plan and given some guidance

22    on -- on -- comments on the different faces that they

23    proposed.

24    "Question:  At the time you wrote this e-mail,

25    if you go to the fourth full -- fourth full paragraph down

1  where it says, 'we currently have two liquid formulations'.

2  "Do you see that?

3  "Answer:  Yes.

4  "Question.  At the time of this e-mail, did you

5  have two liquid formulations, one being a solution and

6  another a suspension for the PCI-32765 compound?

7  "Answer:  I cannot make that out from this

8  paragraph.

9  "Question.  Well, you wrote that, we currently

10 have two liquid formulations, one being a solution, the

11 other a suspension; right?

12 "Answer:  Yes.

13 "Question:  What did you mean by that?

14 "Answer:  Yes, so we must have had two liquid

15 formulations that we were using in pre-clinicals, right.

16 "Question:  And in the following paragraph, you

17 were asking Pharmatek to develop a capsule formulation that

18 is intended to replace the -- the liquid formulations that

19 you had already; right?

20 "Answer:  I can read what it says here.  Okay?

21 And the -- we would have provided Pharmatek with a proposed

22 formulation and asked them to develop that into a capsule

23 formulation that can be used in clinical trials based on our

24 leadership.

25 "Question:  Okay.  And this e-mail indicates you

1  were asking them to develop a capsule formulation to replace

2  the formulations that you had come up with, correct?

3          "You can answer.

4          "Answer:  We would be asking to develop a

5  material in the form of a capsule that we can take to

6  clinical trials.  So there's more steps than just a -- this

7  has to go into the GMP system.  So it has to be developed so

8  you can manufacture it.  That's what we're asking them to do

9  here.

10          "Question:  Is it fair to say, then, that

11  Pharmatek is a company outside Pharmacyclics that you worked

12  with to develop the formulation for PCI-327652?

13          "Answer:  Pharmatek is a company that we worked

14  with to prepare the capsules that we can use in human

15  clinical trials, and in that process, there needs to be some

16  adjustment so you can manufacture the capsule in a -- in a

17  reasonable manner.  And that's a collaborated effort.  The

18  formulation was given by us.

19          "Question:  What formulation did you provide

20  Pharmatek?

21          "Answer:  We provided the formulation that had

22  the excipients and the approximate ratios spelled out.

23          "Question:  Have you seen any documents that

24  show the formulation, including the excipients and the

25  approximate ratios, that you specifically provided to

1  Pharmacyclics?

2        "Answer:  I have seen a project plan, or we

3  asked them to evaluate the manufacturability with an

4  allowance to just one of the components, which is a -- which

5  was used as a diluent.

6        "Question:  So you've seen a project plan asking

7  them to evaluate the manufacturability of ibrutinib with one

8  of the components that was used as a diluent?

9        "Answer:  Yes.

10       "Question:  What about any other components, any

11  other components that were identified to Pharmatek by you or

12  anyone else at Pharmacyclics?

13       "Answer:  A project plan spelled it out

14  particularly, that the diluent may have to be adjusted in

15  order to -- to get a capsule that's full, which is a pretty

16  -- pretty common thing to do.

17       "Question:  Mr. Purro, you can proceed to answer

18  my question, which was, was Pharmatek responsible for

19  adjusting the diluent?

20       "Answer:  We had asked them to evaluate the

21  diluent.  We were responsible for accepting the parameters

22  that they came up with.  They were the manufacturers and are

23  best suited to evaluate that, bring it back to us and for us

24  to say, yes, that's good, or, no, that's not good.

25       "Question:  Were the excipients used in the

liquid formulations that you developed for the animal

studies the same excipients used in the capsule formulation

Pharmatek developed?

"Answer:  I would have to think no.  There

might have been overlap, but usually the excipients are

quite different for liquid than -- than the solid

formulations.

"Question:  If I understood your previous

testimony, it was Pharmatek that was responsible for

adjusting the excipients and then you would sign off on it;

is that right?

"Answer:  Pharmacyclics would sign off on the

batch records.  So that's the ultimate control that you have

over the formulation in the manufacturing process.  Without

that, manufacturing would not commence.

"Question:  Right.  But as far as what decisions

are made on the manufacturing side with respect to what

excipients were to be used, the amounts, those types of

things, Pharmatek was making those decisions.  Correct?

"Answer:  No.

"Question:  Was it solely you that was making

those decisions, Purro?

"Answer:  It was me representing Pharmacyclics

that made these decisions.

"Question:  When you say these decisions, what

1    do you mean?

2                "Answer:  Of what is going to be in the

3    formulation.

4                "Question:  Pharmatek had no involvement

5    whatsoever in deciding what went into the formulation of the

6    capsules; is that your testimony?

7                MS. ANDERSEN:  Asked and answered.

8                THE WITNESS:  We would consider their opinion.

9    If there was an issue where, hypothetically speaking, which

10   I guess I shouldn't do, if there was an issue with an

11   excipient that they couldn't use in the manufacturing

12   facility, we would obviously consider that.  But other than

13   that, no.

14               "Question:  You would consider their opinion.

15   So what were you asking Pharmatek to do?

16               "Answer:  We asked them to take our formulation

17   and make it so it can be prepared on the GMP for clinical

18   trial use.

19               "Question:  Is it your testimony today that they

20   did not change any of the formulation that you provided to

21   them?

22               "Answer:  We had talked about the diluent, okay?

23   So that's -- that's one thing that they did to adapt the

24   process and agreed to that.

25               "(Exhibit 4 was marked for identification and

1    attached hereto.)

2              "Question:  Mr. Purro, I've handed you what's

3    been marked as defendants' Exhibit 4.  Do you recognize this

4    document?

5              "Answer:  Yes.

6              "Question.  What is this document?

7              "Answer:  It's an IND Section, 3.2.P.2

8    pharmaceutical development.

9              "Question:  What does this document show?

10             "Answer:  This document shows the pharmaceutical

11   development as it was at the time of the filing of the IND.

12             "Question:  Okay.  If you go to page 2 of the

13   document, there's a summary presented there under the

14   heading 3.2.P.2 pharmaceutical development.

15             "Do you see that?

16             "Answer:  Uh-huh.

17             "Question:  Were you involved in preparing this

18   submission to the FDA?

19             "Answer:  Yes.

20             "Question:  Okay.  Were you involved in drafting

21   the summary presented on page 2?

22             "Answer:  Yes.

23             "Question:  Okay.  And then an additional dosage

24   strength, the next sentence, of 140 milligrams PCI-32765 was

25   developed and manufactured by Pharmatek beginning in

1  March 2010.

2           "Do you see that?

3           "Answer:  I see that.

4           "Question:  Pharmatek developed the

5  140-milligram PCI-32765 dosage strength?

6           "Answer:  It is -- later in the paragraph, it's

7  explained what they did, meaning that they adjusted the

8  amount of microcrystalline cellulose, and we directed them

9  to do so.

10           "Question:  We'll get to the excipients in a

11  second.  I'm asking about the dosage strength.

12           This document states that Pharmatek developed

13  the additional dosage strength at 140 milligrams, does it

14  not?

15           "Answer:  We asked them to do that.  It was

16  under our guidance and under our direction.  I asked them to

17  come up with a 140 dosage form that fit in between the 40

18  and the 200.

19           "Question:  You asked them specifically to

20  create an additional dosage strength of 140?

21           "Answer:  Yes.

22           "Question:  In the last paragraph it states, the

23  formulation process was transferred from Pharmatek to Aptuit

24  where it was modified to allow for mechanized capsule

25  filling.

1  "Do you see that?

2  "Answer:  I see that.

3  "Question:  Why was the formulation process

4  transferred from Pharmatek to Aptuit?

5  "Answer:  It was transferred to allow for

6  mechanized capsule filling.

7  "Question:  Why -- why did you want to allow for

8  mechanized capsule filling?

9  "Answer:  So the batch sizes could get scaled

10  up.

11  "Question:  And it states here that magnesium

12  stearate and API-glidant was added to the formulation to

13  improve the mechanized process.

14  "Do you see that?

15  "Answer:  Uh-huh.

16  "Question:  Did you come up with a concept of

17  using a diluent to allow you to reduce the dosage of a

18  dosage a form to a level that you would like in a set

19  unit?

20  "Answer:  In the case of ibrutinib, I came up

21  with the idea of using a diluent to bring the formulation

22  from a 200-milligram dose dosage strength down to a

23  40-milligram dosage strength.

24  "Question:  Okay.  Were you the first one to

25  come up with the concept of using croscarmellose sodium to

1  increase the disintegration rate of a capsule?

2          "Answer:  In the case of ibrutinib, I added the

3  croscarmellose sodium to increase the disintegration rate of

4  the ibrutinib capsule.

5          "Question:  Yeah.  Sodium lauryl sulfate is a

6  surfactant that increases PCI-32765 solubility in aqueous

7  media, right?

8          "Answer:  I see that this is stated here, that

9  sodium lauryl sulfate is a surfactant that increases

10  solubility in aqueous media.

11          "Question:  And who -- who came up with the idea

12  to use a glidant?

13          "Answer:  We did.

14          "Question:  Turn to page six of the

15  pharmaceutical development report.  In the section entitled

16  32P-23, manufacturing process development.  If you go to the

17  third -- sorry -- fourth paragraph down at the bottom of the

18  page, it states that, a third intermediate dosage strengths,

19  140 milligrams was developed by Pharmatek.  Do you see that?

20          "Answer:  Yes.

21          "Question:  And did you write this section,

22  Mr. Purro?

23          "Answer:  Yes.

24          "Question:  What did you mean by, a third

25  intermediate dosage strength, 140 milligrams was developed

1   by Pharmatek?

2            "Answer:  We needed an intermediate dosage

3   strength.  And we asked Pharmatek to figure out how we can

4   make 150-milligram dosage strength.  I already mentioned

5   that we instructed them that they can use more diluent as

6   needed to arrive at that 140-milligram dosage strength.  And

7   it says in here again, accept that the inner diluent is

8   used, just a final capsule.

9            "Question:  This states that Pharmatek developed

10   the dosage strength, does it not?

11            "Answer:  It says nothing about having developed

12   the formulation.

13            "Question:  Sure.  This is talking about the

14   fact that Pharmatek developed a dosage strength for

15   PCI-32765 at 140 milligrams; right?

16            "Answer:  Pharmatek developed the manufacturing

17   process via dilution.

18            "Question.  Well, look, Mr. Purro, there are

19   specific words used on this document.  The sentence reads, a

20   third intermediate dosage strength, 140 milligrams was

21   developed by Pharmatek.

22            "Answer:  Okay.

23            "Question:  Okay?  Do you agree with me there

24   that's what it says?

25            "Answer:  Yes, that's what it says.

1  "Question: Okay. And do you have any reason to

2  doubt the accuracy of that statement that was submitted to

3  the FDA?

4  "Answer: I'm a scientist and I wrote it as a

5  scientist. And for me, that was a -- that is an accurate

6  statement. And what is meant by develop is up to the

7  interpretation.

8  "Question: Up to the FDA's interpretation or up

9  to anyone's interpretation?

10  "Answer. Well, the word develop can be

11  interpreted by anyone.

12  "Question: Would it have been Pharmacyclics'

13  practice to include a statement that was ambiguous or false

14  to the FDA in an IND submission?

15  "Answer: Excuse me?

16  "Question: Would it have been Pharmacyclics'

17  practice to include a statement that was ambiguous or

18  false --

19  "Answer: No.

20  "Question -- to the FDA in an IND submission?

21  "Answer: No.

22  "Question: No?

23  "Answer: No.

24  "Question: So the statement included in here,

25  to the best of your knowledge, is accurate and true?

1    "Answer:  The statement is true.

2        "(Exhibit 6 was marked for identification and

3   attached hereto.)

4        "(Exhibit 7 was marked for identification and

5   attached hereto.)

6        "(Exhibit 8 was marked for identification and

7   attached hereto.)

8        "(Exhibit 9 was marked for identification and

9   attached hereto.)

10       "(Exhibit 10 was marked for identification and

11  attached hereto.)

12       "(Exhibit 11 was marked for identification and

13  attached hereto.)

14       "(Exhibit 12 was marked for identification and

15  attached hereto.)

16       "Question:  Mr. Purro, the court reporter is

17  handing you documents that have been marked 6 through 12.  I

18  will represent to you that these are the patents that you

19  have been identified or designated by plaintiffs to testify

20  about.

21       Are you familiar with these documents,

22  Mr. Purro?

23       "Answer:  I'm somewhat familiar with them.

24       "Question:  Okay.  Let's start with Exhibit 9.

25  Do you have that in front of you?  If you turn to the second

1    page, Mr. Purro, what is this document?

2              "Answer:  It's a United States patent.

3              "Question:  And it's a United States patent

4    9,725,455.

5              "Answer:  Correct.

6              "If I refer you to this patent as the '455

7    patent, will you understand what I'm talking about?

8              "Answer:  Yes, I will.

9              "Question:  All right.  And on the left-hand

10   column, there is a listing of inventors.

11             "Do you see that?

12             "Answer:  I see that.

13             "Question:  And it lists yourself first.  It

14   also lists a man named Mark Stephen Smyth.  It lists Erick

15   Goldman and it lists David G. Wirth:

16             "Do you see that?

17             "Answer:  I see that.

18             "Question:  Is it your understanding that all

19   four of these individuals are named inventors -- strike

20   that.

21             "Is it your understanding that all four of these

22   individuals are inventors of the inventions claim in the

23   '455 patent?

24             "Answer:  That is my understanding.

25             "Question:  Do you have any knowledge

1    independent of the fact that they are listed in -- on the

2    face of the patent as to whether they are inventors of the

3    inventions claimed in the '455 patent?

4              "Answer:  I have worked with two of the listed

5    inventors during my time at Pharmacyclics.  I know that they

6    were involved in the ibrutinib project.

7              "(Reporter clarification.)

8              "Answer.  They were involved in the ibrutinib

9    project, so I have no reason to doubt that they're not

10   inventors.

11             "Question.  What is your understanding of the

12   invention of the '455 patent?

13             "Answer:  There was -- there's lots of work

14   described in here.

15             "Question:  I'm asking you what your

16   understanding is.  If you have one, please tell it to me.

17   If you don't, tell me, that, too.

18             "This patent contains part of the work that I

19   did for Pharmacyclics.  That's how I understand it.  It is

20   not spelled out in the title of it, but it's in the body of

21   the document.

22             "Question:  Let's turn to column 78 of this

23   patent.

24             "If you go down to the bottom of the column, you

25   see there's a line 50.  It states:  What is claimed is.

1                  "Do you see that?

2                  "Answer:  I see that.

3                  "Question:  And you see under that is claim 1.

4  Do you see that?

5                  "Answer:  Yes, I do.

6                  "Question:  Claim 1 reads, a crystalline form A

7  of -- I'm just going to say ibrutinib -- that has an X-ray

8  powder diffraction (XRPD) pattern can comprising 2-Theta

9  peaks at 5.7 plus or minus .1 degree, 18.9 plus or minus .1

10 degrees and 21.3 plus or minus .1 degrees.

11                 "Do you see that?

12                 "Answer:  Uh-huh.

13                 "Question:  What is your contribution to claim

14 1?

15                 "Answer:  I do not write this patent.

16                 "Question:  That is not what I asked.  What is

17 your contribution to claim 1?

18                 "Answer:  What is my contribution?  Is that what

19 you're asking?

20                 "Question:  Yes.

21                 "Answer:  To claim 1?  I did not contribute to

22 claim 1.

23                 "Question:  Okay.  Let's go to claim 2.  Can you

24 read that to yourself and let me know what your contribution

25 to claim 2 is?

1         "Answer:  I did not contribute to the

2 crystalline forms.

3         "Question:  You didn't contribute anything to

4 the crystalline forms of ibrutinib?

5         "Answer:  I did not contribute to the

6 crystalline forms.  Okay.

7         "Question:  What did you contribute to claim 1

8 through 30 of the '548 patent?

9         "Answer:  Again, the patent that I contributed

10 to is listed under the Related Application Data, and I would

11 have to further review this.

12         "Claim 27 does mention a pharmaceutical

13 formulation that's using the crystalline form of claim 1,

14 which is ibrutinib and at least one pharmaceutically

15 acceptable ingredient.  I don't know exactly how to

16 interpret that.  I don't write -- I didn't write this

17 patent.  Okay.

18         "Question:  You had nothing to do with

19 identifying crystalline forms of ibrutinib during your work

20 on the ibrutinib project; is that correct?

21         "Answer:  I answered that.  I said, no, I did

22 not.

23         "Question:  All right.  So claim 27.  Any

24 other claims that you believe you contributed to in the

25 '548?

1    "Answer:  I can't answer with certainty, so I

2    don't know.

3    "Question:  Can you turn to Exhibit 10.  What is

4    this document, Mr. Purro?

5    "Answer:  It's a U.S. Patent 9,713,617.

6    "Question:  I'll refer to this as the '617

7    patent; is that okay?

8    "Answer:  Uh-huh.

9    "Question:  Again, the inventors listed here

10    are yourself, Mark Smyth, Erick Goldman Dave Wirth;

11    correct?

12    "Answer:  Correct.

13    "Question:  Was it your idea to come up with

14    an oral administration -- or oral formulation for ibrutinib?

15    "Answer:  That at some point was a company

16    decision to develop an oral -- an oral formulation, and I

17    came up with the oral formulation for ibrutinib.  That was a

18    directive that I received to accomplish a company goal.

19    "Question:  Did you do that by yourself?

20    "Answer:  Yes, I did.

21    "Question:  Did you -- so nobody else

22    contributed to the oral formulation of ibrutinib that is

23    claimed in claim 1 ?

24    "Answer:  I was responsible for the development,

25    for formulation development, at Pharmacyclics.  I was the

1    head of formulation development, and I developed this

2    formulation either directly or by directing another employee

3    to perform experimentation on behalf of the projects.

4            "Question:  So what do you mean without being

5    excessive?  So too much lubricant would be -- wouldn't

6    work?

7            "Answer:  There are ranges where a lubricant

8    would -- would -- would be excessive and you wouldn't

9    want -- wouldn't want to use it at that level.  It's --

10           "Question:  What ranges would those be?

11           "Answer:  That depends on the formulation.

12   Greatly depends on --

13           "Question:  If you can pull up Exhibit 6,

14   please.

15           "Do you recognize this document, Mr. Purro?

16           "Answer:  The document is a United States patent

17   10294231.

18           "Question:  So the '231 patent, if I refer to

19   that, refer to it that way, is that okay?

20           "Answer:  Yes.

21           "Question:  You have not made an ibrutinib

22   tablet formulation; correct?

23           "Answer:  I have --

24           "Question:  I'm sorry?

25           "Answer:  I have not.

1    "Question.  Now, how did you go about making the

2    ibrutinib capsule formulation?

3    "Answer:  I considered all the factors.

4    "Question:  So there are at least two instances

5    where you've had a capsule and tablet formulation contain

6    the same API that you have formulated that have made it to

7    human clinical trials, right?

8    "Answer:  Right.

9    "Question:  And in those two -- and in at least

10   those two instances, the capsule formulation that you

11   formulated, what -- strike that.

12   In at least those two instances, you formulated

13   the capsule formulation prior to formulating the tablet

14   formulation that contained the same API; correct?

15   "Answer:  Yes.

16   "Question:  Now, earlier you had mentioned that

17   you -- when you had worked on the ibrutinib capsule

18   formulation, you at least based your -- at least part of

19   your research and work on the solutions and suspensions.

20   "So my question for you is, in formulating

21   these, at least these two instances with the tablet

22   formulations, did you at least base your research in part on

23   the capsule formulation?

24   "You can go ahead and answer.

25   "Answer:  I would take the capsule formulation

1  into consideration.

2          "Question:  Why would you take the capsule

3  formulation into consideration?

4          "Answer:  Because it provides scientific data.

5          "Question:  What scientific data does it

6  provide?

7          "Answer:  Most importantly, the dissolution

8  profile.

9          "Question:  Anything else?

10         "Answer:  The dissolution profile.

11         "Question:  And besides the dissolution

12 profile, is there anything else that you would consider from

13 the capsule formulation in formulating the tablet

14 formulation?

15         "Answer:  It would, at the minimum, provide

16 compatibility data with the excipients used in the capsule

17 formulations.

18         "Question:  Anything else?

19         "Answer:  No.

20         "Question:  You mentioned that it would be under

21 the assumption that you would want to match the dissolution

22 profiles.

23         "Would you ever want to match a dissolution

24 profile when making a tablet formulation that's already been

25 formulated as a capsule formulation?

1   "That's already been formulated as a capsule

2   formulation containing the same API?

3   "Answer:  Yeah, you might want to do that.

4   "Question:  Why would you want to do that?

5   "Answer:  You would want to do that if you want

6   to change the format from a capsule to a tablet without it

7   impacting the in vivo performance.

8   "Question:  So when formulating a tablet

9   formulation where there was a prior capsule formulation that

10   contained the same API, you would consider the compatibility

11   of the excipients in the capsule formulation with the API in

12   formulating the tablet formulation that contained the same

13   API; is that correct?

14   "Answer:  Not correct.

15   "Question:  Why is that not correct?

16   "Answer:  You start from scratch.  I was saying

17   that it's nice to know if a certain excipient is compatible.

18   Doesn't mean you want to use it.  It's just nice to know.

19   You asked me what other information would you consider.  I

20   said dissolution and then I also said -- since I have

21   compatibility data, that would be something that I would

22   know.

23   "Question:  So you would not consider any of the

24   excipients or the way they interact with the API in

25   formulating the tablet formulation that was previously

1    formulated as a capsule formulation with the same API.

2    "Is that your testimony?

3    "Answer:  Starting from scratch to me means I

4    have all excipients available, even the ones that I

5    previously used in a capsule formulation.  I will not give

6    them priority, okay?

7    "Question:  Now, if you wanted to match a --

8    the -- a tablet formulation of the capsule formulation that

9    was previously formulated with the same API, you would

10    consider the -- the excipients that were compatible with the

11    API in the capsule formulation, correct?

12    "Answer:  Again, I would consider all

13    excipients.

14    "Question:  And are you aware of the specific

15    reference -- you mentioned that those are in the literature.

16    Are you aware of those particular references, or are you

17    just speaking generally?

18    "Answer:  Speaking generally that you're aware

19    that there's an excipient book out there and that's

20    obviously a key reference that every formulator will go

21    to.

22    "Question:  Now, that key reference you're

23    referring to is the Handbook of Pharmaceutical Excipients.

24    Is that correct?

25    "Answer:  Yes.

1         "Question:  And that would have been used

2 commonly for both capsule and tablet formulation, right?

3         "Answer:  Yes.

4         "Question:  You formulated the Imbruvica,

5 ibrutinib capsule formulation, correct?

6         "Answer:  Yes.

7         "Question:  I'm going to refer you to

8 Exhibit 10.  Exhibit 10 is the '617 patent, correct?

9         "Answer:  Exhibit 10.

10         "Question:  Exhibit 10?

11         "Answer:  Exhibit 10, you can refer to as the

12 '617 patent.

13         "Question:  I will direct you to column 78.

14         Looking at claim 1.  Looking at that

15 combination, how many different formulations would come

16 within that claim?

17         "Answer:  I'm sorry, how many formulations

18 followed in that claim?

19         "Question:  How many combinations would fall

20 within that claim?

21         "Answer:  Do you mean theoretically how many

22 could fall into that claim?

23         "Question:  Yes.

24         "Answer:  Having four variables, you'll end up

25 with an infinite number of combinations.

1    "Question:  Would you expect all those diluents,

2    disintegrants, surfactants, lubricants in combination to

3    work in an ibrutinib formulation?

4              "Answer:  No, I would not expect any combination

5    of any of the listed class of excipients to act in the same

6    way.

7              "Question:  And why would you not expect any

8    combination of any listed class of excipients to act in the

9    same way?

10             "Answer:  All these excipients, even though they

11   are in different classifications, they have different

12   properties and they will behave different, especially in

13   combination with each other.  If they didn't, we wouldn't be

14   able to formulate anything.  Everything would be the same

15   all the time.

16             "Question:  Would you need to test the different

17   combinations?

18             "Answer:  Of course.

19             "Question:  So my follow-up question is, when

20   you say of course you need to test the different

21   combinations, what kinds of tests would you need to perform?

22             "Answer:  Dissolution, disintegration,

23   stability.

24             "Question:  Any other tests?

25             "Answer:  That would be the focus, right.  There

1    might be other tests, but that would be the most important

2    test that I would conduct.

3                    "Question:  What would be some not as important

4    tests?

5                    "Answer:  Water content.

6                    "Question:  And when you say water content, what

7    does that mean?

8                    "Answer:  That means you measure how much water

9    is in -- in a capsule, and if that changes over time.

10                    "Question:  Any other tests?

11                    "Answer:  There's many others.  I gave you some

12    examples of the ones that are more relevant to the -- to the

13    testing.

14                    "Question:  When you say relevant to the

15    testing, do you mean relevant to the ibrutinib formulation?

16                    "Answer:  No.  Relevant to how you would

17    evaluate the pharmaceutical formulation in general, which

18    also would include the ibrutinib formulation.  But these

19    were general terms of what I would test for.

20                    "Question:  I'd direct your attention to

21    Exhibit 12.  And what is Exhibit 12?

22                    "Answer:  It's a United States Patent

23    10,294,232.

24                    "Question:  Okay if I refer to it as the '232

25    patent?

1    "Answer:  Yes.

2    "Question:  I'm going to direct you to column

3  78.

4    "Looking at claim 1 at the bottom of column

5  78 --

6    "Answer:  Uh-huh.

7    "Question:  -- how many different formulation

8  combinations would fall within claim 1?

9    "Answer:  I mean I can't really put a limit on

10  it, okay?  It could be -- it could be hundreds of different

11  combinations under these conditions.  Just by the fact that

12  it's one or more disintegrating agent right there, that

13  gives me hundreds of combinations.

14    "Question:  Sure.  How would you go -- how would

15  you go about determining whether each specific combination

16  of diluent, disintegrant, surfactant, lubricant works in the

17  ibrutinib formulation listed here in claim 1?

18    "Answer:  Okay.  Besides testing each and every

19  combination that you propose, there is a methodology that's

20  called designing experiments, where you could design an

21  experiment that would give you a little broader range when

22  you don't have to test each individual one.  That's kind of

23  a complicated approach, but regardless, to answer your

24  questions, you would have to experimentally test a lot of

25  formulations within that range.

1    "Question:  Okay.  I'd like to mark this as

2    Exhibit 19.

3    "(Exhibit 19 was marked for identification and

4    attached hereto.)

5    "Question:  It's a document entitled 3.2.P.2.2,

6    drug product formulation development.  And it is Bates

7    numbered IMBPCY00150028 to IMBPCY00150338.

8    "Have you seen Exhibit 19 before, Mr. Purro?

9    "Answer:  Yes, I have.

10    "Question:  And what is it?

11    "Answer:  This is the formulation development

12    section of the NDA.

13    "Question:  Does this exhibit describe, in part,

14    a number of ibrutinib formulations that you developed?

15    "Answer:  Yes, it does.

16    "Question:  You developed a number of capsule

17    formulations for ibrutinib, correct?

18    "Answer:  Yes.

19    "Question:  And you developed a number of

20    solution and suspension formulations for ibrutinib, correct?

21    "Answer:  Yes.

22    "Question:  I'd like to turn to Table 3 in

23    Exhibit 19.

24    "Answer:  Uh-huh.

25    "Question:  What information is contained in

1    this table?

2              "Answer:   These are formulation component and

3    compositions that were used in Phase 1 and 2 clinical trials

4    by Pharmacyclics.   They were prepared by Pharmatek.   They

5    prepared the clinical trial materials for us.

6              "Question:   And these are formulations, capsule

7    formulations, that you developed?

8              "Answer:   That is correct.

9              "Question:   And in the formulations listed in

10   Table 3, you tried different amounts of microcrystalline

11   cellulose.   Do you see that?

12             "Answer:   Yes.

13             "Question:   You tried different amounts of

14   croscarmellose sodium?   Is that right?

15             "Answer:   They are different amounts, but the

16   percentage is -- is the same.

17             "Question:   And you tried different amounts and

18   percentages of sodium lauryl sulfate; is that right?

19             "Answer:   Yes.

20             "Question:   And you tried different percentages

21   of the active ingredient; is that right?

22             "Answer:   That's correct.

23             "Question:   Sure.   Did you know without testing

24   the amounts of magnesium stearate with the combination of

25   the other excipients whether or not it was -- would be

1   successful as an excipient in the formulation that you

2   ultimately chose?

3               "Answer:  We did not know that.  We had to try

4   it out.  We did have formulations here that contain a higher

5   amount of magnesium stearate.  So it was a fairly safe

6   assumption that a lower amount would not affect the

7   performance of the formulation.

8               "Question:  So you had to conduct experiments in

9   order to know which range of magnesium stearate would be

10  appropriate in the ultimate formulation?

11              "Answer:  Yes."

12              (End of videotaped deposition.)

13              THE COURT:  All right.

14              MS. CLAYTON:  Your Honor, I believe Alvogen

15  intends to call its witness.

16              THE COURT:  Okay.  Great.

17              MR. HANNA:  Dr. Fassihi, can you hear us?

18              MR. SIPES:  I'm sorry, Your Honor.  We're ready

19  to proceed.

20              THE COURT:  Sorry.  I was on mute.  I didn't

21  realize it.  Yes, you should go ahead.  Sorry.

22              ...DR. REZA FASSIHI, having been duly

23  sworn/affirmed as a witness, was examined and testified as

24  follows ...

25  BY MR. HANNA:

1    Q.    Welcome back, Dr. Fassihi.

2    A.    Thank you.

3    Q.    I understand you created a set of demonstrative

4    exhibits?

5    A.    Yes, I did.

6    Q.    How did you create those demonstrative exhibits?  Can

7    you hear us, Dr. Fassihi?

8    A.    Yes, yes.

9    Q.    Okay.  How did you create those demonstrative

10   exhibits?

11   A.    I created them after consulting with Alvogen's

12   counsel.

13   Q.    Now, a few days ago, you discussed Alvogen's tablets.

14   Are there any drawbacks to formulating API in a capsule

15   dosage form?

16   A.    Yes.  There are a number of drawbacks.

17   Q.    And what are they?

18   A.    I have listed them in my slides.  So capsules

19   basically have a limited volume to contani the active

20   ingredient and excipients.  It can pick up moisture and

21   release moisture into the formulation, which makes it

22   unstable.  Capsules are too large to be swallowed by

23   patients and it interferes with compliance.

24   Q.    What happens if the required amount of API exceeds the

25   fixed volume of the capsule?

1    A.    Well, in that case, they just have to increase the

2    number of capsules the patient has to take.

3    Q.    Now, how would formulating the API into a tablet

4    dosage form address that problem?

5    A.    Well, tablets are basically a very advanced

6    consolidated powder.  Therefore, you can put much larger

7    amount of API together with excipients.  It makes advanced

8    tablets that account for a much larger goal.

9    Q.    If the amount of API in a capsule were a concern for a

10   pharmaceutical company, why not manufacture a bigger

11   capsule?

12   A.    Well, the capsule sizes are such that typically, I

13   think you have all taken Amoxicillin capsules, for example,

14   and that is the size number one or size number zero.  That

15   is our limit.  If it is anything larger than that, patient

16   cannot swallow.  So that is the limitation.

17   Q.    Now, if the amount of API in a capsule were concerning

18   to a pharmaceutical company, why not ask the patient to take

19   more capsules?

20   A.    I think what has happened, when it's large, often

21   patients have to take four or five capsules per day and that

22   is very inconvenient.

23   Q.    What is the most common route of administration for

24   pharmaceutical formulations?

25   A.    It's oral route of administration.

1   Q.    And what is the BCS system?

2   A.    The BCS is, BCS stands for Biopharmaceutics

3   Classification system.  It is a system developed by FDA to

4   basically define in terms of solubility and permeability.

5   Q.    How is ibrutinib characterized according to the BCS in

6   terms of its solubilities and permeability?

7   A.    It has been designated BCS Class II, which is low

8   solubility, high permeability.

9   Q.    What types of excipient are used in tablet

10  formulations?

11  A.    I have a demonstrative that I have that appears on the

12  slide.  Generally, what you need to make a tablet, you need

13  fillers, disintegrant, binders, glidants, lubricants and

14  surfactants.

15  Q.    Now, why are fillers or diluents used in tablet

16  formulation?

17  A.    Well, the tablets, they, they should be compressed and

18  therefore come to a stability consolidation is something

19  that depends on the characteristics of the fillers.  That's

20  what they use here.

21  Q.    And what is the most common filler used in tablets?

22  A.    Currently, I think lactose and also microcrystalline

23  cellulose.  Those are the main, main ones.

24  Q.    Why are disintegrants used in tablet formulation?

25  A.    Well, tablets are compressed in the tableting machine

1   as maybe thousands of kilogram host, so they are very strong

2   and damp and they need to be -- break apart once they come

3   in contact with water.  So we need disintegrant to break it

4   up.

5   Q.    And what is an example of a commonly used

6   disintegrant?

7   A.    The most common one is, for example, croscarmellose

8   sodium.

9   Q.    Why are binders used in tablet formulations?

10  A.    Once again, because tablets, they need the thread and

11  binders contribute to that function, that property of the

12  tablet to provide strands and therefore we need to use

13  binders.

14  Q.    What is an example of a commonly used binder?

15  A.    Again, most commonly used is polyvinylpyrrolidone.

16  Q.    Why are glidants used in tablet formulation?

17  A.    The tableting process is very fast.  In tablet making

18  pharmaceutical companies, they provide 5 -- 6,000 tablets

19  per minute.  That means the powder, which is blended

20  together as a formulation, has to flow into the machine.

21  For that reason, glidants are used and they help flow a

22  powder into the machine.

23  Q.    What is the most commonly used glidant?

24  A.    It is colloidal silicon dioxide, which is extensively

25  used.

1  Q.    Why are lubricants used in tablet formulations?

2  A.    Lubricants are used again because the compression

3  requires a lot of work.  So the consolidated tablet, it

4  stays in the machine and has to be ejected.

5              So lubricants are added to help ejection of

6  tablets from the machine so that the --

7  Q.    Are lubricants commonly included in tablet

8  formulation?

9  A.    Yes.

10 Q.    Now, what is the most commonly used lubricant?

11 A.    Magnesium stearate is the one that is extensively

12 used.

13 Q.    Why are surfactants used in tablet formulations?

14 A.    Often the formulation that, for example, use magnesium

15 stearate, if there's low solubility, magnesium stearate is

16 very hydrophobic.  So manufacturing formulators, they add a

17 hydrophilic surfactant to basically create a balance in

18 there.

19 Q.    What is a commonly used surfactant?

20 A.    The most commonly used is sodium lauryl sulfate.

21 Q.    Is it common for a formulator to formulate a tablet

22 with the same inactive excipient used in a prior capsule

23 formulation containing the same API?

24 A.    Of course.  If there already is a product which is

25 approved by FDA and on the market such as, for example, in

1  this case, as a capsule, that will be our starting point,

2  that we use the capsule.  Water is used there.  We try a few

3  times to see if it can be comparable.  If it cannot be

4  comparable, then we look for other resources such as

5  excipients and published information to basically to

6  experiment, routine experimentation to come up with a tablet

7  formulation.

8  Q.   And why is it common to include the same excipients

9  in tablet formulation previously used in a capsule

10  formulation?

11  A.   Well, it is from a regulatory point of view, a

12  laborious process, and if something is already there, the

13  approach is to use those that are FDA approved.  The FDA is

14  very confident with that and you need to play around with an

15  another two or three to build your tablets.

16  Q.   Are there any commercially available ibrutinib

17  products in the U.S.?

18  A.   Yes.

19  Q.   What are they?

20  A.   There are two products on the market, Imbruvica

21  capsule and Imbruvica tablets.

22  Q.   And when did FDA approve Imbruvica capsules?

23  A.   As I have shown on my slide, the capsule was approved

24  in 2013.

25  Q.   Is DTX-1413 the Imbruvica 2013 label?

1   A.   Yes, that's correct.

2   Q.   And when did it publish?

3   A.   That was published in November 2013.

4   Q.   What indications did FDA approve Imbruvica capsules

5   for in 2013?

6   A.   The indication for Imbruvica is for treatment of

7   mantle cell lymphoma.

8   Q.   And what is the recommended dose for treating MCL

9   according to the level?

10  A.   The label indicates 560 milligrams to be taken orally

11  once a day.

12  Q.   Are you aware of any changes to the recommended dose

13  for the indication for Imbruvica capsules?

14  A.   No changes.

15  Q.   In 2013, how much ibrutinib was formulated into each

16  Imbruvica capsule?

17  A.   Again, as the label shows, each capsule contains

18  140 milligrams, so in order to come up with a dose of 560,

19  which is essential for treatment, as they have said, patient

20  has to take four capsules and, of course, compliance with

21  that number of doses that one has to take is just literally

22  too much.

23  Q.   Do Imbruvica capsules contain any inactive excipients?

24  A.   Yes, it does.

25  Q.   And what are they?

1  A.     I have looked at the label again and they describe

2  croscarmellose sodium, magnesium stearate, microcrystalline

3  cellulose and sodium lauryl sulfate.  Yes.

4  Q.     Did FDA approve those excipients in combination with

5  ibrutinib as of 2013?

6  A.     Yes.

7  Q.     And, Dr. Fassihi, can you please provide a summary of

8  your opinions in this case?

9  A.     My opinion, I have looked at the '857 patent and I've

10 read the claim 30 and 37 of '857.  And based on what I have

11 looked at and I've read the literature, the claims are

12 invalid and obvious and also for lack of written

13 description.

14 Q.     And is there a particular date that you applied for

15 priority in terms of the prior art?

16 A.     Yes.  The priority date for '857 was March 10th,

17 March 3, 2015.

18 Q.     Please turn to JTX-0049.

19         Dr. Fassihi, what is JTX-0049?

20 A.     This is the represented patent, '857.

21 Q.     And if you continue on.  Did you review the

22 prosecution history in connection with the '857 patent?

23 A.     Yes, I did.

24 Q.     And why did you review the prosecution history?

25 A.     Just I wanted to understand the, you know, the claims

1   and I went back there.  I looked at prosecution history.

2   Q.   And is JTX-0049 the prosecution history that you

3   reviewed?

4   A.   Yes, it is.

5   Q.   Dr. Fassihi, were FDA approved solid oral dosage

6   formulations of ibrutinib publicly available prior to

7   March 3rd, 2015?

8   A.   I'm sorry.  Can you repeat the question?

9   Q.   Yes.  Were FDA approved solid oral dosage formulations

10  of ibrutinib publicly available prior to March 3rd, 2015?

11  A.   Of course.  The Imbruvica capsule was on the market as

12  of 2013, yes.

13  Q.   Does the Imbruvica 2013 label identify the amount of

14  ibrutinib in Imbruvica capsules?

15  A.   Yes, it does.

16  Q.   And does it identify -- is that the 140 mgs that we

17  looked at previously?

18  A.   That's correct.

19  Q.   Does the Imbruvica 2013 label identify the amount of

20  ingredients in the Imbruvica capsule?

21  A.   Not amount of ingredient, no.

22  Q.   Was there any prior art that described an Imbruvica

23  capsule formulation having the same API and excipients as an

24  Imbruvica capsule?

25  A.   Yes.  There was a publication '172 patent, which also

1    was from Pharmacyclics, which was published in 2013.

2    Q.    And is that DTX-1399?

3    A.    That's correct.

4    Q.    Where in the '172 publication does it describe an

5    Imbruvica capsule formulation having the same API and

6    excipient as an Imbruvica capsule?

7    A.    So if you -- here in the Table 5, and I'm looking at

8    third column in there, which shows 140 milligrams, and it

9    lists everything which is in the capsule.  It does say

10   capsule formulation on the top of the table.

11   Q.    And --

12   A.    So column 3 describes the crystalline compound 1,

13   which is ibrutinib.  It describes microcrystalline

14   cellulose, croscarmellose, sodium lauryl sulfate and

15   magnesium stearate.

16   Q.    Did the '172 publication only disclose ibrutinib

17   capsule formulations?

18   A.    No.  It also disclosed a tablet formulation.

19   Q.    And where in the '172 publication did it disclose a

20   tablet formulation?

21   A.    As I have shown on the slide, it is Example 11, Table

22   6, and it -- right below this example, immediate release

23   tablet.  The list of ingredients are there as well as the

24   range, percentage range of each.

25              So, for example, if you have crystalline

1    compound 1, which is a five percent ibrutinib, you have

2    hypromellose, lactose, magnesium stearate, and a percentage

3    range.

4    Q.    Now, what is hypromellose?

5    A.    Hypromellose is a binder that was added.

6    Q.    Dr. Fassihi, besides the '172 publication, were there

7    any other publications that described ibrutinib tablet

8    formulations prior to March 3rd, 2015?

9    A.    Yes.   In the publication of Goldstein in 2014, which

10   is a different slide.  That was published, also describes a

11   tablet formulation of ibrutinib.

12   Q.    And when you refer to the Goldstein reference, you're

13   referring to WO 2014/004707?

14   A.    That's correct.

15   Q.    And that's DTX-985?

16   A.    Yes.

17   Q.    How many tablet formulations are disclosed in

18   Goldstein 2014?

19   A.    I believe there are three examples there that relate

20   to solid dosage form.

21   Q.    With respect to tablets?

22   A.    Yes.

23   Q.    Now, what ingredients are included?  Does Goldstein

24   2014 describe any immediate release tablet formulation of

25   ibrutinib?

A.    Yes.   Both Example 2 and Example 3.   Let's look at
Example 2.   It says right on the top, ibrutinib and/or
pharmaceutically acceptable salt in non-enteric delayed time
released tablet press.   So it measures that.

        And in the first paragraph starting at to make
immediate release tablets of ibrutinib, and then they
describe all the limits and how to proceed.   And they
eventually make, get to the point for the end of the
paragraph, the powders are blended.   Powder blend is then
tableted using conventional tablet.   That is how the tablets
are made.

Q.    Now, what ingredients are included in the immediate
release tablets disclosed in Goldstein 2014?

A.    Well, it describes, these are in yellow highlight
ibrutinib.   Then there is microcrystalline, lactose, those
two together.   There's a starch.   Further, the sodium starch
glycolate, magnesium stearate and silicon dioxide.

Q.    Now, what is starch?

A.    Starch is the diluent and the binder that is used.

Q.    And what is sodium starch glycolate?

A.    That is a disintegrant.

Q.    Does Goldstein 2014 disclose the amounts of the
ingredients in its immediate release tablets?

A.    Yes.   In Example 2, which is on the right-hand side of
this description, this is a description of the, all of those

1  ingredients in kilogram amount.

2  Q.   Now, would a POSA have understood how to convert the

3  kilogram amount to weight-by-weight percentage?

4  A.   Sure.  Yes.  That's what I've done on the third

5  column.  That is my calculation that I've provided.  So

6  those are exact percentages of those kilogram quantities.

7  Q.   And so what were the weight percentages of each

8  ingredient in Goldstein's 2014 immediate release tablet?

9  A.   Ibrutinib was 80.9 percent.  Microcrystalline

10  cellulose with lactose together, 8.1 percent.  The starch,

11  7.3 percent.  Sodium starch glycolate, 3.2.  Magnesium

12  stearate, 0.3 percent.  Silicon dioxide.  0.2 percent.

13  Q.   And you said 80.9 percent.  Is that with respect to

14  ibrutinib?

15  A.   Yes.

16          THE COURT:  Stop for one second.  Go ahead.

17  Q.   Is Goldstein's 2014 immediate release tablet a high

18  load solid tablet formulation of ibrutinib?

19  A.   Yes, it is.

20  Q.   And why is it a high load solid tablet formulation?

21  A.   Well, you know, the tablets that contain 50 to

22  90 percent of the API are considered a high load

23  formulation.

24  Q.   And --

25  A.   Tablet.  Yes.

1    Q.    And why do you believe that the solid tablet

2    formulations, immediate release tablet formulation is a high

3    load tablet formulation?

4    A.    Well, this one has 80.9 percent, so that is very high.

5    I said between 50 and 90 percent is considered a high load

6    formulation.

7    Q.    You mentioned that Goldstein 2014 disclosed other

8    tablet formulations.  Can you please describe those?

9    A.    Yes.  Example 3 is another one, and it also describes

10   more or less the same components, I believe.  It is an

11   immediate release tablet using the same ingredients and it

12   has different, different amounts.

13   Q.    What was the weight percentage of ibrutinib in the

14   coated tablet disclosed in Example 3 of Goldstein?

15   A.    So these are the kilogram quantities of Example 3 and

16   I did the calculation and the ibrutinib contents of this

17   formulation was 60.98 percent.

18   Q.    And how did you determine that?

19   A.    Well, the kilogram quantity is there and the total of

20   immediate release, the total is 12.38 because the remainder

21   is the coating.  So we are looking at the tablet, the tablet

22   itself before coating dissolved.  So it's 4.36 kilograms,

23   and we have each of them in kilograms which  we can easily

24   calculate.  And based on that, 60.98 is the amount of

25   ibrutinib in that.

1    Q.    Does Goldstein 2014 require that the tablet

2    formulations described in Example 2 and three include a

3    delayed release or modified release coating?

4    A.    That is not a requirement, no.

5    Q.    How do you know that?

6    A.    Well, because it describes, you know, in Example 3, it

7    says it is an immediate release right at the beginning.  As

8    in Example 2 to make immediate release tablets, and it goes

9    on to describe it.  And you make your immediate release

10   tablets.  And then, further, if you want to coat it, then

11   you may or may not.

12   Q.    Does Goldstein 2014 identify the immediate release

13   tablet that you identified earlier as an intermediate?

14   A.    No.

15   Q.    Before March 3rd, 2015, how would a POSA know whether

16   a particular excipient was considered to be safe and

17   effective in humans?

18   A.    Well, the Handbook of Pharmaceutical Excipients is a

19   compendium that every, you know, POSA would look at the

20   FDA's added list.  Excipients that are regarded as safe.

21   Q.    And is DTX-1625 the Handbook of Pharmaceutical

22   Excipients.

23   A.    That's correct.

24   Q.    And what is generally in the Handbook of

25   Pharmaceutical Excipients?

1  A.    In the Handbook of Pharmaceutical Excipients, each of

2  the excipients has a description in terms of physical

3  properties, moisture content, so they give a full

4  description of each of the excipients in there so that we

5  can look and identify what we wanted.

6  Q.    And when did the Handbook of Pharmaceutical Excipients

7  publish, the version that you relied on?

8  A.    This is the third edition, which was published in

9  2000, but it was available before that.

10  Q.    Does the Handbook of Pharmaceutical Excipients

11  describe individually all the excipients in claim 30 and 37

12  of the '857 patent?

13  A.    Yes, it does.

14  Q.    And does the Handbook of Pharmaceutical Excipients

15  include recommended amounts for the excipients in claims 30

16  and 37 of the '857 patent?

17  A.    Yes, it does.

18  Q.    Prior to March 3rd, 2015, would a POSA have been

19  motivated to develop a high load solid tablet formulation of

20  ibrutinib?

21  A.    Yes.

22  Q.    And why is that?

23  A.    Well, because, you know, it is well established within

24  the pharmaceutical industry that you have capsules and you

25  always go ahead and make tablets.  Especially in this case,

1    because as I described earlier, patients have to take four

2    capsules each of 140 in order to have 560-milligram dose,

3    which is necessary for the treatment.

4               So in a situation like that, of course, a POSA

5    would be motivated to make a tablet which would have just

6    single dose, single tablet with other doses.

7    Q.    So would a POSA be motivated to develop tablet dosage

8    units contain more than 140 milligrams?

9    A.    Yes.

10   Q.    And why is that?

11   A.    Because, you know, so to help patients for improving

12   patient compliance and also making tablets is easier,

13   cheaper and faster.

14   Q.    Now, if a POSA thought to make a high load solid

15   tablet formulation of ibrutinib prior to March 3rd, 2015,

16   where would he begin?

17   A.    Well, the starting point would be what is already out

18   there, so they would look at the capsule and they try to

19   compress it.  If it doesn't compress, they start adding one

20   or two excipients which are known to have compressability

21   and that is how they start.

22              They also look at what is available, what other

23   sources of literature are there.  They would also look at

24   that.  It is a routine experimentation.

25   Q.    And what do you mean by routine experimentation?

1   A.      Routine experimentation is just that you have your

2   capsules, you have your active drug and already excipients

3   which are accepted by FDA.  They are compatible.  There is

4   no issue there.

5           So you start modifying the dose to see if you

6   can continue making the tablet.  You can also look at the

7   literature.  Prior to 2015, there's other literature like

8   '172, like 2014, they already have described tablet

9   formulations.  You use those information and you proceed and

10  you make your tablet.

11  Q.      Now, when you said 2014, were you referring to

12  Goldstein 2014?

13  A.      That's correct.

14  Q.      Earlier you had discussed glidants.  Would a POSA have

15  been motivated to use a glidant in consideration with a

16  formulation containing ibrutinib and the four excipients

17  disclosed in the Imbruvica capsules?

18  A.      For the reasons that I mentioned, when we make

19  tablets, the speed of tablet production is high, so every

20  POSA would know that powder has to flow well and uniform.

21  So a well-known glidant.

22  Q.      Now, are powder flowability issues a concern for

23  capsules?

24  A.      Not really, because capsule production is very small

25  and they don't need to be compared.  So it's not the major

1  issue.

2  Q.  Now, earlier you mentioned colloidal silicon dioxide

3  is commonly used as a glidant.

4            Was colloidal silicon dioxide used in an

5  Imbruvica tablet formulation before March 3rd, 2013?

6  A.  Yes.

7  Q.  Where is it used?

8  A.  In Goldstein 2014.  If you look at the Examples 2 and

9  3, in both of those colloidal silicon dioxide is one of the

10  excipients which is used.

11  Q.  Earlier you mentioned that microcrystalline cellulose

12  as a filler that was used in Imbruvica capsules.  Would a

13  POSA have been motivated to only use microcrystalline

14  cellulose is a filler in an Imbruvica tablet formulation?

15  A.  Well, they would use that, but because tablets have to

16  be consolidated, a POSA knows that consolidation and

17  compaction is a necessity to make tablets, so they would

18  look at other fillers which demonstrate good compatibility.

19  Typically, that is lactose.

20  Q.  Now, why would a POSA include lactose in his ibrutinib

21  tablet formulation?

22  A.  Similarly because to facilitate processing,

23  compactability and make the formulation.

24  Q.  Was there any literature that identified lactose in

25  combination with microcrystalline cellulose in that

1  ibrutinib tablet formulation?

2  A.    Yes.  Goldstein 2014, Example 2 and 3.  Both of them,

3  they used microcrystalline cellulose and lactose.

4  Q.    Any others?

5  A.    I believe also in '172 publication, it is also in the

6  examples here.

7  Q.    And why would it have been obvious to select lactose

8  instead of some other filler or use in combination with

9  microcrystalline in an ibrutinib tablet formulation?

10  A.    Well, the '172 publication is a Pharmacyclics

11  publication.  Goldstein also uses lactose.  So these are the

12  ones that they have usually have seen no issue with that, so

13  they -- you know, that's why the POSA would consider lactose

14  as desirable excipient to be added.

15  Q.    Would a POSA have been motivated to use a particular

16  form of lactose in making an ibrutinib tablet formulation?

17  A.    Lactose monohydrate is known to be highly compressible

18  and this information is actually in the Handbook of

19  Pharmaceutical Excipients that describes that.  So, yes,

20  lactose monohydrate would be the ideal one.

21  Q.    In addition to colloidal silicon dioxide and lactose,

22  would a POSA be motivated to include any other excipients in

23  a tablet formulation containing the four previously

24  discussed excipients in Imbruvica capsules?

25  A.    So as I mentioned, because tablets need to be bound

1   together, a strong binder would have been considered.

2   Q.   Why would a POSA have been motivate to use a binder in

3   an ibrutinib tablet formulation?

4   A.   As I mentioned, you know, you wants to use your binder

5   maybe to granulate, but at the same time, you provide a

6   thread to the tablet formation and tablets are to be hard

7   and consolidated, so binders are used.

8   Q.   Would a POSA have used hypromellose or starch in an

9   ibrutinib tablet formulation?

10  A.   I mean, in the examples, they were used, but a POSA

11  would also know that these are sources that is supplied and

12  there's always impurities in there.  For example, a starch:

13  Rice, potato, tomato sauce, and so on.  So they would rather

14  go for a superior binder.

15  Q.   And what kind of binder would they consider then

16  instead?

17  A.   They would consider, for example, a synthetic one,

18  which would be like polyvinylpyrrolidone.

19  Q.   And why would a POSA prefer to use a synthetic binder

20  in an Imbruvica tablet formulation?

21  A.   Well, it's more reliable.  You know, the suppliers are

22  consistently providing the same quality.

23  Q.   Is PVP a commonly used -- when I say PVP, you

24  understand I'm referring to polyvinylpyrrolidone?

25  A.   Yes.

1    Q.    Is PVP a commonly used binder in tablet formulation?

2    A.    Yes, it is extensive use.

3    Q.    Did any literature prior to March 3rd, 2015, identify

4    PVP as a binder that is compatible with ibrutinib in an

5    ibrutinib tablet formulation?

6    A.    Well, prior to that, yes, because polyvinylpyrrolidone

7    was used.  And so what was the question exactly?

8    Q.    Sure.  Did any literature prior to March 3rd, 2015,

9    identify a PVP as a binder that was compatible with

10   ibrutinib in an ibrutinib tablet formulation?

11   A.    Yes.  I think the Pharmaceutical Handbook has that and

12   also the published literature.

13   Q.    And which published literature?

14   A.    I believe it was in 2014.

15   Q.    Goldstein 2014.

16   A.    Yes, as well.

17   Q.    Any other literature?

18   A.    I believe the '172 also had it.  I think I've seen it

19   there as well.

20   Q.    Having selected ingredients for use in an ibrutinib

21   tablet formulation, what would a POSA do next?

22   A.    Well, once the excipients are selected, then the POSA

23   would proceed with manufacture.

24   Q.    And how -- once you have the selection of excipients,

25   how would you determine the amounts of excipients to use in

1  a tablet formulation?

2  A.    Well, they would look back again at percentages that

3  are used in the, both in '172 and in Goldstein 2014 and all

4  the ranges that are provided in the Pharmaceutical Handbook

5  and accordingly determine what percentage they should take

6  and move forward.

7  Q.    So would a POSA have any guidance with respect to the

8  amount of lactose monohydrate to include an ibrutinib tablet

9  formulation?

10  A.    The Example 11 of the '172 publication, we can see

11  Table 6, that they have used microcrystalline cellulose, and

12  the range is 5 to 50 percent.  Lactose, 10 to 75 percent.

13  So those are the two ranges, and, of course, within those

14  ranges, you can pick one that helps you develop your

15  formulation.

16  Q.    And that's DTX-1399?

17  A.    That's correct.

18  Q.    Would a POSA have any guidance with respect to the

19  amount of microcrystalline cellulose to includes an

20  ibrutinib formulation?

21  A.    Yes.

22  Q.    And --

23  A.    So the range is 5 to 50 percent.

24  Q.    And where was that disclosed in the art?

25  A.    Again, in Example 11, the formulation and components

1    are there and in the range on the table indicates 5 percent

2    to 50 percent for microcrystalline cellulose.

3    Q.    Would a POSA have any guidance with respect to the

4    amount of croscarmellose sodium to include an ibrutinib

5    tablet formulation?

6    A.    Again, Example 11 would provide 0 to 15 percent for

7    croscarmellose sodium.

8    Q.    Would a POSA have any guidance with respect to the

9    amount of magnesium stearate is included in an ibrutinib

10   tablet formulation?

11   A.    Yes.  In same Example 11, the magnesium is in the

12   range of .25 percent to 2.5 percent.

13   Q.    Would a POSA have any guidance with respect to the

14   amount of colloidal silicon dioxide to include in the tablet

15   formulation?

16   A.    Yes.  This is a slide from the copies of excerpt from

17   Pharmaceutical Handbook.  The first one is colloidal silicon

18   dioxide.  It mentions in the table .1 to .5 percent is the

19   range.

20   Q.    And that is DTX-1625?

21   A.    That's correct.

22   Q.    Would a POSA have any guidance with respect to the

23   amount of polyvinylpyrrolidone to include in its ibrutinib

24   tablet formulation?

25   A.    Yes.  Again, polyvinylpyrrolidone is mentioned there.

1    This is just excerpt from there and it describes the binder

2    for the lower part of the table, .5 to 5 percent would be

3    amount of binder that can be used.

4    Q.    Would a POSA have any guidance with respect to the

5    amount of sodium lauryl sulfate to include in an ibrutinib

6    tablet formulation?

7    A.    Yes.  Again, excerpt from the Pharmaceutical Handbook.

8    It describes ranges for sodium lauryl sulfate.  So if you

9    want to use it to help solubilization, one to two percent is

10   mentioned.

11   Q.    Now, as of March 3rd, 2015, would a POSA have been

12   motivated to use a particular dose amount of ibrutinib in

13   the ibrutinib tablet formulation?

14   A.    Sure.  I think --

15   Q.    What would that be?

16   A.    The 560, as I mentioned earlier.  That -- the point of

17   movement, because you have a capsule and you want to create

18   a high load formulation, 560, so that is what we used.

19   Q.    And is 560 mgs disclosed in the prior art?

20   A.    Yes.

21   Q.    And what prior art is that?

22   A.    Well, Imbruvica capsules, it's required for a patient

23   to be taking once a day.

24   Q.    Now, prior to March 3rd, 2015, would a POSA have a

25   motivation to combine Imbruvica's 2013 label with a '172

1   publication, Goldstein 2014, and the Handbook of

2   Pharmaceutical Excipients?

3   A.      Sure.  That is a very obvious approach, yes.

4   Q.      And why is that?

5   A.      Well, because you are looking at prior art, what is

6   available, and so you look at what is approved by FDA, such

7   as Imbruvica capsules.  Then you want to make tablets, so

8   you do your own routine experimentation and if you need more

9   information, you look at publications such as '172, which

10  describes the tablets, Goldstein, which describes the

11  tablets and also Pharmaceutical Handbook, which is

12  well-known and routinely used for selection of excipients.

13  Q.      And which of those references relates to the Imbruvica

14  formulation?

15  A.      Imbruvica 2013.  That is the label we talked about

16  earlier.

17  Q.      Any others?

18  A.      Also the 172 publication describes the tablet of

19  Imbruvica.  So does Goldstein 2014.  Ultimately, they have,

20  they have the active ingredient in them.

21  Q.      Well, prior to March 3rd, 2015, would a POSA have had

22  a reasonable expectation of success in making a high load

23  solid tablet formulation?

24  A.      Yes, they would have had that expectation, yes.

25  Q.      And why is that?

1  A.    Well, because already capsules were available and

2  approved by FDA.  Pharmacyclics, you know, they used

3  excipients that they published in the '172 and all the prior

4  art, which are described shows that they are all easy to

5  use.  There is no issue.  So, yes, expectations would have

6  been successful.

7  Q.    Was Pharmacyclics the only pharmaceutical company to

8  develop an ibrutinib tablet?

9  A.    No.  It was also I believe the Goldstein bio, bio

10  pharma, I forget the name, but they also described it,

11  described the tablet, yes.

12  Q.    I think you're referring to Principia Biopharma?

13  A.    That's correct.  Thank you.

14  Q.    And would a POSA have a reasonable expectation of

15  success in making a high load solid tablet formulation

16  containing the claimed ingredient at the claimed amounts?

17  A.    Yes.

18  Q.    And why is that?

19  A.    Well, because the high load formulation was already

20  disclosed in the, as I showed you in the earlier, about

21  80 percent in one formulation of Goldstein, and also in the

22  other formation in '172, so it was all there.  Components

23  were there.  And, yes, a POSA would have been able to

24  deliver the formulation and good expectation of success.

25  Q.    Now, let's shift gears a little bit.  What is a

1  Maillard reaction?

2  A.   A Maillard reaction is basically reducing a sugar, one

3  of them being lactose.  When they come in contact with a

4  strong amine and different conditions, such as high

5  temperature and pH, they might react.  So that is Maillard

6  reaction.

7  Q.   Is ibrutinib an amine containing compound?

8  A.   It has an amino group, but it is a very weak amino

9  group.  So nothing has been said about its potential and

10  compatibility because already the Pharmacyclics publication,

11  they used lactose.  Goldstein used lactose and there was no

12  issue.

13  Q.   So a POSA would not have any concerns with combining

14  that ibrutinib with lactose and making an ibrutinib tablet

15  formulation?

16  A.   No, because it doesn't react like lactose.

17  Q.   So to summarize, is it your opinion that claims 30 and

18  37 of the '857 patent are obvious in view of the prior art?

19  A.   Yes.

20  Q.   Now, I just want to shift gears briefly to your lack

21  of written description argument.

22       Do claims 30 and 37 of the '857 patent identify

23  a mass amount of ibrutinib that can be included in the claim

24  formulation?

25  A.   Well, I have to refer to the slide.  So here, the two

1  claims, 30 and 37.  So claim 37 depends on claim 27, and in

2  there, there's a mass amount which is designated.  If you

3  look at below the chemical structure of the, of claim 27,

4  you will see there an amount of about 70 milligrams to about

5  840 milligrams is mentioned.  So that is the mass amount for

6  that.

7           As far as claim 30 is concerned, there is no

8  mass amount, only percentages, and that means it applies to

9  all masses, because they have not given any mass.  So they

10  say 70 percent weight by weight of the ibrutinib and that

11  means all the strengths can be made.

12  Q.   Do claims 30 and 37 of the '857 patent encompass solid

13  tablet formulations containing 140 mgs and 560 mgs

14  ibrutinib?

15  A.   No.

16  Q.   And -- well, let's take a look again.  Earlier you

17  mentioned they covered 70 to 840 mg.  We'll take it step by

18  step for claim 37.

19  A.   I'm sorry.  Yes.

20  Q.   And so my question is:  Claim 37 contain 140 and 560

21  mgs ibrutinib?

22  A.   You describe that milligram quantity in there, so it

23  doesn't spell it out.  So that is the range that is

24  mentioned.

25  Q.   And does it fall within that range?

1    A.    I think 140 and 560 fall in that range.

2    Q.    And earlier you mentioned that there was no range in

3    claim 30 and so that it covered all ranges.

4    A.    That's correct.

5    Q.    And so would claim 30 then include a tablet

6    formulation containing 140 mgs and 560 mgs ibrutinib?

7    A.    No.

8    Q.    And --

9    A.    Because I don't have the mass amount.

10   Q.    Okay.  So let me ask the question a little

11   differently.  So you mentioned that claim 30 doesn't have

12   the specific range of ibrutinib, the amount, and so you

13   mentioned that it covered all ranges, mgs dosage amount?

14   A.    Yes.

15   Q.    And so my question is:  So that would include, would

16   that include 140 mgs or 560 mgs of ibrutinib?

17   A.    Yes.

18   Q.    And does claim 30 and 37 include amounts of ibrutinib

19   other than 140 and 560 mgs?

20   A.    No, they do not.

21   Q.    So let's break it down again.

22             So in claim 37, where it mentions that it's a

23   range from 70 to 840 mg ibrutinib, does that range include

24   ranges of ibrutinib -- include amounts of ibrutinib other

25   than 140 and 560?  Well, yes.  It is, it is a range from 70

1   to 840.  Yes, it does.

2   Q.    And with respect to claim 30, you mentioned it could

3   cover all ranges.  So it would include tablet formulations

4   that contained ibrutinib in the amount of other than 140 and

5   560?

6   A.    Yes.

7   Q.    Do you think the '857 patent as a guide, does the

8   specification describe solid tablet formulations containing

9   any amount of ibrutinib other than 140 or 560 mgs?

10  A.    No, it doesn't indicate anything beyond those two.

11  Q.    Does Example 1 disclose solid tablet formulations

12  containing any amount of ibrutinib other than 140 or 560

13  mgs?

14  A.    No.

15  Q.    Does Example 5 disclose solid tablet formulations

16  containing any amount of ibrutinib other than 140 or 560 mgs

17  of ibrutinib?

18  A.    No.

19  Q.    Before March 3rd, 2015, would a POSA have understood

20  the '857 patent discloses solid tablet formulations

21  containing any amount of ibrutinib other than 140 or 560

22  mgs?

23  A.    No.

24  Q.    Are you aware that the '857 patent contains a photo of

25  solid oral, of solid oral formulations?

1   A.   Yes.  I've seen that, yes.

2   Q.   That's Figure 3 of JTX-10?

3   A.   Yes.

4   Q.   Does Figure 3 of the '857 patent disclose solid tablet

5   formulations containing 140 mgs, 280 mgs, 420 mgs and 560

6   mgs of ibrutinib?

7   A.   No.

8   Q.   And does the photo indicate what the contents of those

9   tablets are, and B and E through Figure 3?

10  A.   There is no description of formulation there, no.

11  Q.   To summarize, based on everything you have seen and

12  reviewed in the specification of the '857 patent, would a --

13  does the patent, does the '857 patent demonstrate to a POSA

14  before March 3rd, 2015, that the listed inventors were in

15  possession of solid tablet formulations containing any

16  amount of ibrutinib other than 140 or 560 mgs?

17  A.   No.

18            MR. HANNA:  I will pass the witness.

19            THE COURT:  It's 5:00 o'clock, so we'll call it

20  a day.

21            All right.  Thank you, Mr. Hanna.  It's

22  5:00 o'clock.  We're getting ready to call it a day.  Let's

23  just briefly talk time.

24            So, Doctor, you're excused for the day.  I guess

25  you'll be back Monday.

1    Mr. Sipes, do you intend to cross-examine the

2  witness?

3    MR. SIPES:  I had planned to do a little

4  cross-examination, Your Honor.

5    THE COURT:  We'll see you then, Dr. Fassihi.

6  We're going to begin on Monday at 8:30.  All right?

7    And the lawyers just want to stick around.

8  Thank you, Doctor.  Have a good weekend.

9    THE WITNESS:  Thank you.

10    THE COURT:  We'll see you Monday.

11    (Witness excused.)

12    THE COURT:  And then let's talk about time.  I

13  believe there have been communications between counsel and

14  my deputy clerk and/or case manager, and I understand that

15  day three was broke down as follows:  Three hours 11 minutes

16  for plaintiffs.  Four hours, 47 minutes for defendants.  So

17  leaving us for the first three days a total of eight hours

18  and 42 minutes expended by, if that's the right word, by

19  plaintiffs, 15 hours, 10 minutes by defendants.

20    Now, I don't have the debts broken down in the

21  specifics that I have, Ms. Clayton, but I'm going to stick

22  to the 10.5/16.5 breakdown.  Where do defendants -- unless

23  the defendants have agreed to some alternative arrangement.

24    MS. CLAYTON:  I think that's the plan that we

25  still have right now, Your Honor.  We'll confer with Alvogen

1    over the weekend if we think we can give them more time.

2              I think on that breakdown --

3              THE COURT:  Well, just keep in mind when I say

4    that, you know, you're free to do whatever you want.  You

5    can be courteous.  That's great and generous as you might

6    want.

7              I'm going to benefit from some closing arguments

8    and I told you all that in terms of planning for your trial.

9    And everybody has to bear the consequences of the decisions

10   they make about how they want to try their case.  And I have

11   already indicated, I mean, I think things could have been

12   quicker with some of the experts.  And this last thing is a

13   great example.  I mean, you know, you don't need to keep

14   repeating questions about, to make your point when a single

15   question often will do it.

16             So I will say based on the manner in which the

17   evidence has been adduced, I am confident that 27 hours was

18   more than enough for both sides to try their case,

19   especially with Zydus' departure, and I'm very confident

20   it's an eminently fair distribution between the two

21   defendants to say that Alvogen was given 16.5 and defendants

22   were given 10.5.

23             MS. CLAYTON:  Your Honor, I think we've

24   calculated thus far Sandoz has used six hours and

25   18 minutes.  Is that correct?  And so whatever the

1    difference is there and I'm a little tired, so my brain is

2    not going to be able to have me do that math quickly.

3    Whatever the balance is, that's the time that would be

4    attributable to Alvogen.

5              THE COURT:  Okay.  You guys can work that out

6    over the weekend.  We've got numbers here.  If there's a

7    dispute, you let me know, but all three parties, I will

8    remind them that I do think I would benefit from narrowly

9    focused closing arguments.  Okay?  All right.

10             MR. SIPES:  And, Your Honor, you know, as the

11   plaintiff, we've grown increasingly concerned, here we are

12   on Friday.  We have yet to start our response to their

13   invalidity case.  A lot of this is out of our hands.  They

14   tell us even after Dr. Fassihi, they have another witness to

15   call.

16             THE COURT:  Okay.  But, wait.  Mr. Sipes, I

17   guess I'm confused.  You have got plenty of time left to try

18   your case.  Right?

19             MR. SIPES:  Yes.  I just want to make sure --

20   we're going to calculate over the weekend that there remains

21   enough time through Wednesday afternoon.

22             THE COURT:  But I calculated -- oh, because

23   you're -- look, built into the schedule is more than

24   27 hours per side.

25             MR. SIPES:  Okay.

1       THE COURT:  Right?  I mean, we've got Monday,

2  Tuesday and Wednesday scheduled.  I mean, we've got, you

3  know, 17 hours scheduled for Monday and Tuesday.  I mean,

4  the defense only has -- I mean, ballpark today, do you think

5  they've used six today, five?

6       MR. SIPES:  That's probably about right.

7       THE COURT:  So that means that at the end of

8  today, they only have, you know, five-and-a-half to six

9  hours or so left for their entire case.

10      MR. SIPES:  Right.  All right, Your Honor.  I

11  got it.  We look forward to starting our case.  Thank you,

12  Your Honor.

13      THE COURT:  Okay.  Anything else?

14      MR. HANNA:  Yes.  I have exhibits I'd like to

15  enter in for Dr. Swift yesterday.

16      THE COURT:  Why don't you do that, confer over

17  the weekend, make sure it's all streamlined.  That's an

18  example, if you all agree to it, just give me something in

19  writing.  We will just put it in the record in evidence and

20  save time.

21      MR. HANNA:  Yes, Your Honor.

22      MS. CLAYTON:  Sounds good, Your Honor.

23      THE COURT:  And, Ms. Clayton, I might be

24  inferring too much.  If you are afraid of time, you let me

25  know.  I do think you've not unduly taken time and I don't

1  want your client to be prejudiced.

2            MS. CLAYTON:  I think with the time we have

3  left, Your Honor, it won't be a problem, but if I become

4  concerned, I will let you know.

5            THE COURT:  Anything else?  Everybody have a

6  good weekend.  I will see you Monday morning.  Thank you.

7            MR. SIPES:  Thank you.

8            MS. CLAYTON:  Thank you.

9            (Court recessed at 5:10 p.m.)

10                 -  -  -